16651/SAB/PJB                                    Attorney ID# 6224469

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS -
EASTERN DIVISION**

KRISHNA NARSIMHAN                )
                                 )
                Plaintiff,        )        Case No.: 1:19-cv-01255
        vs.                       )
                                 )
LOWE'S HOME CENTERS, LLC,        )
                                 )
                Defendant.        )

**<u>PLAINTIFF'S MOTION IN LIMINE # 14</u>**

**<u>TO BAR ANY REFERENCE TO PLAINTIFF CONTRIBUTING TO OR BEING THE
CAUSE OF THE SUBJECT OCCURRENCE</u>**

NOW COMES Plaintiff, KRISHNA NARSIMHAN, by and through his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., prior to the selection of the jury in this cause, moves this Honorable Court to enter an Order *in Limine* barring and prohibiting Defendant, LOWE'S HOME CENTERS, LLC, or its counsel, agents, employees and/or any witness called by the Defendant, or questions by defense counsel from making statements, offering evidence, testimony , remarks, arguments or from conveying directly or indirectly to the panel by any means, including the fact that this motions have been presented and ruled upon, for the subject matter identified in the title and body of this motion, and in support states as follows:

**<u>INTRODUCTION</u>**

Plaintiff seeks an order from the Court barring any argument, testimony or comments to or in the presence of the jury that Plaintiff was contributorily negligent in causing the metal down rod to strike his right, lower extremity or was the sole cause of

1

the subject occurrence.  There is no evidence, nor can the Defendant identify any

evidence, that any actions by the Plaintiff contributed to or was the cause of the subject

occurrence.

## **RELEVANT FACTS**

Plaintiff was injured on June 25, 2016 at Lowe's Home Center in Carol Stream,

Illinois wherein one of Defendant's employees, Marcella Martinez, caused a metal down

rod to strike Plaintiff's right lower extremity.  The incident occurred at a checkout

register and was recorded by the store's video surveillance system. The video depicts

the Plaintiff approach the register with a shopping cart with the metal down rod and the

ceiling fan he was intending to purchase.  The video depicts Plaintiff taking his hands off

the cart and reach into his pocket to get his wallet to pay for the items in his cart.

The video shows Defendant's employee is the only person in control of the metal

down rod just before the occurrence.  Ms. Martinez walks out from behind the checkout

register and grab the down rod.  She removes the down rod from the cart in order to

scan the bar code.  After, she attempts to place it back into the cart.  The video shows

that as she places the metal down rod back into the cart, the manner in which she

places the metal down rod, causes it to slide between the openings in the shopping cart

and strike the plaintiff on the right, lower extremity.  This impact causes Plaintiff to fall to

the floor and remain on the floor for several seconds until he is able to stand up.  (*The*

*video of the subject incident is available for the court to observe.  The parties have*

*agreed to its admission in evidence in the Joint Final Pretrial Order.*)

At her deposition, Defendant's employee Marcella Martinez, testified that she

was the only one who handled the metal down rod, she alone controlled it and Plaintiff

2

did not do anything to cause the metal down rod to strike slide through the shopping

cart and strike Plaintiff's right, lower extremity.  Furthermore, she did not offer any

warning to Plaintiff before she placed the metal down rod in the cart.  (See below)

*(Exhibit A: Deposition of Marcella Martinez, page 23, lines 16-18, taken on July 8, 2020)*

> Q.    Did Mr. Narsimhan have his hands on that rod at all?
>
> A.    No.

*(Exhibit A: Dep of Marcella Martinez, page 42, line 5 through page 44, line 13, taken on July 8, 2020)*

> Q.    You placed the rod in the cart in a manner that allowed it to fall through the hole in the cart, true?
>
> A.    Yes.
>
> Q.    And this cart was the same as every other cart that's used at Lowe's; in other words, there was nothing defective, or strange, or unusual about it, is that a fair statement?
>
> A.    That is correct.
>
> Q.    When Mr. Narsimhan rolled that cart up to your cash register, was there anything wrong with the way the cart was loaded or with the way the rod was in the cart?
>
> A.    Yes, those rods were not meant to be in those carts.
>
> Q.    And did you tell him that?
>
> A.    I do not remember.
>
> Q.    But you knew that as part of your training that you're not supposed to put those rods in those carts?
>
> A.    Correct.
>
> Q.    But you put that rod in that cart after you scanned it, right?
>
> A.    I did.

Q.     And did you know as part of your training that the reason you don't put those rods in those carts is because it could fall through the holes and hurt somebody?

A.     Correct.

Q.     And you knew that at the time?

A.     Yes.

Q.     But you put the rod in the cart anyway, right?

A.     Yes.

Q.     Did Mr. Narsimhan do anything to cause his injury?

A.     No.

Q.     Now you wrote in your statement that you watched it fall – I'm sorry, I'll let you read the next line, I don't what to mischaracterize it. Just read the next line, please starting with: I watched it fall out.

A.     I watched it fall out and told him be careful.  He steps back as it's falling.

Q.     Okay.  When you say you told him to be careful, I want you to explain that to me. Did you see the rod falling out of the cart?

A.     Yes.

Q.     At what point did you tell him to be careful, was it -- well, strike it.

Q.     At what point did you tell him to be careful?

A.     As it was falling.

Q.     Not before you put it in?

A.     No.

## **ARGUMENT**

It is settled in Illinois that where there is no testimony or other evidence as to the plaintiff's contributory negligence, no instruction on that issue should be given to the jury. *Smith v. Bishop*, 32 Ill.2d 380, 205 N.E.2d 461.  Whether a plaintiff is guilty of contributory negligence is ordinarily a question of fact for the jury.  It becomes a

4

question of law only when the evidence is so clearly insufficient to establish due care that all reasonable mind would reach the conclusion that there was contributory negligence. *Swenson v. City of Rockford*, 9 Ill. 2d 122 (1956); *Gray v. Terminal R.R. Ass'n of St. Louis*, 37 Ill. App. 2d 3765 (4th Dist. 1962)

Ms. Martinez testified that based on her personal involvement as well as re review of the video, that Plaintiff did not do anything to cause his injury. (Ex. A., Pg. 43:15-17) Ms. Martinez was the only one in control of the down rod prior to the incident and she is the one that placed it in the shopping cart in such a way as to cause it to slide through the openings in the cart and strike Mr. Narsimhan.

Further, the Asset Protection and Safety Officer, for the subject Lowe's store Eileen Parks, prepared a report after the incident and preserved the video. She reviewed the video of the incident and she has no criticism of the Plaintiff's actions.

*(Exhibit B: Dep of Eileen Parks, page 20, line 12 through page21, line 8, taken on July 8, 2020)*

Q.     Do you have any criticism of anything that Mr. Narsimhan did?

A.     If I'm understanding you correctly, you're asking if I have any criticism of what he did?

Q.     Yes.

A.     No, I do not.

Q.     Okay. Do you have any personal knowledge of what occurred aside from what you saw on the video?

A.      I do not.

Q.     Do you have any knowledge of this incident from speaking to any witness or from any other source aside from what you saw in the video?

A.     I do not.

Q.      So if you watch the video and I watched the video, then we each have the same amount of information about what occurred, is that what you're saying?

A.      Yes.

Furthermore, the store manager for the subject Lowe's on the date of the

incident, Jody Rankin, gave a deposition in this case. Mr. Rankin testified that based on

his personal knowledge and conversations with other employees, Plaintiff did not have

any responsibility for the downrod falling through the cart:

*(Exhibit C: Deposition of Jody Rankin, Pg. 32: 16 through 33: 8, taken on December 9,*

*2020*)

Q.      Okay. From this document, from the e-mail, from any memory you may have of the incident, is there anything that you know of, from talking to people involved or witness, that in any way indicates that Krishna Narsimhan had any responsibility for the downrod falling through the cart and hitting his foot?

A.      No

Moreover, Mr. Rankin gave the opinion that there was no criticism of the cart that

Plaintiff used to shop for the downrod, and the use of the cart was within Lowe's policy:

*(Exhibit C: Deposition of Jody Rankin, Pg. 45, lines 12-17, taken on December 9, 2020*)

Q.      Okay. And once completing the scanning of the – of the rod, she then put it back in the cart and that's when the accident occurred, okay. So my question to you is, was it proper for her to put it back into the cart?

A.      Yes.

He also testified that if the downrod is placed carefully into the cart, this incident

should never have happened:

*(Exhibit C: Deposition of Jody Rankin, Pg. 36, lines 7-10, taken on December 9, 2020*)


Q.      Okay.  Would you agree with me that if a metal downrod is placed into a car carefully, that this incident should never have happened?

A.     Yes.

Finally, it is the responsibility of the Lowe's employee to put the metal downrod in the cart carefully so as not to hurt a customer:

*(Exhibit C: Deposition of Jody Rankin, Pg. 32, lines 16-24, taken on December 9, 2020)*

Q.     Okay. You would agree with me that – well, correct me if I'm wrong, but would you agree with me that if a Lowe's store cashier is placing a metal downrod into a customer's cart, the Lowe's employee should perform that task carefully so that it doesn't fall through the customer's cart and hit a customer's ankle, right?

A.     Yes.

The Defendant has not disclosed any witness with any personal knowledge nor expert opinion that the Plaintiff caused or contributed to the subject incident.  Defendant has not produced any evidence in discovery that would even infer that Plaintiff caused or contributed to the occurrence. Indeed, all three of the Lowe's employees who were deposed in this case, all testified, that Plaintiff was not responsible for the rod falling through the cart and striking him.  Therefore, any testimony, questions or comments about Plaintiff's contributory negligence or role in the subject occurrence would be unfairly prejudicial to the Plaintiff.

## **CONCLUSION**

WHEREFORE, Plaintiff respectfully requests this Court enter an order barring and prohibiting Defendant, LOWE'S HOME CENTERS, LLC, or its counsel, agents, employees and/or any witness called by the Defendant, or questions by defense counsel from making statements, offering evidence, testimony , remarks, arguments or from conveying directly or indirectly to the panel by any means, including the fact that

this motions have been presented and ruled upon, that Plaintiff caused the subject

occurrence or was contributorily negligent during the occurrence.

Respectfully submitted:

/s/Steven A. Berman

Attorneys for Plaintiff

Steven A. Berman sberman@anesilaw.com
Patrick J. Blum pblum@anesilaw.com
**ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.**
161 N. Clark St. / 21st Floor
Chicago, IL   60601
Telephone:  312/372-3822
Fax: 312/372-3833

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF ILLINOIS
 3               EASTERN DIVISION
 4  KRISHNA NARSIMHAN,        )
 5       Plaintiff,           )
 6  vs.                       )  No. 19-cv-01255
 7  LOWES HOME CENTERS, LLC,  )
 8       Defendant.           )
 9
10       The discovery deposition of
11  MARCELLA MARTINEZ taken in the above-entitled
12  cause, before MARGARET A. RITACCO, CSR, a notary
13  public of Cook County, Illinois, on July 8th, 2020,
14  at the time of 10:00 a.m., via videoconference,
15  pursuant to notice.
16
17
18
19
20
21
22
23  Reported by:  MARGARET A. RITACCO, CSR
24  License No.:  084-002796
```

**Page 2**

```
 1  APPEARANCES:
 2       ANESI, OZMON, RODIN,
 3       NOVAK & KOHEN, LTD., by
 4       MR. MICHAEL L. TEICH,
 5       161 North Clark Street, 21st Floor
 6       Chicago, Illinois  60601
 7       (312) 372-3822
 8       mteich@anesilaw.com
 9            Representing the Plaintiff
10
11       LEWIS, BRISBOIS, BISGAARD & SMITH, by
12       MR. RONALD W. PAYNE,
13       555 West Monroe Street, Suite 300
14       Chicago, Illinois  60661
15       (312) 463-3360
16       Ron.Payne@lewisbrisbois.com
17            Representing the Defendant.
18
19
20
21
22
23
24
```

**Page 3**

```
 1                I N D E X
 2  WITNESS                        EXAMINATION
 3  MARCELLA MARTINEZ
 4    BY MR. TEICH                      5
 5
 6
 7
 8            E X H I B I T S
 9  NUMBER                       IDENTIFICATION
10  Martinez Deposition
11    Exhibit No. 1                    33
12    Exhibit No. 2                    84
13    Exhibit No. 3                    84
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1    THE REPORTER:  My name is Margaret Ritacco, CSR.
 2  The parties are present via videoconference to
 3  take the discovery deposition of Marcella
 4  Martinez in the matter of Krishna Narsimhan
 5  versus Lowe's Home Center, Case No. 19-cv-1255
 6  in the United States District Court, Northern
 7  District of Illinois, Eastern Division.  Today's
 8  date is 7/8/20, and the time is 10:00 a.m.
 9       This deposition is being taken at the
10  instance of the plaintiff.  This deposition is
11  being taken by means of videoconferencing, and
12  the oath will be administered remote by the
13  court reporter pursuant to Governor Pritzker's
14  Executive Order 2020-14.
15       Will all parties present please state
16  your name and agreement with this procedure.
17    MR. TEICH:  This is Michael Teich and yes, we
18  agree.
19    MR. PAYNE:  This is Ron Payne and I agree.
20    THE WITNESS:  This is Marcella Martinez and I
21  agree.
22                 (Witness sworn.)
23    MR. TEICH:  Ms. Martinez, please state and
24  spell your name for the record.
```

EXHIBIT
A

1    THE WITNESS: Marcella Renee Martinez. It's
2 M-A-R-C-E-L-L-A, R-E-N-E-E, last name,
3 M-A-R-T-I-N-E-Z.
4    MR. TEICH: Thank you.
5         MARCELLA MARTINEZ,
6 called as a witness herein, having been first
7 duly sworn, was examined and testified as
8 follows:
9              EXAMINATION
10 BY MR. TEICH:
11    Q.   Let the record reflect that this is the
12 deposition of Marcella Renee Martinez taken
13 pursuant to notice.
14         Ms. Martinez, my name is Michael Teich.
15 I represent the plaintiff in this case, and I'm
16 going to be asking you the majority of the
17 questions, and when we finish, Mr. Payne here
18 may have some questions for you as well.
19         Have you ever given a deposition
20 before?
21    A.   No.
22    Q.   Okay. I'm going to go over a few
23 ground rules, and the purpose of those is to
24 make this go as smoothly as possible and to make

5

1 the court reporter's job as easy as possible.
2         So the first rule is that I want to
3 make sure that you understood every question
4 before you answered it. You should not be in a
5 position of having to hear -- I'm sorry, you
6 should not be in the position of having to
7 answer a question that you didn't hear, maybe
8 the video broke up, maybe there was background
9 noise, or a question that you didn't understand.
10 So if you need me to repeat a question or
11 rephrase a question, I will be happy to do that,
12 just let me know, okay?
13    A.   Okay.
14    Q.   Okay. Otherwise, when we read the
15 transcript later, if you answer a question and
16 you don't tell us that you didn't understand it,
17 we're going to all assume that you understood
18 and heard the question before you answered it,
19 okay?
20    A.   Okay.
21    Q.   Another thing to keep in mind is that
22 the court reporter is writing everything down
23 that's said. Even though we're also being video
24 recorded in this instance, the court reporter's

6

1 transcript will be the primary record of this
2 conversation, and so we can't speak over one
3 another. So just wait until I finish my
4 question before you start to answer, and I will
5 do the same thing, okay?
6    A.   Okay.
7    Q.   Great. And the third thing to keep in
8 mind with the court reporter is you have to use
9 words when you answer the question, and I know
10 that sounds strange, but you'd be surprised how
11 often somebody says uh-huh or uh-uh or shakes
12 their head, or nods, or something like that, and
13 the court reporter can't take that down, so you
14 need to use words, say yes, no, that kind of
15 thing, okay?
16    A.   Got it.
17    Q.   All right. If at any point during the
18 deposition you want to take a break, let me know
19 and I will be happy to take a break. We can go
20 off the record. You have to answer whatever
21 question -- whatever question is pending, but as
22 soon as you do that, then we can take a break
23 for as long as you like, okay?
24    A.   I understand.

7

1    Q.   Are you able to hear me and see me
2 okay?
3    A.   Yes.
4    Q.   All right, great. If at any point
5 there's -- if there's any problem with the video
6 or any technological issue, just let us know.
7    A.   Okay.
8    Q.   You told me that you've never given a
9 deposition before. Have you ever been a party
10 to or a witness in any other legal proceeding?
11    A.   First on training for my job I have.
12    Q.   Okay. What kind of -- tell me about
13 that.
14    A.   The legal proceeding or my job?
15    Q.   Well, how is it that you were involved
16 in a legal proceeding as part of your job
17 training?
18    A.   I work in professional liability
19 insurance, so as I was learning more about
20 professional liability, some of our insurers do
21 have to do depositions or attend trials as
22 witnesses, so I was able to either be on the
23 phone or watch a video.
24    Q.   Okay. Well, then this process will

8



1  give you some insight into that, I suppose,
2  going forward.
3      A.   Yes, sir.
4      Q.   What is your current position, who do
5  you work for and what do you do?
6      A.   I work for Hanover Insurance, and I am
7  a professional liability claims adjustor.
8      Q.   And when did you begin that job?
9      A.   I have been there for three years now.
10     Q.   Okay.  And before I get into that, just
11  give me your home address please, I didn't ask
12  you that.
13     A.   It's ████████████, and that's West
14  Chicago, Illinois 60185.
15     Q.   Do you have any plans to move from that
16  address?
17     A.   Not any time soon.
18     Q.   And how long have you been there?
19     A.   I will have been here in March for a
20  year.
21     Q.   Okay.  Is that a house or an apartment?
22     A.   It's a house.
23     Q.   And the only reason I'm asking you
24  these questions is because you're no longer

9

1  employed by Lowe's; if this case were to go to
2  trial down the road and we needed to contact
3  you, we might not be able to rely on them to
4  find you, so that's why I'm asking you these
5  questions.  I'm not trying to be too intrusive.
6          Tell me a little bit about your
7  training at Hanover Insurance, when did that
8  begin?
9      A.   So when I -- my first year I had to do
10  just system training.  I just started out as a
11  regular claims adjustor assistant, so I didn't
12  do too much at the beginning, it was just all
13  paperwork and learning the system.  After about
14  a year is when they promoted me.
15         Then I had to take the Texas adjustors
16  test, so that was also just book training and
17  learning the business.  I didn't get to
18  start learning about depositions and trials and
19  lawsuits until this past year.
20     Q.   Okay.  And that all occurred, that
21  training occurred, largely in 2017, does that
22  sound right?
23     A.   Yes.
24     Q.   All right.  And you said you took the

10

1  exam in Texas.  Are you -- do you handle claims
2  that are primarily based in Texas or what?
3      A.   No, because Texas' license covers, I
4  think, 40 -- 45 or 47, I'm not exactly sure on
5  the number of states, so they cover most of the
6  states in the United States, so I practice all
7  over.
8      Q.   Okay.  So you handle claims in a
9  variety of the states around the country?
10     A.   Correct.
11     Q.   And you said professional liability, so
12  is that physicians, lawyers, what kind of
13  professionals?
14     A.   Mostly lawyers, accountants, sometimes
15  mortgage field services, sometimes real estate
16  agents.  Small business owners.
17     Q.   Okay.  You've never testified, though,
18  officially, you've only been through this sort
19  of process as part of your training, is that a
20  fair statement?
21     A.   Correct.
22     Q.   And what is your highest level of
23  formal education?
24     A.   High school diploma.

11

1          I'm sorry, you cut out a little bit.
2      THE REPORTER:  I'm sorry, we couldn't hear
3  you here.
4      MR. TEICH:  Okay.  I heard some background
5  noise, I don't know what that was.  It wasn't
6  coming from my end.  We'll try again.
7  BY MR. TEICH:
8      Q.   I asked you when you graduated high
9  school.
10     A.   2010.
11     Q.   Where?
12     A.   Southern Garrett High School.  It's in
13  Oakland, Maryland.
14     Q.   And when did you move to Illinois?
15     A.   Let's see.  Maybe 2000 -- at the end of
16  2012.
17     Q.   Okay.  So you started at Hanover
18  Insurance in 2017.  What was the job you had
19  immediately before that?
20     A.   Lowe's.
21     Q.   And when did you start working at
22  Lowe's, and when did you finish working at
23  Lowe's?
24     A.   So -- sorry, I was confused when you

12

Marcella Martinez 07/08/2020

1  said I no longer work there. I still currently
2  work there.
3       Q.   Sorry, I didn't realize that. So you
4  currently work both at Lowe's and at Hanover?
5       A.   Correct.
6       Q.   Okay. When did you start work for
7  Lowe's, when did you first work for Lowe's?
8       A.   I believe my seasonal start date was
9  January -- I think February 24, 2017 -- no,
10  2016.
11      Q.   Okay. And when you started in February
12  of 2016, you were working full time, or part
13  time, or seasonally, how did that work?
14      A.   I started as a seasonal cashier.
15      Q.   Okay. And did you ever become a
16  full-time cashier or a full-time employee?
17      A.   Not -- no.
18      Q.   Okay. So the incident that we're here
19  to discuss occurred in June of 2016.
20      THE REPORTER: Mike, you went out there. We
21  left off with in June of 2016.
22  BY MR. TEICH:
23      Q.   Okay, I'm going to start the question
24  again.

13

1       The incident that we're here to
2  discuss, the one involving my client, occurred
3  in June of 2016. So does that seem about right
4  to you, that you'd been working for Lowe's for
5  about four months at that time?
6       A.   Yes.
7       Q.   Were you still working as a seasonal
8  cashier in June of 2016?
9       A.   Yes.
10      Q.   So describe for me, I don't know very
11  much about Lowe's employment practices, as a
12  matter of fact I know nothing about Lowe's
13  employment practices, what does it mean to be a
14  seasonal cashier as opposed to any other type of
15  cashier?
16      A.   So when we get into our busy season, we
17  tend to hire a lot of extra help. That doesn't
18  mean that they're permanent. So at the end of
19  our season, our management has -- has the right
20  to be like okay, your service with us is done
21  now, or they offer them a permanent position and
22  then they have them sign a piece of paper for
23  it.
24      Q.   Okay. And for how long did you stay as

14

1  a seasonal cashier for Lowe's?
2       A.   I think until about July or August. It
3  may have been a little bit longer, I don't know
4  when I signed my -- my permanent position.
5       Q.   All right. Now you said the busy
6  season. So February doesn't strike me as a busy
7  season for most businesses. Is it a busy season
8  for Lowe's?
9       A.   No, but that is when they start hiring
10  for the season, and that's when they'll
11  typically start training.
12      Q.   Okay. And so you became a permanent
13  Lowe's employee, you said, maybe around August
14  of 2016?
15      A.   Uh-huh. Yes.
16      Q.   Are you still a permanent Lowe's
17  employee?
18      A.   I am.
19      Q.   Okay. And are you a full-time
20  permanent employee, or a part time, or is there
21  some other distinction?
22      A.   I'm a part time.
23      Q.   And what is your current position or
24  title with Lowe's?

15

1       A.   Currently I am an appliance associate.
2       Q.   Back in June of 2016, you were still
3  working as a cashier, is that right?
4       A.   Correct.
5       Q.   And when did you change from being a
6  cashier to having a different position with the
7  company?
8       A.   Just a few weeks ago.
9       Q.   So from February of 2016 through a few
10  weeks ago, you were a cashier for Lowe's?
11      A.   So about -- I want to say maybe right
12  after the summertime they moved me to customer
13  service, and 90 percent of my time when I worked
14  there was spent in customer service.
15      Q.   And that would have been the end of
16  last summer?
17      A.   Correct.
18      Q.   Okay. When you became a part time --
19  strike that.
20       When you became a permanent employee in
21  August of 2016, did you also become a full-time
22  employee?
23      A.   No.
24      Q.   Have you ever been a full-time

16



1  employee?
2      A.   No.
3      Q.   Okay.  So you've always worked part
4  time for Lowe's?
5      A.   Yes.
6      Q.   What did you do before you worked for
7  Lowe's?
8      A.   I was a bartender at Buffalo Wild
9  Wings.
10     Q.   Which one?
11     A.   The one in Warrenville.
12     Q.   How long did you do that?
13     A.   Probably about three years.
14     Q.   Do you still do that?
15     A.   I do not.
16     Q.   You stopped that when you went to
17  Lowe's?
18     A.   Correct.
19     Q.   Okay.  Had you had any retail
20  experience prior to working as a cashier at
21  Lowe's?
22     A.   Nope, I had always been in the food
23  industry.
24     Q.   Aside from Lowe's, Lowe's was the only
                                                        17

1  retail job you've ever had, is that a fair
2  statement?
3      A.   Yes.
4      Q.   Lowe's is the only job you've had where
5  you've worked a checkout line like you did at
6  Lowe's as a cashier?
7      A.   Yes.
8      Q.   Now I -- I know you're not in the same
9  room as your attorney.  Did your attorney
10  provide any documents to you to review prior to
11  your deposition?
12     A.   The -- the incident report.
13     Q.   The handwritten one that you prepared?
14     A.   I believe so, yes.
15     Q.   Okay.  Any other documents?
16     A.   No.
17     Q.   Have you reviewed, either today or
18  yesterday in preparation for this deposition, or
19  at any previous time, have you reviewed any of
20  the videos that were taken of this incident?
21     A.   I did not.
22     Q.   Okay.  Have you reviewed either in
23  preparation for your deposition or at any
24  previous time any other document, or statements,
                                                        18

1  reports, regarding this incident, aside from
2  your handwritten?
3      A.   No.
4      Q.   So I mentioned a few minutes ago the
5  incident and it occurred on June 25th, 2016 at
6  the Lowe's location in Carol Stream, is that
7  correct?
8      A.   Yes.
9      Q.   Do you remember that incident?
10     A.   Vaguely.
11     Q.   Okay.  The Carol Stream location, is
12  that the location that you worked at regularly
13  in June of 2016?
14     A.   Yes.
15     Q.   Is that the only location you've ever
16  worked at for Lowe's?
17     A.   Yes.
18     Q.   And on that day, on June 25, 2016, you
19  were working at the cash register, is that
20  right?
21     A.   Yes.
22     Q.   And Mr. Narsimhan, the plaintiff in
23  this case, was one of your customers, is that
24  right?
                                                        19

1      A.   Yes.
2      Q.   He was checking out?
3      A.   Yes.
4      Q.   What do you remember about what it was
5  that he was purchasing?
6      A.   So it was like a metal rebar.
7      Q.   Do you remember anything else?
8      A.   No, just the -- just the few pieces of
9  rebar.  It was metal bar.
10     Q.   Okay.  Now it's my understanding that,
11  and just to give you the context, you know,
12  obviously he's already given a deposition in
13  this case, I assume you've not reviewed the
14  deposition transcript for his deposition, have
15  you?
16     A.   No.
17     Q.   Okay.  And he described that among
18  other things, he was purchasing what he called a
19  down rod for a ceiling fan.
20          You popped out -- you popped away there
21  for a second, I don't know if you heard that.
22          Did you hear my question?
23     A.   I'm sorry, can you repeat it.
24     Q.   Yes.  Mr. Narsimhan described that what
                                                        20

Marcella Martinez 07/08/2020

1  he was purchasing was a down rod that would be
2  used to suspend a ceiling fan.  Does that sound
3  right to you, or do you think it was different
4  than that?
5      A.    I don't know.  I'm not familiar with
6  the metal bars.  I just remember it being metal
7  bars.
8      Q.    Okay.  So you just remember it was some
9  kind of a metal bar?
10     A.    Yes.
11     Q.    You don't know what the purpose of it
12 was?
13     A.    No.
14     Q.    Okay.  Because you referred to it as
15 rebar before, which is a different kind of a
16 thing used in construction, but if it was in
17 fact a ceiling down rod, ceiling fan down rod,
18 you wouldn't dispute that, would you?
19     A.    No.
20     Q.    And it's my understanding that he came
21 up to the register with a cart.  Is that your
22 recollection as well?
23     A.    Yes.
24     Q.    And it's my understanding that you came

                                              21

1  out from behind your counter as part of the
2  checkout process, is that your understanding,
3  too?
4      A.    Yes.
5      Q.    And you removed the rod from his cart,
6  is that right?
7      A.    Yes.
8      Q.    And you scanned the rod?
9      A.    Yes.
10     Q.    And then you tried to place the rod
11 back into the cart, is that right?
12     A.    Yes.
13     Q.    And when you let go of the rod, as you
14 were placing it into the cart, it fell and hit
15 his foot or ankle, is that correct?
16     A.    I did not see that part.
17     Q.    Okay.  So which part did you not see,
18 the part where it hit him, or the part where it
19 fell, or which?
20     A.    I did not see the part where it slid
21 through the cart and hit him.
22     Q.    Okay.  So let's break that down a
23 little bit.  So it's your -- I think we're in
24 agreement up until the point where you took the

                                              22

1  rod out and scanned it and you were placing it
2  back into the cart, is that correct?
3      A.    Correct.
4      Q.    Was anybody else assisting you in
5  placing that rod into the cart?
6      A.    No.
7      Q.    Did Mr. Narsimhan have his hand on that
8  rod --
9      THE REPORTER:  You went out there, Mike.
10     THE WITNESS:  I'm sorry, you cut out.
11     MR. TEICH:  I hear the background noise.
12 Hold on one second.  Okay.  Can you hear me
13 better now?
14     THE WITNESS:  Yes.
15 BY MR. TEICH:
16     Q.    Did Mr. Narsimhan have his hands on
17 that rod at all?
18     A.    No.
19     Q.    Okay.  So as you were placing the rod
20 into the cart, what's the last thing you
21 remember seeing?
22     A.    I remember placing it in the corner of
23 the cart so it wouldn't slide through a hole,
24 and I turned around to go to my register.

                                              23

1      Q.    Okay.  And what's the next thing that
2  happened that you recall?
3      A.    When I went to my register, I did hear
4  him say ow and kneel down.
5      Q.    Okay.  And is it your recollection that
6  you made it all the way back to your register
7  before you heard him yell ow and kneel down?
8      A.    Yes.
9      Q.    And by the way, we know that this was
10 around 9:35 a.m.
11           Is that consistent with what you
12 remember?
13     A.    I don't know.
14     Q.    That's fine.  And by the way, I should
15 have told you this earlier in the deposition:
16 If at any time I ask you a question and you
17 don't know the answer, I want you to tell me
18 that you don't know.  I don't want you to guess
19 or any of those things.  It's perfectly fine if
20 it's a true statement to say I don't know or I
21 don't remember, okay?
22     A.    Okay.
23     Q.    All right.  So if we -- if I tell you
24 that this happened around 9:35 a.m., you don't

                                              24



1  have any reason to despite that, you just don't
2  remember one way or the other, is that a fair
3  statement?
4      A.   Correct.
5      Q.   Okay.  Do you remember which register
6  you were working on?
7      A.   Register 9.
8      Q.   And how many registers were there at
9  that time?
10     A.   On the front end there's 1, 2, 3, 4, 5,
11 6 on the front end.
12     Q.   So how is it that this one is labeled
13 No. 9?
14     A.   So it starts all the way in lumber from
15 No. 1 and goes all the way to outside garden to
16 I believe -- to believe -- I believe it's No.
17 21.
18     Q.   I see.  And when you say on the front
19 end, was this register No. 9 considered to be
20 one of the six that was in the front end?
21     A.   Correct.
22     Q.   And where is register 9 in relation to
23 the store end?
24     A.   So register 9 is at the exit doors, and

25

1  it's the register all the way to the right if
2  you're exiting the building.
3      Q.   Okay.  All right.  I have in front of
4  me Answers to Interrogatories.  You don't have
5  any documents in front of you other than your
6  statement, do you?
7      A.   No.
8      Q.   Do you even have your statement in
9  front of you right now?
10     A.   I do not.
11     Q.   Okay, that's fine.  I'm not going to
12 mark these, because I don't -- I understand that
13 you -- you told me earlier that you never
14 reviewed any documents in connection with this
15 incident, so I'm just going to ask you a
16 question -- for counsel's purposes, I'm
17 referring to Answers to Interrogatories.
18          There was an answer given to Question
19 No. 2 in which the question was to identify all
20 people who were at the scene where this incident
21 happened either at the time of the incident,
22 immediately before or immediately after the
23 incident.
24          Did anybody ever ask you to identify

26

1  who else would have been around the scene at
2  that time?
3      A.   No.
4      Q.   Okay.  I'm going to ask you that
5  question right now.
6          So, obviously, you were there at the
7  register and Mr. Narsimhan was there.  Who else
8  do you recall that would have been in the
9  vicinity or in a position that they did or might
10 have seen this occur?
11     A.   My head cashier.
12     Q.   Okay.  And who was that?
13     A.   I don't know at the time.
14     Q.   Okay.  You mean you knew the person,
15 but you didn't know the person's name, or you
16 can't remember now who the head cashier would
17 have been?
18     A.   I don't know who it would have been at
19 the time.
20     Q.   How do you know as you sit here now
21 that your head cashier would have been in a
22 position near you?
23     A.   They always stand at the corner usually
24 right behind register 9 because they have to

27

1  stand there to look for -- to see if cashiers
2  need help, or for a theft, or for incidents.
3      Q.   Okay.  And do you have in your mind a
4  list of who it might have been, in other words,
5  who worked around that time?
6      A.   Yes.
7      Q.   Okay.  Give me some names of people who
8  it might have been.
9      A.   So it might have been a woman named
10 Lubna Ismail.
11     Q.   Okay.
12     A.   It might have been a man named Travis
13 Scott.
14     Q.   Okay.  Anyone else?
15     A.   I believe also Cindy Allan, I believe
16 her name is.
17     Q.   Okay.  Anyone else?
18     A.   That's -- that's all I remember.
19     Q.   Okay.  And presumably there would be
20 some kind of personnel records that would
21 indicate which head cashier would be working the
22 same shift as you that morning?
23     A.   Correct.
24     Q.   Okay.  Let's continue with the

28



1 question, and that is who would have been in the
2 position to see or possibly see this incident.
3     So you named one, and that would have
4 been the head cashier. Who else?
5     A.   Other cashiers.
6     Q.   Anyone that you can think of?
7     A.   No.
8     Q.   Okay. And no one ever asked you to
9 identify anybody that might have seen this, is
10 that a fair statement?
11    A.   Correct.
12    Q.   What about people who worked at the
13 exit door?
14    A.   We don't -- we don't have people that
15 work at the exit door.
16    Q.   All right. I'm going to go through a
17 couple of names that were identified by Lowe's,
18 and I'm going to ask you if you know who they
19 are and help me fill in some blanks here.
20    Do you know somebody named Jody Rankin?
21    A.   I do.
22    Q.   Who is Jody Rankin?
23    A.   At the time, he was the store manager.
24    Q.   And one of the questions I was going to

29

1 ask you is if that's a man or a woman; that's a
2 man as I understand, is that correct?
3     A.   Yes.
4     Q.   And he no longer works there?
5     A.   Correct.
6     Q.   Can you describe him for me physically,
7 white, black...
8     A.   Tall, Caucasian, blond hair.
9     Q.   Okay. And do you know where he works
10 now?
11    A.   I do not.
12    Q.   Do you have any contact information for
13 him?
14    A.   I do not.
15    Q.   You don't keep in touch with him?
16    A.   No.
17    Q.   Have you ever discussed this incident
18 with him?
19    A.   No.
20    Q.   Do you know if he was there working the
21 day that this incident occurred?
22    A.   I do not.
23    Q.   Next person I want to ask you about is
24 someone by the name of Eileen Parks. Do you

30

1 know who that is?
2     A.   Yes.
3     Q.   Who's Eileen Parks?
4     A.   At the time she was the loss
5 prevention.
6     Q.   Is it your understanding that she was
7 loss prevention for that store, or did she have
8 a region that she covered; how did that work?
9     A.   She was the loss prevention for that
10 store.
11    Q.   Does she still work for Lowe's as far
12 as you know?
13    A.   As far as I know.
14    Q.   Okay. And what does she do now?
15    A.   I'm sorry, I thought you said she still
16 works for Lowe's.
17    Q.   Right. So is she still in the same
18 position at Lowe's as loss prevention?
19    A.   Not at our store, she's at a different
20 location.
21    Q.   Okay. Do you know which location?
22    A.   I do not.
23    Q.   Can you describe her?
24    A.   She is a Caucasian woman, blond hair, I

31

1 think she's about 5'4".
2     Q.   Okay. And do you stay in touch with
3 Ms. Parks?
4     A.   No.
5     Q.   Do you know if Ms. Parks was at the
6 store when this incident occurred?
7     A.   I do not know.
8     Q.   Did you ever discuss this with her?
9     A.   No.
10    Q.   Did anybody come to the register where
11 you were working to discuss with you following
12 the incident?
13    A.   I do remember later on my manager on
14 duty coming to me and asking me to write an
15 incident report.
16    Q.   Okay. Would that have been later on
17 the same day?
18    A.   I don't remember.
19    Q.   Okay. Did anybody ever tell you that
20 they saw what happened?
21    A.   No.
22    MR. TEICH:  Okay. All right. Why don't we
23 mark -- Ms. Court Reporter, we're going to mark
24 as Deposition Exhibit 1 the handwritten

32

1  statement of Ms. Martinez dated June 25, 2016.
2           (whereupon, MARTINEZ Deposition
3            Exhibit No. 1 was marked for
4            identification.)
5  BY MR. TEICH:
6      Q.   Ms. Martinez, you have a copy of that
7  in front of you, is that right?
8      A.   I do not, no.
9      Q.   I'm sorry, I thought you said you did.
10 Okay.  Then when the time comes, if necessary,
11 I'll put it up on the screen.
12          Margie, you have a copy, do you not?
13     THE REPORTER:  No.
14     MR. TEICH:  A set of exhibits was e-mailed to
15 you guys yesterday by Rosetta.  Okay.
16          Counsel, do you have an objection if we
17 mark these exhibits officially later on and if I
18 just show them to your witness on the screen in
19 the meantime?
20     MR. PAYNE:  Yeah, that's fine.
21 BY MR. TEICH:
22     Q.   Okay.  Give me a moment while I pull
23 this up.  I realize you're working off of your
24 phone and the screen is not real big, but,

33

1  Ms. Martinez --
2      A.   I see it.
3      Q.   Maybe that's better.  Can you see that?
4      A.   Hold on.  I can see part of it, yes.
5      Q.   Okay.  I'm going to go to a full screen
6  so you can see the whole thing.
7      A.   Okay.
8      Q.   All right.  And for the record, I'm
9  showing you a single page statement with the
10 date 6/25/16 in the top right corner, and it's
11 handwritten.  And I'm going to ask you to just
12 identify whether this is the statement that you
13 told me earlier that you wrote some time after
14 the incident.
15     A.   Yes.
16     Q.   Okay.  And is all of the handwriting on
17 this page yours?
18     A.   It is.
19     Q.   And that's your signature at the
20 bottom?
21     A.   It is.
22     Q.   All right.  I'm going to try to get a
23 little bit more detail about when you wrote
24 this.

34

1      Q.   Given that it's dated 6/25/16, is it
2  your understanding that you would have written
3  it the same day that this incident occurred?
4      A.   Yes.
5      Q.   Do you remember what hours you would
6  have worked that day, and again, the incident
7  occurred at 9:35 a.m., if that helps.
8      A.   I don't remember.
9      Q.   Did you have a regular shift that you
10 were working back then?
11     A.   I did not.
12     Q.   What were -- were there -- even if you
13 didn't have a regular shift, were there regular
14 shifts established; in other words, 6:00 to noon
15 or something like that?
16     A.   6:00 a.m. to 3:00 p.m.
17     Q.   Okay.  So if you were working at the
18 register at 9:35 a.m., is it likely that you
19 were working a shift that began at 6:00 and
20 ended at 3:00?
21     A.   Yes.
22     Q.   Do you know one way or the other
23 whether you would have completed this report
24 some time before you finished your shift at

35

1  3:00 p.m. that day?
2      A.   Yes.
3      Q.   And the answer is yes, you would have
4  completed it before 3:00 p.m. that day?
5      A.   Yes.
6      Q.   In other words, you weren't called back
7  to Lowe's to do --
8      THE REPORTER:  Mike, you went out there, I'm
9  sorry.
10 BY MR. TEICH:
11     Q.   I said:  In other words you were not
12 called back to Lowe's to complete this after
13 your shift ended, nothing like that occurred, is
14 that correct?
15     A.   No.
16     Q.   I'm correct about that?
17     A.   You are correct, yes.
18     Q.   Now, I don't know if seeing this
19 refreshes your recollection at all, but I'm
20 going to ask the question again:  Do you recall
21 who it was that asked you to write this?
22     A.   I do not.
23     Q.   Do you remember where you were when you
24 wrote this; in other words, were you in an

36

1  office, were you at your register, were you in a
2  break room?
3      A.  Yes, it was the install office.
4      Q.  And what is the install office?
5      A.  The office -- the install office is the
6  office located right behind register 9.
7      Q.  What do you recall about the
8  circumstances that led up to this; did you
9  volunteer to write out a statement, did somebody
10  tell you that you needed to write a statement,
11  how did that work?
12      A.  I was told that the gentleman had --
13  well, he had an incident, so I knew that I had
14  to write a statement.  I was just waiting until
15  they told me I needed to sit down and write it.
16      Q.  Okay.  I'm not sure I understood that.
17          Are you saying that you knew in your
18  mind that you were going to need to write a
19  statement because an incident occurred or
20  somebody told you that?
21      A.  Yes.  Both.
22      Q.  Okay.  So once this occurred, you knew
23  that you were going to have to write a
24  statement?

                                              37

1      A.  Yes.
2      Q.  Was it your understanding that you were
3  the one that reported this incident to
4  management, or did Mr. Narsimhan or someone else
5  report it?
6      A.  I don't remember who reported it.
7      Q.  Okay.  Do you remember having a
8  conversation with anybody at Lowe's that day
9  about this incident?
10      A.  Just the person who pulled me aside to
11  write the incident.
12      Q.  And you don't remember who that person
13  was?
14      A.  I do not.
15      Q.  But do you remember any details about
16  that conversation?
17      A.  I do not.
18      Q.  Okay.  So you said that someone pulled
19  you aside saying you needed to write the report.
20  So that would indicate to me that whoever
21  approached you knew about this incident already,
22  is that a fair characterization?
23      A.  Yes.
24      Q.  And do you know how that person would

                                              38

1  have known about the incident?
2      A.  I don't remember.
3      Q.  If I -- I'm going to zoom out a little
4  bit and make it a little easier for you to see
5  the words, and I'm going to ask you, if you
6  could, to just read the first couple of lines
7  and then I'll stop you.
8      A.  Hold on, I'm sorry, I've got to zoom
9  out a little bit.  Okay.
10          Customer came to my register 9 at
11  9:35 a.m.  I was putting the item back into the
12  cart, down rod.  One of them fell through the
13  cart holes.
14      Q.  All right.  I'm going to stop you
15  there.
16          So we already talked about whether this
17  was a down rod or rebar or something else?
18      A.  Yeah.
19      Q.  And you've already answered those
20  questions.  I'm going to ask you about the one
21  of them part.  Is it your understanding that
22  there were multiple rods?
23      A.  Three.
24      Q.  That's your memory right now, that's

                                              39

1  your best guess?
2      A.  I believe there was three.
3      Q.  Okay.  And I'll ask you again:  Do you
4  remember what else may have been in the cart?
5      A.  I don't remember what else was in the
6  cart.
7      Q.  Okay.  All right.  Now you wrote one of
8  them fell through the cart holes.  So tell me
9  what you mean by that.
10      A.  So I -- hold on.  Let me -- let me see.
11  One of them fell through the cart holes.  One of
12  the rods fell through the cart holes.
13      Q.  When you say --
14      A.  So --
15      Q.  I'm sorry, I didn't mean to interrupt
16  you.  Go ahead.
17      A.  I'm sorry.  The cart he was using was a
18  red grocery -- well, our red push carts, which
19  look like regular grocery carts with holes all
20  over them.
21      Q.  And the holes that you're describing,
22  these are normal, these aren't defects, right?
23      A.  These are normal, yes.
24      Q.  That's the way the cart is designed?

                                              40



1    A.   Yes.
2    Q.   So is it my understanding that the rod
3  fell through the hole as you were placing it
4  into the cart?
5    A.   Yes.
6    Q.   And you already told us you were the
7  only one placing that into the cart, is that
8  right?
9    A.   Correct.
10    Q.   So you placed the rod into the cart in
11  a manner that allowed it to fall through the
12  hole, is that a fair statement?
13    A.   Can you repeat that.
14    Q.   Yeah.  You placed the rod into the cart
15  in a manner that allowed it to fall through one
16  of these holes, is that a fair statement?
17    A.   Can you --
18  MR. PAYNE:  I'll object to the form.
19  MR. TEICH:  You can still answer the
20  question.
21    THE WITNESS:  Can you rephrase it.
22  BY MR. TEICH:
23    Q.   What is it about the phrasing that you
24  don't understand?

41

1    A.   When you said that I placed it in there
2  for it to fall through the holes.
3    Q.   I think -- I'll repeat it, because I
4  don't think that's what I said.  I think what I
5  said was:  You placed the rod in the cart in a
6  manner that allowed it to fall through the hole
7  in the cart, true?
8    A.   Yes.
9    Q.   And this cart was the same as every
10  other cart that's used at Lowe's; in other
11  words, there was nothing defective, or strange,
12  or unusual about it, is that a fair statement?
13    A.   That is correct.
14    Q.   When Mr. Narsimhan rolled that cart up
15  to your cash register, was there anything wrong
16  with the way the cart was loaded or with the way
17  the rod was in the cart?
18    A.   Yes, those rods were not meant to be in
19  those carts.
20    Q.   And did you tell him that?
21    A.   I do not remember.
22    Q.   But you knew that as part of your
23  training that you're not supposed to put those
24  rods in those carts?

42

1    A.   Correct.
2    Q.   But you put that rod in that cart after
3  you scanned it, right?
4    A.   I did.
5    Q.   And did you know as part of your
6  training that the reason you don't put those
7  rods in those carts is because it could fall
8  through the holes and hurt somebody?
9    A.   Correct.
10    Q.   And you knew that at the time?
11    A.   Yes.
12    Q.   But you put the rod in the cart anyway,
13  right?
14    A.   Yes.
15    Q.   Did Mr. Narsimhan do anything to cause
16  his injury?
17    A.   No.
18    Q.   Now you wrote in your statement that
19  you watched it fall -- I'm sorry, I'll let you
20  read the next line, I don't want to
21  mischaracterize it.
22    Just read the next line, please,
23  starting with:  I watched it fall out.
24    A.   I watched it fall out and told him be

43

1  careful.  He steps back as it's falling.
2    Q.   Okay.  When you say you told him to be
3  careful, I want you to explain that to me.
4    Did you see the rod falling out of the
5  cart?
6    A.   Yes.
7    Q.   At what point did you tell him to be
8  careful, was it -- well, strike it.
9    At what point did you tell him to be
10  careful?
11    A.   As it was falling.
12    Q.   Not before you put it in?
13    A.   No.
14    Q.   You said you didn't see whether it hit
15  him or not, is that a fair statement?
16    A.   I'm sorry, can you say that again.
17    Q.   Yeah.  You told me earlier in the
18  deposition that you did not see whether the rod
19  hit him or not, is that a fair statement?
20    A.   Right.
21    Q.   I'm trying to get the timing down here,
22  this is what I'm grappling with.
23    So you saw the rod falling out of the
24  cart, you told him to be careful.  Would you

44



1    have told him to be careful before or after it
2    hit him, or do you not know.
3        A.   While it was falling.
4        Q.   And you've never had the opportunity to
5    see the video of this, is that right?
6        A.   That is correct.
7        Q.   All right.  Go ahead and read the next
8    line for me, please.  I scrolled up a little
9    bit.
10       A.   Falling.  I say sorry and ask if he is
11   okay.  I did not see it him hit, so I figured
12   everything was okay.
13       Q.   All right.  So let me ask you about
14   that.
15            Did you see the rod hit the ground?
16       A.   I don't believe so.
17       Q.   Okay.  At what point -- well, strike
18   that.
19            Was there a period of time after the
20   rod fell and before you saw Mr. Narsimhan on his
21   knee?
22       A.   Can you repeat that.
23       Q.   Sure.  You say that you didn't see it
24   hit him so you figured everything was okay.  And

45

1    I'm trying to figure out like at what point you
2    figured everything was okay.
3            Was there a period of time after the
4    rod fell that you saw Mr. Narsimhan and he
5    appeared to be okay to you?
6        A.   I -- I don't remember.
7        Q.   Okay.  So just tell me as best you
8    remember what it was that made you figure
9    everything was okay.
10       A.   I asked -- I asked him directly when I
11   was at the register.
12       Q.   Okay.  Did you ask him that before or
13   after you saw him on his knee?
14       A.   After.
15       Q.   Okay.  So after he went on his knee and
16   got back up, you asked him if he was okay?
17       A.   Yes.
18       Q.   I'll get to that in a minute.
19            In your statement you said you didn't
20   see it hit him so I figured everything was okay.
21   But then in the next line you say, and correct
22   me if I'm reading this wrong, you say:  As I
23   turned my head back, he's on his knee.
24       A.   Yes.

46

1        Q.   Okay.  So was there a time when you
2    looked at him after the rod fell and he looked
3    like he was okay, but then when you went back
4    and looked at him a second time, he was on his
5    knee?
6        A.   Can you say that one more time.
7        Q.   Sure.  I'm just trying to get the
8    timing right here, and, you know, I'll ask you
9    an open-ended question, I'll let you use your
10   words to describe it as best you remember.
11            What was it that led you to believe he
12   was okay, but then when you turned around, you
13   saw he was on his knee?
14       A.   Right.  So I asked him if he was okay.
15   I don't remember if he said anything.  When I
16   was able to turn back around, I did see that he
17   was kneeling down.
18       Q.   So you're saying you asked him if he
19   was okay after the rod fell, but before you saw
20   him on his knee?
21            And again I know this is a long time
22   ago.  I -- I'm not asking you to guess here.  If
23   you remember, tell me; and if you don't, feel
24   free to tell me that you don't recall.

47

1        A.   I don't recall exact, no.
2        Q.   As you remember this incident now as
3    you sit here today, would it be correct to say
4    that you don't know one way or the other whether
5    the rod hit him?
6        A.   Correct.
7        Q.   If he says that it hit him, you can't
8    dispute that, is that true?
9        A.   That is true.
10       Q.   All right.  So you wrote:  As I turned
11   my head back, he's on his knee.  I put it back
12   in the cart.  I was confused about how he was
13   hurt.
14            Did I read that correctly?
15       A.   Yes.
16       Q.   Tell me what you were confused about.
17       A.   Because I didn't see it hit him.
18       Q.   Okay.  Anything else?
19       A.   No.
20       Q.   You don't have any opinion as to
21   whether it could have injured him if it did hit
22   him, is that a fair statement?
23       A.   Correct.
24       Q.   By the way, I didn't ask you this

48



Marcella Martinez 07/08/2020

1  before, I should ask you now:  To the best of
2  your ability now, and I realize it's several
3  years later, can you describe the rod for us in
4  terms of its length, its width, how heavy it
5  was?
6      A.   I know it was brown and long.
7  Weight-wise, I wouldn't know.  They are kind of
8  heavy.
9      Q.   Okay.  And you've already said it was
10  metal, is that correct?
11      A.   Yes.
12      Q.   Do you remember what kind of shoes
13  Mr. Narsimhan was wearing?
14      A.   I do not.
15      Q.   Okay.  And since you never saw whether
16  it hit him or not, you can't express any opinion
17  as to what part of his body it hit, true?
18      A.   Correct.
19      Q.   Whether it was his foot, or his ankle,
20  or his leg, you don't know any of that, is that
21  right?
22      A.   I do not.
23      Q.   I think the next line is, and correct
24  me if I'm wrong, he finishes checking out and
49

1  leaves.  And then did you write okay?
2      A.   Yes.
3      Q.   What does that mean?
4      A.   I do not know.  He leaves okay.
5      Q.   Next line:  I ask my head cashier if I
6  was seeing things, and I think there's a
7  question mark there, is that correct?
8      A.   Yes.
9      Q.   And again, is this the same head
10  cashier that you referred us to earlier?
11      A.   Yes, that was standing a little behind
12  me.
13      Q.   And you gave us a few names of who it
14  might have been?
15      A.   Correct.
16      Q.   As you read this statement now, does it
17  refresh your recollection at all as to who that
18  was?
19      A.   No.
20      Q.   Whoever it was, did the head cashier
21  tell you that he or she saw the incident?
22      A.   I don't remember.  I don't remember.
23      Q.   Okay.  Well, your next line in here is:
24  He agreed he did not see him get hit with the
50

1  down rod.
2          Did I read that correctly?
3      A.   Yes.
4      Q.   So first of all that tells us that
5  whoever the head cashier was was a man, is that
6  right?
7      A.   Yes.
8      Q.   Okay.  And whoever it was told you that
9  he did not see Mr. Narsimhan get hit with the
10  down rod, is that correct?
11      A.   Yes.
12      Q.   Do you remember whether he was saying
13  he saw the incident but didn't see him get hit,
14  was he saying he didn't see the incident at all,
15  or did he mean something else?
16      A.   I don't know.
17      Q.   Is there any person that you know of
18  who can tell us that they saw the incident and
19  can tell us one way or the other whether that
20  rod hit his foot?
21      A.   I don't know.
22      Q.   Okay.  All right.  Now I want to go
23  back to the incident, and I want to talk about
24  everything you remember about your interactions
51

1  and conversations with Mr. Narsimhan.
2          So he pulls up to your cash register
3  with his cart.  Do you remember any conversation
4  that you had with him before this incident
5  occurred?
6      A.   I do not.
7      Q.   Is the first thing you remember saying
8  to him:  Be careful?
9      A.   No.
10      Q.   What is the first thing you remember
11  saying to him?
12      A.   It would have been hello.
13      Q.   Okay.  So again, I'm not -- I'm not
14  suggesting that you didn't talk to him.  I'm
15  asking what you remember about the conversation.
16      A.   Oh, I don't remember our first
17  conversation.
18      Q.   Okay.  So ordinarily, as with any
19  customer, you would have said hello, you would
20  have exchanged some pleasantries, how are you,
21  that kind of thing?
22      A.   Yes.
23      Q.   Okay.  And you probably did this with
24  this customer as well, right?
52

1    A.   Yes.
2    Q.   You just don't remember the details, is
3 that fair?
4    A.   That is correct.
5    Q.   I know from your report that you say
6 that you told him to be careful at some point
7 during the incident, you've already described
8 that, is that right?
9    A.   That is correct.
10    Q.   What I'm asking is:  Do you recall
11 anything specific that you and he talked about
12 prior to that moment?
13    A.   No.
14    Q.   Okay.  What can you tell me about any
15 conversation you recall having with him after
16 saying be careful?
17    A.   Other than asking him if he was okay,
18 that was it.
19    Q.   Okay.  Now you told us earlier that you
20 asked if he was -- if he was okay after you
21 already came back around to your register, is
22 that right?
23    A.   Yes.
24    Q.   And he was already standing up again by

53

1 that point, is that right?
2    A.   Yes.
3    Q.   Did you see him at any time while he
4 was down on his knee?
5    A.   Yes.
6    Q.   Did you talk to him at all while he was
7 down on his knee?
8    A.   I don't remember.
9    Q.   When you came back around to your
10 register and asked him if he was okay, what do
11 you remember him telling you?
12    A.   I don't remember him saying anything.
13    Q.   Was there any other conversation that
14 you recall having with him as he was checking
15 out and before he walked away from your cash
16 register?
17    A.   None.
18    Q.   So the only things you recall are you
19 told him to be careful while the rod was
20 falling, and then you recall asking him if he
21 was okay while you were standing at your cash
22 register, is that a fair statement?
23    A.   Yes.
24    Q.   And you don't remember anything he

54

1 might have said to you?
2    A.   I don't.
3    Q.   You don't remember if he told you yes,
4 I'm okay, or no, my foot hurts, or anything
5 along those lines, you don't recall what he
6 said?
7    A.   I don't recall what he said, no.
8    Q.   Okay.  Have you ever spoken with him
9 again since that moment in time after he
10 finished checking out and walked away?
11    A.   No.
12    Q.   Have you ever seen him again since
13 then?
14    A.   No.
15    Q.   Never seen him in the store or you've
16 never seen him at all, is that a fair statement?
17    A.   No, that's a fair statement.
18    Q.   Do you remember whether you've ever
19 seen him or interacted with him at any time
20 before this incident?
21    A.   No.
22    Q.   Now I know from the video that I had an
23 opportunity to watch that there was another
24 customer that came up to the register

55

1 immediately after Mr. Narsimhan.
2    Do you have any recollection of that?
3    A.   I do not.
4    Q.   Do you have any recollection of having
5 any conversation with the next customer in line
6 about what had just occurred?
7    A.   I do not.
8    Q.   Okay.  I know from watching the video
9 that after that customer that followed
10 Mr. Narsimhan, you walked away from your
11 register; do you remember any of that?
12    A.   I do not.
13    Q.   Do you remember who you spoke with when
14 you walked away from your register within the
15 first few minutes of that occurring?
16    A.   No, I do not.
17    Q.   You told me that -- strike that.
18    Remind me, the person who asked you to
19 write the report, did you say it was the store
20 manager that was working that day?
21    A.   No, a manager on duty.
22    Q.   What's the difference between a store
23 manager and a manager on duty?
24    A.   A manager on duty is a manager who is

56

1  being the manager for that time of period, and
2  the store manager is -- he's the store manager.
3  He doesn't typically do stuff like that.
4      Q.  Did I ask you for names of people who
5  might have been the ones that asked you to write
6  that report?  I don't think I did.
7          Can you tell me some names of people
8  who might have been the ones that asked you to
9  write that report?
10     A.  It might have been -- I don't
11  believe -- I can't remember because all those
12  managers are gone.
13     Q.  Okay.  Do you remember if it was a man
14  or a woman?
15     A.  I do not.
16     Q.  But it was a manager on duty that
17  would -- that would have been the title?
18     A.  Yes.
19     Q.  Is there a particular department,
20  manager on duty for a particular department, or
21  is it for the whole store?
22     A.  For the whole store.
23     Q.  So if I wanted to get personnel records
24  to find out who it would have been, I would just

57

1  take a look and see who the manager on duty was
2  for that shift?
3      A.  Correct.
4      Q.  Okay.  So obviously you had a
5  conversation with that person because that
6  person is the one that pulled you aside and
7  asked you to write a report, correct?
8      A.  Yes.
9      Q.  Do you remember anything about the
10  conversation you had with that person?
11     A.  I do not.
12     Q.  Do you remember that person asking you
13  any questions, or any details, or any
14  particulars about what occurred?
15     A.  No.
16     Q.  Do you remember that person telling you
17  whether the customer had reported the incident,
18  or made a complaint, or anything along those
19  lines?
20     A.  No.
21     Q.  Do you remember what you would have
22  told that person about what had occurred?
23     A.  What I wrote in my statement.
24     Q.  Okay.  Do you remember anything else

58

1  either different from or in addition to what you
2  wrote in your statement?
3      A.  No.
4      Q.  Did you have any other conversations
5  with that person throughout the rest of your
6  shift that day about it?
7      A.  No.
8      Q.  Did you discuss this incident with any
9  other people that day?
10     A.  No.
11     Q.  Did you discuss this incident with
12  anybody other than your attorney any time since
13  that day?
14     A.  No.
15     Q.  So as you sit here today, the first
16  time you've had any conversation with anybody
17  other than your lawyer about this incident is on
18  the day it happened when you discussed it with
19  your manager on duty, is that what you're
20  telling me?
21     A.  That is correct.
22     Q.  Were there any other forms that were
23  filled out as part of this incident that you
24  know of, filled out by you or anybody else?

59

1      A.  Not that I know of, just my statement.
2      Q.  As part of your training at Lowe's or
3  as part of the experience you've had in the
4  years working there, are you familiar with any
5  sort of formalized accident or incident
6  reporting forms that are used when a customer is
7  injured?
8      A.  I don't recall.
9      Q.  Have you ever been involved in any
10  other incidents before or after this one in
11  which a customer was injured or claimed to have
12  been injured, and when I say involved I mean as
13  a witness, as a person on duty, anything along
14  those lines?
15     A.  No.
16     Q.  Have you ever been required to fill out
17  any kind of an accident or incident report at
18  Lowe's?
19     A.  No.
20     Q.  Now one of the disclosures that Lowe's
21  provided to us regarding what your testimony at
22  trial would be states that you would be
23  testifying to rules, procedures, practices of
24  Lowe's, so I'm going to ask you some questions

60



1  about it.
2        What rules are in place at Lowe's that
3  you are familiar with that would apply to this
4  type of situation?
5      A.   I don't know off the top of my head.
6      Q.   Okay.  Are there rules that you know of
7  regarding how you're supposed to load items into
8  a cart as a cashier?
9      A.   Can you repeat that.
10     Q.   Sure.  Does -- does Lowe's have any
11 rules in place that you're aware of that govern
12 how you're supposed to load items into a cart as
13 a cashier, not as a customer?
14     A.   Yes.
15     Q.   Okay.  Are those rules published in
16 some kind of a handbook, or is it training
17 materials or memos, where do those rules exist?
18     A.   Training videos.
19     Q.   Okay.  And those training videos, how
20 do they apply to this situation?
21     A.   So the videos don't -- the videos don't
22 show when wrong materials are in wrong carts.
23 They just show us how to place certain materials
24 in the correct carts.

61

1      Q.   Okay.
2      A.   As far as -- so the videos don't show
3  if customers bring the wrong materials for the
4  wrong carts, they just show us if they were to
5  bring the correct materials for the correct
6  cart, is that -- did I say that better?
7      Q.   I think I understood what you meant,
8  yes, thank you.
9      A.   Okay.
10     Q.   Was there a correct type of cart that
11 was supposed to be used for rods like the one
12 involved in this incident?
13     A.   Yes.
14     Q.   What kind of cart is that?
15     A.   They are called H carts.
16     Q.   And what's the difference between an H
17 cart and the type of cart that Mr. Narsimhan was
18 using?
19     A.   So an H cart is kind of like a flatbed
20 cart, but it has four rails with two small rails
21 on each side.  So any sort of long PVC, long
22 piping, long lumber, anything long and/or heavy
23 goes on those carts.
24     Q.   As part of your training, or in the

62

1  training videos, or in any other rules that
2  you're familiar with, has Lowe's told you that
3  when you are placing rods like the one that
4  Mr. Narsimhan was purchasing, you should put
5  them in an H cart, not in the type of shopping
6  cart he was using?
7      A.   No.
8      Q.   Was it your understanding that you were
9  violating any company rules when you did that?
10     A.   No.
11     Q.   I'm going to ask you the same questions
12 but I'm going to use the word procedures and
13 practices instead of rules, because that's how
14 the -- your testimony was described to me.
15        Are you familiar with any procedures or
16 practices at Lowe's that govern this issue?
17     A.   Can you repeat that.
18     Q.   Yeah.  Are you familiar with any
19 procedures or practices at Lowe's that you were
20 trained on or instructed on with regard to how
21 to properly load rods of this type into a cart?
22     A.   We have videos.
23     Q.   Same thing that you already told me
24 about?

63

1      A.   Yes.
2      Q.   Did you receive any kind of a reprimand
3  or discipline or anything from this incident?
4      A.   No.
5      Q.   Do you know if -- strike that.
6        Did you change any of your personal
7  procedures or practices after this incident?
8      A.   I did.
9      Q.   How so?
10     A.   I made sure if customers came up with
11 the wrong materials in their carts, I would take
12 them out of their carts and keep then out of
13 their carts and ask them if we could load them
14 for them.
15     Q.   Okay.  And when you say load them for
16 them, you would have put them in a different
17 type of cart?
18     A.   I would have put them in a different
19 cart or asked a floor associate to carry them
20 themselves and load them for the customer.
21     Q.   Okay.  And that's to avoid any further
22 injuries to customers, is that right?
23     A.   Correct.
24     Q.   Do you know whether the store changed

64



1    any of its policies and procedures following
2    this incident?
3        A.   I do not know.
4        Q.   Was there any kind of a company wide or
5    store wide memo, announcement, discussion that
6    resulted from this incident?
7        A.   I do not know.
8        Q.   Does Lowe's provide you, as a cashier,
9    with ongoing training?
10       A.   Yes.
11       Q.   What form does that training take?
12       A.   On the computer.
13       Q.   How often do you do that?
14       A.   Very often.
15       Q.   Weekly, monthly?
16       A.   There's probably new training every
17   couple of weeks, every couple of months.
18       Q.   And is that training primarily safety
19   related or does it vary, sometimes safety,
20   sometimes administrative.
21       A.   Sometimes safety, sometimes
22   administrative.
23       Q.   How often do you do safety training,
24   would you say?

65

1    MR. PAYNE:  I'm sorry, I had an interference.
2    I didn't hear that question at all.
3        MR. TEICH:  Yeah, I stopped, because I heard
4    the interference as well.  So I'll start over.
5    BY MR. TEICH:
6        Q.   Is it your understanding that if that
7    had been in place at the time of this incident,
8    in other words if there had been someone in the
9    aisle, then perhaps they would have shown what
10   the proper cart was to use for this rod?
11       A.   Yes.
12       Q.   The changes that you made to your
13   personal way of doing things, you already told
14   us about that, you said now you do things a
15   little bit differently.  You could have done
16   that at the time, is that correct?
17       A.   Yes.
18       Q.   There's nothing preventing you from
19   getting -- or having somebody get a different
20   cart or loading it differently, is that right?
21       A.   Correct.
22       Q.   Okay.  Just to recap, I think you have
23   already shared with us all of the conversations
24   you've ever had with Mr. Narsimhan at any time,

67

1        A.   So computer safety training, maybe once
2    a month.  We do have this new app safety
3    training, that gets done once a week.
4        Q.   And since this incident occurred, do
5    you recall having any safety training that would
6    impact this type of incident either with regard
7    to selection of carts, or proper loading of
8    carts, or that kind of thing?
9        A.   Can you repeat that.
10       Q.   Sure.  I'm asking if any of the safety
11   training that you've received since this
12   incident would be relevant to this incident?
13       A.   Yes.
14       Q.   Okay.  Tell me about that.
15       A.   So we've had some safety training with
16   having more associates in the specific aisles
17   for those materials that customers commonly
18   wouldn't know how to handle them or how to put
19   them on carts, to do it for them.
20       Q.   Anything else?
21       A.   No.
22       Q.   Is it your understanding that if
23   someone had been present in that aisle when
24   Mr. Narsimhan was --

66

1    is that correct?
2        A.   That is correct.
3        Q.   To the best of your recollection, is
4    that right?
5        A.   Yes.
6        Q.   Are there any other observations that
7    you made of Mr. Narsimhan that you haven't
8    shared with us?
9        A.   No.
10       Q.   You shared with us all of the
11   conversations you've had with any other witness
12   or anyone else who may have information about
13   what happened here?
14       A.   I'm sorry, can you say that again.
15       Q.   Sure.  Have you shared with us
16   everything you know or every conversation you've
17   had with anybody who might have seen this or
18   anybody who might have information about the
19   incident?
20       A.   Oh, yes.
21       Q.   All right.  If I can, I'm going to show
22   you one of the videos here.
23            (A video was viewed.)
24

68



Marcella Martinez 07/08/2020

BY MR. TEICH:
1   Q.   Okay.  Can you see that?
3   A.   I can.
4   Q.   I've got it paused, and for the record,
5   there were three videos that were disclosed to
6   us by Lowe's.
7        This video appears to be an overhead
8   shot of the cashier and Mr. Narsimhan, would you
9   agree with that?
10  A.   Yes.
11  Q.   And you've never seen that before, is
12  that correct?
13  A.   Yes, that is correct.
14  Q.   I've got -- before I start, I got the
15  video paused at the 1:03 mark, one minute, three
16  second mark, and I'm just going to ask can you
17  identify -- is that you that we see in the video
18  wearing the -- a red vest?
19  A.   I cannot tell.
20  Q.   Okay.  I'm going to play it a little
21  bit, and if there comes a point where you can
22  tell me if it is you or is not you, please let
23  me know.
24           (A video was viewed.)

                                              69

BY MR. TEICH:
2   Q.   Do you recognize the gentleman that
3   just walked up to the counter?
4   A.   Oh, yes, with the bars.
5   Q.   Okay.  Is that Mr. Narsimhan?
6   A.   I don't know what he -- I don't
7   remember what he looks like.
8   Q.   Okay.  As far as you remember the
9   incident, though, does this appear to be the
10  person as best you can recall in terms of the
11  way he looks, what he's wearing, what he's got
12  in his cart, et cetera?
13  A.   Yes.
14  Q.   Okay.  And from what you can see, does
15  it appear to be register 9 at the Lowe's, Carol
16  Stream?
17  A.   Yes.
18  Q.   Okay.  And I'm going to back it up just
19  a little bit.
20           (A video was viewed.)
21  BY MR. TEICH:
22  Q.   Again, you're telling us that you're
23  not sure if that's you or not, is that correct?
24  A.   I -- right.

                                              70

1   Q.   Okay.  Well, I'm going to represent for
2   the record that this video was produced to us by
3   Lowe's, and Lowe's represented that this is a
4   video of the incident that we're going to
5   describe.
6   A.   Okay.
7   Q.   So, Ms. Martinez, if at any point you
8   believe that this does not show you and does not
9   show the incident, please let me know, okay?
10  A.   Okay.
11  Q.   Otherwise I'm going to proceed under
12  the assumption that is in fact you, that is
13  Mr. Narsimhan, and that this was the incident,
14  okay?
15  A.   Okay.
16  MR. PAYNE:  I am going to -- I'm stopping and
17  skipping, although I've caught most questions
18  and answers, but I'm unable to see any of this
19  video from my laptop.  I'm logging back in on my
20  phone to see if that gives me a better
21  connection.  So I'm going to log out for a
22  couple -- a minute and try and log back in.
23  MR. TEICH:  All right.  We can wait.
24

                                              71

1           (whereupon, a discussion was had
2            off the record.)
3   MR. TEICH:  Should I try the video?  Do you
4   want to see if it works any better now?  Are you
5   okay with the fact -- we can't hear you right
6   now, or at least I can't.  Okay.  Does it seem
7   to be working now Ron?  Okay.  All right.
8           (A video was viewed.)
9   BY MR. TEICH:
10  Q.   Ms. Martinez, I paused video at the
11  1:13 mark, and it looks at this point like you
12  have come out from behind your counter as you've
13  told us you did, is that right?
14  A.   Yes.
15  Q.   And at this point, what would you be
16  doing?
17  A.   Scanning.
18  MR. TEICH:  I think we lost Ron.  For the
19  record, it looks like Mr. Payne -- Mr. Payne's
20  video feed has cut out, so I'm going to wait
21  until he comes back.  Okay.  There he is.
22           Are you back, Ron?  Okay.
23           (A video was viewed.)
24

                                              72



1  BY MR. TEICH:
2      Q.   Seeing the video now -- by the way,
3  Ms. Martinez, do you remember, did you notice
4  anything unusual about Mr. Narsimhan before the
5  incident, was he limping, did he appear to be
6  injured, anything along those lines?
7      A.   No.
8      Q.   When you came out from behind the
9  counter to do the scanning, is that something
10 that you typically do or normally do?
11     A.   Yes.
12     Q.   That's a regular part of your job as
13 cashier, is that right?
14     A.   Yes.
15     Q.   And do you have like a handheld scanner
16 that you use?
17     A.   Yes.
18     Q.   Is that wireless or wired, how does
19 that work?
20     A.   It's wireless.
21     Q.   When you came around the corner to do
22 the scanning, did you have anything else in your
23 hands or just the scanner?
24     A.   I don't remember.

73

1      Q.   Typically would you have anything else
2  in your hands or just the scanner?
3      A.   If I needed to deactivate a security in
4  a box, then yes.
5      Q.   And what kind of tool is that?
6      A.   It would be anything powered, anything
7  electric.
8      Q.   Would it be -- I'm sorry, what kind of
9  tool would you use?
10     A.   Oh, I would have to -- if you can see
11 that light gray box on my register, on the flat
12 part, I would have to run the item over it.
13     Q.   Okay.  Otherwise, the only thing you'd
14 have in your hand is a handheld scanner, is that
15 right?
16     A.   Correct.
17     Q.   Can you describe that for us, what is
18 it, is it like the size of a cell phone or
19 how -- what is that like?
20     A.   It's a size of maybe three or four
21 cellphones.
22     Q.   But you don't know?
23     A.   Four or five iPhones.
24     Q.   But it's a one hand device, you hold it

74

1  in one hand?
2      A.   Yes.
3      Q.   And at this part of the video you're
4  scanning an item, right?
5      A.   Yes.
6               (A video was viewed.)
7  BY MR. TEICH:
8      Q.   Okay.  I'm going to start at about 1:12
9  on the video, and I'm going to play it.
10          Do you know where you're standing at
11 this time in relation to the cart?
12     A.   I'm in front of it.
13     Q.   Okay.  It's like at the front end of
14 the cart?
15     A.   Prob -- yeah.
16     Q.   Now the incident happens at around the
17 1:26 mark, I'll tell you that right now before I
18 play it.  We're at about 1:20 now.  Again, I
19 know you're looking at this on your phone.
20          Can you tell me where you would be
21 looking as you're placing the rod back into the
22 cart?
23     A.   Looking where he originally had it,
24 which is like the corner.

75

1      Q.   So when he walked up with that rod in
2  the cart, describe for us how it was in the
3  cart.
4      A.   So you can see that they're laying in
5  the cart coming out of it, so they were at
6  the -- I'm trying to explain it better.
7      Q.   Here, I backed up to about the 1:10
8  mark on the cart.
9      A.   Yeah.  So if you see where his hands
10 are --
11     Q.   Uh-huh?
12     A.   -- and you follow it all the way down,
13 that's typically where a child would sit, and
14 you can either lift that up or have it flat.  So
15 when you have it flat, there is like a bar at
16 the bottom that is kind of like where it was --
17 where it would be sitting, is right there so it
18 wouldn't fall through the hole, like just barely
19 sitting there.
20     Q.   Okay.  And he's got it with the rod
21 sticking over the front edge of the cart and --
22     A.   Correct.
23     Q.   -- angled back toward the back of the
24 cart, is that correct?

76

Marcella Martinez 07/08/2020

1    A.   Correct.
2    Q.   When you put the rod back in the cart
3  after you scanned it, did you put it back in
4  basically the same position or in a different
5  position?
6    A.   The same, because -- the same.
7    Q.   You were about to say because, did I
8  cut you off there?
9    A.   I'm sorry?
10   Q.   You were about to say because, and I
11 don't know if I cut you off, and I just want to
12 give you an opportunity to finish your answer.
13   A.   Oh, no.  I put it the same.
14              (A video was viewed.)
15 BY MR. TEICH:
16   Q.   I'm playing it again.  He walks off and
17 right now you're scanning it, right?
18   A.   Yes.
19   Q.   And you told me that you're looking
20 towards the corner where you're going to stick
21 the end of the rod, right?
22   A.   Yes.
23   Q.   And I just stopped it at around 1:28.
24 So let me back it up again.  I'm going to play

77

1  it again from about 1:20, okay?
2    A.   Okay.
3              (A video was viewed.)
4  BY MR. TEICH:
5    Q.   Okay.  Now this is the first time
6  you've had an opportunity to see this since the
7  day that it occurred, is that right?
8    A.   That is correct.
9    Q.   And it's the first time you've had an
10 opportunity to see the video at all, is that
11 correct?
12   A.   That is correct.
13   Q.   Is this generally consistent with what
14 you remember happening?
15   A.   Yes.
16   Q.   All right.  From where you were
17 standing at the front of the cart when you were
18 placing that rod in the cart, could you see the
19 customer?
20   A.   I could see the customer.
21   Q.   And I'm going to go back again to the
22 1:20 -- yeah, I'll go back again to where you
23 come out from around the counter.
24              (A video was viewed.)

78

1  BY MR. TEICH:
2    Q.   So you come out from around the counter
3  at around 1:11 or 1:12, right?
4    A.   Uh-huh.
5    Q.   Is that a yes?
6    A.   Yes.
7    Q.   Then it looks like you're putting the
8  rod back in at around 1:25 or so, and I'll let
9  you get there and see if you agree with me,
10 okay?
11        At what point in there do you think it
12 was that you told him to be careful?
13   A.   When it was sliding through.
14   Q.   Okay.  So would you say -- so here we
15 are at like 1:21.
16   A.   Uh-huh.
17   Q.   It doesn't seem to be sliding through,
18 does it?
19   A.   No, I don't see it sliding through.
20   Q.   1:22, 23, 24, 25.  Would you agree that
21 it starts to slide through at around 1:25?
22   A.   Yes.
23   Q.   Okay.  So you think you told him to be
24 careful around 1:25?

79

1    A.   Yes.
2    Q.   Okay.  And you agree that he's hit
3  already by around 1:26, is that correct?
4    A.   I'm sorry.  Yes.
5    Q.   Okay.  Would you agree with me that
6  from the video it appears that he goes down to
7  his knee immediately when he gets hit?
8    A.   Can you play it again, I'm sorry.
9    Q.   Of course.
10              (A video was viewed.)
11   THE WITNESS:  And what was the question?
12 BY MR. TEICH:
13   Q.   Would you agree with me that from the
14 video, and I'll play it again as many times as
15 you'd like, from the video it appears that he
16 goes down to his knee immediately once the rod
17 hits him?
18   A.   Yes.
19   Q.   And he's already down on his knee
20 before you pick up the rod, is that correct?
21   A.   Yes.
22   Q.   Okay.  So -- and again, I know this is
23 a long time ago.  I'm trying to figure out when
24 it would have been that you saw him and thought

80

1  he was okay, and then a period of time passed
2  and you turned your head and saw he was on his
3  knee.  So at what point --
4      A.  Can you say...
5      Q.  Yeah.  At what point in the video did
6  you see him and think he was okay where he was
7  on his knee?
8      A.  I don't remember.
9      Q.  Okay.  Having had the opportunity to
10 review the video now, do you remember anything
11 else about any conversations you may have had,
12 in other words, does this jog your memory in
13 that regard at all?
14     A.  Not -- no.
15     Q.  I don't have any more questions about
16 this part of the video, but I'll play it in
17 case -- because I know you haven't had a chance
18 to see it before.
19         We lost Ron, so I'll stop and I'll
20 wait.  Okay, there he is.
21             (A video was viewed.)
22 BY MR. TEICH:
23     Q.  All right.  I'm going to move towards
24 the end of the video because -- by the way,

81

1  here, let me do this before we move to the end
2  of the video.
3         There comes a time here when -- that
4  Mr. Narsimhan walks away and there's another
5  customer that walks up, do you see that?
6      THE REPORTER:  I'm sorry, we're having a
7  little feedback, Mike.  We couldn't hear you.
8  BY MR. TEICH:
9      Q.  Okay.  Okay.  I advanced the video to
10 the point after Mr. Narsimhan completed his
11 transaction and walked away.  And there's
12 another customer that comes up behind him.
13         Do you see that?  I'll try one more
14 time, because I heard the interference.
15         I advanced the video to a point after
16 Mr. Narsimhan has completed his transaction and
17 walked away, and there's another customer that
18 comes up behind him, do you see that?
19     A.  Yes.
20     Q.  And I asked you some questions before
21 whether you remember having any conversations
22 with that customer about the incident.
23         Now that you've had a chance to see
24 that gentleman, does it refresh your

82

1  recollection, was there any discussion with him
2  about what had just happened?
3      A.  No.
4             (A video was viewed.)
5  BY MR. TEICH:
6      Q.  So I'm going to advance the video close
7  to the end, and at around the 4:10 mark on the
8  video it looks like you finished with the
9  customer and then you walk way.
10         And again, do you recall what you did
11 when you walked away?
12     A.  I do not.
13     Q.  Okay.  Ms. Martinez, I'm going to show
14 you one other video.  Bear with me, please.
15             (A video was viewed.)
16 BY MR. TEICH:
17     Q.  All right.  Can you see this video?
18     A.  I can.
19     Q.  There's a gentleman standing in sort of
20 the center of the frame, African-American man,
21 wearing a red vest, do you see him?
22     A.  Yes, I do.
23     Q.  Do you know who he is?
24     A.  I do.

83

1      Q.  Who is that?
2      A.  That would be Travis Scott.
3      Q.  And he's one of the persons you named
4  earlier, is that right?
5      A.  Yes.
6      Q.  Because I remember the name, but I
7  can't recall what position you said he may have
8  been.  Is he the head cashier?
9      A.  Yes.
10     Q.  And is he standing in a position where
11 the head cashier would typically stand?
12     A.  Yes.
13     Q.  And is that right by the exit door?
14     A.  It is.
15     MR. TEICH:  For the record, I -- I don't
16 remember if I identified the first video we
17 watched.  For the record, why don't we mark that
18 as Deposition Exhibit No. 2, and we'll mark this
19 video which is a video of the exit area as
20 Deposition Exhibit 3.
21             (Whereupon, MARTINEZ Deposition
22             Exhibit Nos. 2 and 3 were
23             marked for identification.)
24

84

BY MR. TEICH:

1  BY MR. TEICH:
2      Q.   Do you know whether Mr. Scott still
3  works at Lowe's?
4      A.   He does.
5      Q.   Do you know what his current position
6  is?
7      A.   A cashier.
8      Q.   At the same location?
9      A.   At the same location.
10     Q.   And I'm going to advance this video.
11 The time lengths on these two videos are roughly
12 the same.  I'm going to advance the video
13 around --
14     THE REPORTER:  Mike, you're going out there.
15 We only have I'm going to advance the video
16 around, that's where we left off.
17              (A video was viewed.)
18 BY MR. TEICH:
19     Q.   Okay.  I advanced the video to around
20 the 1:17, 1:18 mark.  And on the very right
21 frame of the video there is a cashier.
22          Do you see that?
23     A.   I do.
24     Q.   Does that appear to be you doing the

85

1  same things we just saw from the overhead shot?
2      A.   Yes.
3      Q.   Is that basically, given what you
4  understand about the layout of the store, that's
5  where you had been working at cash register
6  No. 9?
7      A.   Yes.
8      Q.   And we're looking at a cart that looks
9  like it's got one or possibly more than one rod
10 sticking out the front end of the cart, is that
11 correct?
12     A.   Yes.
13     Q.   And in your right hand are you holding
14 the scanner that you described?
15     A.   I am.
16     Q.   So what we're looking at here is you
17 scanning the rod, is that correct?
18     A.   Yes.
19     Q.   All right.  And if we get to around the
20 1:32 mark, it looks to be like that's when you
21 put the rod in the cart and it slid through the
22 hole; would you agree with that?
23     A.   Yes.
24     Q.   Now Mr. Scott looked like he was in a

86

1  position to see the whole thing, wasn't he?
2      A.   It looks that way, yes.
3      Q.   Having seen the video now, do you
4  recall one way or the other whether he told you
5  that he witnessed the incident?
6      A.   I don't recall.
7      Q.   Do you remember ever speaking to him
8  about what he saw?
9      A.   I think I just turned and -- I turned
10 and asked him.
11     Q.   Okay.  Do you remember when you did
12 that, was it after --
13     A.   I don't remember when I -- when I asked
14 him.
15     Q.   And what did he tell you as far as you
16 recall, if you recall?
17     A.   That he didn't see it hit him.
18     Q.   Okay.  I'm going to advance the video
19 to the 2:45 mark.
20              (A video was viewed.)
21 BY MR. TEICH:
22     Q.   And I want to ask you -- there's a
23 woman that walks out of an office there, do you
24 see that at the top?

87

1      A.   Yeah.  Could you -- I'm sorry.
2      Q.   Yeah, I'll go back.
3      A.   Just...
4      Q.   I'll go back.
5      A.   I may know who it is.
6              (A video was viewed.)
7      THE WITNESS:  Okay.  I do.
8  BY MR. TEICH:
9      Q.   Who is that?
10     A.   Her name is Linda.  I think her last
11 name is Rouge.
12     Q.   Did you say Rowe, like R-O-W-E?
13     A.   No, I think it's R-O-U-G-E.  I'm not
14 sure on her last name.
15     Q.   And what is her position?
16     A.   At the time she was -- oh, man, at the
17 time she worked in the install office.
18     Q.   And the install office is the office
19 you told about earlier where you were when you
20 wrote your report, is that correct?
21     A.   That's correct.
22     Q.   And is that the install office that we
23 see her walk out of right there?
24     A.   Yes.

88

1    Q.    Okay.  Did you ever ask her if she
2  witnessed this?
3    A.    I did not.
4    Q.    Do you know who else would have been
5  working in the install office at the time?
6    A.    I don't.
7    Q.    From your familiarity or understanding
8  of the layout in there, people working in there,
9  are they able to have a clear view of your work
10 station when you're working at checkout No. 9?
11   A.    They would just have a view of behind
12 my register.
13   Q.    Okay.  So if they were working in
14 there, and again I know you don't work in there
15 regularly, but based upon your understanding of
16 that room, would they be able to see this
17 incident?
18   A.    Not the incident, no.
19                  (A video was viewed.)
20 BY MR. TEICH:
21   Q.    I'm going to advance the video a little
22 bit further to around the 3:08 mark.  There's a
23 woman speaking with Mr. Scott.
24          Do you see her?

89

1    A.    Are you able to back it up just when
2  she gets there.
3    Q.    I'll back it up so you can watch her
4  walk in.
5    A.    I don't know who she is.
6    Q.    Do you know if she's a store employee
7  or not?
8    A.    No, I can't tell.
9    Q.    Okay.  As you were working at your
10 register, do you remember overhearing any part
11 of this conversation that they're having?
12   A.    No.
13                  (A video was viewed.)
14 BY MR. TEICH:
15   Q.    Now if we advance forward to about
16 4:20, remember I told you earlier that after
17 that second customer you walk away from your
18 register?
19   A.    Yes.
20   Q.    So this appears to be you walking right
21 over towards Mr. Scott, is that correct?
22   A.    That is correct.
23   Q.    And at this point it looks like you're
24 having a conversation with Mr. Scott and with

90

1  this other woman, is that correct?
2    A.    Yes.
3    Q.    Do you know what you were talking
4  about?
5    A.    No.
6    Q.    Would this have been when you would
7  have asked him what he saw or do you think that
8  that had already occurred, or if it occurred at
9  a different time or what?
10   A.    I think that's when I asked him.
11   Q.    Okay.  So do you remember anything else
12 about that conversation other than you asking
13 him and he telling you that he didn't see the
14 rod hit my client?
15   A.    No.
16   Q.    Okay.  Do you remember that woman being
17 involved in the conversation at all?
18   A.    I do not.
19   Q.    Do you remember what you're laughing
20 about here?
21   A.    No.
22   Q.    Okay.  That's the end of the video.
23          You've never seen any other videos or
24 photos of the incident or of my client, is that

91

1  true?
2    A.    That's true.
3    Q.    And you have no information about the
4  severity of his injury, is that true?
5    A.    That's true.
6    Q.    You're not going to express any opinion
7  at trial regarding the nature or the severity of
8  his injury, is that true?
9    A.    That is true.
10   MR. TEICH:  Thank you.  I don't have any
11 other questions, but Mr. Payne may.
12   MR. PAYNE:  I don't have any questions.
13   MR. TEICH:  Signature?  Ron?
14   MR. PAYNE:  I had a little feedback.
15       I don't have any questions at this time
16 for this witness, and I don't believe there is
17 signature, it's a federal case.
18   MR. TEICH:  You can reserve signature if you
19 want to, it's a federal rule, but you don't have
20 to.  You don't have to say anything on the
21 record, you just have to affirm or...
22   MR. PAYNE:  I am going to reserve signature
23 because there were a lot of times where the
24 questions and answers dropped out, I want to see

92

```
 1   them.  So we'll reserve signature.
 2         MR. TEICH:  Okay, very good.
 3             Ms. Martinez, thank you very much.
 4         THE WITNESS:  Thank you.
 5             (Proceedings concluded at 12:34 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                                    93
```

```
 1   STATE OF ILLINOIS     )
 2                         )  SS:
 3   COUNTY OF C O O K     )
 4         I, MARGARET A. RITACCO, a notary public
 5   within and for the County of Cook and State of
 6   Illinois, do hereby certify that heretofore,
 7   to-wit, July 8, 2020, personally appeared before
 8   me, at 200 North LaSalle Street, Suite 2900,
 9   Chicago, Illinois, MARCELLA MARTINEZ, in a cause
10   now pending and undetermined in the United
11   States District Court for the Northern District
12   of Illinois Eastern Division, wherein KRISHNA
13   NARSIMHAN is the Plaintiff, and LOWE'S HOME
14   CENTERS, LLC, is the Defendant.
15         I further certify that the said
16   MARCELLA MARTINEZ was first duly sworn to
17   testify the truth, the whole truth and nothing
18   but the truth in the cause aforesaid; that the
19   testimony then given by said witness was
20   reported stenographically by me in the presence
21   of the said witness, and afterwards reduced to
22   typewriting by Computer-Aided Transcription, and
23   the foregoing is a true and correct transcript
24   of the testimony so given by said witness as
                                                    95
```

```
 1         IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                 EASTERN DIVISION
 4   KRISHNA NARSIMHAN,        )
 5         Plaintiff,          )
 6   vs.                       )  No. 19-cv-01255
 7   LOWES HOME CENTERS, LLC, )
 8         Defendant.          )
 9         I, MARCELLA MARTINEZ, being first duly
10   sworn, on oath say that I am the deponent in the
11   aforesaid deposition taken on the 8th day of
12   July, 2020; that I have read the foregoing
13   transcript of my deposition and affix my
14   signature to same.
15         _____
16                 MARCELLA MARTINEZ
17
18   Subscribed and sworn to
19   before me this         day
20   of                  , 2020
21
22
23   Notary Public
24
                                                    94
```

```
 1   aforesaid.
 2         I further certify that the signature to
 3   the foregoing deposition was reserved by counsel
 4   for the respective parties.
 5         I further certify that the taking of this
 6   deposition was pursuant to notice and that there
 7   were present at the deposition the attorneys
 8   hereinbefore mentioned.
 9         I further certify that I am not counsel
10   for nor in any way related to the parties to
11   this suit, nor am I in any way interested in the
12   outcome thereof.
13         IN TESTIMONY WHEREOF:  I have hereunto
14   set my hand and affixed my notarial seal this
15         day of              , 2020.
16
17
18
19
20
21         NOTARY PUBLIC, COOK COUNTY, ILLINOIS
22         LIC. NO. 084-002796
23
24
                                                    96
```



```
 1        McCorkle Litigation Services, Inc.
             200 N. LaSalle Street 2900
 2           Chicago, Illinois 60601-1014
 3  July 20, 2020
 4  LEWIS, BRISBOIS, BISGAARD & SMITH
    MR. RONALD W. PAYNE,
 5  555 West Monroe Street, Suite 300
    Chicago, Illinois  60661
 6
    IN RE:  KRISHNA NARSIMHAN vs.
 7          LOWES HOME CENTERS, LLC
    COURT NUMBER:  No. 19-cv-01255
 8  DATE TAKEN:  July 8, 2020
    DEPONENT:  MARCELLA MARTINEZ
 9
    Dear Mr. Payne:
10
    Enclosed is the deposition transcript for the
11  aforementioned deponent in the above-entitled
    cause.  Also enclosed are additional signature
12  pages, if applicable, and errata sheets.
13  Per your agreement to secure signature, please
    submit the transcript to the deponent for review
14  and signature.  All changes or corrections must
    be made on the errata sheets, not on the
15  transcript itself.  All errata sheets should be
    signed and all signature pages need to be signed
16  and notarized.
17  After the deponent has completed the above,
    please return all signature pages and errata
18  sheets to me at the above address, and I will
    handle distribution to the respective parties.
19
    If you have any questions, please call me at the
20  phone number below.
21
    Sincerely,
22  Cindy Alicea                 MARGARET A. RITACCO
    Signature Department          Court Reporter
23                                (312)263-0052
24  cc:  ALL COUNSEL ORDERING THE TRANSCRIPT
                                           97
```



```
 1        IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                  EASTERN DIVISION
 4   KRISHNA NARSIMHAN,          )
 5           Plaintiff,          )
 6       vs.                     )   No. 19-cv-01255
 7   LOWES HOME CENTERS, LLC,    )
 8           Defendant.          )
 9
10        The discovery deposition of
11   EILEEN PARKS taken in the above-entitled cause,
12   before MARGARET A. RITACCO, CSR, a notary
13   public of Cook County, Illinois, on July 8th, 2020,
14   at the time of 12:46 p.m., via videoconference,
15   pursuant to notice.
16
17
18
19
20
21
22
23   Reported by:  MARGARET A. RITACCO, CSR
24   License No.:   084-002796
```
                                                    1

```
 1   APPEARANCES:
 2        ANESI, OZMON, RODIN,
 3        NOVAK & KOHEN, LTD., by
 4        MR. MICHAEL L. TEICH,
 5        161 North Clark Street, 21st Floor
 6        Chicago, Illinois  60601
 7        (312) 372-3822
 8        mteich@anesilaw.com
 9             Representing the Plaintiff
10
11        LEWIS, BRISBOIS, BISGAARD & SMITH, by
12        MR. RONALD W. PAYNE,
13        555 West Monroe Street, Suite 300
14        Chicago, Illinois  60661
15        (312) 463-3360
16        Ron.Payne@lewisbrisbois.com
17             Representing the Defendant.
18
19
20
21
22
23
24
```
                                                    2

```
 1                 I N D E X
 2   WITNESS                          EXAMINATION
 3   EILEEN PARKS
 4     BY MR. TEICH                        5
 5
 6
 7
 8            E X H I B I T S
 9   NUMBER                          IDENTIFICATION
10       (NO EXHIBITS WERE MARKED.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```
                                                    3

```
 1        THE REPORTER:  My name is Margaret Ritacco, CSR.
 2   The parties are present via videoconference to
 3   take the discovery deposition of Eileen Parks in
 4   the matter of Krishna Narsimhan versus Lowe's
 5   Home Center, Case No. 19-cv-1255, in the United
 6   States District Court, Northern District of
 7   Illinois, Eastern Division.  Today's date is
 8   7/8/20, and the time is 12:46.
 9        This deposition is being taken at the
10   instance of the plaintiff.  This deposition is
11   being taken by means of videoconferencing, and
12   the oath will be administered remote by the
13   court reporter pursuant to Governor Pritzker's
14   Executive Order 2020-14.
15        Will all parties present please state
16   your name and agreement with this procedure.
17        MR. TEICH:  Michael Teich on behalf of the
18   plaintiff, and I agree.
19        MR. PAYNE:  Ron Payne on behalf of the
20   defendant, and I agree.
21        THE WITNESS:  Eileen Parks, I agree.
22            (Witness sworn.)
23        MR. TEICH:  Thank you.
24        Ms. Parks, will you please state and
```
                                                    4

EXHIBIT
B

1  spell your name for the record.
2      THE WITNESS:  It's Eileen Parks, E-I-L-E-E-N,
3  P-A-R-K-S.
4      MR. TEICH:  Thank you.
5              EILEEN PARKS,
6  called as a witness herein, having been first
7  duly sworn, was examined and testified as
8  follows:
9              EXAMINATION
10 BY MR. TEICH:
11     Q.  Let the record reflect that this is the
12 deposition of Eileen Parks taken pursuant to
13 notice.
14     Ms. Parks, my name is Michael Teich.
15 Once again, I represent the plaintiff in this
16 case.  I'm going to be asking you some
17 questions.
18     Have you ever given a deposition
19 before?
20     A.  Yes.
21     Q.  About how many times do you think
22 you've been deposed?
23     A.  Once or twice.
24     Q.  And were those occasions also in

5

1  connection with your work at Lowe's?
2      A.  Yes.
3      Q.  Now I'm getting a message -- we're
4  doing this -- for the record, we are doing this
5  by Zoom and I'm getting the message that Eileen
6  Elliot Parks' network band is low.  So I'm just
7  going to ask:  Are you able to see and hear me
8  okay?
9      A.  Yes.
10     Q.  If at any point during the deposition
11 that becomes an issue, will you please let me
12 know?
13     A.  Yes.
14     Q.  All right.  And even though you've
15 given depositions before, I'll go over a couple
16 of ground rules to make things go a little more
17 smoothly.
18     One is I want to make sure when we read
19 the transcript later on that we can rely upon
20 your answers, so that we know that you heard and
21 understood each question before you answered it.
22     So I see you nodding your head, which
23 is good.
24     A.  Yes.

6

1      Q.  If there comes a time I ask you a
2  question and you didn't hear it or you didn't
3  understand it, please speak up and let me know,
4  and I will repeat the question or rephrase it,
5  or do anything else that I need to do, okay?
6      A.  Okay.
7      Q.  And again, because there is a court
8  reporter here, the questions that I ask and the
9  answers that you give have to be out loud, using
10 words.  If you nod your head or shake your head,
11 then she's not going to be able to take that
12 down, okay?
13     A.  Okay.  Yes.
14     Q.  And, again, because there's a court
15 reporter, we have to avoid speaking over one
16 another as much as possible.  So I will wait
17 until you finish an answer before I start to
18 speak, and I'll ask that you wait until I finish
19 my question before you start to answer, okay?
20     A.  Okay.
21     Q.  Did you hear my last little statement
22 there?
23     A.  Yes.
24     Q.  And you agree with that?

7

1      A.  Yes.
2      Q.  Thank you.  And if I ask you any
3  questions that you don't know the answer to,
4  feel free to tell me I don't know or I don't
5  remember.  As long as that's true, that's a
6  perfectly acceptable answer.  I don't want you
7  to guess, okay?
8      A.  Okay.
9      Q.  Give me your address, please.
10     A.  520 North Lombard Avenue in Lombard,
11 Illinois 60148.
12     Q.  Who do you currently work for?
13     A.  Lowe's Home Improvement.
14     Q.  And for how long have you worked for
15 Lowe's?
16     A.  It's 16 years.
17     Q.  What is your current position with
18 Lowe's?
19     A.  Asset protection and safety.
20     Q.  For how long has that been your title?
21     A.  16 years.
22     Q.  Do you work at a -- currently, do you
23 work at a particular store or a particular
24 region; how does that work?

8

1   A.   I work at Chicago Brickyard, Store
2  1845.
3       Q.   And when did you start working at that
4  store?
5       A.   This store I started in September
6  of 2019.
7       Q.   What store did you work at before that?
8       A.   I worked --
9       THE REPORTER:  We didn't get any answer.
10  Mike, we're not getting any --
11      MR. TEICH:  Yeah, I'm seeing that, too.  I
12  think it's her band wave.
13      THE WITNESS:  You can't hear me?
14  BY MR. TEICH:
15      Q.   We can now.  There was a good 15 to 20
16  seconds there you were not legible.  So let me
17  ask the question again.  Hopefully that's not a
18  recurrent issue.
19      A.   Okay.
20      Q.   What store did you work at before
21  Chicago brick house?
22      A.   Brickyard.  I worked at Northbrook from
23  August -- or from June until September, 2019.
24      Q.   And before that?

9

1       A.   I was laid off from January -- February
2  1st until I came back in June of 2019.
3       Q.   Okay.  And prior to February 1st, 2019,
4  where did you work?
5       A.   Carol Stream.
6       Q.   How long were you at the Carol Stream
7  store?
8       A.   15 years.
9       Q.   What did you do before you went to work
10  with Lowe's?
11      A.   I worked for Nordstrom.
12      Q.   Also in loss prevention?
13      A.   Customer service, and then loss
14  prevention, yeah.
15      Q.   And how long did you work at Nordstrom?
16      A.   Ten years.
17      Q.   What did you do before that?
18      A.   I owned a Dairy Queen.
19      Q.   What's your highest level of formal
20  education?
21      A.   Two years of community college.
22      Q.   Do you have a degree?
23      A.   No.
24      Q.   Okay.  How did -- how did you get into

10

1  loss prevention?
2       A.   Just I started as a fraud investigator
3  for Nordstrom, and I worked out of the loss
4  prevention office and started seeing what they
5  did and went to that part of it, loss
6  prevention, catching shoplifters and such.
7       Q.   And what kind of training did you
8  receive when you first went into loss
9  prevention?
10      A.   At Nordstrom it was training for --
11  just with your coworkers at Nordstrom, it was
12  that.  But when I got to Lowe's, it was four
13  weeks of training, two based on loss prevention
14  and two weeks -- or one week, I'm not sure, on
15  safety.  It might have been two weeks.
16      Q.   Okay.  Tell me about your overall job
17  responsibilities, what is your -- how do you
18  describe your job; what do you do?
19      A.   What I do is basically operational
20  loss, external loss, internal loss and safety
21  throughout the store, making sure that our top
22  stock is safe, that the store is safe overall.
23      Q.   Okay.  Is there anybody at -- strike
24  that.

11

1       For the 15 years or so that you worked
2  at the Carol Stream location, would you say that
3  you were the person with the highest level of
4  responsibility with regard to safety?
5       A.   I wouldn't say that, no.
6       Q.   Okay.  Who would that person be?
7       A.   I mean, it's -- it's management.  So
8  store management and ASMs are the ones that are
9  responsible for reporting, but I also can do
10  that with workmen's comp and general
11  liabilities.
12      Q.   Okay.  And just for the uninitiated,
13  workmen's comp would deal with injuries to
14  people who work for Lowe's, correct?
15      A.   Yes.
16      Q.   And general liabilities would deal with
17  injuries to customers and other people who are
18  on Lowe's premises, is that correct?
19      A.   Yes.
20      Q.   You -- the reason you're giving your
21  deposition today is that your name was provided
22  to me in an interrogatory response as somebody
23  who was at the scene either at the time of or
24  immediately before or after the occurrence.

12

1      Were you at the scene either at the
2  time of or immediately before or after this
3  occurrence?
4      A.  No, I was not.
5      Q.  Okay.  What is your involvement --
6  generally, tell me what your involvement with
7  this incident was, and then we'll get into
8  specific questions and answers.
9      A.  I basically wrote the report.  I'm not
10  sure how it -- how I wrote the report, because it
11  wasn't there, so I'm not sure if it was the next
12  day, but I have to pull video and turn that in.
13      Q.  Okay.  And when you say you wrote the
14  report, which report are you referring to?
15      A.  The incident report.  That --
16      Q.  That -- I'm sorry, I violated one of my
17  rules and I started speaking before you were
18  finished.  I'll ask the question again.
19      What incident are you referring to?
20      A.  The incident report for the customer
21  that was injured.  I'm the one that wrote the
22  report, probably for my store manager.
23      Q.  Okay.  So at some point following this
24  incident, you wrote an incident report and you

13

1  turned it in to who, the store manager?
2      A.  I gave it to the store manager.
3      Q.  Okay.
4      A.  Yes.
5      Q.  Do you have a copy of that incident
6  report in front of you?
7      A.  I do.
8      MR. TEICH:  Okay.  Counsel, that was never
9  turned over in discovery, was it?
10      MR. PAYNE:  You know, I don't know.  You did
11  written discovery in this case before I was
12  involved.  I assumed that the incident report
13  was turned over.  Do you not have that?
14      MR. TEICH:  No, all I have is Ms. Martinez'
15  handwritten report.
16      MR. PAYNE:  For the record, I don't know the
17  basis of why the incident report would be
18  withheld, but I will be happy with a
19  supplemental request to either provide it or
20  provide a specific objection, if the client did
21  have some objection.
22      MR. TEICH:  Okay.  I mean that's fine.
23  Obviously I'd like to have that when I depose
24  the witness who wrote the report.  You know, I

14

1  suggest that I ask a few more questions here and
2  then we suspend the dep and we come back when I
3  have the report.  You know, I can't imagine any
4  reason why it would be privileged, but if you're
5  going to claim privilege, maybe we need to get
6  through that before we finish this deposition.
7      MR. PAYNE:  Again, I'll be happy to provide
8  the report later.  I don't know what the basis
9  of it not being tendered.  I assumed that you
10  had it.
11      MR. TEICH:  No, that's fine.  I mean, I'm not
12  putting you on the spot.
13      MR. PAYNE:  And honestly, I think if you ask
14  a few questions, Ms. Parks' actual knowledge of
15  the accident is pretty much limited to her
16  pulling the video, so.
17      MR. TEICH:  Yeah, that's fine.
18  BY MR. TEICH:
19      Q.  Ms. Parks, aside from the one incident
20  report that you told me that you completed and
21  that you have in front of you, have you prepared
22  any other report in connection with this matter?
23      A.  With this matter?
24      Q.  Yes.

15

1      A.  No.
2      Q.  Okay.  Have you reviewed any other
3  reports in connection with this incident?
4      A.  No.
5      Q.  Did you ever review Ms. Martinez'
6  handwritten statement?
7      A.  No.
8      Q.  Did you ever speak to the plaintiff in
9  this case?
10      A.  No.
11      Q.  Who did you speak to in preparing the
12  report that you did prepare?
13      A.  I was told probably to pull the video,
14  probably by Jody Rankin who was the store
15  manager at the time.  I was told to pull the
16  video, and that's about the extent of it.
17      Q.  Okay.  And did you pull the video?
18      A.  Yes.
19      Q.  Do you remember when that was?
20      A.  I do not know the date, except maybe
21  what I wrote on the report.
22      Q.  Okay.  So the incident occurred on
23  June 25, 2016.  Would you have pulled the video
24  around that time?

16

Eileen Parks 07/08/2020

1    A.   It depends if I was at work or not.
2    Q.   Well, according to your report, when
3 did you pull the video?
4    A.   I -- it doesn't ask when you -- it says
5 the 25th.
6    Q.   And when you --
7    A.   -- but that, I do not remember.
8    Q.   When did you prepare your report, is it
9 dated?
10    A.   It's dated 6/25.
11    Q.   Would that have been when you prepared
12 the report?
13    A.   No, that would probably have been the
14 incident date.
15    Q.   Okay.  In any event, you reviewed the
16 video, is that correct?
17    A.   Yes.
18    Q.   And does your report contain your
19 impression...
20    THE REPORTER:  I'm sorry, I couldn't hear
21 you, Mike.
22 BY MR. TEICH:
23    Q.   Does your report contain your -- your
24 impression upon review of the video?

17

1    A.   I still can't hear you.
2    Q.   I'll try one more time.
3         Does your report contain your
4 impression based upon your review of the video?
5    A.   Yes.
6    Q.   How long is your report?
7    A.   It's just a page.  It just basically
8 has the customer's name, and what the incident
9 was, and that I pulled video, and I signed off
10 that I pulled video.
11    Q.   Okay.  When you watched the video, what
12 did you see?
13    A.   The customer came -- I have the -- what
14 we do is we pull the customer coming into the
15 store, and then the incident itself, and then
16 exiting the store.
17    Q.   And when was the last time you had the
18 opportunity to review the video of the incident
19 itself?
20    A.   I just reviewed.
21    Q.   In your words, what did you see -- in
22 your words, as someone who's got safety
23 responsibilities in the store, what did you see
24 in the video?

18

1    A.   I saw basically -- I only could see the
2 rod go onto the floor.
3    Q.   Could you tell one way or the other
4 whether the rod struck the customer?
5    A.   I could not tell.
6    Q.   Are you prepared to testify based upon
7 your review of the video that the rod did not
8 strike the customer?
9    A.   No.  I cannot tell.
10    Q.   If the customer claims that the rod
11 struck him, you would not dispute that, would
12 you?
13    A.   I cannot tell if it struck him or not.
14    Q.   Okay.  What is your understanding of
15 what the cause of this incident was?
16    A.   From what I understand, the cashier put
17 the rod in the cart and the rod went through the
18 cart.
19    Q.   And did you come to any conclusion as
20 to what should have been done differently to
21 prevent this?
22    A.   I do not.
23    Q.   Do you have any criticism of the way
24 the rod was place in the cart?

19

1    A.   I didn't hear you.
2    Q.   Do you have any criticism of the way
3 the rod was placed into the cart?
4    A.   I do not.
5    Q.   Do you have any criticisms of anything
6 Mr. Narsimhan...
7    A.   I do not.
8    THE REPORTER:  I couldn't hear you, I'm
9 sorry, Mike.
10    MR. TEICH:  I'll repeat the last question.
11 BY MR. TEICH:
12    Q.   Do you have any criticism of anything
13 that Mr. Narsimhan did?
14    A.   If I'm understanding you correctly,
15 you're asking if I have any criticism of what he
16 did?
17    Q.   Yes.
18    A.   No, I do not.
19    Q.   Okay.  Do you have any personal
20 knowledge of what occurred aside from what you
21 saw on the video?
22    A.   I do not.
23    Q.   Do you have any knowledge of this
24 incident from speaking to any witness or from

20

**Page 21**

1  any other source aside from what you saw in the
2  video?
3      A.  I do not.
4      Q.  So if you watch the video and I watch
5  the video, then we each have the same amount of
6  information about what occurred, is that what
7  you're saying?
8      A.  Yes.
9      MR. TEICH:  In that case, I'm going to
10 suspend the deposition.  I'd like to see the
11 statement, Ron.  I may or may not want to ask
12 some additional questions based upon the
13 statement or the report, but, you know, from
14 what I've heard, I think I'm probably
15 entitled...
16      I'm not asking you to respond to this.
17 I know you need to speak to your client before
18 you stake out a position.  I'm just stating for
19 the record that I'm probably entitled to that
20 report and I should have it before I depose this
21 witness.
22      So I'm going to end the deposition now
23 with the right to revisit it once I receive
24 that.

**Page 22**

1      MR. PAYNE:  Okay, that's fine.  If you can
2  just put your request in writing or else I can
3  put a response writing, I'd appreciate that,
4  because I'm not certain that -- I believe I
5  looked at the document and it may be
6  confidential in that it may have been
7  prepared...
8      THE REPORTER:  I can't hear you.
9      MR. TEICH:  Hold on, Ron.  One second.
10      Ms. Parks, can you mute your
11 microphone.  I have a feeling we're getting
12 feedback from you.
13      Go ahead, Ron, try it again.
14      MR. PAYNE:  I just wanted to state for the
15 record that I believe the document is
16 privileged.  It was prepared and it's just a
17 base of litigation and sent directly to
18 third-party administrators for investigation of
19 claims; therefore I belive it may be protected
20 and confidential.
21      MR. TEICH:  That's fine, and again, I'm not
22 going to hold you to anything you say now on the
23 spur of the moment.  I know that you're going to
24 need to stake out a position check.

**Page 23**

1      I'll just state that there was no
2  privilege log provided and there was no
3  indication that this document is privileged.  So
4  if it was being held back to claim a
5  privilege...
6      MR. PAYNE:  Okay.
7      MR. TEICH:  It may have just been an
8  oversight, maybe somebody intended to send it
9  over and didn't.
10      So I'll get the document or I'll get
11 your claim of privilege, because if this is
12 being claimed, then there might be other things
13 over which privilege is being claimed, and I'd
14 like to know that.
15      So we'll get to the bottom of it and
16 then I'll make a decision as to whether I want
17 to revisit that.
18      MR. PAYNE:  Okay.
19      Is there anything else, I guess?
20      MR. TEICH:  No not at the moment.
21      MR. PAYNE:  Oh, well the deposition is
22 suspended then.
23      MR. TEICH:  Okay.  Thank you.
24      Thank you, Margie.

**Page 24**

1  THE REPORTER:  Thank you.
2  MR. PAYNE:  Thanks, Eileen.
3  THE WITNESS:  Thank you.
4      (whereupon, the deposition was
5       continued sine die.)
6  (Proceedings concluded at 1:07 p.m.)

```
1    STATE OF ILLINOIS      )
2                           )   SS:
3    COUNTY OF C O O K      )
4
5       I, MARGARET A. RITACCO, being first duly
6    sworn, on oath says that she is a court reporter
7    doing business in the City of Chicago; and that
8    she reported in shorthand the proceedings of
9    said deposition, and that the foregoing is a
10   true and correct transcript of her shorthand
11   notes so taken as aforesaid, and contains the
12   proceedings given at said deposition.
13
14   _____
15        MARGARET A. RITACCO, CSR
16        LIC. NO. 084-002796
17
18
19
20
21
22
23
24
                                        25
```



**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF ILLINOIS
 3                 EASTERN DIVISION
 4   KRISHNA NARSIMHAN,        )
 5          Plaintiff,         )
 6     vs.                     )   No. 19-cv-01255
 7   LOWE'S HOME CENTERS,      )
 8   LLC,                      )
 9          Defendant.         )
10
11       The discovery deposition of
12   JODY RANKIN taken in the above-entitled cause,
13   before MARGARET A. RITACCO, CSR, a notary
14   public of Cook County, Illinois, on December 9,
15   2020, at the time of 10:00 a.m., via
16   videoconference, pursuant to subpoena.
17
18
19
20
21
22
23   Reported by:  MARGARET A. RITACCO, CSR
24   License No.:  084-002796
```

**Page 2**

```
 1   APPEARANCES:
 2       ANESI, OZMON, RODIN,
 3       NOVAK & KOHEN, LTD., by
 4       MR. STEVEN BERMAN,
 5       161 North Clark Street, 21st Floor
 6       Chicago, Illinois  60601
 7       (312) 372-3822
 8       sberman@anesilaw.com
 9            Representing the Plaintiff;
10
11       LEWIS, BRISBOIS, BISGAARD & SMITH, by
12       MR. TIMOTHY J. YOUNG,
13       555 West Monroe Street, Suite 300
14       Chicago, Illinois  60661
15       (312) 463-3360
16       Tim.Young@lewisbrisbois.com
17            Representing the Defendant.
18
19
20
21
22
23
24
```

**Page 3**

```
 1                I N D E X
 2   WITNESS                        EXAMINATION
 3   JODY RANKIN
 4     BY MR. BERMAN                       5
 5     BY MR. YOUNG                       38
 6     BY MR. BERMAN, FURTHER             48
 7     BY MR. YOUNG, FURTHER              49
 8
 9              E X H I B I T S
10   NUMBER                        IDENTIFICATION
11   RANKIN Deposition
12     Exhibit No. 1                      24
13     Exhibit No. 2                      28
14     Exhibit No. 3                      34
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1       THE REPORTER:  My name is Margaret Ritacco, CSR.
 2   The parties are present via videoconference to
 3   take the discovery deposition of Jody Rankin in
 4   the matter of Krishna Narsimhan versus Lowe's
 5   Home Center, Case No. 19-cv-1255, in the United
 6   States District Court, Northern District of
 7   Illinois, Eastern Division.  Today's date is
 8   December 9, 2020, and the time is 10:00 a.m.
 9       This deposition is being taken at the
10   instance of the plaintiff.  This deposition is
11   being taken by means of videoconferencing, and
12   the oath will be administered remote by the
13   court reporter pursuant to Governor Pritzker's
14   Executive Order 2020-14.
15       will all parties present please state
16   your name and agreement with this procedure.
17       MR. BERMAN:  Steve Berman for the plaintiff,
18   yes, I agree.
19       MR. YOUNG:  Timothy Young for the defendant,
20   yes, agree.
21       THE WITNESS:  Jody Rankin, yes, agreed.
22                (Witness sworn.)
23       MR. BERMAN:  Okay.  Thank you.  Mr. Rankin,
24   my name is Steve Berman.  I'm going to be asking
```

EXHIBIT
C

1  you some questions today.  Have you ever given a
2  deposition before?
3      THE WITNESS:  Yes, I have.
4      MR. BERMAN:  Okay.  Terrific.
5          So, for the record, this is the
6  deposition of Jody Rankin taken pursuant to
7  notice, and, I believe, subpoena and taken
8  pursuant to the applicable Federal Court Rules.
9          Mr. Rankin, could you just please state
10 and spell your full name for the record.
11     THE WITNESS:  Sure.  Jody Rankin, J-O-D-Y,
12 R-A-N-K-I-N.
13             JODY RANKIN,
14 called as a witness herein, having been first
15 duly sworn, was examined and testified as
16 follows:
17             EXAMINATION
18 BY MR. BERMAN:
19     Q.   Okay.  And what is your date of birth?
20     A.   ████████, 1967.
21     Q.   What's your residence address?
22     A.   ████████████, Plainfield,
23 Illinois, 60586.
24     Q.   And is that a house or an apartment?

                                                    5

1      A.   A house.
2      Q.   Okay.  Do you live there with anyone
3  else?
4      A.   Yes.
5      Q.   Who do you live there with?
6      A.   My wife and my daughter.
7      Q.   And what is your wife's name?
8      A.   Melissa.
9      Q.   And how old is your daughter?
10     A.   She is 17.
11     Q.   17.  And what is her name?
12     A.   ████
13     Q.   Okay.  Can you tell us a little bit
14 about your educational background, where you
15 went to high school, college, et cetera?
16     A.   Sure.  I went to high school at
17 Crete-Monee High School in Crete, Illinois.  And
18 I graduated from Lewis University in Romeoville,
19 Illinois, in 1991.
20     Q.   Are you currently employed, sir?
21     A.   Yes.
22     Q.   Where are you employed?
23     A.   Home Depot.
24     Q.   Okay.  And what is your job title at

                                                    6

1  Home Depot?
2      A.   I'm an assistant store manager.
3      Q.   Okay.  And which location are you
4  assigned to?
5      A.   Orland Park, Illinois.
6      Q.   When did you first start working for
7  the company Home Depot?
8      A.   October of 2016.
9      Q.   Have you always worked for the same
10 Orland Park location?
11     A.   No, I worked at the Shorewood location,
12 Chicago Ridge, Calumet City and now Orland Park.
13     Q.   Okay.  Prior to working for Home Depot,
14 where did -- who did you work for?
15     A.   Lowe's.
16     Q.   Lowe's, okay.  And how long did you
17 work for the company Lowe's?
18     A.   13 years.
19     Q.   Back in June of 2016, were you working
20 for Lowe's?
21     A.   Yes.
22     Q.   And at that point in time, which --
23 which store were you assigned to?
24     A.   Carol Stream, Illinois.

                                                    7

1      Q.   And were you the store manager at that
2  point in June of 20 -- June 25, 2016, at Carol
3  Stream Lowe's.
4      A.   Yes.
5      Q.   How long were you assigned to that
6  Carol Stream store?
7      A.   About five years.
8      Q.   Okay.  And during that five-year period
9  of time, were you always store manager there or
10 had your job title changed at that location at
11 all?
12     A.   No, it was always store -- store
13 manager.
14     Q.   Okay.  Great.  And before I get into
15 your -- specifically to the Carol Stream store,
16 I would assume, you've told me, that you worked
17 at other Lowe's as well, right?
18     A.   Yes.
19     Q.   Which other stores, Lowe's stores, did
20 you work at?
21     A.   Kankakee, Illinois, Schererville,
22 Indiana, St. Charles, Illinois.  I think that's
23 it.
24     Q.   Okay.  And for the 13 years you worked

                                                    8

1  for Lowe's, were you always the store manager or
2  did you kind of start at the bottom and work
3  your way up to the top?
4      A.  No, actually, I started off as an
5  assistant store manager in the St. Charles
6  store, and after about a year and a half, I
7  became the store manager.
8      Q.  Great.  What kind of experience did you
9  have -- work experience did you have before
10  starting at Lowe's 13 years prior to that?
11     A.  I was a store manager for Circuit City.
12     Q.  And which location were you -- did you
13  work -- were you working at for that company?
14     A.  The most recent one was Naperville,
15  Illinois.
16     Q.  Okay.  So let me just ask about the
17  relevant time frame.  That's the one that's
18  going to be the Carol Stream store for -- in the
19  year of 2016.  As store manager for Lowe's at
20  the Carol Stream store, what were your
21  day-to-day duties and responsibilities?
22     A.  Oversee the operations and sales
23  functions of the store.  I mean, goals of
24  achieving profit and sales, directly managing

9

1  three assistant managers and approximately 130
2  associates.
3      Q.  Is associates the term used for
4  employees of the store?
5      A.  Yes.
6      Q.  Okay.  Which would include cashiers at
7  the --
8      A.  Yes.
9      Q.  -- front of the store?  Okay.  As store
10  manager, to what extent, if at all, are you --
11  were you involved in training cashiers?
12     A.  I wasn't really.  I wasn't really
13  involved in training direct cashiers.
14     Q.  Okay.  Was there somebody, to your
15  knowledge, at Lowe's Carol Stream who was
16  involved in the process of training a cashier as
17  to what their responsibilities were?
18     A.  It would have been the front end
19  supervisors and the head cashiers.
20     Q.  Okay.  Do you know a cashier who was
21  working back in -- sorry -- in June of 2016 by
22  the name of Marcella Martinez?
23     A.  It slightly rings a bell.
24     Q.  Okay.  Fair enough.  You said that

10

1  there was, you know, 130 associates.  I get it
2  that you might not remember everyone.
3          So let me just ask a broad question.
4  The reason I brought up Marcella Martinez is she
5  is going to be relevant for some other questions
6  we're going to be talking about today.  To the
7  best of your knowledge, to the best of your
8  memory, can you tell me what individual from
9  Lowe's, if any, was involved in training
10  Marcella Martinez relative to the job position
11  of cashier?
12     A.  I can't remember anyone's names from
13  back then.
14     Q.  Okay.  Do you know if Marcella Martinez
15  was trained by someone from Lowe's to do the job
16  of cashier, if at all?
17     A.  I can -- well, I mean, as part of
18  the -- as part of the employment process,
19  everyone gets trained on their position.  So she
20  would have been trained to perform her job
21  functions.
22     Q.  Okay.  And are you answering that
23  question because you're aware of the general,
24  normal custom and practice over at Lowe's versus

11

1  the specific -- this particular person,
2  Ms. Martinez?
3      A.  Yes.
4      Q.  Okay.  So then let's talk about -- so
5  is it fair to say from your knowledge, from your
6  memory and your personal observations, you can't
7  testify definitively that Ms. Martinez was
8  trained by Lowe's, but you assume she was; is
9  that fair?
10     A.  Correct, yes.
11     Q.  Okay.  So then let's talk about that
12  process.  You said everyone gets trained for
13  their -- for their job position.  For the job of
14  a cashier, can you tell me what the process was
15  back at Lowe's prior to June 25, 2016?
16     A.  There would be some online training
17  that each cashier went through during the
18  orientation process explaining the different
19  functions of being a cashier, and then they
20  would have been matched up with a mentor on the
21  sales floor to hand -- to do hands-on training,
22  transactions, until they were comfortable doing
23  them on their own.
24     Q.  And then you said that the people at

12



McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

9..12

1  Lowe's who were responsible for that type of
2  training would be a front end supervisor or
3  someone who is a head cashier; is that right?
4      A.  Correct.  Yes.
5      Q.  Back in 2016, who was the front end
6  supervisor or supervisors for the Carol Stream
7  Lowe's store?
8      A.  I don't remember her name.
9      Q.  Okay.  It was just one person though?
10     A.  There was one front end supervisor,
11 yes.
12     Q.  And it was a female?
13     A.  Yes.
14     Q.  Okay.  Fair enough.  Let me ask you the
15 same question about head cashiers.  Back in the
16 same time frame in 2016, prior to June 25th, who
17 were the head cashiers over at the Carol Stream
18 Lowe's store?
19     A.  I don't remember.
20     Q.  Okay.  Was it one person or more than
21 one person for the head cashiers?
22     A.  No, there were multiple head cashiers.
23     Q.  How many were there?
24     A.  I don't remember a specific amount.

13

1      Q.  Can you give me an estimate, was it
2  more than five, less than five?
3      A.  Probably four to five.
4      Q.  Okay.  What would be the responsibility
5  of a head cashier during the sales time --
6  forgetting the training for a moment, during the
7  actual sales on the floor, what do head cashiers
8  do?
9      A.  Observe the cashiers to ensure that
10 they're giving good customer service, ringing --
11 ringing all of the merchandise correctly and
12 stepping in when necessary if there's an
13 increase in customer count and making general
14 observations of the cashiers and customers.
15     Q.  All right.  To your knowledge -- well,
16 strike that.
17         What, if any, knowledge do you have as
18 to this online training and orientation process
19 for the job of being a cashier at Lowe's?
20     A.  The training consisted of going through
21 different acronyms and procedures of being a
22 cashier, that would help the cashier understand
23 how to ring up customers, such as looking inside
24 large garbage cans and tubs to make sure there

14

1  is no product inside, to ring up all of the
2  items, even those that seem to look -- look the
3  same, they may not be the same.  So training on
4  different functions of how to be a cashier.
5         Every employee went through safety
6  training.  Every employee went through customer
7  service training.
8      Q.  Okay.  Let me follow up on what you
9  just said a moment ago.  You said every employee
10 went through safety training.  What does that
11 entail relative to cashiers?
12     A.  I don't -- I don't remember the
13 specifics of what the safety training would have
14 consisted of.
15     Q.  So I'll ask you very specifically, and
16 again, if you don't know, it's fair.  I'm just
17 asking, you know, because you were the store
18 manager, I'm trying to find out some information
19 here.
20         We are going to be talking about an
21 incident that occurred to my client in which a
22 rod fell -- at the cashier's station, fell
23 through one of the holes in the -- the cart and
24 down and through the hole and kind of hit my

15

1  client.  My question for you is simply this.  To
2  your knowledge, relative to safety training,
3  were Lowe's cashiers trained to be observant as
4  to how they place long, thin items into a cart
5  to prevent those items from falling through the
6  cart and hitting a person?
7      A.  No.
8      Q.  Okay.  So, to your knowledge -- and
9  again, based upon your knowledge as store
10 manager and your knowledge of the safety
11 training provided to Lowe's employees and
12 cashiers, was there any safety training relating
13 to how to stack or place objects into a
14 customer's cart so as not to injure a customer?
15     A.  No.
16     Q.  Okay.  And let me broaden the question
17 even a little bit more because we were talking
18 about the safety training for that online
19 training and orientation for clerk -- for store
20 clerks or for cashiers.  To your knowledge,
21 working at Lowe's for 13 years, has there ever
22 been any training at Lowe's for any employees at
23 Lowe's as to the concept of how to place or
24 stack items in a customer's cart so as to not

16



1  injure customers?
2      A.   No.
3      Q.   Okay.  All right.  In terms of your
4  responsibilities as a store manager for Lowe's,
5  did you have any responsibility for documenting
6  or investigating any accidents or incidents that
7  occurred at the store?
8      A.   Yes.
9      Q.   Tell me about your responsibility
10 relative to that.
11     A.   When an incident occurred, the manager
12 on duty would take down -- take down some
13 general information and specifics about the type
14 of incident, record the information, and submit
15 it to our insurance company with all of the
16 details of the incident.
17     Q.   And obviously, over at the Lowe's
18 store, back in June of 2016, that you worked at,
19 there were some surveillance cameras that
20 potentially could observe an incident that might
21 occur, right?
22     A.   Yes.
23     Q.   And as part of your responsibility as
24 the store manager, if the -- if an incident is
                                                    17

1  reported to you, it's part of your job to -- I
2  would imagine, correct me if I'm wrong here --
3  would be to kind of save the video of the
4  incident; is that right?
5      A.   That would be the loss prevention
6  manager that would be the one that would do
7  that.
8      Q.   Okay.  Got it.  So let me ask you
9  about -- you mentioned loss prevention manager.
10 Do you remember the name Eileen Parks?
11     A.   Yes.
12     Q.   Back in June of 2016, was Eileen Parks
13 the Lowe's loss prevention manager for that same
14 store we're talking about, the Carol Stream
15 store?
16     A.   Yes.
17     Q.   Okay.  Great.  Tell me a little bit
18 more from your -- from your knowledge what the
19 duties and responsibilities on a day-to-day
20 basis are for the Lowe's loss prevention
21 manager, Eileen Parks, back in June of 2016?
22     A.   She would walk on the sales floor
23 looking for any potential shoplifters.  She
24 would view video to look for any shoplifters.
                                                    18

1  She was also responsible for safety training and
2  loss prevention training of the -- of the
3  cashiers to ensure that everything was run
4  correctly and paid for when they left the store.
5      Q.   Yeah, so I'm glad you touched upon
6  that, because that was my next question.  You
7  mentioned the loss prevention manager may have
8  also been involved in some safety training.  Is
9  that the same safety training you were talking
10 about before when you were talking about the
11 orientation process for cashiers?
12     A.   Yes.
13     Q.   Okay.  So that's not a separate
14 training that we already have -- we haven't
15 already talked about, accurate?
16     A.   No, no, correct.
17     Q.   What I said is correct?
18     A.   Yes.
19     Q.   Okay.  So then I won't go back over all
20 those questions about safety training.
21     A.   Okay.
22     Q.   Okay.  As the store manager for the
23 Carol Stream store back on June 25, 2016, did
24 you have an office at the store?
                                                    19

1      A.   Yes.
2      Q.   Where was your office located relative
3  to the -- to the cashiers in the front of the
4  store?
5      A.   It was -- it was near the front of the
6  store, probably 50 yards away from the cashiers.
7      Q.   When you say 50 yards away, do you --
8  and I know -- I'm trying to orient to myself.
9  Would you say, if it's possible, north, south,
10 east or west of the cashiers or how -- or the
11 front end of the store, how would you
12 characterize it, where your office was located?
13     A.   I mean, it was at -- it was at the
14 front of the store.  I don't recall which --
15 which direction that the store -- the store was
16 oriented on, quite honestly.
17     Q.   Okay.  Fair enough.  I'm assuming --
18 and I understand that the registers were all
19 numbered, they all had numbers associated with
20 them; is that right?
21     A.   Yes.
22     Q.   One of the registers was listed as
23 Register 9, identified as Register 9, is that
24 accurate, over at that Lowe's store?
                                                    20

1    A.   I don't remember the exact register
2  numbers.
3    Q.   Okay.  Well, my question was going to
4  be where is -- where was your office located
5  relative to Register 9, can you give me an
6  answer to that or if you don't know -- if you
7  don't know, that's --
8    A.   I can't recall.  Yeah, I don't recall.
9    Q.   Fair enough.  From -- hypothetically,
10  if you were sitting in your office on June 25,
11  2016, did you -- if you were in the office, did
12  you have a window that overlooked the cash
13  registers?
14    A.   No.
15    Q.   Okay.  So if you were in your office,
16  you wouldn't be within eyeshot of the cash
17  registers; is that accurate?
18    A.   Correct.
19    Q.   Okay.  Did your office have windows
20  that you could look in -- at the doorway there
21  to -- that leads to the outside after the people
22  leave the cash registers?
23    A.   No.
24    Q.   Okay, okay.  What was your custom back

21

1  in June of 2016 as to the amount -- the time you
2  spent in your office at the store versus walking
3  the floor?
4    A.   I would say probably 85 percent was on
5  the sales floor, 15 percent was in the office.
6    Q.   Okay.  Great.  I'm going to ask you a
7  question or some questions now about an incident
8  that occurred, which I don't know if you
9  remember or not.  But there was an incident that
10  occurred on June 25, 2016, to my client,
11  Krishna Narsimhan, that happened over at
12  Register 9 when a downrod slid out of a shopping
13  cart and hit him in the lower leg or foot.  Do
14  you recall being notified of that incident at
15  some point?
16    A.   Yes.
17    Q.   Okay.  How did you first learn of that
18  incident?
19    A.   I don't recall.
20    Q.   Okay.  Well, let me back up even
21  further.  Did you witness that incident?  Did
22  you see it happen?
23    A.   Not to my -- not to my knowledge, no.
24    Q.   Okay.  The incident occurred at

22

1  approximately 9:30 or 9:37 a.m.  Could you tell
2  me, as you sit here today, whether you were in
3  the office, your office, at the time of that
4  incident, or whether you were on the floor?
5    A.   I don't recall.
6    Q.   Okay.  It's my understanding that you
7  did, at some point, speak to my client,
8  Krishna Narsimhan.  Do you recall that?
9    A.   No, I do not.
10    Q.   Okay.  You don't recall having any
11  telephone conversation with my client
12  whatsoever?
13    A.   No.
14    Q.   Let me see if I can show you something
15  that might refresh your memory, it might not,
16  but let's find out.  And what I'll do is,
17  I'll -- I'm going to share my screen so you can
18  take a look at what I'm looking at as well.  And
19  it's an e-mail that, I believe, you sent or a
20  copy of an e-mail.  Can you see my screen now?
21    A.   Yes.
22    Q.   Okay.  It's an e-mail that's, I
23  believe, from you.  It says from Jody Rankin and
24  there's your store -- Lowe's store e-mail

23

1  address, correct?
2    A.   Yes.
3    Q.   Okay.  So we are going to mark this,
4  just to be clear, as your Deposition Exhibit
5  No. 1.
6              (whereupon, RANKIN Deposition
7              Exhibit No. 1 was marked for
8              identification.)
9  BY MR. BERMAN:
10    Q.   It appears like it was sent on June 25,
11  2016, at 11:46 a.m.  Do you see that?
12    A.   Yes.
13    Q.   Okay.  Wonderful.  And the body says --
14  we can both read it together, but it says:  Hi
15  Krishna, this is to confirm that we spoke about
16  an incident today where a ceiling fan downrod
17  slid out of your shopping cart at Register 9 at
18  9:37 a.m. and struck your ankle while you were
19  paying for your purchase.
20        I didn't finish the rest of it, but
21  let's just finish it.  When you -- the rest of
22  it says:  When you called me at 11:35 a.m., you
23  stated that the site of the injury was starting
24  to have a burning sensation.  If there is any

24



1  update or change in your condition, please let
2  me know.  And then you list his phone number.
3          By looking at this e-mail, that we're
4  marking as your Deposition Exhibit No. 1, does
5  that refresh your memory that you spoke to my
6  client?
7      A.   No, actually.
8      Q.   Okay.  So just by looking at this, you
9  can read it just like anyone else, but it
10  doesn't refresh your memory about anything that
11  happened on the telephone between yourself and
12  Krishna Narsimhan; is that accurate?
13      A.   Correct, yes.
14      Q.   Okay.  Fair enough.  So that being
15  said, let's just make sure that we're clear.
16  The e-mail address that's listed here, it says
17  Jody.T.Rankin@store.lowes.com.  Was that, in
18  fact, your e-mail address at the time?
19      A.   Yes.
20      Q.   And the salutation at the bottom says,
21  thanks, and it says Jody Rankin, Store Manager,
22  1821, Lowe's of Carol Stream.  Do you see that?
23      A.   Yes.
24      Q.   What does 1821 mean?

25

1      A.   That's the store number.
2      Q.   Store number, the Lowe's number, each
3  store has a number, right?
4      A.   Yes.
5      Q.   Okay.  So that would -- that would be
6  consistent with the Carol Stream store, I'm
7  guessing, right?
8      A.   Yes.
9      Q.   Okay.  So looking at this salutation,
10  which says Jody Rankin, Store Manager, Lowe's of
11  Carol Stream, that would be consistent with an
12  e-mail that you would have sent, right?
13      A.   Yes.
14      Q.   Okay.  So looking at this document, you
15  don't have any reason to doubt that this is an
16  e-mail that you sent back on June 25, 2016, at
17  11:46 a.m., do you?
18      A.   No.
19      Q.   Okay, okay.  And it's just that it
20  doesn't refresh your memory.  You've probably
21  spoken to so many people on the phone, you just
22  don't recall; is that fair?
23      A.   Yes, correct.
24      Q.   Okay.  I am going to -- whoops -- stop

26

1  sharing that at the moment, and we're going to
2  move on.
3          Now, with regards to this incident that
4  we're talking about of the downrod sliding out
5  of a shopping cart and striking my client, do
6  you recall speaking to any witnesses who
7  actually observed the incident?
8      A.   No.
9      Q.   Do you recall doing any kind of like
10  investigation or taking any action relative to
11  that incident?
12      A.   I do not.
13      Q.   Okay.  Do you recall looking at the
14  video of that incident?
15      A.   No.
16      Q.   Do you recall ever speaking to
17  Eileen Parks about the incident?
18      A.   No.
19      Q.   Okay.  I'll show you what I can --
20  oops, hold on a moment, sorry.
21          I'm just going to wrap up by showing
22  you a couple of extra documents and see if it
23  refreshes your memory.  And if it doesn't,
24  that's fine too, but I have to just find out.

27

1          We could mark, as your Deposition
2  Exhibit No. 2, an incident report document from
3  Lowe's.  Do you see this document?
4      A.   Yes.
5                    (Whereupon, RANKIN Deposition
6                     Exhibit No. 2 was marked for
7                     identification.)
8  BY MR. BERMAN:
9      Q.   This is a document, I assume, that
10  you're familiar with because working at Lowe's
11  you're familiar with these types of doc -- these
12  types of forms, right?
13      A.   Yes.
14      Q.   It -- at the top, it's a little bit cut
15  off, but this is how it was produced to us.  I
16  believe it says incident report, though, for
17  customer incident only, right?
18      A.   Yes.
19      Q.   Is this a type of document that you've
20  been involved in filling out in the past when
21  working at Lowe's?
22      A.   Yes.
23      Q.   At the top, right-hand corner, it says
24  completed by Jody Rankin, Store Manager.  Do you

28



1  see that there?
2      A.   Yes.
3      Q.   So my question for you is, up here at
4  the top in section number one, it's handwritten.
5  Do you recognize that as being your handwriting?
6      A.   It is not.
7      Q.   It is not your handwriting, okay.
8  Wonderful.  Do you know whose it was?
9      A.   No, I don't.
10     Q.   Okay.  There is some other handwriting
11 that appears on this form, like say, for
12 example, in box number two.  To me, it looks
13 different, I'm no expert, but I'm going to ask
14 you if you recognize any of the handwriting to
15 identify who may have written the handwritten
16 portions of box number two on this Exhibit 2?
17     A.   I wrote the phone number and the e-mail
18 address on there.
19     Q.   Okay.  So that -- wonderful.  That
20 actually appears in blue on the form, right?
21     A.   Yes.
22     Q.   Do you see that?  Okay.  Other than
23 what appears in blue, I'm just going to throw it
24 out to you by, you know, looking at the form, is
                                               29

1  there any other portions of the document that
2  you recognize, any of the handwriting
3  whatsoever?
4      A.   No.
5      Q.   Okay.  Other than yourself at Lowe's
6  over at -- around June 25, 2016, was there any
7  other employee who would have the responsibility
8  of filling out a form, such as this one, this
9  Exhibit 2, this incident report?
10     A.   The -- any manager on duty or assistant
11 manager would have the responsibility if it
12 occurred.  And also Eileen Parks would have that
13 same responsibility.
14     Q.   Okay.  And it looks like at the bottom
15 of the form, and, again, I'm just asking.  If
16 you don't know, that's fine, but I have to ask.
17 It says sign off, print first/last name.  It
18 appears, to me, that it's signed by
19 Eileen Parks.  Do you even -- do you recognize
20 her signature there?
21     A.   Yes.
22     Q.   Okay.  So from your knowledge of
23 Eileen Parks, you recognize that she did sign
24 the document?
                                               30

1      A.   Yes.
2      Q.   In your knowledge of the Lowe's store
3  as store manager, she would have the authority
4  to fill this form out and sign off on it, right?
5      A.   Yes.
6      Q.   Got it.  I am looking at the form, and,
7  obviously, it says employee who last inspected,
8  Marcella Martinez' name is listed here.  The
9  customer's name is listed.  The video was pulled
10 by Eileen Parks, which would be consistent with
11 her responsibilities, right?
12     A.   Yes.
13     Q.   Does this form -- looking at this form
14 refresh your memory of this incident at all?
15     A.   No.
16     Q.   Okay.  Does this form refresh your
17 memory of any conversations you may have had
18 relative to this incident at all?
19     A.   No.
20     Q.   Got it.  By looking at this form --
21 again, I don't see it, but maybe I'm not seeing
22 it correctly.  By looking at this form, is there
23 any way that this form can help us identify who
24 the head cashier was at the time of the
                                               31

1  incident?
2      A.   Well, yeah -- well, it could have been
3  Marcella Martinez, but yeah, I can't confirm
4  that -- that she's -- her name is on there as
5  being there in that area, but I can't confirm
6  she is actually the head cashier, no.
7      Q.   Okay.  It's my understanding that she
8  was a cashier but not the head cashier, so I'm
9  just wondering if there's anything else, like
10 there would be any other identifying -- other
11 ways to identify if she is not the head cashier,
12 who would be -- would have been at that time of
13 the incident.  Is there any way you can think
14 of?
15     A.   No.
16     Q.   Okay.  You would agree with me that --
17 well, correct me if I'm wrong, but would you
18 agree with me that if a Lowe's store cashier is
19 placing a metal downrod into a customer's cart,
20 the Lowe's employee should perform that task
21 carefully so that it doesn't fall through the
22 customer's cart and hit a customer's ankle,
23 right?
24     A.   Yes.
                                               32

1    Q.   Okay.  From this document, from the
2  e-mail, from any memory you may have of the
3  incident, is there anything that you know of,
4  from talking to people involved or witnesses,
5  that in any way indicates that Krishna Narsimhan
6  had any responsibility for the downrod falling
7  through the cart and hitting his foot?
8    A.   No.
9    Q.   Okay.  By looking at the type of
10 product, it says 48-inch bronze downrod, there's
11 an item number, and it says vendor name Harbor
12 Breeze.  And we know it's for a ceiling fan.
13 Are you familiar with that type of product?
14   A.   Yes.
15   Q.   It says bronze.  Is it solid bronze or
16 just bronze -- bronze plated, to your knowledge?
17   A.   Bronze plated.
18   Q.   Do you know what the rest of the item
19 is made of?
20   A.   I don't, no.
21   Q.   Okay.  Do you have any knowledge of
22 the -- the weight of that item?
23   A.   Under a pound, probably, a couple --
24 maybe a couple of pounds.

33

1    Q.   So maybe a couple of pounds, you think?
2    A.   Maybe, yeah.  It's not very heavy.
3    Q.   Yeah, okay.  Is it solid metal or is it
4  hollow, to your knowledge?
5    A.   It's hollow.
6    Q.   It's hollow, okay.  Got it.  I'll stop
7  sharing the screen on that.
8         And I was going to ask you about one
9  other thing, but before I even do, did you ever
10 observe or see the handwritten statement that
11 was done by Marcella Martinez?
12   A.   I don't recall seeing it.
13   Q.   Okay.  I'll show you, and, again, I'm
14 just going to ask if this refreshes your memory.
15 If not, that's fine, but I have to ask.
16        What I'm showing you, and we'll mark as
17 your Deposition Exhibit 3, is a handwritten
18 statement signed by Marcella Martinez dated,
19 again, 6/25/16, okay, and it's relating to the
20 incident.
21             (Whereupon, RANKIN Deposition
22              Exhibit No. 3 was marked for
23              identification.)
24

34

1  BY MR. BERMAN:
2    Q.   Is this a document that you've seen
3  ever before right now?
4    A.   Not that I recall.
5    Q.   Okay.  It says at the top, customer
6  came to my register at 9:35 a.m.  I'm just going
7  to kind of highlight where I'm reading from.  I
8  was putting the item back into the cart,
9  downrod, one of them fell through the cart
10 holes.  I watched it fall out and told him, be
11 careful.
12        Again, you can read the rest of this
13 yourself.  I'm not trying to step on your toes,
14 but by looking at this document -- again, the
15 question is, does this refresh your memory of
16 speaking to Marcella or of any knowledge or
17 information about this incident that you may --
18   A.   No.
19   Q.   -- have had?
20   A.   No.
21   Q.   Okay.  From working at Lowe's for 13
22 years, you know, quite some time, have you heard
23 of any other incidents that were similar to this
24 incident with my client in which an object fell

35

1  through one of the holes in the cart and struck
2  a person in the foot or the leg?
3    A.   No.
4    Q.   Have you ever heard of that happening
5  at Home Depot?
6    A.   No.
7    Q.   Okay.  Would you agree with me that if
8  a metal downrod is placed into a cart carefully,
9  that this incident should never have happened?
10   A.   Yes.
11   Q.   Okay.  And again, I -- you know, to be
12 clear, you were disclosed as one of the -- by
13 the defendant as somebody who was present at
14 the -- on the job floor or at least on the site
15 at the time of the accident.  And to be clear,
16 you can't tell me where you were within the
17 store at the time of the incident, and that's
18 accurate?
19   A.   Correct.
20   Q.   Okay.  Other than what was written in
21 the e-mail that was purportedly written by you
22 to Krishna Narsimhan, you don't have any other
23 knowledge of Mr. Narsimhan's injuries from this
24 incident, do you?

36



1    A.   No.
2    Q.   Okay.  You never -- as far as you know,
3  you've never seen Krishna Narsimhan ever again
4  since June 25, 2016?
5    A.   No, I have not.
6    Q.   Or even on that day, you don't recall
7  ever seeing him that day either, correct?
8    A.   Correct.
9    Q.   Okay.  I'm just checking my notes,
10 Mr. Rankin.
11        To your knowledge, after this incident
12 occurred, was there any kind of safety meeting
13 or safety stand-down or conversation over at
14 Lowe's with the associates, or anyone at the
15 store, as to try to prevent such an incident
16 from ever occurring again?
17   A.   Not that I recall.
18   Q.   When you left Lowe's, was this employee
19 Marcella Martinez still employed there?
20   A.   I don't recall.
21   Q.   You don't know, okay.
22        Mr. Rankin, that's all the questions I
23 have at this time.  Thank you for your time.
24 I'm sure Mr. Young has some follow-ups,

37

1  potentially.
2        MR. YOUNG:  I do.  Thanks, Steve.
3        Jody, hi, Tim Young, I represent
4  Lowe's.  How are you doing?
5        THE WITNESS:  Good.  Thank you.
6                  EXAMINATION
7  BY MR. YOUNG:
8    Q.   Good.  I will be a little shorter than
9  Steve.  Steve had the hard job.
10        So outside of the incident report that
11 Steve showed you and the statement that he
12 showed you, handwritten statement of Marcella
13 Martinez, fair to say you don't have any other
14 information, details, facts as to how this
15 incident occurred; is that proper?
16   A.   Correct, yes.
17   Q.   And you have no independent
18 recollection of this incident outside of the
19 materials that you've been shown by -- by Steve
20 today, correct?
21   A.   Correct.
22   Q.   Now, you said you couldn't remember any
23 post-accident communications regarding
24 Marcella's work or the incident, correct?

38

1    A.   Correct.
2    Q.   Was Marcella put on any type of work
3  probation or retraining or anything like that
4  that you can recall?
5    A.   I don't recall.
6    Q.   If she had, would that be in her
7  personnel file or would there be any
8  documentation to that effect?
9    A.   There would be no documentation for a
10 retraining or a training documentation or
11 anything like that, no.  The only documents we
12 would hold on to are performance documentations.
13   Q.   Okay.  Was -- let me look at my notes
14 here.  We can get back to the -- Steve asked you
15 about the product, the specific product.  And I
16 just want to make sure we're clear.  It was
17 hollowed and it was a -- it was bronze plated,
18 correct?
19   A.   Correct.
20   Q.   Okay.  And you are familiar with that
21 product, correct?
22   A.   Correct.
23   Q.   And your testimony, when he asked you
24 about the weight of the product, I recall you

39

1  saying initially it was under one pound or could
2  be a couple of pounds.  Do you remember that?
3    A.   Yes.
4    Q.   Okay.  Is it fair to say that the --
5  the product that has been identified as being
6  involved in this incident was, at most, a couple
7  of pounds and could be under a pound?
8    A.   It probably -- now that I think about
9  it, it's probably more like a couple of pounds,
10 two to three pounds.  It's probably -- it's
11 probably more than one pound.  It's probably --
12 a 48-inch downrod is probably two to
13 three pounds.
14   Q.   Okay.  All right.  And you've handled
15 those before, is it fair to say?
16   A.   Yes.
17   Q.   Now, with respect to -- to checkout
18 carts, do you know the actual checkout cart that
19 Mr. Narsimhan was using on the date of the
20 incident?
21   A.   From the descriptions of what I've
22 heard, I can picture which shopping cart was
23 being used, yes.
24   Q.   What can you picture?

40

1    A.   The red shopping cart that -- that has
2  holes in it, a normal cart at shopping centers.
3    Q.   All right.  It kind of looks like a
4  Jewel shopping cart, maybe bigger?
5    A.   Yeah.  Yes.
6    Q.   Plastic or steel?
7    A.   Plastic.
8    Q.   Back in 2016, you were familiar with
9  those?
10   A.   Yes.
11   Q.   Was that the Lowe's -- that was a cart
12 that Lowe's used in its stores?
13   A.   Yes.
14   Q.   Now, did Lowe's have any other carts
15 available for customer use?
16   A.   Yes.
17   Q.   What -- what were those?
18   A.   There was a flatbed cart that is low to
19 the ground that's used to carry heavy objects,
20 such as lawnmowers, things along those lines.
21 There are other carts that are flat but more
22 about waist high that are used to carry drywall,
23 things along that nature.  And then there is a
24 cart, that has been described as an H-cart or a

41

1  taco cart, that is used to carry items such as
2  2-by-4s, drywall, things along that line.
3    Q.   All right.  Are there -- are those
4  carts, the flatbed carts, the flat and waist
5  height -- high cart and the H-cart, do those
6  carts have holes in them?
7    A.   The flat cart does not.  The H-cart is
8  completely open.  It's just a -- it is --
9  it's -- it's tubular steel that is used to keep
10 upright doors and drywall and you can lay
11 2-by-4s down on the sides of it, so...
12   Q.   All right.  I went off screen because I
13 want to look at something, and I'll be right
14 back.
15       Mr. -- or Jody, I want you to assume
16 that Mr. Narsimhan that day was purchasing a
17 Hunter fan as a replacement fan for his home,
18 and included in that fan was a -- the need for a
19 downrod, okay?
20   A.   Yes.
21   Q.   I realize I'm not -- I'm not giving you
22 any details with respect to the size of that box
23 or whatever, but are you familiar with Hunter
24 fans?

42

1    A.   Yes.
2    Q.   Is that a product that you sell in Home
3  Depot stores?
4    A.   No.
5    Q.   All right.  But you did sell them at
6  Lowe's, correct?
7    A.   Yes.
8    Q.   And you sold them back in June of '16,
9  right?
10   A.   Yes.
11   Q.   And, generally speaking, what size of a
12 box would that fan -- would a Hunter fan be in?
13 And I know I'm not giving you any dimensions or
14 anything like that, but just generally speaking.
15   A.   Probably two -- 2 feet by maybe a foot
16 and half.  Yeah, two -- yeah, so it's about the
17 general size of it, so...
18   Q.   All right.  And would a box that size
19 fit into one of the red shopping carts?
20   A.   Yes.
21   Q.   Would -- would it also fit into any of
22 the other carts that you identified, other than
23 the red shopping cart?
24   A.   It would fit into any of them, yes.

43

1    Q.   Do you know how heavy, generally
2  speaking again, a Hunter fan might be?
3    A.   Maybe 20 pounds.
4    Q.   Okay.  Do customers have the right to
5  select whatever cart they want when they enter
6  into a Lowe's store?
7    A.   They do, yes.
8    Q.   Lowe's employees don't -- strike that.
9        And it's -- Lowe's relies on the
10 customers to determine what carts they need in
11 order to select the product that they want,
12 right?
13   A.   Yes.
14   Q.   Lowe's is a self-serve store; fair to
15 say?
16   A.   Yes.
17   Q.   Consumers can ask -- customers can ask
18 questions of Lowe's personnel if they need be,
19 but, generally speaking, the customer is on
20 their own to select, put in their carts, bring
21 up for customer checkout whatever items they
22 want, correct?
23   A.   Yes, correct.
24   Q.   I want -- I want you to assume that

44

---

1   Ms. Martinez -- when Mr. Narsimhan came up to
2   check out, he pushed his cart into checkout area
3   nine at the Lowe's store in question, and she
4   was -- she scanned the -- the fan and then got
5   the rod out in order to scan that, okay.  Was
6   that -- based upon your experience and work at
7   Lowe's, back in June 2016, was that proper for a
8   customer service cashier to do?  Was that proper
9   activity for them to do as far as checking out a
10  customer?
11      A.   Yes.
12      Q.   Okay.  And once completing the scanning
13  of the -- of the rod, she then put it back in
14  the cart and that's when the accident occurred,
15  okay.  So my question to you is, was it proper
16  for her to put it back into the cart?
17      A.   Yes.
18      Q.   Okay.  Now, obviously, this accident
19  occurred, okay.  But out -- certainly outside of
20  the accident occurring, was her activities in
21  performing her job responsibilities that day
22  proper and consistent with Lowe's policy?
23      A.   Yes.
24      Q.   And subsequent to this incident, she

45

1       Q.   So would a downrod fit flat in that red
2   cart, to your knowledge?
3       A.   No, it would not.
4       Q.   So how -- how is a downrod of that size
5   -- well, have you ever had any experience
6   putting a downrod into a red flat -- into a red
7   cart at Lowe's?
8       A.   Yes.
9       Q.   Okay.  How is that -- how have you done
10  that?
11      A.   Placed -- well, placed one end against
12  the front of the cart and the rod would -- would
13  travel backwards.  And if it would fit into the
14  cart, I mean, it would fit flat.  Otherwise, it
15  would stick above -- above the handle area where
16  the customer would push it with the handle.
17      Q.   Okay.  Why would you put it in that
18  manner?
19      A.   It would be the most secure way of
20  doing that.
21      Q.   With the part sticking out of the cart
22  being closest to who, the driver of the cart
23  or --
24      A.   Yeah.

47

---

1   was not reprimanded for her activities as a
2   cashier; is that correct?
3       A.   Correct.
4       Q.   You don't have any knowledge as to how
5   this -- this downrod was placed in the cart when
6   Ms. Martinez removed it from the cart to scan
7   it; is that correct?
8       A.   Correct.
9       Q.   You just know that it was -- based upon
10  the incident report, it was 48 inches long,
11  correct?
12      A.   Correct.
13      Q.   How -- how is a 48-inch -- well, strike
14  that.
15           How -- how long and how wide are those
16  red basket carts?
17      A.   I'd be guessing.  I mean, I can
18  probably tell you an approximate size.
19      Q.   Please.
20      A.   They would be approximately, probably,
21  three and half feet by two feet.
22      Q.   Okay.  And a 48-inch downrod would be
23  four feet, correct?
24      A.   Correct.

46

1       Q.   -- the front?
2       A.   No, the driver of the cart.
3       Q.   Do you know how this rod was positioned
4   before Ms. Martinez took it out of the cart?
5       A.   No.
6   MR. YOUNG:  I think that's all I have.  Thank
7   you, sir.  Steve may have some.
8   MR. BERMAN:  Just a few follow-up questions
9   based upon some of the things you were just
10  asked.
11           FURTHER EXAMINATION
12  BY MR. BERMAN:
13      Q.   You said that, in the past, you've
14  placed a 48-inch downrod into a red cart and you
15  did it in a careful manner, right?
16      A.   Yes.
17      Q.   Okay.  And obviously, if you had seen a
18  customer over at Lowe's with a red cart and a
19  Hunter fan and a 48-inch downrod in their cart
20  walking around and continuing shopping, you
21  wouldn't have found that to be unusual, would
22  you?
23      A.   Correct, no, I would not.
24      Q.   Okay.  Now, you would consider that --

48

---



Jody Rankin 12/09/2020

1  placing the Hunter fan and the downrod into the
2  red cart generally using ordinary care, while --
3  as a customer walking around the store, right?
4      A.  Yes.
5      Q.  Okay.  You talked about the job tasks
6  of a cashier, and I understand that.  Would it
7  be fair to say, as the store manager for Lowe's,
8  you would expect your cashiers to perform their
9  job tasks in a careful manner, right?
10     A.  Yes.
11     Q.  You would agree that -- on behalf of
12  Lowe's as their store manager, you would agree
13  that it was the responsibility of the cashiers
14  to perform their tasks -- their job tasks
15  reasonably carefully when it comes to putting a
16  downrod back up into a person's cart so as not
17  to injure a person, right?
18     A.  Yes.
19     MR. BERMAN:  Okay.  Sir, I don't have any
20  further questions.  Anything else?
21     MR. YOUNG:  Maybe just one or two.
22              FURTHER EXAMINATION
23  BY MR. YOUNG:
24     Q.   Mr. Rankin, do you have any reason to

49

1  question Ms. Martinez' actions in putting the
2  downrod back into the cart, that she did so in a
3  safe manner?
4      MR. BERMAN:  Objection as to foundation.
5      THE WITNESS:  No.
6  BY MR. YOUNG:
7      Q.  You have no -- you don't have any
8  reason to doubt that she was not being careful
9  when she was putting the downrod back into the
10  cart?
11     A.  No.
12     MR. BERMAN:  Objection to form and
13  foundation, reason to doubt.
14  BY MR. YOUNG:
15     Q.  Did she ever tell you -- do you have an
16  independent recollection of her ever telling you
17  that she was hurrying or she was not being
18  careful at the time?
19     A.  I do not.
20     Q.  Do you have any written documentation
21  that suggests that she was not being careful in
22  performing her job responsibilities that day?
23     A.  No.
24     MR. YOUNG:  That's all I have.

50

1      MR. BERMAN:  Okay.  No further questions.  I
2  believe -- and I'm trying to remember, Tim, you
3  can help me out here, but I believe that you
4  have the right to sign -- review the deposition
5  transcript, if you'd like.  Mr. Rankin, if you
6  want to review the deposition transcript just to
7  proofread it, to see that what was transcribed
8  was accurately written of what we all said
9  today, you have the right to do that.  If you
10  wish to waive that right, you don't have to
11  proofread the transcript.  I think most
12  witnesses waive, but it's really up to you, it's
13  your choice.
14     MR. YOUNG:  It's truly -- Steve is accurate.
15  It's truly a proofreading.  You can't change
16  your testimony.  You know, if you said no to
17  something, you can't say yes to something now,
18  so...
19     THE WITNESS:  Yeah.  I waive that right.
20     MR. BERMAN:  Okay.  Thank you very much for
21  your time, sir, I appreciate it.
22     MR. YOUNG:  Thanks, Jody.  Thanks, Steve.
23     MR. BERMAN:  Yeah.  And, Margie, we'll be
24  ordering the transcript, okay?

51

1      THE REPORTER:  Yes.
2      MR. BERMAN:  If you need, I can get you
3  the -- I can get you the exhibits.  I'll e-mail
4  those over to you.
5      THE REPORTER:  All right.
6      MR. YOUNG:  And, Margie, I'll take an e-tran
7  with an index.
8          (Proceedings concluded at 11:09 a.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

52



```
1   STATE OF ILLINOIS     )
2                         )   SS:
3   COUNTY OF C O O K     )
4           I, MARGARET A. RITACCO, a notary public
5   within and for the County of Cook and State of
6   Illinois, do hereby certify that heretofore,
7   to-wit, December 9, 2020, personally appeared
8   before me, via videoconference, JODY RANKIN, in
9   a cause now pending and undetermined in United
10  States District Court, Northern District of
11  Illinois, Eastern Division, wherein
12  KRISHNA NARSIMHAN, is the plaintiff, and
13  LOWE'S HOME CENTERS, LLC, is the Defendant.
14          I further certify that the said
15  JODY RANKIN was first duly sworn to testify the
16  truth, the whole truth and nothing but the truth
17  in the cause aforesaid; that the testimony then
18  given by said witness was reported
19  stenographically by me in the presence of the
20  said witness, and afterwards reduced to
21  typewriting by Computer-Aided Transcription, and
22  the foregoing is a true and correct transcript
23  of the testimony so given by said witness as
24  aforesaid.
                                              53
```

```
1           I further certify that the signature to
2   the foregoing deposition was waived by counsel
3   for the respective parties.
4           I further certify that the taking of this
5   deposition was pursuant to subpoena and that
6   there were present at the deposition the
7   attorneys hereinbefore mentioned.
8           I further certify that I am not counsel
9   for nor in any way related to the parties to
10  this suit, nor am I in any way interested in the
11  outcome thereof.
12          IN TESTIMONY WHEREOF:  I have hereunto
13  set my hand and affixed my notarial seal this
14  17th of December, 2020.
15
16
17
18
19
20      NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21      LIC. NO. 084-002796
22
23
24
                                              54
```

