16651/SAB/PJB                                           Attorney ID# 6224469

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

KRISHNA NARSIMHAN                    )
                                     )
            Plaintiff,               )       Case No.: 1:19-cv-01255
    vs.                              )
                                     )
LOWE'S HOME CENTERS, LLC,            )
                                     )
            Defendant.               )

### PLAINTIFF'S MOTION IN LIMINE # 15

### TO BAR THE TESTIMONY OF JOSHUA PRAGER, M.D. OPINION THAT DR. FARBMAN WOULD HAVE DIAGNOSED COMPLEX REGIONAL PAIN SYMDROME

NOW COMES Plaintiff, KRISHNA NARSIMHAN, by and through his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., prior to the selection of the jury in this cause, moves this Honorable Court to enter an Order *in Limine* barring and prohibiting Defendant, LOWE'S HOME CENTERS, LLC, or its counsel, agents, employees and/or any witness called by the Defendant, or questions by defense counsel from making statements, offering evidence, testimony , remarks, arguments or from conveying directly or indirectly to the panel by any means, including the fact that this motions have been presented and ruled upon, for the subject matter identified in the title and body of this motion, and in support states as follows:

### INTRODUCTION

Plaintiff seeks an order from the Court barring any testimony of Defendant's medical witness, Joshua Prager, MD, Plaintiff's treating doctor would have recognized and appreciated Complex Regional Pain Syndrome signs and symptoms in 2016

through 2018 if such were present. Defendant's witness uses this belief as a basis for his opinion that Plaintiff is not suffering from CRPS. Plaintiff argues this testimony is irrelevant, unfairly prejudicial and unreliable in that it is speculative and does not meet the *Daubert* standard.

## RELEVANT FACTS

Defendant's Medical Witness, Dr. Joshua Prager, speculates as to what another doctor may have done. Specifically, Dr. Prager states that it was his belief Dr. Farbman was a "competent neurologist" and therefore, if CRPS signs and symptoms were present, he would have appreciated them:

*(Exhibit A. Deposition of Dr. Joshua Farbman, page 120, line through page 121, line 21, taken on 06/21/21)*

Q.   Okay. And in this case, Mr. Narsimhan saw Dr. Farbman and Dr. Saeed, and I think in your opinion, the Budapest criteria was not properly documented, correct?

A.   Nobody ever -- I mean, Dr. Farbman's account from what I gleaned from reading his notes and the way he does things -- it appears he may have retired. I don't know. I got that impression from the chart. But I got the impression he was a competent **neurologist that were CRPS present he would have picked it up**. (emphasis added)

Q.   What gave you that impression?

A.   Because a competent neurologist should be able to do that.

Q.   You think any competent neurologist in the world should be able to do that?

A.   Well, should and does are two different things, but if it's a competent neurologist, "should" fits.

Q.   How do you -- what makes you think that Dr. Farbman is such a competent neurologist that he should be able to perform a Budapest criteria examination and document it properly?

A.   Well, that's a whole different thing. That's different than what you asked me, sir. What you asked me is would he be competent to be able to make a diagnosis, and documenting it is another thing. But based on the way his notes are written -- and believe me, I see the broad spectrum of notes. And based on the quality of his notes, it's my opinion that he's a competent neurologist. Now, I'm not there at

2

his own institution, but he's not at a shabby institution either. That in a good institution somebody who keeps good notes, who doesn't copy his notes from visit to visit verbatim is a competent neurologist.

Q.      Is there any other reason other than doesn't copy his notes from day to day that indicates that Dr. Farbman is a competent neurologist capable of understanding and performing and documenting the Budapest criteria, anything else?

(objection omitted)

A.      And, Ms. Hay, thank you, because I was going to use nonlegal words to say he was twisting what I was saying. And the bottom line is, I'm not saying that he was competent to document the diagnostic criteria for CRPS, but he's competent to be able to make a diagnosis even if he doesn't document it properly or at the minimum -- and this is really important – at the minimum raise in his differential diagnosis, which any competent neurologist would do, would raise the possibility of CRPS if it was present, and he did not do that.

## <u>ARGUMENT</u>

Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Fed.R.Evid. 401* Relevant evidence is excludable under Federal Rule of Evidence 403, on the basis that its probative value is outweighed by the danger that it will cause unfair prejudice, confuse the issues, mislead the jury, cause undue delay, waste time, or be needlessly cumulative. *Fed. R. Evid. 403.* Dr. Prager is offering evidence of another doctor's state of mind that is irrelevant and prejudicial since he has no basis for such an opinion.

The admissibility of expert witness testimony is governed by Rule 702 of the Federal Rules of Evidence and the body of case law that has developed from the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Under Rule 702, expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule

702 also "requires that (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010)(citing Fed. R. Evid. 702). This rule "applies to all expert testimony, not just testimony based on science." *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420 n.10 (7th Cir. 2005).

Rule 702 requires that the district court act as a "'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006). In exercising its gatekeeper function, a district court must examine (among other things): (1) the expert's qualifications; (2) the expert's methodologies; and (3) the relevance of the expert's proposed testimony. *Adams v. Ameritech Servs.*, 231 F.3d 414, 423 (7th Cir. 2000).

Courts are expected to reject any subjective belief or speculation by an expert. *Ammons v. Amamark Unif. Servs., Inc.* 368 F.3d 809, 816 (7th Cir. 2004).

The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy Rule 702 and *Daubert. Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Although required to perform its role as a gatekeeper, a district court's "[d]eterminations on admissibility should not supplant the adversarial process; shaky expert testimony may be admissible, assailable by its opponents through cross examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Courts are expected to reject any subjective belief or speculation by an expert. *Ammons v. Amamark Unif. Servs., Inc.* 368 F.3d 809, 816 (7th Cir. 2004).

The deposition testimony offered by Dr. Prager is nothing more that pure speculation as to another doctor's thoughts and impressions during an examination and how that doctor would respond. Further, the testimony assumes he knows the background, training, experience, and knowledge of not just Dr. Farbman, but every neurologist, and that it is the same and therefore, would have acted in the manner he (Dr. Prager) would have under similar circumstances.

Dr. Prager's testimony is speculation as to the knowledge and familiarity that Dr. Farbman "should have had" as a "competent neurologist". It is not based in any scientific, technical or specialized knowledge. He has no basis to give an opinion as to how Dr. Farbman would observe and appreciate during an examination, nor does he have any idea Dr. Farbman's background, training, experience and knowledge of CRPS such as to identify, diagnose or even raise its possibility. He has no basis to make any statement that Dr. Prager, let alone any other neurologist, would have done at anyone particular time without having the ability to read the mind of such doctor.

The speculative testimony by Dr. Prager has no basis in fact and assumes that Dr. Prager would be able to "read the mind" of Dr. Farbman years after the subject medical treatment Dr. Farbman provided to the Plaintiff. The only witness who would be in a position to give any testimony in this regard would be Dr. Farbman himself.

Dr. Prager admits that he is not familiar with Dr. Farbman either personally or by reputation. (*Ex. A, Pg. 34: 3-5*) This testimony is irrelevant, unfairly prejudicial and unreliable. There is no scientific, technical or specialized knowledge that he is using to arrive at this opinion. Nor is this an opinion that would be necessary or even helpful for a jury in order to decide the issue of this case.

## **CONCLUSION**

WHEREFORE, Plaintiff respectfully requests this Court enter an order barring and prohibiting Defendant, LOWE'S HOME CENTERS, LLC, or its counsel, agents, employees and/or any witness called by the Defendant, or questions by defense counsel from making statements, offering evidence, testimony, remarks, arguments or from conveying directly or indirectly to the panel by any means, including any testimony by Dr. Prager as to:

–  As to Dr. Farbman's background, training, experience and knowledge, including, but not limited to the examination, identification and/or diagnosis of Complex Regional Pain Syndrome;

–  As to what Dr. Farbman should have been able to observe and appreciate as a "competent neurologist" during the examination of the Plaintiff:

–  As to what Dr. Farbman was considering regarding Plaintiff's examination, and based on this, how Dr. Farbman would have recorded signs or symptoms of CRPS;

–  That, Plaintiff was not experiencing any signs or symptoms of CRPS because of what Dr. Prager believes that Dr. Farbman "should have" been able to do.

Respectfully submitted:

/s/Steven A. Berman
_____

Attorneys for Plaintiff

Steven A. Berman sberman@anesilaw.com
Patrick J. Blum pblum@anesilaw.com
**ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.**
161 N. Clark St. / 21st Floor
Chicago, IL   60601
Telephone:  312-372-3822
Fax: 312-372-3833

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION
 3
   KRISHNA NARSIMHAN,        )
 4                           )
                             )
            Plaintiff,       )
 5                           )
      -vs-                   ) Case No. 1:19-cv-01255
 6                           )
   LOWE'S HOME CENTERS, LLC, )
 7                           )
            Defendant.       )
 8                           )
   _____)
 9
10           The deposition of JOSHUA P. PRAGER, M.D.,
11   called for examination pursuant to the Rules of Civil
12   Procedure for the United States District Courts
13   pertaining to the taking of depositions, taken before
14   Judith T. Lepore, Certified Shorthand Reporter for the
15   State of Illinois, License No. 084-004040, via
16   videoconference, at the hour of 3:03 p.m.
17
18
19
20
21
22
23
24
                                                          1
```

**Page 2**

```
 1   ALL APPEARANCES VIA VIDEOCONFERENCE:
 2       ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.
 3       BY:  STEVE A. BERMAN, ESQ.
 4       161 North Clark Street
 5       21st Floor
 6       Chicago, Illinois  60601
 7       312.372.3822
 8       sberman@anesilaw.com
 9           Representing the Plaintiff;
10
11       HEPLER BROOM LLC
12       BY:  LINDA HAY, ESQ.
13       30 North LaSalle Street
14       Suite 2900
15       Chicago, Illinois  60602
16       312.230.9100
17       linda.hay@heplerbroom.com
18           Representing the Defendant.
19
20
21
22
23
24
                                                          2
```

**Page 3**

```
 1                        INDEX
 2   WITNESS                              PAGE
 3   JOSHUA P. PRAGER, M.D.
 4       Examination by Mr. Berman       5, 155
         Examination by Ms. Hay          136
 5
 6
 7                      EXHIBITS
 8   EXHIBIT                         MARKED FOR ID
 9   Dr. Prager Deposition
10   Exhibit A                           8
     Exhibit B                           17
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                                          3
```

**Page 4**

```
 1           THE REPORTER:  On the record.  This
 2   deposition is being taken by means of Zoom video
 3   teleconference.  The attorneys participating in this
 4   deposition acknowledge that I am not physically
 5   present in the deposition, and the oath will be
 6   administered remotely.
 7           The parties and their counsel consent to this
 8   arrangement and waive any objections to this manner of
 9   reporting.
10           Will all counsel present please state your
11   name and indicate your agreement on the record.
12           MR. BERMAN:  Steve Berman.  I agree.
13           MS. HAY:  Linda Hay for the defendant.
14   Agreed.
15               (Witness duly sworn.)
16           MR. BERMAN:  Doctor, will you please state
17   and spell your full name.
18           THE WITNESS:  Joshua P. Prager, M.D., M.S.,
19   D.A.B.P.M.
20           MR. BERMAN:  Is it P-r-a-g-e-r your last
21   name?
22           THE WITNESS:  Correct.
23           MR. BERMAN:  Thank you.
24           For the record this is the deposition of
                                                          4
```

EXHIBIT
A

1  Dr. Joshua Prager taken pursuant to notice and taken
2  pursuant to the applicable Federal Rules of Civil
3  Procedure.
4              JOSHUA P. PRAGER, M.D.,
5  called as a witness herein, having been
6  first duly sworn, was examined and testified
7  as follows:
8                  EXAMINATION
9  BY MR. BERMAN:
10     Q.   Dr. Prager, I'm assuming you've given
11  depositions before, right?
12     A.   I have.  I'm just trying to clean up --
13  because I'm having a little trouble hearing you.  So
14  I'm trying to clean up some background noise here, and
15  I think I already did.
16          Okay, I have.  And if you're going to ask me
17  about the admonitions, I'm happy to dispense with all
18  admonitions or no admonitions, but I prefer not to
19  have some --
20     Q.   I'm happy to dispense with all of them.
21  Except for one thing I would to say everybody -- for
22  the record at least I say is, if there's ever a
23  question I ask you that's not clear in any way or not
24  understandably phrased, don't answer and ask me to

5

1  rephrase it.  If you answer the question, I will
2  assume you understood the question the way it is was
3  phrased, okay?
4     A.   Fair.
5     Q.   Let's go through some brief background
6  information.
7          What is your -- what's your date of birth?
8     A.   ███/49.
9     Q.   What's your residence address?
10    A.   ██████████████, Santa Monica,
11  California.
12    Q.   And what is your profession?
13    A.   I am a licensed medical doctor.
14    Q.   What is the name of your practice or where
15  you practice?
16    A.   Well, it's Joshua Prager, M.D. is one;
17  California Pain Medicine Centers is two; and Center
18  for the Rehabilitation of Pain Syndromes (CRPS) is 3.
19    Q.   Do you have a particular office or address of
20  an office, or do you practice out of multiple
21  locations?
22    A.   I practice out of one office.
23    Q.   What's the address of your office you
24  practice out of?

6

1     A.   2001 Santa Monica Boulevard, Suite 1280 West,
2  Santa Monica, California.
3     Q.   And you're here today because you've been
4  disclosed as a retained medical expert on behalf of
5  the defendant Lowe's in this Narsimhan versus Lowe's
6  litigation, correct?
7     A.   That is correct.
8     Q.   And you performed work as a medicolegal
9  expert on other cases as well, not just this one,
10  correct?
11    A.   Correct.
12    Q.   In this case you reviewed certain records;
13  you performed an examination of Mr. Narsimhan; and
14  you've come to certain opinions and conclusions; is
15  that fair?
16    A.   That is correct.
17    Q.   And as sort of a beginning stage or beginning
18  point, I kind of want to make sure about what you've
19  reviewed, start there.  But before I even do that, I'm
20  going to -- I have literally two exhibits in this
21  deposition, Doctor.  I'll show you what's been marked
22  as Exhibit A, what we're marking as Exhibit A.  And
23  all Exhibit A is is the notice of deposition that has
24  the rider to it, and I'll just show you.

7

1              (whereupon, Exhibit A was marked
2                  for identification.)
3  BY MR. BERMAN:
4     Q.   So can you see my screen, Doctor?
5     A.   I can.
6     Q.   So Exhibit A is just a notice of virtual
7  deposition with a rider it says for June 21st,
8  3 o'clock Central Time, and then the rider is attached
9  to it.  Have you seen this document?
10    A.   I have not.
11    Q.   Have you produced to the defense any
12  documents in conjunction with this rider?
13    A.   No, it doesn't look like I have, but I have
14  some of them at my disposal.
15    Q.   Well, let's just talk about that for a
16  moment.
17         Per the rider for Exhibit No. 1 is your CV.
18  I have a copy of your CV that's marked in Deposition
19  Exhibit No. 2, which is going to be the disclosure of
20  yourself which contains your reports and your CV and
21  your testimony list.  So we can dispense with No. 1.
22         No. 2 asks for any and all publications and
23  presentations authored or prepared by you that form
24  the basis for or support any of your opinions in this

8

1  case. Do you have those with you today?
2      A.   I'm just trying to think if they -- just
3  because I gave a presentation I wouldn't be using it
4  to support, and the same for publications. So
5  although I've published -- well, I don't know that the
6  publications and even -- well, the publications that I
7  have written about CRPS do not relate to this case,
8  per se. And the presentations that I give, I don't
9  actually have access to. So, I mean, the basis for my
10 opinion is literature that I have read, which is not
11 requested here explicitly, and also experience of
12 caring for these kind of patients for better than
13 25 years.
14     Q.   Okay. So at least it looks like the rider
15 item No. 2, there would be no document that would
16 comply with that because there's no particular
17 publications or presentations that you've prepared or
18 authored that relate specifically to this Narsimhan
19 case?
20     A.   Specifically, correct.
21     Q.   Let's move on to three. All deposition
22 transcripts, literature, articles, textbooks, other
23 documents, or things you reviewed in conjunction with
24 this case, or do you have those in front of you,

9

1  those items?
2      A.   Yes.
3      Q.   We can go over what those items are. I'm not
4  going to ask you to list them right now. I'll do that
5  in a moment, so I will dispense with that one.
6          No. 4 asks for notes, preliminary
7  impressions, opinions, reports, letters, or other
8  documents generated by you in conjunction with this
9  case. We know you prepared at least two reports; one
10 relating to the medical examination itself, and one
11 that was attached to the 26(a) disclosure. What I'm
12 wondering is, do you have any notes or handwritten
13 notes or preliminary impressions or thoughts written
14 down other than those reports?
15     A.   I do not.
16     Q.   Do you have any kind of -- going back to
17 No. 3 where it talks about deposition transcripts or
18 documents reviewed by you, do you have medical records
19 that have handwritten notes on them or Post-it notes
20 that include some of your thoughts while you were
21 reviewing those?
22     A.   I reviewed everything electronically, and I
23 didn't create any electronic notes.
24     Q.   So for No. 4 there would be nothing to

10

1  respond to, right?
2      A.   Correct.
3      Q.   No. 5 says, "Copies and citations of any
4  articles, texts, literature, rules, regulations, or
5  other materials upon which you rely to support your
6  opinions in this case." Are there any articles or
7  texts or literature that you rely on to support your
8  opinions in this case?
9      A.   There would be I would say essentially one
10 article that has particular relevance, which is
11 Harden's article on the diagnosis -- the diagnostic
12 criteria for complex regional pain syndrome; otherwise
13 known as the Budapest criteria.
14     Q.   Dr. Harden's article, when was that from?
15     A.   I believe around '03, but I don't know for
16 sure.
17     Q.   Are there any other literature, articles,
18 texts that you think would be supportive of your
19 opinions in this particular case?
20     A.   Well, you know, actually, I haven't explored
21 with anyone or written about anyone about treatment
22 for CRPS, but I could rely on either treatment
23 guidelines or a particular article regarding treatment
24 algorithm for CRPS. I hadn't thought about that until

11

1  you're asking me now. But I certainly know what are
2  in both of those, and either one could suffice to
3  discuss treatment.
4      Q.   Do you have a name or a citation of a
5  particular article in mind that you're referring to
6  right now?
7      A.   There was one originally by Boas, B-o-a-s,
8  and then a modification or just an update on that was
9  written by Stanton-Hicks regarding treatment for CRPS.
10     Q.   What year or years were those articles?
11     A.   They are relatively old. I think Boas was
12 around '98, and Stanton-Hicks was around 2000.
13     Q.   Do you have the citations for any of those
14 articles that you just --
15     A.   I don't. It's just that I've read them, and
16 I know them.
17     Q.   And obviously the reason I'm asking you this
18 question in the deposition today is because I put this
19 in the rider asking for this information that would be
20 relevant for me to potentially question you about
21 during today's deposition. So you haven't produced
22 those to defense counsel who retained you in this
23 case, have you?
24     A.   If we want to take just a brief pause, I

12

1  could probably find them on the internet really
2  quickly and send them to defense counsel who could
3  then send them to you.  I don't think it would take
4  more than five minutes.  Because I haven't done that,
5  I would deduct the time it takes me to do that from
6  time you're paying for and also suspend the time of
7  the deposition if necessary.
8      Q.  I appreciate that, and we can do that when
9  we're off the record.  So I appreciate that.
10      Just to follow up on this one for No. 5 here,
11  are there any articles, texts, or literature say that
12  were written or produced in the last five years that
13  you think are particularly relevant to CRPS or your
14  opinions in this case?
15      A.  No.
16      Q.  Have you written any articles regarding CRPS
17  in the last five years?
18      A.  I think only in relation to the use of
19  ketamine.
20      Q.  The next one is No. 6.  It talks about
21  correspondence between yourself and defense attorneys
22  or anyone on defendant's behalf.  Was there any
23  correspondence between yourself and any attorneys who
24  retained you in this case?

13

1      A.  Nothing besides letters of transmittal.
2      Q.  So there are letters of transmittal?
3      A.  Right.
4      Q.  And you would be able to produce those to me
5  as well?
6      A.  I think so.  I mean, I don't think if -- if
7  you have my file, you will see what has been
8  transmitted to me.  So it will just say we sent you
9  this, and you'll have this.  So there's nothing other
10  than that.
11      Q.  The only reason, Doctor, I'm asking you is I
12  don't have your whole file in front of me.  I did the
13  rider asking for this information, which I wasn't
14  given any information.  I thought you would produce
15  that before today's deposition, but it wasn't.  So I'm
16  asking you about it as we're sitting here.  So that's
17  the reason.
18      MS. HAY:  Steve, I know that the doctor has
19  an electronic file that he has available, and I note
20  on your rider, you know, the request is for him to
21  produce the materials at the time of or prior to the
22  start of this deposition.  So he does have an
23  electronic file in front of him that should contain
24  everything, and we're happy to get a copy of that.

14

1  But he has that there and available.
2      MR. BERMAN:  That's what I'm asking for.  I
3  didn't get it at the time of or the start of the
4  deposition.  So now we're in the middle of the
5  deposition.  We're actually inside the deposition, and
6  I'm asking about those details because I haven't been
7  given that before the deposition.
8      THE WITNESS:  I can have somebody create --
9  while I'm doing it so it doesn't take from our time to
10  upload everything that we have, or at least a list of
11  it, which probably would be more efficient because
12  everything on the list you have.  So if you want me
13  to, I'll ask my assistant to just send that list to
14  you.
15  BY MR. BERMAN:
16      Q.  You know what, in all honesty, I'm not
17  concerned really about you duplicating depositions
18  that you haven't notated or highlighted because I have
19  that stuff or medical records.  But if there's
20  handwritten notes or highlights on there, I'd like to
21  see that.  If there's letters, if there is, for
22  example, correspondence, I'd like to see that.
23  Invoices, I'd like to see those.  Just your entire
24  file relative to this cause of action, I'd like to see

15

1  that.
2      A.  Let's see.  I lost the screen you were
3  sharing.
4      Q.  I'm not sharing it anymore.  I'm not sharing
5  the screen because I think the only answer to this
6  question is, you're going to produce your entire file
7  including all the stuff we just talked about in the
8  rider and send it over to defense counsel.
9      A.  With the exception of my income taxes, which
10  I think is an invasion of privacy, and I will not send
11  them.
12      Q.  I'm not going to push that issue.  That's a
13  standard request that's done for everybody in
14  Illinois, and for right now at the moment, I'm not
15  going to push it because I don't know either side is
16  going to be pushing that issue.
17      A.  Thank you.
18      Q.  You're welcome.  That's all I'm asking for as
19  to Exhibit 1 -- I'm sorry -- Exhibit A, my mistake.
20  For purposes of today's deposition, we'll make
21  Exhibit B the disclosure, so make this really easy.
22  And I'll show you what I'm going to mark.
23
24

16



---

**Page 17**

```
 1              (Whereupon, Exhibit B was marked
 2                   for identification.)
 3  BY MR. BERMAN:
 4       Q.   So if you can see my screen, Exhibit B is the
 5  document in which you were disclosed as an expert
 6  witness in the case, and that's three pages.  And
 7  attached there are Exhibits 1, 2, and 3, so B-1, B-2,
 8  and B-3.  So B-1 is your IME report, B-2 is your CV,
 9  and then B-3 is your expert report in this case, which
10  is three pages.
11       A.   Okay.
12       Q.   And then B-4 is your testimony list.
13       A.   Okay.
14       Q.   I'll just ask you -- I'm not going to go
15  through your CV, Doctor.  I've looked at it.  It's
16  extensive.  I get it.  My only question to you,
17  Doctor, is, the one that was attached here as
18  Exhibit B-2 for your deposition today, is that current
19  and up to date or does that need to be made up to date
20  with additional information?
21       A.   It's not completely up to date, but nothing
22  that would be added if I updated it would be
23  particularly -- would be germane to this case.
24       Q.   Okay, I understand that.
```

---

**Page 18**

```
 1              So let's start with what I want to talk to
 2  you about, which is essentially what information do
 3  you have in this case, what records or information did
 4  you review relative to this case.  And to do that I'm
 5  going to go to again Deposition Exhibit B, which is
 6  the 26(a)(2) disclosure of yourself.  Have you seen
 7  this document before by the way?
 8       A.   No.
 9       Q.   You can see that it's three pages.  The
10  reason I'm using this is because it seems to list
11  everything that you reviewed.  So I'm going to ask you
12  to take a brief look at it and tell me if the list is
13  accurate.  So starting at facts or data considered
14  here --
15       A.   Right.
16       Q.   -- in forming opinions.  I can make it
17  bigger.  And go through at least one and two and tell
18  me if you reviewed all that information.
19       A.   I have.
20       Q.   Okay, good.
21              And then 3, 4, 5, and 6, did you review all
22  that information?
23       A.   Yes.
24       Q.   Is there anything that you reviewed that's
```

---

**Page 19**

```
 1  not listed in this --
 2       A.   I believe I did receive something
 3  subsequently.  Let me just go into my file and tell
 4  you -- what's the last date that you have of when I
 5  received things?  There is 4/23/21.
 6       Q.   I don't think it tells us.  Oh, it does.  It
 7  says 4/23/21.
 8       A.   So on 5/20 I received Wheaton Chiropractic,
 9  two files.  On 5/4/21 I received four -- no, three
10  deposition transcripts, which I thought I saw there.
11  Well, Jodi Rankin is one of them.  For whatever reason
12  I have these in No. 6, but it wasn't listed with a
13  date and time.  New ones that I'm showing you are --
14  there were two records in one PDF.  One of them was
15  from a psychologist, and for whatever reason it's not
16  booting on my computer.  Hold on a second.
17              I'm not sure what the problem is.  I could
18  try to do it off this computer.  I have two computers
19  here.  This one doesn't want to let me go to -- here,
20  let me try one other thing.
21       Q.   Sometimes technology doesn't help.
22       A.   Okay, let's try from scratch here.
23              Okay, now it came up.  So there's a
24  Dr. Patricia Merriman.  I have two notes from her.
```

---

**Page 20**

```
 1  And I have a note from Dr. Patel that was cosigned by
 2  Dr. -- okay, here's Dr. Patel's note.  By
 3  Dr. Buvanendran.  Those are the only things I
 4  received.  And in that same receipt of documents were
 5  a number of pictures taken by the plaintiff.
 6       Q.   So the only thing -- I've gone through this
 7  list in your Deposition Exhibit B of the documents you
 8  reviewed, facts or data considered by Dr. Prager in
 9  forming his opinions, and it's records, it's
10  information, it's also depositions that you reviewed.
11  Correct so far?
12       A.   Yes.
13       Q.   It also includes a video, the video of the --
14  I assume of the incident.
15       A.   Correct.
16       Q.   Did you view that?
17       A.   I did.
18       Q.   Okay, good.
19              It seems to indicate under No. 4 here that
20  you were sent on 4/2/21 your own Rule 35 IME report.
21  Is that accurate?
22       A.   I assume so.  I mean, I already had it.  It's
23  called "Records Received."  Let's see on 5/2 what I
24  have.
```

1    Q.   That's the question that I was wondering.
2   Maybe that was a mistake because it seems like it's
3   your own report.
4    A.   It is my own report, and it was not sent to
5   me on that date.
6    Q.   Fair enough.
7         From looking at this, you reviewed multiple
8   depositions.  I wrote it down.  You reviewed the
9   deposition transcript of Krishna Narsimhan, the
10  plaintiff himself, right?
11   A.   Right.
12   Q.   You reviewed the deposition transcript of
13  Dr. Saeed; is that right?
14   A.   Correct.
15   Q.   You reviewed the deposition transcript of
16  Dr. Joshi?
17   A.   Correct.
18   Q.   You reviewed the deposition transcript of
19  plaintiff's wife, Kerri; is that right?
20   A.   That one I discussed -- no, I don't believe
21  I've reviewed that one.
22   Q.   Fair enough.  That's why I'm going over them.
23  You never know.
24        Did you review the --

                                                      21

1   were which I had concern about, if I'm remembering it
2   right.
3    Q.   Well, Jodi Rankin, she was just a store
4   employee.  She was an employee of Lowe's.  She wasn't
5   a medical provider.
6    A.   She is not the one who took a phone call?
7    Q.   She was.
8    A.   Right, okay.  Apparently, Mr. Narsimhan
9   explained -- at least from what I remember of the
10  deposition, he was complaining about burning pain in
11  his leg to her.
12   Q.   Is that relevant to you, to your opinions?
13   A.   Yes.
14   Q.   How?
15   A.   If we have an allegation of CRPS based on the
16  injury that occurred, we wouldn't expect that by a
17  piece of metal hitting the lower part -- or
18  essentially around the ankle from the front would
19  cause burning in the back.  If that were to become a
20  CRPS symptom, it would take weeks to get to that
21  point, and it doesn't make anatomical sense, if I'm
22  remembering that that was the source of that
23  complaint.
24   Q.   So just I'm understanding you for a moment

                                                      23

1    A.   Hold on.  I just want to make sure.  I know I
2   didn't review that in preparation for today.  Let me
3   just make sure I never reviewed it.
4    Q.   It's under No. 6 here deposition transcripts.
5   It says, Kerri Krishna.
6    A.   I don't have files that are organized that
7   way.
8         It doesn't look like I have that one.
9    Q.   And it is strange the way it's listed on this
10  Exhibit B.  It's listed in No. 6, Kerri Krishna, not
11  Kerri Narsimhan.  But the bottom line is you don't
12  believe you ever reviewed the deposition transcript of
13  plaintiff's wife, Kerri?
14   A.   Hold on one second.  One more time.
15        I don't believe so, no.  I don't recall.
16   Q.   And next one's listed as Jodi Rankin.  Did
17  you review the deposition transcript of Jodi Rankin?
18   A.   Yes.
19   Q.   Was there anything in that deposition of
20  Jodi Rankin that you felt was relevant to your medical
21  opinions in this case?
22   A.   I reviewed that a while back, and I'm just
23  trying to conjure up in my memory.  But I think she
24  did comment at that time about what his complaints

                                                      22

1   before we move on, the complaint -- if the complaint
2   to Jodi Rankin on the day of the occurrence, you know,
3   shortly after the occurrence was that he was having
4   burning pain in the area where he was struck by the
5   bar, would that affect your opinions?
6    A.   Well, I don't remember it being that way.
7   But hypothetically, if he had burning pain exactly
8   where it hit, that might not be extraordinary, but if
9   it were proximal to it, which there certainly are --
10  if that's the place I read it, somewhere else in short
11  temporal proximity to the event, you wouldn't get
12  burning pain proximal to a strike on the ankle if it
13  were CRPS, or to tell you the truth in almost any
14  other situation, right after being hit on the ankle
15  because there's no way to explain why that would
16  occur.
17   Q.   I'm just wondering is it the location of the
18  symptom or the type of symptom itself that's of issue?
19   A.   Well, I think, Mr. Berman, what you're asking
20  me is if it was -- he had burning precisely where the
21  thing hit him, it wouldn't mean that much to me from a
22  negative standpoint.  If it's anywhere else -- now,
23  for distal it's something else, and distal would mean
24  going toward the toes.  But that's not where he's

                                                      24

1  complaining about.  He's complaining about it going up
2  his leg, and up his leg is something that takes -- I
3  mean, to put it in lay terms, time to percolate.
4      Q.   Right, okay.
5      A.   It wouldn't happen in short temporal
6  proximity.
7      Q.   All right.  So let's go on.  I was asking
8  about depositions.  I'm sorry.  I took a little detour
9  there.  Sorry about that.
10          So you did read Jodi Rankin's deposition.
11 Did you read the deposition of Physical Therapist
12 Lisa Schwartz?
13     A.   Yes.
14     Q.   Did you review the deposition transcript of
15 Dr. Motiwala?
16     A.   I think you're pronouncing it wrong, but I
17 did read that deposition.
18     Q.   It could be pronounced different, but that's
19 the way it's spelled so I'm going to go with it.
20     A.   No, you put an N in there that I don't think
21 is there.
22     Q.   Matiwala?
23     A.   It's Matiwala, not Mantiwala.
24     Q.   Matiwala.

25

1  an error.
2      Q.   Okay.  The bottom line is, you did review it?
3      A.   Correct.
4      Q.   Okay, wonderful.
5          MS. HAY:  Just to be clear, Steve, I think
6  you might have mentioned it, and I'm not sure if I see
7  it.  I was trying to pull up the document, but I'm
8  having a little bit of difficulty.  And it's hard to
9  read the entire document you have here.  But he did
10 review Dr. Joshi's testimony, too.
11         MR. BERMAN:  I think that was on there.
12         THE WITNESS:  I think it was on there, too.
13         MS. HAY:  I see it there.  There it is under
14 No. 5.
15 BY MR. BERMAN:
16     Q.   At least I didn't miss that one.
17          Okay.  Are there any other records or
18 deposition transcripts that are not included on that
19 disclosure that you think that you reviewed that we
20 can update or record today?
21     A.   Not that I know of.
22     Q.   Terrific.
23          The records you reviewed, the medical records
24 you reviewed, are those the type of records that a

27

1      A.   Yeah.
2      Q.   That's what I thought I said, but I'm sorry
3  if I messed it up.
4      A.   No apology is necessary to me.
5      Q.   I'll call her later.
6          All right.  So the question I have is, did
7  you review the deposition of Physical Therapist
8  Brian Fischer?
9      A.   I don't recall doing that.
10     Q.   Did you review the deposition transcript of
11 Dr. Buvanendran?
12     A.   I did.
13     Q.   You did, okay.  That's not listed in this
14 disclosure.
15     A.   Are you sure?
16     Q.   Pretty sure.
17     A.   There it is.  The records -- oh, that's
18 Narsimhan right under there.  Well, I apologize.  I
19 did review that.
20     Q.   That's why I check.
21     A.   Good.
22     Q.   I missed it, too, Doctor.  I'm just checking.
23     A.   It would have been in the same batch where I
24 got his CV, so if it's not listed there somebody made

26

1  doctor such as yourself could reasonably rely on in
2  formulating opinions like this?
3      A.   That's an excellent question, and it's not a
4  simple answer because those kind of records are what I
5  would attempt to rely upon pending the way things are
6  documented -- actually, probably just the best way to
7  put it is, depending on how things are documented, but
8  also depending on how things were particularly done in
9  order to allow me to fully depend upon them.
10     Q.   Let's see if I understand your answer, and I
11 think I do.
12     A.   You may want to mute.
13     Q.   What's that?
14     A.   Somebody may want to mute because there's a
15 siren going.
16     Q.   That's actually coming out of my window.
17     A.   You can't mute, okay.
18     Q.   No.
19     A.   Don't worry about it.  If it was one of the
20 other -- well, Judy's on mute herself.
21     Q.   I'm going to suppress background noise.
22     A.   It's gone now.
23     Q.   Is that better?
24     A.   It's much better.

28



1    Q.   Good.  If there's a problem with the audio,
2  just let me know.  I'll try to fix it.
3         So, again, I'm just going to follow up and
4  come back to your last answer.  The records you
5  reviewed in this case you said you would normally --
6  are the type of records you would rely on except it
7  kind of depends on how the examination findings are
8  documented in the records, right?
9    A.   Correct.
10   Q.   So in other words, when you're reviewing a
11 case such as this -- and you've done this before, I
12 know -- you've come across I assume some doctors that
13 don't document their findings as well as others; is
14 that fair?
15   A.   That's definitely fair.
16   Q.   In this particular case, you reviewed the
17 records, and did you have some concerns about how
18 Dr. Farbman's records were documented?
19   A.   Not particularly.
20   Q.   In this case did you have any concern about
21 how any of the examinations -- strike that -- how any
22 of the doctors documented their findings or
23 examinations relative to my client Mr. Narsimhan?
24   A.   Yeah, I'm just trying to remember.  The first

29

1  doctor in I believe 2018, the first doctor to suggest
2  a diagnosis of complex regional pain syndrome was
3  Saeed, and I'm trying to remember if she adequately
4  documented the criteria in order to entertain such a
5  diagnosis.
6         Are you still there?
7    Q.   I thought you were looking up something to
8  answer the question regarding Dr. Saeed's initial
9  diagnosis of CRPS.  I was just waiting for you
10 honestly.
11   A.   Sorry.  I was waiting for you.  I was just
12 saying that based on my recollection I don't remember
13 seeing in her notes sufficient documentation to
14 establish a diagnosis of CRPS.
15   Q.   You mentioned you received records from a
16 Wheaton Chiropractic Clinic, I believe?
17   A.   That's correct.
18   Q.   Was there any records of information
19 contained in those records that was of relevance to
20 your opinions in this case?
21   A.   Yes.
22   Q.   What?
23   A.   That throughout that treatment that was --
24 I'm just tying to remember how long.  It was, I

30

1  remember, about three months of treatment.  If I
2  remember right, in 2016 from September to December, he
3  was being treated for pain.  And if I remember right,
4  there were about 20 of those visits during that
5  three-month interval, and not once was there a
6  complaint of leg pain.
7    Q.   What was he being treated for during that
8  time frame?
9    A.   His arms and hands.
10   Q.   At Wheaton Chiropractic?
11   A.   If I remember right, yeah.  Why don't we go
12 there and see.
13        Sorry it's taking so long.  Maybe if I did a
14 search under Wheaton, it would come up quicker.  There
15 it is, okay.  So here we have -- that one is not
16 useful.
17        Well, here, just if we look at -- I'm looking
18 for the date of this form that Mr. Narsimhan filled
19 out himself on it looks like 5/20/16.  It's a little
20 hard to read how he filled out the form.  But
21 nonetheless, at some point in 2016 -- oh, it's 9.  He
22 just makes a funny 9.  He fills out a form on 9/20/16
23 where it says, "pain and numbness or cramps," and he
24 puts in his hands but he doesn't put in his feet or

31

1  his legs either.  It's only his hands.
2    Q.   Okay.
3    A.   And he indicates that he has moderate
4  frequency and moderate intensity.  And then the
5  examination report -- okay.  Well, here's a patient
6  progress report dated 10/11 where the only complaints
7  that he fills out or that are filled out relate to the
8  arms and shoulders, and there's nothing on the legs.
9  And what I can tell you is, I have 68 pages of notes.
10 During the course of reviewing those 68 pages of
11 notes -- and here is a form.  I believe this was
12 filled out by the patient himself.  He's only
13 complaining of pain in the wrist, hands, and neck of
14 recurring -- yeah.  And here is a note, a typed note,
15 thank God, left wrist, left forearm, so his complaints
16 are completely limited to his upper extremities.  And
17 what I can tell you -- we can go through all these
18 notes, but I think it's wasting your time and money to
19 do it because my best recollection of all these
20 notes -- I mean, here, we'll go to one of the last
21 notes, neck, arms, wrist, diagnoses, cervical,
22 cervical, forearm, okay, and that's December.  So now
23 we've just spent three months, and we're only up to
24 page 22.  And what I can tell you is, I've been

32

1  through all these notes and not that recently, but it
2  was important to me when I went through them that
3  there was nothing related to his lower extremities,
4  although he's very vocal about the pain and numbness
5  in his upper extremities.
6      Q.  Okay, I understand what you're saying.  From
7  your experience, Doctor, do chiropractors typically
8  treat neuropathic pain?
9      A.  That's what apparently they were treating him
10  for here in the upper extremities, pain.  I mean, I
11  think your question is a good question.  I'm not sure
12  why he's referred there in the first place.
13      Q.  I'm asking you, in your experience, in your
14  opinion, do chiropractors treat neuropathic pain?
15      A.  They can.  It's not what they usually treat.
16      Q.  Do chiropractors treat CRPS?
17      A.  Unfortunately I've seen the case where they
18  have, but I don't think it's a good idea.
19      Q.  I hear you.
20          All right, let's move on.  I'm going to ask
21  you about some of the doctors that names you're
22  familiar with in this case, and the question is going
23  to be for each one:  Are you familiar with one of
24  those doctors or medical professionals personally or

33

1  by representation, okay?
2      A.  Okay.
3      Q.  Let's start with Dr. Farbman, are you
4  familiar with him personally or by reputation?
5      A.  No.
6      Q.  What about Dr. Saeed?
7      A.  No.
8      Q.  What about Dr. Motiwala?
9      A.  No.
10      Q.  What about Physical Therapist Brian Fischer?
11      A.  No.
12      Q.  A Physical Therapist Lisa Schwartz?
13      A.  No.
14      Q.  What about Dr. Buvanendran?
15      A.  It's interesting because I think his name may
16  have sounded slightly familiar to me.  And I looked
17  him up, and so I have some idea who he is.  But very
18  interestingly we were both on a conference call last
19  week.  But he did not say so much as one word, and he
20  didn't put his camera on.  I believe that was him.  I
21  can't say that for sure, but I believe it was.  But
22  his camera wasn't on, and he didn't say a word.  And
23  that's the only contact I remember having with him.
24      Q.  To be fair, with regard to Dr. Buvanendran,

34

1  you don't know him personally?
2      A.  Correct.
3      Q.  And what, if anything, can you tell me you
4  know about Dr. Buvanendran from a professional
5  reputation standpoint?
6      A.  I think he has an interest in CRPS.
7      Q.  Other than that, anything else?
8      A.  He's on the faculty of Northwestern, if I
9  remember right.  He's a medical faculty member.
10      Q.  Anything else?
11      A.  I believe he's esteemed in his field.
12      Q.  Okay, fair enough.
13          I know that you, Doctor, are one of -- I
14  don't know if I'm phrasing this right, but one of the
15  few doctors who performs a dorsal root ganglion
16  stimulation procedure; is that accurate?
17      A.  Yes.  At the time whatever was written said
18  that that was the case.  More people are doing it now.
19      Q.  Dr. Buvanendran is one of those doctors who
20  performs that type of dorsal root ganglion stimulation
21  procedure, correct?
22      A.  I believe so.
23      Q.  I'm going to ask you about -- before we get
24  into the meat of your testimony, I'm going to ask you

35

1  a little about your overall review of -- your time
2  reviewing this particular case.  Can you tell me how
3  much time it took you to review all these records we
4  were just listing earlier?
5      A.  Well, I have to say to you, Mr. Berman, that
6  unfortunately it's never been tabulated.  And I do
7  most of that work from home, and I didn't bring those
8  individuals tabulations.  And what I can promise is,
9  well before trial you will have a summation of all
10  that, but it hasn't been done.  The only thing I've
11  invoiced the defense for is my hotel and air.
12      Q.  Okay, all right.  So let me switch gears and
13  do it this way.  Maybe this will be a shorthand
14  version for you.  I'm going back to Exhibit B.  In
15  Roman numeral six, "a statement of the compensation to
16  be paid," and it lists your compensation schedule.  Is
17  this accurately listed?
18      A.  Well, the independent medical examination is
19  not because it was on out-of-town one, and that's my
20  fee for in-office medical exam.  So the other one
21  is a much higher fee.
22      Q.  What was the fee you charged defense counsel
23  for your independent medical examination of
24  Mr. Narsimhan?

36



1    A.   Well, if you're going to be legalistic, I
2    haven't charged them anything else.
3        Q.   What fee will you be charging?
4        A.   Yeah, it was two days of my time at $8,000 a
5    day.
6        Q.   So $16,000 total for the IME?
7        A.   Correct.  Well, the IME and travel to be
8    fair.
9        Q.   All inclusive?
10       A.   Correct.
11       Q.   Does the rate for performing an IME include
12   the report itself as well, or is that extra?
13       A.   No, that's all inclusive.
14       Q.   Your deposition time, is this accurate,
15   $1,500 per hour?
16       A.   Correct.
17       Q.   Does that start when the deposition starts?
18       A.   Yes.
19       Q.   So in terms of say, for example, time
20   preparing, time reviewing records and getting ready
21   for today's deposition, is that charged at the 960 per
22   hour rate?
23       A.   Correct.
24       Q.   Then I think you said you haven't prepared

37

1    and invoice, but you will.  And that will include
2    specific listings of the amount of time you spent
3    reviewing records, consulting with the attorney,
4    preparing for the deposition, all at that $960 per
5    hour rate, right?
6        A.   In excruciating detail.
7        Q.   And I know you said that you
8    performed -- strike that.
9            I know you've been retained as an expert
10   witness not just in Illinois or California but
11   throughout the country; is that right?
12       A.   That's correct.
13       Q.   And is that because you're a recognized
14   expert in the field of CRPS?
15       A.   Well, it's not only CRPS.  I have expertise
16   in spinal cord stimulation, precision spinal
17   diagnostics and therapeutics, intrathecal pumps, yeah.
18   But, you know, Mr. Berman, you're predominantly right,
19   probably 80 percent of that retention is related to
20   CRPS, but my expertise in spinal cord stimulation is
21   comparable to my expertise in CRPS.
22       Q.   I understand.  And also you're a practicing
23   medical doctor in the field of pain management at this
24   time as well, right?

38

1        A.   That's correct.
2        Q.   So you see patients, right?
3        A.   80 percent of the time.
4        Q.   Okay.  In terms of -- so just take out the
5    times when you're a treating medical doctor, and the
6    times -- I'm just going talk to you about the times
7    you're retained as a medical expert witness in
8    litigation.  For the times you're retained as a
9    medical expert in litigation, what percentage of the
10   times are you retained by a representative of the
11   injured party versus the times you're retained by
12   someone who the injured party has a claim against?
13       A.   Okay.  I'm going to give you a complicated
14   answer that I'm sure you'll be happy.  I am retained
15   initially by the plaintiff probably about two-thirds
16   of the time.  When it comes time for a designation, I
17   am retained -- or the retention is maintained about
18   60 percent by the defense and 40 percent by the
19   plaintiff.  If you want an explanation, I can give you
20   why that is.
21       Q.   I'm not sure even what that means.  Can you
22   explain that?
23       A.   Yeah.
24       Q.   The designation.

39

1        A.   By the end, let's say trial, it would be
2    60 percent defense.  But there's an attrition, for
3    lack of a better word, of many of the plaintiffs'
4    cases before we get to that point.
5        Q.   Got it.  I didn't realize.
6            In terms of your work as a medicolegal
7    expert, how much money do you earn or generate per
8    year say over the last four or five years?
9        A.   I'm prepared to discuss that in percentage,
10   and in percentage up until last year, I was estimating
11   somewhere around 16 percent because 20 percent of my
12   time is not caring for patients.  And of that
13   20 percent, about 80 percent of it is medicolegal.  So
14   up until last year it was about 16 percent.  But
15   during COVID my medical practice decreased, so the
16   percentage of medicolegal percentage-wise went up over
17   20 percent.  Do you follow that?
18       Q.   Not really.  When you answer in percentages,
19   it doesn't really answer my question because it's too
20   vague, so I'm just going to ask you to answer the
21   question that I asked.  If you want me to repeat it,
22   we can repeat it.
23       A.   Well, I think I understand the question.  And
24   we don't break it out here the way revenue comes in,

40



1  so I don't really have a full answer.  My estimate is
2  about up until last year under 20 percent, and with
3  COVID over 20 percent.
4      Q.  All right.  If I'm understanding what your
5  answer is, you're saying that your revenue that
6  relates to medicolegal work specifically, not treating
7  patients, is 20 percent of your income; is that what
8  you're saying?
9      A.  I'm saying that, yeah, up until last year it
10  was.  This year, now that my practice is busy again,
11  the percent of medicolegal is going down again.  But
12  last year -- I think you understood what I said --
13  that because my practice income went down and the
14  medicolegal practice stayed about the same, I had a
15  higher percentage of medicolegal than I had in any
16  other prior year because I just -- my medical practice
17  income was substantially reduced.
18      Q.  So then if we're going back to 2019 and
19  you're saying that 20 percent of your practice's
20  income relates to your medicolegal work only, what's
21  the total practice income so I can figure out the
22  20 percent of it?
23      A.  Well, that we would have to have a discovery
24  referee tell you that that's necessary for me to tell.

41

1      Q.  So you won't -- you could answer that
2  question, but you won't?
3          MS. HAY:  I think the doctor -- just a
4  second, Doctor.
5          I think the doctor already testified that he
6  couldn't estimate those specific numbers because his
7  practice isn't set out that way, so I think he's
8  already answered that.
9          MR. BERMAN:  I don't think he answered that
10  specific question.  I think he changed the question.
11  Can we have the doctor answer the question
12  specifically?
13          MS. HAY:  Sure.  I think he already asked and
14  answered it.  But, Doctor, you can answer it again.
15          THE WITNESS:  What I said is that I don't
16  know that that is information that -- it appears to me
17  that that's an invasion of privacy, and that -- I've
18  been asked the same question probably 20 times, and in
19  all 20 times including federal court when I've
20  declined to answer that question, the judge has
21  vindicated my decision to do that.
22  BY MR. BERMAN:
23      Q.  All I'm asking you right now is you
24  understand that the question is, in 2019 what was your

42

1  total practice's revenue so that we could figure out
2  the 20 percent of that as just your federal, you can
3  answer that, but you wouldn't because you think it's
4  an invasion of privacy; is that fair?
5      A.  Correct.
6          MS. HAY:  Note my objection based upon the
7  doctor's answer.
8  BY MR. BERMAN:
9      Q.  Would that be true for 2018 as well,
10  Dr. Prager?
11      A.  It would be true for all years.
12      Q.  For this particular case, can you tell me the
13  name of the law firm that initially retained you?
14      A.  Yes, it was Lewis Brisbois.
15      Q.  My question for you, Doctor, have you ever
16  been retained by any attorneys from the firm Lewis
17  Brisbois other than in this case?
18      A.  Not in Chicago.
19      Q.  What about in any other city?
20      A.  I've probably done two or three cases for
21  Lewis Brisbois' Los Angeles office.
22      Q.  And have those other two cases that you've
23  been retained by defense counsel Lewis Brisbois, have
24  those been retentions on behalf of a defendant in a

43

1  case?
2      A.  I cannot swear to that, but I believe that
3  that would be true.
4      Q.  What about defense counsel that's currently
5  handling the defense of this case Hepler Broom, have
6  you ever worked with that law firm before?
7      A.  I don't believe so.  We could ask Ms. Hay
8  if I -- and then I would testify to whatever she tells
9  me, but I don't know of any.  I guess only the --
10      Q.  You shouldn't say that, by the way.
11      A.  I think it's only the second case I've done
12  in Chicago.
13      Q.  All right.  Turning your attention to
14  Mr. Narsimhan and his case specifically.
15          You understand from your review of the
16  records that Mr. Narsimhan was involved in an incident
17  on June 25th, 2016, in which he was at Lowe's and a
18  metal bar fell onto his right lower extremity just
19  above the ankle, right?
20      A.  Correct.
21      Q.  And you saw the video of that; you know that
22  that incident occurred, correct?
23      A.  Correct.
24      Q.  As far as you reviewed the records of this

44



1  entire case and your entire knowledge of Mr. Narsimhan
2  and his life, is it fair to say that you have no
3  knowledge of Mr. Narsimhan complaining of any prior
4  right lower extremity pain or symptoms prior to the
5  incident of June 25th, 2016?
6      A.   That's correct.
7      Q.   You agree that the impact between the metal
8  bar and Mr. Narsimhan's right lower extremity was a
9  traumatic impact?
10     A.   That's an interesting question, because to a
11 layperson the word "traumatic" has big meaning.  To a
12 physician, it just means something out of the ordinary
13 essentially.  And so we have minor trauma, moderate
14 trauma, severe trauma, and just so that I'm clear on
15 what I'm expressing, I would consider this a minor
16 trauma.
17     Q.   What was the weight of the metal bar that
18 landed on Mr. Narsimhan?
19     A.   I don't remember.
20     Q.   What was the speed at which it contacted
21 Mr. Narsimhan's right lower extremity?
22     A.   I haven't read a biomedical or bioengineering
23 analysis to know the answer to that.
24     Q.   If you don't know the weight of the bar or

45

1  the speed at which it contacted Mr. Narsimhan's right
2  lower extremity, why do you call it a minor or minimal
3  impact?
4      A.   Because I saw the video.
5      Q.   Any other reason?
6      A.   That's a good reason.
7      Q.   Any other reason?
8      A.   No.
9      Q.   You saw in the medical records that since the
10 incident -- sorry.  You saw in the medical records and
11 deposition testimony that since the incident of the
12 impact between the metal bar and Mr. Narsimhan's right
13 lower extremity, he has been consistently complaining
14 of pain and symptoms of discomfort in that right lower
15 extremity, correct?
16     A.   No.
17     Q.   That is not correct?
18     A.   It's correct that it's not correct.
19     Q.   When was Mr. Narsimhan's pain or discomfort
20 healed such that he wasn't complaining of any pain or
21 discomfort in that right lower extremity?
22     A.   During the interval at least from 9/16 to
23 12/16, but I actually don't see complaints really
24 until -- well, there were some complaints, but I

46

1  didn't see anybody entertaining a diagnosis of CRPS
2  for over two years following that incident despite the
3  fact that there were intermittent complaints of pain.
4  But then there were sustained periods, or at least one
5  sustained period where there wasn't, but I believe
6  there were other periods where there were no
7  complaints.
8      Q.   Did you review Dr. Farbman's records,
9  correct?
10     A.   I have.
11     Q.   And he treated Mr. Narsimhan in July 2016,
12 August 2016, October 2016, February 2016, March 2017,
13 May 2017, April -- I'm sorry -- August 2017, February
14 2018, April 2018, May 2018, and June 2018.  You saw
15 those records, correct?
16     A.   I did.
17     Q.   And throughout those records were locations
18 of complaints of pain in the right lower extremity.
19 Do you acknowledge that?
20     A.   Well, throughout might be a stretch, but
21 there were intermittent at least complaints of pain in
22 the right lower extremity.
23     Q.   In what record did you ever see in
24 Mr. Narsimhan's case that says his right lower

47

1  extremity pain had gone away?
2      A.   Well, I don't think there was one where it
3  said it went away, but I think there were ones where
4  there were not descriptors of it.  And I would have to
5  look that up to find out specifically when that was.
6      Q.   When you said -- I think what you said to me
7  was that in the chiropractic records there was no
8  description of right lower extremity pain, correct?
9      A.   I did say that, yes.
10     Q.   Is it your opinion then that during the time
11 that Mr. Narsimhan was seeing a chiropractor for his
12 neck and upper extremities that he therefore not
13 experiencing pain in his lower extremity?
14     A.   Well, I mean, you're the lawyer with res ips,
15 or I think that's the term, that if you see it --
16 well, if it's not documented, then it's not there.
17     Q.   That's not what res ipsa is, Doctor.
18     A.   No, I know.  I realize it.  That's why I took
19 it back.
20          Okay.  So here I'm just looking here for the
21 date of this evaluation.
22     Q.   Doctor, I know we're pausing here.  I'm
23 waiting for you.  Are you still --
24     A.   That's correct.  I was looking to see if in

48

1    Dr. Farbman's notes, I could find -- I mean, he was
2    talking about pain there.  He wasn't entertaining a
3    diagnosis of CRPS.  He was talking about -- well, he
4    was mentioning the diabetes, if I remember right.  He
5    was mentioning peripheral neuropathy with numbness,
6    which is not a sign of CRPS.  And contemporaneously
7    and previously he was being seen by Dr., I think his
8    name was Ignatius at Northwestern from 2012, 2015.
9    Then in 2016 just before this incident, he began to be
10   seen by the doctor that you pronounced the name wrong
11   Matiwala.  And Dr. Matiwala was constantly discussing
12   the need to better maintain glucose control, and
13   Dr. Matiwala was -- who's I believe a general
14   practitioner, an internist, not a neurologist and not
15   an endocrinologists as misstated by one of your
16   experts.  But Dr. Matiwala was just working really
17   hard to get good insulin control or good -- he said
18   the insulin dosage had not changed in many years.  He
19   wasn't monitoring his glucose.  He was gaining weight.
20   He wasn't watching his diet.  So there was a lot of
21   things contemporaneously going on that went on beyond
22   the period where this incident occurred.
23       Q.   Doctor, I think you're getting pretty far
24   from my actually question, so let me see if I can

49

1    narrow it down.  What I'm wondering is -- I know you
2    reviewed records from before and after the incident of
3    6/25/16.  My question for you is, in the records
4    reviewed after 6/25/16, was there any doctor or
5    medical practitioner who noted that the right lower
6    extremity was healed or that the pain had gone away?
7       A.   Well, I think another way of putting it was
8    were there consistent complaints in the records of
9    those doctors that there was pain.  Because the way
10   those charts are set up, there aren't problem lists
11   where then you say problem terminated, so whatever
12   they were focusing on that day, whether it be arms and
13   hands, were what they were discussing.  And if they
14   weren't discussing the leg at that time, they weren't
15   discussing the leg.  It doesn't mean one way or
16   another whether it went away or didn't went away.  It
17   just meant that it wasn't enough of an issue that it
18   would be in the record.
19       Q.   Sorry, Doctor.  I'm going to ask you to
20   answer the question the way it's phrased, if you can
21   please.
22            Can we have it read back, Judy?
23            (Whereupon, the record
24                 was read as follows:

50

1            "Q.  Doctor, I think you're
2            getting pretty far from my
3            actually question, so let me see
4            if I can narrow it down.  What
5            I'm wondering is -- I know you
6            reviewed records from before and
7            after the incident of 6/25/16.
8            My question for you is, in the
9            records reviewed after 6/25/16,
10           was there any doctor or medical
11           practitioner who noted that the
12           right lower extremity was healed
13           or that the pain had gone away?)
14       THE WITNESS:  Okay.  I mean, the construct of
15   the question makes it hard to answer.  And so with
16   that introduction, what I will say is, no one made it
17   go away -- but I want you to include this in my
18   answer -- no one said it went away but there were
19   times where nobody described the problem.
20   BY MR. BERMAN:
21       Q.   And you read Mr. Narsimhan's deposition in
22   which he indicated in his deposition that from the
23   time of the incident of June 2016 up until the time at
24   least his deposition was given he had consistent pain

51

1    in his right lower extremity, correct?
2       A.   Correct.
3       Q.   Mr. Narsimhan himself has indicated that the
4    pain -- (audio interruption) -- any period of time
5    when the right lower extremity pain had gone away or
6    healed subsequent to the incident, correct?
7       MS. HAY:  Excuse me.  Steve, could you just
8    repeat that question?  You were cutting out just a
9    little bit.
10   BY MR. BERMAN:
11       Q.   Upon reviewing Mr. Narsimhan's deposition
12   testimony, you would agree that at least Mr. Narsimhan
13   has indicated that he has had consistent pain in his
14   right lower extremity only since the incident of June
15   2016, correct?
16       A.   He has said that, yes.
17       Q.   And there is no medical documentation to
18   prove otherwise, correct?
19       A.   Well, I actually just provided you
20   documentation otherwise.  If we look at Wheaton
21   Chiropractic, there's a three-month period where he is
22   being actively treated for pain, tingling and
23   numbness, and at no point is the leg ever brought up.
24       Q.   All right.  So the fact it's not brought up,

52



1  I think you said already that that's not an indication
2  he was not complaining of pain in his leg; it's just
3  that it wasn't being treated at the chiropractic
4  clinic?
5      A.   No, he filled out a form himself, okay, in
6  his handwriting with his signature where he did not --
7  where they asked him.  I mean, it was a diagram and a
8  table where his diagram of his pain only included his
9  hands, and the table where you could check off leg or
10 foot was not checked off.  So that was not only the
11 facility or the chiropractor himself, but it was also
12 Mr. Narsimhan not filling in leg pain.
13     Q.   Okay.  So if Mr. Narsimhan didn't fill in leg
14 pain because he wasn't at the chiropractor to treat
15 his leg pain, he was being treated for the leg pain by
16 the neurologist, would that affect your opinions in
17 any way?
18     A.   No.
19     Q.   From your entire review of this case, are you
20 aware of any other traumatic incident or event that
21 injured Mr. Narsimhan's right lower extremity other
22 than the incident at Lowe's in June of 2016?
23     A.   That's a very good question, and I am not.
24     Q.   From your review the record, would you at

53

1  least agree that the impact between the metal bar and
2  Mr. Narsimhan's right lower extremity at Lowe's caused
3  Mr. Narsimhan pain?
4      A.   I agree with that.
5      Q.   You have an opinion as to the diagnosis of
6  the pain that the incident of the metal bar hitting
7  Mr. Narsimhan in right lower extremity, what it was?
8      A.   I think you got garbled again there.  I don't
9  know if anybody else heard it, but I couldn't hear it.
10     Q.   Okay.  Let me ask you some general questions
11 first.  As a recognized expert in CRPS, would you
12 agree that in most patients CRPS is a chronic
13 condition that can be permanent?
14     A.   It is a chronic condition that can be
15 permanent that can also go into remission.
16     Q.   In what percentage of cases that you're aware
17 of are symptoms of CRPS permanent, and in what
18 percentage of cases do those go into remission
19 completely?
20     A.   In my practice more than 50 percent of the
21 patients go into complete remission.
22     Q.   When you say --
23     A.   It doesn't mean they don't come out of
24 complete remission.  But they go into complete

54

1  remission, and we follow the ISP treatment guidelines
2  in how we get there.
3      Q.   Are you talking about -- you said greater
4  than 50 percent of your patients go into remission at
5  some point.  Is that 51 percent, 60 percent?  How
6  would you further characterize it?
7      A.   It's the majority.  And I can tell you that
8  my largest referral source for CRPS and our
9  comprehensive interdisciplinary functional
10 rehabilitation program is the workers' compensation
11 system of the state of California because we get such
12 a high percentage of patients back to work.  And what
13 I can tell you is in the occupational health
14 literature, people who have been out of work for
15 greater than a year only have an 18 percent chance of
16 going back to work ever, and that we get more than
17 50 percent of our patients go back to work.  And the
18 savings they have in terms of not having to pay future
19 wages are substantial.
20     Q.   That's fine.  You didn't answer my actual
21 question, so I'll rephrase it.
22     A.   I answered.
23     Q.   My question is, you say that your clinic gets
24 greater than 50 percent of patients into remission at

55

1  some point, and I'm wondering what that percentage is.
2  What does that mean?
3      A.   I don't have an exact number, but it's more
4  than half.
5      Q.   So there's some percentage less than half of
6  patients that never go into remission of CRPS
7  patients?
8      A.   Well, if you want -- I can tell you that the
9  vast majority, like probably over 90 percent get
10 substantial remission even though they don't get
11 complete remission.
12     Q.   Would you agree that a patient has a
13 better -- a CRPS patient has a better chance of
14 achieving remission of symptoms if the systems are
15 recognized early and effective treatment is initiated
16 early?
17     A.   Yes.
18     Q.   In your opinion, when is the best -- from an
19 early standpoint, when is the best time to recognize
20 the CRPS and begin treatment of it?
21     A.   Three months.
22     Q.   Would you also know that patients who are in
23 their teens or 20s have a better chance of achieving
24 remission of CRPS symptoms than other patients?

56



1     A.   Achieving 100 percent remission, yes.
2     Q.   In your practice do you use Gabapentin as
3  treatment for resolving CRPS pain?
4     A.   Well, not -- resolving is probably not an
5  appropriate term.  It is one of the medications that
6  we use in the treatment of CRPS, as well as other
7  neuropathic pain conditions including diabetic
8  peripheral neuropathy.
9     Q.   So you're saying that Gabapentin is used to
10  treat CRPS, as well as other types of neuropathy such
11  as diabetic neuropathy pain, correct?
12     A.   Right.  And in fact Gabapentin is FDA
13  approved for treating at least two neuropathic pain
14  syndromes of which CRPS is not one of them, and
15  nonetheless, we use it.
16     Q.   That was my next question.  As a recognized
17  expert in CRPS, in your clinic you use Gabapentin as a
18  treatment -- one of the treatments for CRPS pain,
19  right?
20     A.   Right.  It's my number two treatment
21  pharmacologically.
22     Q.   In your experience, though, using this
23  particular drug Gabapentin, how effect is Gabapentin
24  in terms of resolving CRPS pain 100 percent?

57

1     A.   Well, I mean, we keep coming back to
2  resolving the CRPS pain.  I don't think Gabapentin
3  resolves any kind of pain.  Gabapentin treats pain
4  successfully, and the limiting factor on Gabapentin is
5  not any kind of toxicity.  It's just side effects that
6  are not permanent, and they're not dangerous.  But
7  they exist, and that is the limiting factor in using
8  Gabapentin.
9     Q.   I'm not asking you about ketamine yet because
10  I might ask you about that in a minute.  But let's
11  stick with Gabapentin for just a moment, Doctor, if
12  you could.  In your practice or just in general, can
13  you tell me how effective Gabapentin is in bringing
14  CRPS symptoms into remission like we were talking
15  about, remission?
16     A.   I would say zero bringing it into remission.
17     Q.   So is it accurate to say that Gabapentin is
18  used to help minimize the symptoms of CRPS pain?
19     A.   Yes, and also to be a tool to allow other
20  treatments to do what you were talking about to help
21  get people in remission.  Gabapentin by itself will
22  not get you into remission, but it may sufficiently
23  alleviate the pain to allow you to participate in a
24  functional rehabilitation program that can then get

58

1  you into remission.
2     Q.   You said Gabapentin is also used for diabetic
3  neuropathies.  In your opinion is Gabapentin more
4  effective treating diabetic neuropathy?
5     A.   I think it's equally effective.  It's just
6  what I was saying before, Mr. Berman, that it's
7  approved for two neuropathic pain conditions by the
8  FDA.  It doesn't mean it doesn't work in other
9  situations.  And in terms of comparable amount of
10  pain, I would say it's equally effective in
11  diabetic -- it's very hard to measure pain, but by the
12  way the patient describes the pain to you, if they
13  were describing it with an etiology of what we call
14  DPNP, diabetic peripheral neuropathy pain, or CRPS
15  pain, the same degree of pain would be treated
16  comparably.
17     Q.   I'm going to ask you about CRPS symptoms and
18  signs, and you know those are two different things,
19  right?
20     A.   I sure do.  Most don't.  Very good.
21     Q.   I'm going to ask you this question, and if
22  you don't like the way it's phrased, just let me know.
23  I'll break it up.  But I want to just ask you
24  generally, in your experience can CRPS symptoms and

59

1  signs wax and wane from day to day or week to week?
2     A.   Yes.
3     Q.   Can CRPS symptoms and signs wax and wane even
4  throughout the day?
5     A.   Yes.
6     Q.   In your experience can CRPS patients have
7  some good days and some bad days?
8     A.   Yes.
9     Q.   In your experience can CRPS patients have
10  some good days where they have less symptoms and signs
11  than they have on their bad days?
12        MS. HAY:  I'm sorry, Steve.  Could you repeat
13  that question?
14        THE WITNESS:  That one got garbled again.
15  BY MR. BERMAN:
16     Q.   Can CRPS patients have some good days in
17  which they have less symptoms and signs of the CRPS
18  than they have on their bad days?
19     A.   I think that's kind of asked and answered,
20  but the answer is still yes.
21     Q.   I'm still on some of these general questions.
22  This dorsal root ganglion stimulation issue, DRG,
23  that's a surgical procedure; is that right?
24     A.   Correct.

60



1    Q.   That's an invasive procedure, right?
2    A.   Correct.
3    Q.   Are there certain potential surgical
4  complications that go along with that DRG procedure?
5    A.   Something you didn't ask -- at the beginning
6  you said you're one of the few physicians in the
7  country that perform it.  I stopped performing it and
8  do an alternative procedure because of exactly what
9  you're saying.
10   Q.   So what are the potential surgical
11 complications of the DRG procedure that caused you to
12 stop performing?
13   A.   Well, there are a few things.  One is not --
14 two of them are not officially complications as
15 defined.  But I've had a hardware failure in
16 multiple -- multiple kinds of hardware failure
17 including a year later having the lead pull out of the
18 pulse generator so it needed surgical revision.  I've
19 had multiple leads fracture.  And you could call those
20 complications, or you could just call them equipment
21 malfunctions.  But regardless of what they are, they
22 require surgical revision, another surgery.  But the
23 third one is that in placing the dorsal root ganglion
24 lead there is a risk of hurting a nerve, and that's

61

1  probably the principal reason that I stopped doing it.
2    Q.   But also as a surgeon, would you consider
3  that the potential for infection is a potential
4  surgical complication of DRG?
5    A.   It depends.  Yeah, officially when I have to
6  read and when I go over the risks and benefits of any
7  surgery, I have to tell patients that there is a risk
8  of infection, but we have an extreme -- I also in my
9  practice, unlike cases that I review sometimes in
10 medical malpractice, we have an extremely low, below
11 1 percent infection rate requiring explantation.
12   Q.   Doctor, in your experience, with your
13 knowledge of this procedure, the DRG procedure, do you
14 know what the usual and customary and reasonable cost
15 of such a procedure is?
16       MS. HAY:  Just object to form and foundation.
17       THE WITNESS:  Yes.
18 BY MR. BERMAN:
19   Q.   What is it?
20       MS. HAY:  Same objection, but you can answer,
21 Doctor.
22       THE WITNESS:  Okay.  Well, we have to --
23 there are a minimum of three kinds of charges for
24 performing the procedure.  One is called the facility

62

1  fee; the other one is either called a technical fee or
2  professional fee; and the third one is the anesthesia
3  fee.  And for a trial the professional fee can be
4  anywhere between $1,000 and $9,800 as far as what I've
5  seen.  And just so you know, Mr. Berman, I actually do
6  reviews for insurance companies, so I have a pretty
7  good idea of this.  I also see lien fees that are
8  multiples of these numbers that I quoted you, but
9  these I don't feel are legitimate fees.
10 BY MR. BERMAN:
11   Q.   That's what I asked you in your opinion what
12 is a reasonable fee, not a --
13   A.   Okay.  Professional between 1,000 and 9,800.
14 For the lead placement, facility, anywhere between
15 5 and $20,000.  For the placement and anesthesia,
16 anywhere between 500 and $1,000.
17   Q.   Is that for the trial of the DRG or permanent
18 implantation?
19   A.   I just gave you numbers for the trial.
20   Q.   What about for the permanent implantation
21 after the trial is completed?
22       MS. HAY:  Just note my continuing form and
23 foundation objections, but you can answer, Doctor.
24       THE WITNESS:  Professional fees, anywhere

63

1  between probably 3,500 up to 15,000.  Facility fees
2  within reason, anywhere between 28 and 40,000.
3  Anesthesia fees anywhere between 750 and $1,500.
4  BY MR. BERMAN:
5    Q.   And, Doctor, because there was a foundation
6  objection by Ms. Hay, I want to just make sure you and
7  I were clear.  I mean, you were explaining this
8  before.  You are aware of this procedure; you are
9  aware of the cost of the procedure in your practice;
10 and also you review these costs for insurance
11 companies so you're aware what the usual and customary
12 and reasonable costs are.  Is that fair?
13   A.   Just as you were distinguishing between signs
14 and symptoms, I will distinguish between costs and
15 charges.  I think the word you wanted to use was
16 charges rather than costs.  Because somebody charges
17 an amount, it doesn't mean they get it.  And what they
18 get paid is the cost, but what they charge is what
19 they charge.
20   Q.   In your experience, you can review the
21 charges and make a determination of whether that's
22 what's within the realm of reasonable charges or not,
23 right?
24       MS. HAY:  Same ongoing objections.

64

1      THE WITNESS:  Right.
2  BY MR. BERMAN:
3      Q.   And what you were explaining to us earlier
4  were what you consider reasonable charges for such a
5  DRG procedure, correct?
6      A.   Correct.
7      MS. HAY:  Please note all my continuing
8  objections to all of those questions with regard to
9  costs and charges.
10  BY MR. BERMAN:
11      Q.   Also, I know that you are a recognized expert
12  in ketamine and use of ketamine to treat individuals
13  with CRPS; is that right?
14      A.   Correct.
15      Q.   And you still continue to use that type of
16  treatment, the ketamine treatment to help reduce
17  symptoms or put CRPS symptoms into remission; is that
18  accurate?
19      A.   Not only symptoms, but signs.
20      Q.   Fair enough.  So both?
21      A.   Both.
22      Q.   Let me ask you about that for just a moment.
23  Ketamine treatment, are there some potential side
24  effects or potential risks of that type of treatment

65

1  for CRPS symptoms and signs?
2      A.   Again, I think it depends on who is
3  administering it because I'm certainly -- we spent
4  about 10 years looking at all possible side effects to
5  see how they could all be mitigated, and I think we
6  have a special sauce so that they all can be
7  mitigated.  In terms of actual risks, there is a risk
8  of hepatic injury or liver injury that if you're
9  careful on how you do it; in other words, periodically
10  monitor liver function, if you discontinue it before
11  it becomes a real big problem, it resolves on its own.
12  And, in fact, in our practice, we've noted a few
13  patients that started to have changes in their liver
14  function discontinued, and within a few weeks their
15  liver function was back to normal.  That's why I said
16  it depends on whose hands it is, because unfortunately
17  there are, for lack of a better word, cowboys out
18  there that don't read the literature and don't really
19  care for pain patients but only want to administer
20  ketamine infusions for their own personal reasons who
21  don't really do it as a true physician should and wind
22  up with complications.  But in the people that I know
23  around the country who are administering ketamine,
24  they're administering it carefully and not having

66

1  complications.
2      Q.   In terms of the ketamine treatment that
3  you're familiar with, because you're an expert in it,
4  is this an infusion that's only a one-time infusion;
5  is it multiple times?  How long does it take, in other
6  words, and how many treatments does the ketamine take
7  to get the desired effect of reduction or remission of
8  symptoms?
9      A.   Okay.  That's a very complicated answer.  And
10  this is one where I do give lectures, and the lectures
11  take up a whole hour.  Now, all of that whole hour
12  aren't exactly on the question you asked, but it's a
13  more complicated answer than you may want to hear
14  right now.  I'll try to give you an abbreviated
15  answer.
16      Q.   If you could simplify it for me.
17      A.   Okay.  So there are three different ways at
18  the minimum of administering intravenous ketamine.
19  One is the one-day infusion followed sequentially by
20  others; the other is the 24-hour continuous inpatient
21  infusion that is not coma; and the third one is
22  ketamine coma where the patient has a breathing tube
23  put in the ICU for five days and undergoes very high
24  dosage ketamine treatment with general anesthesia

67

1  simultaneously.
2      What is the most common are the daily
3  infusions, and Dr. Schwartzman who wrote the first
4  articles on this advocated 20 consecutive daily
5  treatments at a relatively low dose that he was doing
6  given the manpower he had administering it with him.
7  There are very few -- I don't know if anybody still --
8  his studies demonstrated efficacy under those
9  circumstances, but I don't know of anybody doing
10  20 days of infusion because it's cost prohibitive.
11      So the more common way, as I mentioned,
12  Mr. Berman, is to do up to ten days of infusions.  And
13  I'll just tell what you our protocol is.  We do a
14  three-day trial, three consecutive days with
15  escalating dosages on each day.  And at the end of
16  three days if on the fourth day the patient still
17  appears to have some benefit a day after the third
18  infusion, we consider then doing a full course of ten,
19  but we don't want to obligate the patient to ten days
20  if it doesn't look like it's going to work.  Now, what
21  I can tell you is that probably 80 percent -- and I
22  don't have the exact number.  But the vast majority of
23  patients after the three-day infusion proceed to the
24  ten days with the infusion.

68



1    Now, what the literature shows is, if you
2  have a successful ketamine treatment -- and in our
3  practice it would be the ten-day course -- that
4  50 percent of the patients have sustained benefit so
5  that they never have to get any ketamine again.  And
6  the remaining 50 percent usually require booster
7  infusions, which the longest -- well, that can be
8  either monthly or every three months for years.
9      Q.   Let's just talk about that sort of common
10  example of ketamine treatment that works, the ten-day
11  treatment.  Do you have knowledge of the reasonable
12  and customary type of cost of that ten-day ketamine
13  treatment?
14      MS. HAY:  I'll object to form and --
15      THE WITNESS:  Yes.
16      MS. HAY:  Just one second.  I'll object to
17  form and documentation given the doctor's locale, but
18  you can go and answer, Doctor.
19      THE WITNESS:  Yes, I see variability between
20  500 and $2,500 per infusion.
21  BY MR. BERMAN:
22      Q.   And I know that you talked about your
23  understanding of these costs as an expert in this
24  field.  Would your understanding of the usual and
69

1  reasonable costs, the reasonable charges differ
2  between California and Illinois and New York and all
3  over the country?
4      A.   The problem is, Mr. Berman, this is not
5  something I have the opportunity to review because
6  none of the guidelines for treatment of any kind of
7  problems aside from depression -- well, none of
8  them -- no guidelines include ketamine infusions for
9  treatment of pain, headaches, or depression, no
10  guidelines do.  So insurance companies tend not to pay
11  for it except by exception, and I've not had the
12  opportunity ever to review billing for that.  But I
13  speak at ketamine conferences, and I speak to the
14  people who are the active ketamine practitioners in
15  the country.  And I have an idea about what people
16  charge.
17      Q.   And that's throughout the country, right?
18      A.   Yes.
19      Q.   So for the DRG you're familiar with what
20  people charge throughout the country, correct?
21      A.   Yes.
22      Q.   Understood.
23      I'm going to switch gears for just a moment.
24  I'm finished talking about the ketamine for now.  Now
70

1  I'm going to switch gears and ask you about diabetic
2  neuropathy.  I know some of your opinions in this case
3  relate to diabetic neuropathy.  Is it your opinion in
4  this case that Mr. Narsimhan's symptoms in his right
5  lower extremity relate to diabetic neuropathy?
6      A.   Yes.
7      Q.   And you've treated diabetic neuropathy pain
8  and symptoms before, right?
9      A.   Right.  I'm a board-certified internist, and
10  I have treated diabetic neuropathy and diabetic
11  neuropathic pain long before I ever became an
12  anesthesiologist and subsequently became a pain
13  physician.  So I was actually an attending physician
14  in internal medicine, practiced internal medicine.
15      Q.   And that's good.  That background's important
16  because the question I have is, how do signs and
17  symptoms of diabetic neuropathy differ from signs and
18  symptoms of CRPS, if at all?
19      A.   Well, the symptoms are the same
20  predominantly.  The signs can be different.  Both can
21  get thinning skin certainly.  Both can get peripheral
22  hair changes.  With diabetic neuropathy, there are
23  other things that can simultaneously be occurring that
24  can cause compromises in calculation, and that's
71

1  actually very common.  And sometimes the compromise in
2  circulation can create pain that's as bad as the
3  peripheral neuropathic pain.  In many ways they're
4  similar, but you can even get sometimes the trophic
5  changes in diabetic peripheral neuropathy.  You can
6  certainly get swelling in diabetic -- well, you can
7  get swelling in diabetes where the extremities are
8  involved, whether it's the diabetic peripheral
9  neuropathy that's causing that problem or the diabetes
10  that hasn't been well controlled.  So I think
11  that's -- we can dig in a little deeper later, but I
12  think that should probably be telling you what you
13  want to know.
14      Q.   Yes, yes.  The reason I asked you the initial
15  question is, I'm wondering in your practice or in your
16  work as an expert witness, have you seen times when
17  diabetic neuropathy has been confused for CRPS and
18  vice versa where CRPS has been confused as diabetic
19  neuropathy?
20      A.   Actually in my neuropathy, which is far more
21  limited than my clinical practice, I have not seen
22  that before.  But it's actually not uncommon for
23  patients to get referred to me from the community
24  where somebody thinks the patient has CRPS, but, in
72



1 fact, they don't. And it's a substantial
2 percentage -- although 80 percent of the patients that
3 I see in my practice are referred to me for potential
4 diagnosis of CRPS, a significant percentage of them
5 don't have CRPS.
6     Q.   Just to make sure -- just so I'm asking the
7 right question, Doctor, I want to make sure I
8 understand you. In your practice have you seen times
9 when other doctors have diagnosed CRPS when, in fact,
10 the actual diagnosis should have been diabetic
11 neuropathy?
12     A.   Yes.
13     Q.   Have you ever seen times when doctors have
14 diagnosed diabetic neuropathy when, in fact, the
15 diagnosis should have been CRPS?
16     A.   Yes.
17     Q.   You've seen both, okay.
18          And in this case, in this Narsimhan case,
19 you've seen doctors such as Dr. Buvanendran,
20 Dr. Saeed, Dr. Joshi, their diagnosis in this case
21 that Mr. Narsimhan had right lower extremity CRPS;
22 you've seen that, right?
23     A.   They have said that, yes.
24     Q.   And in your opinion, in fact, the diagnosis

73

1 shouldn't be CRPS; it should be right lower extremity
2 diabetic neuropathy; is that correct?
3     A.   DPNP, yeah. More than just diabetic
4 peripheral neuropathy, but diabetic peripheral -- we
5 call it DPNP, diabetic peripheral neuropathy pain.
6     Q.   DPNP?
7     A.   DPNP.
8     Q.   Got it, okay.
9          And in Mr. Narsimhan's situation, in his
10 case, in your opinion, Doctor, after reviewing the
11 entire record, what brought upon the symptoms of his
12 DPNP?
13     A.   The diabetes out of control.
14     Q.   When did the diabetes become out of control
15 such that the DPNP began?
16     A.   Well, he had DPNP treated by Dr. Farbman in
17 bilateral upper extremities for quite a period of time
18 preceding the incident at Lowe's. And what's really
19 important to understand, Mr. Berman, is that diabetic
20 peripheral neuropathy and DPNP both tend to show
21 themselves in the longest axons. Axon being a nerve,
22 okay. And so it's usually more common to see it in
23 the legs first than the arms, but if you have it in
24 the arms, it usually shows up in the legs shortly

74

1 thereafter because the legs have longer nerves than
2 the arms do.
3          And, you know, just for you to understand,
4 you know, you don't get DPNP in your chest wall where
5 the nerves are very close -- you know, where they come
6 out is very close to where they wind up. You don't
7 get DPNP on your lips. But you do get DPNP in your
8 hands and feet very commonly for people who have
9 uncontrolled diabetes.
10     Q.   And from reading the records that reflected
11 that at the time just prior to the incident
12 Mr. Narsimhan was being referred to the neurologist
13 Dr. Farbman for bilateral wrist carpal tunnel
14 syndrome. Is that what the records shows?
15     A.   I don't remember that that was the only
16 thing, and I don't remember that the EMG necessarily
17 showed that.
18     Q.   I'm not saying what the actual diagnosis was.
19 I'm saying that's what he was referred to Dr. Farbman
20 for.
21     A.   I don't recall that. We would have to find
22 the exact time and date of the note, and you can put
23 it up on the screen to show me that. Because that's
24 not what I remember, but I won't swear to it.

75

1     Q.   All right. In your opinion, however, as of
2 July 2016 and prior even to that, is it your opinion
3 that Mr. Narsimhan did not have carpal tunnel syndrome
4 in his wrists?
5     A.   Well, you said wrist, and it's unusual to
6 develop bilateral --
7     Q.   Wrists, plural.
8     A.   Okay. It's unusual to develop bilateral
9 carpal tunnel syndrome simultaneously, but usually one
10 side is predominant. And looking at the pictures that
11 he drew during that time interval, it sure looked like
12 there was asymmetry.
13     Q.   So your opinion was -- what was the cause of
14 the bilateral wrists, plural, pain?
15     A.   Diabetic peripheral neuropathy unless I see
16 records that are to the contrary.
17     Q.   An EMG was done of the upper extremities,
18 right?
19     A.   Correct.
20     Q.   What did that find?
21     A.   I'd have to look it up. I didn't commit
22 everything to memory. But I do know where it is.
23          Okay. It does find bilateral median moderate
24 neuropathy.

76



1    Q.   Meaning?
2    A.   That means that the median nerve is being
3 compressed.
4    Q.   Consistent with carpal tunnel syndrome?
5    A.   Yes.
6    Q.   And not consistent with DPNP in the wrist,
7 correct?
8    A.   Correct.
9    Q.   And also the right lower extremity was
10 examined in the EMG, and there were no positive
11 findings, were there?
12    A.   Right lower extremity -- no, there wasn't
13 clinical correlation advised.
14    Q.   So to be fair and to be accurate, the EMG
15 that was performed in July about a month after the
16 occurrence at Lowe's found consistent findings of
17 carpal tunnel syndrome in the bilateral wrists and no
18 consistent findings of DPNP in the right lower
19 extremity; is that correct?
20    A.   No polyneuropathy in the lower extremity.
21    Q.   So what I said, is that correct?
22    A.   Well, I just clarified it a little bit, so I
23 stick with what I said.
24    Q.   Well, would DPNP be evidenced by

77

1 polyneuropathy in the lower extremity?
2    A.   It would be one sign of it, yes.
3    Q.   So the EMG that was done of Mr. Narsimhan's
4 right lower extremity of July 26, 2016, was not
5 consistent with DPNP in the right lower extremity; is
6 that correct?
7    A.   Correct.
8    Q.   You also said -- and if I understand what you
9 said -- and I believe I heard what you said -- the way
10 DPNP forms is when diabetes becomes out of control; is
11 that right?
12    A.   Correct.
13    Q.   Can you explain to me, when you say "out of
14 control," exactly what you mean by that?
15    A.   What I mean by that is that you have elevated
16 blood sugars chronically.
17    Q.   You said elevated blood sugars, chronic
18 something, and I didn't hear the rest.
19    A.   Chronically.
20    Q.   Chronically?
21    A.   Yeah.
22    Q.   Anything else?
23    A.   That's what diabetes out of control is.
24    Q.   Okay.  And the way to test for elevated blood

78

1 sugars is an A1C test; is that right?
2    A.   Hemoglobin A1C.
3    Q.   Yes?
4    A.   Yes.
5    Q.   And I think this was discussed in
6 Dr. Matiwala's deposition that if an A1C level was
7 over 7, it means that the diabetes can become out of
8 control, but under 7 the diabetes is in control.  Do
9 you remember him saying that?
10    A.   Yes.
11    Q.   Do you agree with that, that's accurate?
12    A.   People draw the line at different places, but
13 I think that's a reasonable place to draw the line.
14    Q.   And I believe in Dr. Matiwala's records, you
15 reviewed all of his A1C recordings?
16    A.   Yes.
17    Q.   So prior to the incident in Lowe's, we have
18 at least I guess two visits to Dr. Matiwala.  You saw
19 that, right, in the records?
20    A.   Matiwala.
21    Q.   Matiwala.
22    A.   Yes.
23    Q.   You saw in the records that there was a visit
24 of February 2016 and May 31st of 2016 prior to the

79

1 incident at Lowe's, correct?
2    A.   Correct.
3    Q.   And then there was a visit with Dr. Matiwala
4 in September of 2016 that's after the incident at
5 Lowe's, correct?
6    A.   Right.
7    Q.   You saw that initially the A1C in February of
8 2016 was 8.5, and you consider that essentially out of
9 control, correct?
10    A.   That's correct.
11    Q.   And then the next visit of May 31st, 2016, so
12 a little less than a month before our incident of
13 June 25th, 2016, the A1C level was 6.6.  Would you
14 consider that A1C level an indication of under control
15 diabetes?
16    A.   That's borderline under control.
17    Q.   It's under 7, so therefore it's within the
18 in-control level?
19    A.   It's high under control.
20    Q.   What would you consider high then?
21    A.   What I'm saying -- you know, if it's 0.5
22 higher, you would say it's out of control.  So it's
23 borderline.  That's what it is.
24    Q.   Would you agree that -- in your opinion,

80

1 would you think that a person who has a 6.6 A1C would
2 be at risk for having diabetic peripheral neuropathy
3 with pain, DPNP?
4     A.  If they maintain that, no.
5     Q.  September of 2016 the A1C level was 6.7, so
6 point one higher.  Would that person at that time be
7 susceptible or at risk for DPNP?
8     A.  Marginally.  Likely not, but not impossible.
9     Q.  So what was it about the A1C levels in May
10 and September of 2016 that indicate to you that as of
11 June 25th, 2016, Mr. Narsimhan was complaining of
12 right lower extremity diabetic neuropathy with pain?
13     A.  Say again, please.
14     Q.  What is it about the A1C levels of
15 Mr. Narsimhan in May of 2016 at 6.6 and September of
16 2016 at 6.7 that indicate to you that after 6/25/2016
17 Mr. Narsimhan was complaining of DPNP in his right
18 lower extremity?
19     A.  Those particular ones would not necessarily
20 suggest that he would get diabetic peripheral
21 neuropathy, but he did have others previously that --
22 again, I pointed out that Dr. Matiwala pointed out
23 that his insulin dosage had not changed for years, and
24 that he needed -- I mean, he really needed dietary

81

1 counseling, and that he was not monitoring his
2 glucose.  Now, those two isolated ones I completely
3 agree with you, Mr. Berman, likely would not put him
4 at risk, but we really don't know what went on long
5 before that.  We don't really know so much about what
6 happened subsequently as well.
7     Q.  If a person who has diabetes, the diabetes
8 gets out of control causing DPNP, can one of the
9 treatments for that DPNP be getting diabetes within
10 control?
11     A.  It won't get the neuropathy better.  It will
12 prevent it from progressing.
13     Q.  When did the DPNP symptoms start for
14 Mr. Narsimhan?
15     A.  I don't know.
16     Q.  Dr. Matiwala testified that throughout his
17 time treating Mr. Narsimhan that Mr. Narsimhan had
18 type 2 diabetes mellitus without complications.  Did
19 you see that?
20     A.  Yes.
21     Q.  Would a complication of diabetes be this DPNP
22 that we're discussing?
23     A.  Yes.
24     Q.  So according to Dr. Matiwala's records and

82

1 his deposition, Dr. Matiwala, the doctor who was
2 treating Mr. Narsimhan for the diabetes, felt like the
3 diabetes was without complication, therefore without
4 DPNP, true?
5     A.  Yes.
6     Q.  And also, Dr. Matiwala performed diabetic
7 foot exams.  You saw that, right?
8     A.  Yes.
9     Q.  Is part of the reason why a doctor does
10 diabetic foot exams is to try to see if there is any
11 indication of DPNP or diabetic peripheral neuropathy?
12     A.  No.
13     Q.  Okay.  So a diabetic foot exam, in your
14 opinion, has nothing to do with finding whether a
15 person has diabetic peripheral neuropathy in their
16 feet?
17     A.  Correct.  I shouldn't say -- it's not the
18 main reason they do it.
19     Q.  But it can help to find -- strike that.
20         Diabetic foot exams can help find DPNP in a
21 person's feet?
22     A.  Correct.  Just so you know, that's not the
23 principal reason that that exam is done.
24     Q.  It doesn't have to be the principal reason.

83

1 It can be an ancillary reason.  Dr. Matiwala
2 consistently performed diabetic foot exams and found
3 them to be negative, and, in fact, in his deposition,
4 Dr. Matiwala felt that based on the diabetic foot
5 exams there was no indication of diabetic peripheral
6 neuropathy in Mr. Narsimhan's right lower extremity.
7 Did you see that?
8     A.  I don't remember that.
9     Q.  Would you disagree with that testimony if it
10 was there?
11     A.  Well, if the testimony is there, I wouldn't
12 disagree with what his opinion is.
13     Q.  Switching gears for just a moment.
14         I think you saw in the record -- correct me
15 if I'm wrong, but I think you saw in the record that
16 prior to the incident of June 25th, 2016, at Lowe's,
17 Mr. Narsimhan was very active, ran on the treadmill,
18 did 5Ks, that kind of thing.  Did you see that?
19     A.  Yes.  According to him, yes.
20     Q.  Is that something that if a person has
21 diabetic peripheral neuropathy in their feet or foot
22 that this would make running on the treadmill and
23 performing 5Ks difficult to do?
24     A.  Yes.

84



1    Q.   So do you see any indication in the record
2  prior to June 25th, 2016, that Mr. Narsimhan had
3  diabetic peripheral neuropathy in his right lower
4  extremity?
5    A.   No.
6    Q.   You saw in the record I believe that because
7  of the pain and discomfort in Mr. Narsimhan's right
8  lower extremity that he was less physically active,
9  correct?
10   A.   That's what he says, yes.
11   Q.   Obviously pain in the lower extremity can
12 cause people to be less active, run less, be on their
13 feet less, walk less, that kind of thing, agree?
14   A.   Yes.
15   Q.   Dr. Matiwala was asked on page 41 of his
16 deposition whether the symptoms of right lower leg
17 burning pains, if he was able to eliminate those as
18 diabetic complications, and he said yes, he would.
19 Did you see that in the deposition?
20   A.   Yes.
21   Q.   Do you disagree with Dr. Matiwala, the doctor
22 who was treating Mr. Narsimhan for his diabetes?
23   A.   Hold on a second.
24   Q.   It's page 40, line 23 to page 41, line 3.  It

85

1  says, "Okay.  And these symptoms that he's reporting
2  on a consistent basis, were you able to eliminate
3  those as diabetes complications?"  Answer:  "Yes, I
4  would based on the EMG conduction study he'd
5  undergone."  Do you see that question and answer?
6    A.   I do, yes.
7    Q.   Do you disagree with Dr. Matiwala?
8    A.   No.
9    Q.   On page 45 of Dr. Matiwala's deposition, he
10 was asked at line 10:  "And throughout the time you
11 were seeing Mr. Narsimhan, you were able to get his
12 diabetes under control, correct?"  Answer:  "That is
13 correct."
14   A.   You said 45, 10.  I'm on 45, 10.  I don't see
15 that.  Oh, okay.
16   Q.   Should I reread it?
17   A.   Yes.  Okay, yes.
18   Q.   And the question was:  "Throughout the time
19 that you were seeing Mr. Narsimhan, were you able to
20 get his diabetes under control, correct?"  Answer:
21 "That is correct."  Do you see that?
22   A.   Yes.
23   Q.   Do you disagree with Dr. Matiwala, the doctor
24 who was seeing and treating Mr. Narsimhan for his

86

1  diabetes?
2    A.   No.
3    Q.   If Dr. Matiwala says that he was able to get
4  the diabetes under control, yet you in your opinion
5  testified that the diabetes was out of control which
6  was what caused the DPNP; is that correct?
7    A.   That it had not been under control.
8    Q.   When was the diabetes not under control such
9  that it caused the DPNP in Mr. Narsimhan's right lower
10 extremity?
11   A.   Say the question again, please.
12   Q.   Yes.  The question is when was the diabetes
13 out of control such that it caused DPNP in Mr.
14 Narsimhan's right lower extremity?
15   A.   During the time before he started seeing
16 Dr. Matiwala or at the beginning.
17   Q.   We just went over this, Doctor.  In the
18 beginning when Mr. Narsimhan started seeing
19 Dr. Matiwala in May and September, in those two visits
20 it was under 7, the A1C was under 7.  So that's an
21 indication of the diabetes being in control; you agree
22 with that, right?
23   A.   I think when he first started seeing
24 Dr. Matiwala, that the diabetes was above 7.

87

1    Q.   Yes.  So are you saying that in February 2016
2  the diabetes was out of control such that it caused
3  the DPNP to begin in the right lower extremity?
4    A.   It put the patient at risk.
5    Q.   So when was the diabetes out of control such
6  that it actually caused, not put him at risk, but
7  actually caused the DPNP to begin?
8        MS. HAY:  Just object to asked and answered.
9  If you want to answer again, Doctor, go ahead.
10       THE WITNESS:  He was at risk in February of
11 2016.
12 BY MR. BERMAN:
13   Q.   I know, Doctor, but you said, in your
14 opinion, Mr. Narsimhan has DPNP in the right lower
15 extremity; is that right?
16   A.   Yes.
17   Q.   When was the diabetes out of control such
18 that it caused that to actually begin, the DPNP in the
19 right lower extremity?
20       MS. HAY:  Objection, asked and answered.  You
21 can answer again, Doctor.
22       THE WITNESS:  I think he was set up for it in
23 February '16.

88

BY MR. BERMAN:

Q.   He was what?

A.   A setup.

Q.   Set up?

A.   Yeah.

Q.   But the DPNP didn't start in February 2016, did?

A.   We don't know.

Q.   You don't know?

A.   Likely it did not.

Q.   So do you know when the DPNP started?

A.   No.

Q.   The symptoms of DPNP?

MS. HAY:  Objection, asked and answered three times.

BY MR. BERMAN:

Q.   Doctor, is it accurate to say that diabetic peripheral neuropathy typically is seen bilaterally?

A.   Yes.

Q.   And in this case it's your opinion that the DPNP is exclusive to the right lower extremity of Mr. Narsimhan, correct?

A.   Yes.  Well, we don't know exclusively.

Q.   What do you know?

89

A.   That on his examination -- well, we know that nobody ever did an distracted examination on this gentleman who makes certain accusations that I know have significant discrepancy.  And I did not see, Mr. Berman, one distracted examination on this man who complains of pain when you look at him and you touch him and he sees you, but he doesn't consistently complain of pain when you distract him.

Q.   Which doctor indicated that Mr. Narsimhan does not complain of pain when you touch his right lower extremity when he's distracted?

A.   Nobody ever did a distracted examination, which an expert in CRPS would always do.

Q.   Because no one ever did that test, are you assuming that it would be negative for CRPS?

A.   No, I'm only -- we're not talking for CRPS. We're talking for pain.  We truly don't know what it would have shown.  The only place there's a data point with a distracted exam is my exam where you were there.

Q.   So are you assuming that because Dr. Farbman, Dr. Saeed, Dr. Buvanendran, Dr. Matiwala, all these doctors who didn't do a distracted exam for pain that it would have been negative when those doctors saw and

90

examined Mr. Narsimhan?

A.   What I'm saying is that we really don't know what a distracted exam would have shown.  That's all I can say.  We know that my distracted exam showed inconsistency.  They never did.  And this is a guy who has a motivation to have pain or to describe pain.

Q.   That's true for any plaintiff in the world, right?

A.   It's true.  Well, not all of them complain about pain.  They complain about different things.

Q.   Any plaintiff who is complaining of pain has a motivation to say they have pain because in your opinion they've got a case, right?

MS. HAY:  I'm sorry.  I didn't hear the end of that question, Steve.  Can you repeat it?

MR. BERMAN:  Because they have a case.

MS. HAY:  Thank you.

THE WITNESS:  Any patient that has a complaint of CRPS has motivation to demonstrate they have pain.

BY MR. BERMAN:

Q.   You didn't diagnose secondary gain in Mr. Narsimhan's case, did you?

A.   I don't like to go into secondary gain.  I

91

just see marked discrepancy here.

Q.   I'm just asking, did you make the diagnosis or not?

A.   What do you mean?

Q.   Did you make a diagnosis of secondary gain in Mr. Narsimhan --

A.   I don't make a diagnosis of secondary gain. I don't make it.

Q.   Let's talk about your examination of Mr. Narsimhan, and that would be relating to the report of 1/21.  Do you have the report in front of you, or do you want me to put it on the screen?

A.   I can put it up very quickly so I can have it in front of me.

Okay.  We are talking about the independent medical examination performed on 1/15/21; that's what we're talking about at the moment, correct?

Q.   We're talking about the examination 1/15/21 that you performed in Chicago near O'Hare.

A.   Yes.

Q.   You called it an independent medical evaluation.  I don't call it an independent medical evaluation because at that time you were retained by the defense to perform the examination, correct?

92

1      A.   You can call it what you wish.  I do it as an
2  independent exam.
3      Q.   I hear you.  But at the time you examined
4  Mr. Narsimhan, you had been retained by the party that
5  Mr. Narsimhan had a claim against, right?
6      A.   Right.  And it's my job to do an objective
7  exam, which is why I call it independent.
8      Q.   But the answer to my yes is yes; is that
9  correct?
10     A.   The answer to that question is yes.
11     Q.   And during that medical examination, you
12  spent a total of about an hour with Mr. Narsimhan,
13  correct?
14     A.   Yes.
15     Q.   You told Mr. Narsimhan at the time that you
16  were retained by the other side; you told him that,
17  right?
18     A.   That I was retained by the defense, yes.
19     Q.   And you told him that there was no
20  physician-patient relationship generated from this
21  examination; it was for medicolegal purposes only,
22  correct?
23     A.   Correct.
24     Q.   During the examination, you took a history,

93

1  then you did an examination for symptoms and signs of
2  potentially indicating CRPS, right?
3      A.   Well, you don't do an examination for
4  symptoms.  You only do an examination for signs.
5      Q.   So you did a history for symptoms, right?
6      A.   Correct.
7      Q.   You asked the patient -- you asked the
8  client.  I'm sorry.  At the time of your examination,
9  you asked my client what his symptoms were, right?
10     A.   Correct.
11     Q.   And then you performed an examination looking
12  for the signs that might be related to CRPS, right?
13     A.   Correct.
14     Q.   And the signs can be objective signs, right?
15     A.   The exam was the objective signs, correct.
16     Q.   So things like swelling, the way the skin
17  looks, hair changes, moisture, sweating, those are
18  things that can be observed by the examiner, correct?
19     A.   Correct.
20     Q.   And those can be documented at times
21  photographically, those signs, correct?
22     A.   Excuse me?  Say again.
23     Q.   Some of those signs upon examination can be
24  documented photographically because they're objective,

94

1  correct?
2      A.   Correct.
3      Q.   In your examination of Mr. Narsimhan, you
4  took no pictures; is that correct?
5      A.   That is correct.
6      Q.   So to be fair, whether Mr. Narsimhan had any
7  signs relating to a diagnosis of CRPS would not be
8  documented one way or the other by use of photographs
9  from your examination, true?
10     A.   It could -- well, some of them are -- you
11  can't diagnosis temperature with photographs.  You can
12  diagnosis tremor, hypertonia, spasticity with
13  photographs.  What you can diagnose with photographs
14  are changes in the hair.  Edema is hard because the
15  way you diagnose edema is by looking for pitting, and
16  you can't do pitting in a photograph.  So what you can
17  see are changes in the hair, skin, nails, or color
18  changes.
19     Q.   To be fair, Doctor, all I'm asking is, you
20  took no pictures during your examination of
21  Mr. Narsimhan to document the existence of or lack of
22  signs relating to a diagnosis of CRPS, true?
23          MS. HAY:  Objection, asked and answered.  You
24  can answer, Doctor.

95

1          THE WITNESS:  Well, the only answer I give is
2  that I did not take pictures, because I don't agree
3  with what followed.
4  BY MR. BERMAN:
5      Q.   In your examination of Mr. Narsimhan, it
6  said, "Reflexes could not be performed at the ankle."
7  Why is that?
8      A.   Because of pain that he would have
9  experienced based on what he was saying.
10     Q.   That's related to the right ankle, correct?
11     A.   Correct.
12     Q.   The ankle is the one that's at issue in this
13  case, correct?
14     A.   Correct.
15     Q.   Same with sharpness.  It says, "Sharpness
16  examination was deferred in the right leg, as
17  mentioned above."  That's because it would have caused
18  significant pain in the right lower extremity,
19  correct?
20     A.   Because of what he said, yes.
21     Q.   It says, "Calcaneal reflexes were deferred
22  secondary to prevent pain."  Same thing, correct?
23     A.   Correct.
24     Q.   That was only on the right side?

96



1    A.   Correct.
2    Q.   It says, "Dorsiflexion of the right foot was
3  deferred."  What does that mean?
4    A.   It means that I didn't ask him to bend his
5  foot toward the ceiling.
6    Q.   And it says, "deferred."  Why was that in
7  this case?
8    A.   Same thing, because he was complaining of
9  pain.
10   Q.   It was in the right affected leg as opposed
11 to --
12   A.   I was trying to avoid the pain.  I didn't
13 want to cause him any pain.  And you were there, and
14 you saw that I wasn't trying to cause him any pain or
15 did I cause him any pain.
16   Q.   I'm not accusing you of purposefully trying
17 to cause him pain.  I'm saying that -- I think you're
18 agreeing with me that you deferred dorsiflexion of the
19 right foot test because you felt that could cause him
20 increased pain in his right affected lower extremity,
21 correct?
22   A.   If I recall correctly, I did ask him, and he
23 said it was too painful to do, so we deferred it.  So
24 he never attempted it.

97

1    Q.   And let's go to page 4 of your report where
2  you talk about the requirements for CRPS.  These are
3  the Budapest requirements you're referring to
4  specifically, right?
5    A.   Yes.
6    Q.   One was pain out of proportion for the
7  original injury.  It says, "Mr. Narsimhan endorses
8  this."  That means -- well, explain to me what you
9  mean when you say, "Mr. Narsimhan endorses this."
10   A.   Well, that's what he says, so I counted that
11 as positive.  When I do evaluations whether I am
12 retained by the plaintiff or the defense, I don't
13 always say that the plaintiff endorses it, but he
14 endorsed it.
15   Q.   Endorses means is positive in that
16 requirement No. 1 is met?
17   A.   I guess if you want to say it in more simple
18 language, that's what he says.  I mean, I think
19 "endorses" is clear, but if you have trouble -- that's
20 what he says.
21   Q.   So requirement No. 1 of the Budapest test for
22 CRPS is met, correct?
23   A.   Right.
24   Q.   Requirement No. 2 of the Budapest test for

98

1  CRPS is, "Symptoms described by the patient from three
2  out of the four designated diagnostic categories."
3  Mr. Narsimhan endorses this as well, correct?
4    A.   Correct.
5    Q.   So requirement No. 2 for the Budapest test
6  for CRPS is met, correct?
7    A.   Correct.
8    Q.   Requirement No. 3, that's the signs we were
9  talking about upon examination.  Two of the four
10 designated categories is required to have been met.
11 This one was not met, correct?
12   A.   No. 3 was not fully met, right.
13   Q.   So requirement No. 3 was not fully met
14 because only one but not two of the criteria were met;
15 is that accurate?
16   A.   Categories.
17   Q.   Categories.  Accurate?
18   A.   Yes.
19   Q.   All right.  So sensory was met after
20 vasomotor, sudomotor/edema, motor/trophic, correct?
21   A.   Correct.
22   Q.   So the vasomotor are things such as -- let me
23 check my notes, Doctor.  Vasomotor are things like
24 skin color changes, temperature differences, right?

99

1    A.   Right.
2    Q.   Sudomotor/edema are things like sweating or
3  excessive sweating, correct?
4    A.   Sweating, goose bumps.
5    Q.   Motor/trophic changes are things like
6  decreased range of motion, weakness, spasticity,
7  tremor, dryness around the skin, right?
8    A.   Well, a certain kind of dryness of the skin,
9  but yes, it would be scaly skin.
10   Q.   Scaly, okay.
11        You saw in Dr. Buvanendran's notes that he
12 noted upon examination that Mr. Narsimhan had color
13 changes to his right and left; you saw that, right?
14   A.   Right and left?
15   Q.   Yes.
16   A.   Okay.
17   Q.   I'm just asking about Dr. Buvanendran's
18 records that I know you reviewed.
19   A.   If it's right or left, it doesn't mean
20 anything.  Right and left, it doesn't mean anything to
21 me.
22   Q.   All right.  Well, let's be clear then.
23 Dr. Buvanendran noted in his records that there was a
24 color change to the right lower extremity; there was

100



1  temperature difference between the right lower
2  extremity and left lower extremity.  Do you see that?
3      A.  Well, I don't know what page you're on, which
4  document.
5      Q.  Dr. Buvanendran's records.
6      A.  Why don't you put it up on the screen.
7      Q.  I don't have it on the screen.
8  Dr. Buvanendran's record -- it's also on page 49 and
9  50 of his deposition if you want to look it up, if you
10 have access to that as well.
11     A.  Well, I do.
12     Q.  It says here there's change to the nailbeds.
13 What is that considered?  Is that a trophic change or
14 sudomotor change, vasomotor?
15     A.  It's not sudomotor.
16     Q.  I'm sorry.  Say that again.
17     A.  It's not a sudomotor change.  It could be a
18 vasomotor change if it's described as such.
19     Q.  So in Dr. Buvanendran's records and in his
20 deposition on page 49 to 50, he describes on
21 examination observing color change to the right lower
22 extremity, temperature differential, and changes to
23 the nailbeds in the right.  Do you see that?
24     A.  Trophic changes to the nailbed, yeah, he
                                                      101

1  does.
2      Q.  So that would -- in terms of signs on
3  examination, that would meet requirement three for the
4  Budapest criteria, correct?
5      A.  He met it on that date, yes.
6      Q.  In terms of symptoms, Dr. Buvanendran noted
7  hypersensitivity, the increased sweating, swollen, so
8  edema.  Those would be signs -- I'm sorry.  My
9  mistake.  Those would be symptoms consistent with
10 meeting requirement two of the Budapest -- let me back
11 up, Doctor.  I screwed that up entirely.
12         Dr. Buvanendran in his records and his
13 deposition indicated that there were certain symptoms
14 he elicited during his examination or his history of
15 Mr. Narsimhan which included burning, stabbing pain in
16 the right lower extremity, swollen right lower
17 extremity, color change to the right lower extremity,
18 hypersensitivity to the right lower extremity, and
19 increased swelling in the right lower extremity.  Do
20 you see that?
21     A.  Is that in his deposition or that's in his --
22     Q.  In his records.
23     A.  I'm looking at his record now.  What date?
24     Q.  The first date of examination.
                                                      102

1      A.  10/19, something like that?
2          I have 1/13/20, 2/14/20, 1/21/20.  That's a
3  follow-up.
4      Q.  7/30/19, try that one.
5      A.  When?
6      Q.  7/30/19.  Okay?
7      A.  Okay, here, 7/30/19.  Okay, I see it.
8      Q.  Okay, there we go.
9          So in Dr. Buvanendran's record of his
10 examination and history that he took of Mr. Narsimhan
11 on 7/30/19, the requirement Nos. 2 and 3 of the
12 Budapest criteria have been met, correct?
13     A.  Yes.
14     Q.  Requirement one would be met as well because
15 that's ongoing pain that is disproportionate with the
16 inciting event, correct?
17     A.  According to this.
18     Q.  And I think we talked about this earlier, so
19 what I'm wondering is -- I think you said that signs
20 relating to CRPS can wax and wane, and people can have
21 good days and bad days with regard to those signs,
22 right?
23     A.  True.
24     Q.  And do you know, maybe you don't know, but do
                                                      103

1  you recall that Mr. Narsimhan when he saw you, when
2  you were asking him questions, he told you that today,
3  when he was seeing you in the examination, was a much
4  better day than usual?  Do you recall that?
5      A.  I don't vividly recall it, but I wouldn't say
6  it didn't happen.
7      Q.  So hypothetically, if Mr. Narsimhan was
8  having a much better day on the day you saw him, which
9  was January 15th, 2021, that means he may have less
10 signs of CRPS than other days, correct?
11     A.  That's true.
12     Q.  Do you disagree with Dr. Buvanendran that
13 when Dr. Buvanendran saw Mr. Narsimhan that
14 Mr. Narsimhan met the requirements of CRPS?
15     A.  I have an issue, but as documented on that
16 visit, it would fulfill the diagnostic criteria for
17 CRPS.
18     Q.  So Dr. Buvanendran's examination and history
19 and findings of Mr. Narsimhan would be consistent with
20 fulfilling the Budapest criteria for CRPS.  True so
21 far?
22     A.  Yeah, I mean, 7/30/19.  Now, where I have
23 issue with Dr. Buvanendran is --
24     Q.  Before you give me your issue, answer the
                                                      104



1  question.
2      A.  Okay.  That exam as he documented would be
3  consistent with meeting the Budapest criteria for
4  diagnosis of CRPS.
5      Q.  Now tell me your issue.
6      A.  My issue is that all his exams have the exact
7  same temperatures at the same places, have the same
8  misspelling in words that he used like gauze, and it
9  kind of -- it compromises the credibility of this
10 whole situation if he's cutting and pasting.  There
11 are three exact exams on different dates where he has
12 temperatures measured at 1.5 degrees to the calf;
13 medial area, 2.5 degrees; 2.2 degrees at the foot.
14 And I can tell you that way, way, way beyond medical
15 probability that the temperatures -- three
16 temperatures at three different places to be exactly
17 the same on three different days is virtually
18 impossible.  Statistically way, way less than
19 1 percent.  Within medical probability, within medical
20 reason, within medical anything, you cannot have that,
21 and here's a guy on three different occasions
22 reporting the exact same thing.  That's what I have an
23 issue with.
24      Q.  I understand that.  Here's my question,

105

1  though, generally for you:  Can a patient meet the
2  Budapest criteria for CRPS on one examination, but
3  then possibly not meet the Budapest criteria on the
4  next examination --
5      A.  Yes.
6      Q.  -- or does it have to be -- okay.
7      A.  I think I answered that question to you a few
8  times already.
9      Q.  Oh, good.
10         So as a treating doctor, if you have a
11 patient who at times doesn't meet the Budapest
12 criteria but had previously met the Budapest criteria,
13 do you change the diagnosis?
14      A.  Actually, what I say under those
15 circumstances is that there are documented diagnoses
16 of CRPS in the chart, and that on my exam it appeared
17 that the CRPS is in remission if there were CRPS
18 before based on credible examinations.
19      Q.  That makes sense.  But you say, "in
20 remission," which does not change the diagnosis.  It
21 continues the diagnosis, but it's just the symptoms
22 are in remission?
23      A.  If they are credible exams, yes.
24         As a matter of fact, last week I did exactly

106

1  that on a plaintiff's exam.
2      Q.  I'm certain that you reviewed Physical
3  Therapist Schwartz's records and Physical Therapist
4  Fischer's records, correct?
5      A.  I don't know that I have Fischer's records.
6  I reviewed Schwartz's records.
7      Q.  You don't have Fischer's records?
8      A.  I don't think I do.
9      Q.  Maybe I'm mistaken.  I thought you had them,
10 but maybe not.
11      A.  I think I told you at the beginning I didn't.
12      Q.  I'm almost certain you told me you did not
13 have his deposition.  I know that for a fact.  But I
14 thought you had his records.  Maybe that's where I was
15 mistaken.
16      A.  I don't recall the name Fischer as I was
17 doing it.  Do you know the facility where I could look
18 for it?
19      Q.  Yes, I think I do.
20      A.  Hold on.  I can do a search.  Fisher,
21 F-i-s-h-e-r?
22      Q.  I have it, F-i-s-c-h-e-r.
23      A.  Wait.  We have to know for sure which way.
24      Q.  F-i-s-c-h-e-r, Brian Fischer.

107

1      A.  No items match the search.
2      Q.  In your practice -- let me just ask you this
3  way.  I'm not worried about that at this time.  I'm
4  going to try to wrap up, if I can.
5         In your practice, at times do you prescribe
6  physical therapy for patients with a diagnosis of
7  CRPS?
8      A.  Definitely.
9      Q.  So physical therapy is one recognized method
10 of treatment for CRPS, right?
11      A.  It's one important component.
12      Q.  Okay.  And are there certain -- to your
13 knowledge, are there certain physical therapists who
14 seem to have more training in regards to treating CRPS
15 patients than others?
16      A.  For sure.
17      Q.  Dr. Buvanendran, in fact, prescribed physical
18 therapy for his patient Dr. Narsimhan.  You saw that
19 prescription, right?
20      A.  You said Dr. Narsimhan.  Is he a doctor?
21      Q.  Did I mess up the question?  I had it right
22 for me.  I don't know about you.
23         Dr. Buvanendran prescribed physical therapy
24 to treat the right lower extremity symptoms in his

108



1  patient Mr. Narsimhan, right?
2      A.  Yes.
3      Q.  You don't have a problem with that
4  prescription for that type of treatment for those
5  symptoms, do you?
6      A.  No.  I'm very careful with how I prescribe it
7  myself, but I don't know his infrastructure to be able
8  to know if I like the way he prescribed it or not.
9  But it's the right thing to do.
10     Q.  And Physical Therapist Fischer -- let me back
11 up.  Physical Therapist Schwartz, who I know you did
12 review her records and her deposition, indicated upon
13 her initial examination of 1/13/20, she wrote down
14 "53-year-old male who presents with signs and symptoms
15 consistent with referring diagnosis."  Do you see
16 that?
17     A.  Yes.  Well, I don't see it.
18     Q.  Well, referring diagnosis, but take out the
19 words CRPS right lower extremity, right?
20     A.  Here, I have Lisa Schwartz in front of me
21 now.
22     Q.  Take a look at 1/13/20.  Its page 97 of the
23 records if it helps at all.
24     A.  Okay.  So she says -- hold on.  It looks like
109

1  I have 1/13/20, page 1 of 4, and then I don't have
2  pages 2 of 4.  I don't have pages 2 of 4, so I don't
3  have what you're quoting.
4      Q.  Do you have the diagnosis portion of that
5  where it says "Outpatient Physical Therapy Initial
6  Evaluation"?
7      A.  Excuse me.  I have page 1 of 4, which doesn't
8  go down to that.  Then pain location, pain range, and
9  then it goes right into -- unfortunately, it goes into
10 the exam of 2/14.  So I only have one page of that.  I
11 have plaintiff's Bates page 94.  Is that what you're
12 looking at?
13     Q.  No.  No, I'm looking at the records
14 themselves.  Maybe you're missing them.  But the
15 initial evaluation by Lisa Schwartz was on 1/13/2020.
16     A.  Which I have 1/13/2020.  I have that.
17     Q.  That's what I'm looking at.
18     A.  I only have one page of it.
19     Q.  Do you see on 1/13/2020 Lisa Schwartz's
20 records show a diagnosis CRPS --
21     A.  I don't think you're getting what I'm saying.
22 She had four pages of notes.  I only received one.
23     Q.  I'm asking which one?  Do you have a
24 diagnosis on one page?
110

1      A.  Page 1 of 4, the last thing is, "patient
2  goes".
3      Q.  So do you know what the patient,
4  Mr. Narsimhan, was -- what diagnosis Mr. Narsimhan was
5  referred to Lisa Schwartz to treat?
6      A.  She says the diagnosis was made in 2019.
7  Started with PT immediately after he had his first
8  injections.
9      Q.  So we don't know what the diagnosis was he
10 was referred to her for?
11     A.  Well, no.  It said there was a diagnosis made
12 in 2019.
13     Q.  It says, "a diagnosis."  What was the
14 diagnosis?
15     A.  No, it says, "diagnosis CRPS in 2019."  You
16 should be able to find that in the 1/13.
17     Q.  All right.  So Mr. Narsimhan presented to
18 Lisa Schwartz for physical therapy on 1/13/2020 with a
19 diagnosis of CRPS right lower extremity, agreed?
20     A.  That's what Dr. Buvanendran sent him to her
21 for.
22     Q.  And the assessment that Lisa Schwartz stated
23 in her records was "Patient is a 53-year-old male who
24 presents with signs and symptoms consistent with
111

1  referring diagnosis."
2      A.  Okay.  Please read her physical examination
3  to me because I don't have it.
4      Q.  I'm just asking you if you've seen the
5  assessment or not.
6      A.  Well, I've told you that I only have page 1
7  of 4 of that.  I've said it like three or four times.
8      Q.  So you're telling me you don't have the
9  assessment in that?
10     A.  I keep telling you the same thing.  Yes, I do
11 not have the assessment.  I only have Bates page 94,
12 page 1 of 4 of Lisa Schwartz's 1/13/20 note, and I'm
13 missing pages 2, 3, and 4.  It didn't come to me on
14 that PDF.
15     Q.  Did you ever ask the attorney who sent you
16 the records to give you more complete records for
17 Ms. Schwartz?
18     A.  I did not.
19     Q.  If you're missing certain portions of the
20 records, wouldn't that be relevant to your opinions?
21     A.  It would.
22     Q.  Then you're missing certain portions of
23 Linda Schwartz's examination and assessments of her
24 patient Mr. Narsimhan, right?
112



1    MS. HAY: I think it's Lisa Schwartz, by the
2  way, Steve.
3  BY MR. BERMAN:
4    Q.  Lisa Schwartz.
5    A.  It is.  It's Lisa Schwartz.
6    Q.  With that caveat, can you answer my question?
7    A.  The answer is, it would have been better if I
8  had asked for those records, but I missed that in the
9  plethora of records that I was reviewing.
10   Q.  Let me switch gears.  It is accurate you
11 commonly don't see nerve damage visible in patients
12 diagnosed with CRPS?
13   A.  Can you repeat that, please?
14   Q.  Is it accurate that you commonly don't see
15 nerve damage visible in patients diagnosed with CRPS?
16   A.  In CRPS 1.
17   Q.  In CRPS 1, that's true?
18   A.  That's true in CRPS 1.
19   Q.  CRPS 2 is when there's actual damage to a
20 nerve, correct?
21   A.  Correct.
22   Q.  You saw Dr. Saeed in her records and
23 deposition that she came to the conclusion based upon
24 her examinations of Mr. Narsimhan that her diagnosis
                                                      113

1  was CRPS right lower extremity, correct?
2    A.  Right.  And that was, in 7/7/18, two years --
3    Q.  I know when it was.  Just answer my question.
4  That's okay.
5    A.  I answered it.
6    Q.  And you disagree with that diagnosis, right,
7  by Dr. Saeed?
8    A.  I'm having trouble finding that note, but I
9  would like to -- do you have that note in front of
10 you?
11   Q.  Not that I can put on the screen.  I have it
12 in paper.
13   A.  I have a webcam myself.  I can give it to
14 you.
15      She makes a possible diagnosis of CRPS at
16 that time, and I guess my question is, why would that
17 happen two years after the incident?
18   Q.  My question is, Doctor, do you disagree with
19 Dr. Saeed's diagnosis of CRPS right lower extremity?
20   A.  I don't have the note in front of me at the
21 moment, and I can't commit.
22   Q.  You can't say whether you agree or disagree
23 with Dr. Saeed?
24   A.  Until I have the opportunity to review her
                                                      114

1  note, I cannot do that.  There are just so many
2  records here.
3    Q.  What about Dr. Buvanendran, Dr. Buvanendran
4  made a diagnosis of CRPS right lower extremity; you
5  saw that in the records, right?
6    A.  Yes.
7    Q.  Do you disagree with Dr. Buvanendran's
8  diagnosis of CRPS right lower extremity?
9    A.  I believe in his multiple duplicated
10 evaluations, that they did provide diagnostic criteria
11 for CRPS.  Asked and answered.
12   Q.  No, I know that you said that there were
13 diagnostic criteria present for CRPS in
14 Dr. Buvanendran's records.  I'm simply asking, as a
15 medical professional based on your review of the
16 records, do you disagree with Dr. Buvanendran's
17 diagnosis of CRPS right lower extremity for
18 Mr. Narsimhan?
19   A.  What I'm saying -- and I think I keep -- I
20 mean, I don't know how I can say it differently.  That
21 his documentation supports a diagnosis of CRPS in the
22 multiple duplicated evaluations that he put in his
23 chart.
24   Q.  So you agree with Dr. Buvanendran's
                                                      115

1  diagnosis?
2       MS. HAY: I'm sorry.  Can you read that -- I
3  missed that question, Steve, or can Ms. Court Reporter
4  read it back?
5  BY MR. BERMAN:
6    Q.  Sure.  I'm simply asking, can you tell me you
7  agree or disagree with Dr. Buvanendran's diagnosis?
8       MS. HAY: Hold on one second, Doctor.  I'll
9  just object to asked and answered.  I think he's
10 answered it already, but you can go ahead and answer,
11 Doctor.
12      THE WITNESS: Well, clearly, Mr. Berman, I
13 was not present at that exam.  And what I'm telling
14 you, Mr. Berman, is that his documentation if done
15 accurately, even though I raise the question how three
16 consecutive examinations could have the exact same
17 data in them, but if he is documenting accurately in
18 his three duplicated exams, then they do fulfill the
19 diagnostic criteria for CRPS.  And not being there, I
20 cannot go further in what I have to say.
21 BY MR. BERMAN:
22   Q.  So as a medicolegal consultant in this case,
23 you can't state an opinion of whether you agree or
24 disagree with Dr. Buvanendran's diagnosis?
                                                      116

1    A.   I'm going to say the same thing.  I wasn't
2  there.  What I can tell you is that he provided
3  adequate documentation in his duplicated examinations
4  to provide a positive diagnosis utilizing the
5  diagnostic criteria of Budapest -- of the
6  International Association for the Study of Pain for
7  the diagnosis of CRPS.
8    Q.   I know, but you weren't there for any of
9  these doctors who examined Mr. Narsimhan other than
10  yourself.
11    A.   Correct.
12    Q.   So despite that, you're giving opinions about
13  the diagnosis for Mr. Narsimhan's pain even though you
14  weren't present at the examinations of Dr. Saeed,
15  Dr. Buvanendran, Dr. Matiwala, Dr. Farbman, Physical
16  Therapist Fischer, Physical Therapist Schwartz, right?
17    A.   I don't have Physical Therapist Fischer's
18  notes at all, and Physical Therapist Schwartz, I don't
19  have the salient parts of her notes.  And on the
20  others, the only thing I can opine on is whether they
21  met the diagnostic criteria based on their
22  documentation.
23    Q.   It is a fair characterization to say that the
24  only thing you can really opine on is whether the

117

1  records accurately documented the diagnostic criteria
2  for CRPS on any given date?
3    A.   That's what I'm telling you.
4    Q.   So Mr. Narsimhan may have had the diagnostic
5  criteria for CRPS on dates other than the documented
6  dates of Dr. Buvanendran, but it wasn't properly
7  documented, that's possible, fair?
8    A.   Well, that's flipping it the other way.  And
9  what that's saying is, maybe people did completely
10  inadequate exams on other days, and that's why they
11  didn't come up with the diagnosis of CRPS.  I think
12  that's what you're trying to say.
13    Q.   Have you ever seen any doctors who maybe
14  aren't as familiar with the Budapest criteria as you
15  who perform examinations of patients, and then maybe
16  don't document the Budapest criteria as carefully as
17  you?
18    MS. HAY:  Can you read that back, please?
19  That was a long question.
20         (whereupon, the record
21              was read as requested.)
22    MS. HAY:  I'm just going to object to form,
23  foundation and vague and confusing.  But if you
24  understand, you can answer that, Doctor.  Go ahead.

118

1    THE WITNESS:  I'm going to answer it,
2  Ms. Hay, the way I want to answer it.  You may not
3  like the answer.
4    At least what I'm gleaning from what you're
5  saying, Mr. Berman, is do I see people that make a
6  diagnosis of CRPS but did not provide adequate
7  diagnostic criteria to establish that diagnosis, and
8  clearly I see that all the time.
9  BY MR. BERMAN:
10    Q.   And do you see the opposite as well, Doctor,
11  you at times see doctors who fail to recognize CRPS
12  because they don't perform the Budapest criteria
13  examination?
14    A.   Yes, I see that, too.
15    Q.   Okay.  And in this case, Mr. Narsimhan saw
16  Dr. Farbman and Dr. Saeed, and I think in your
17  opinion, the Budapest criteria was not properly
18  documented, correct?
19    A.   Nobody ever -- I mean, Dr. Farbman's account
20  from what I gleaned from reading his notes and the way
21  he does things -- it appears he may have retired.  I
22  don't know.  I got that impression from the chart.
23  But I got the impression he was a competent
24  neurologist that were CRPS present he would have

119

1  picked it up.
2    Q.   What gave you that impression?
3    A.   Because a competent neurologist should be
4  able to do that.
5    Q.   You think any competent neurologist in the
6  world should be able to do that?
7    A.   Well, should and does are two different
8  things, but if it's a competent neurologist, "should"
9  fits.
10    Q.   How do you -- what makes you think that
11  Dr. Farbman is such a competent neurologist that he
12  should be able to perform a Budapest criteria
13  examination and document it properly?
14    A.   Well, that's a whole different thing.  That's
15  different than what you asked me, sir.  What you asked
16  me is would he be competent to be able to make a
17  diagnosis, and documenting it is another thing.  But
18  based on the way his notes are written -- and believe
19  me, I see the broad spectrum of notes.  And based on
20  the quality of his notes, it's my opinion that he's a
21  competent neurologist.  Now, I'm not there at his own
22  institution, but he's not at a shabby institution
23  either.  That in a good institution somebody who keeps
24  good notes, who doesn't copy his notes from visit to

120



1  visit verbatim is a competent neurologist.
2      Q.   Is there any other reason other than doesn't
3  copy his notes from day to day that indicates that
4  Dr. Farbman is a competent neurologist capable of
5  understanding and performing and documenting the
6  Budapest criteria, anything else?
7          MS. HAY:  Just object to misstating his prior
8  testimony about his review of his record, but you can
9  go ahead and answer, Doctor.
10         THE WITNESS:  And, Ms. Hay, thank you,
11  because I was going to use nonlegal words to say he
12  was twisting what I was saying.
13         And the bottom line is, I'm not saying that
14  he was competent to document the diagnostic criteria
15  for CRPS, but he's competent to be able to make a
16  diagnosis even if he doesn't document it properly or
17  at the minimum -- and this is really important -- at
18  the minimum raise in his differential diagnosis, which
19  any competent neurologist would do, would raise the
20  possibility of CRPS if it was present, and he did not
21  do that.
22  BY MR. BERMAN:
23      Q.   What about Dr. Saeed, did you get the
24  impression that she was a competent neurologist to
                                                    121

1  make a diagnosis of CRPS even if she doesn't document
2  the Budapest criteria properly?
3      A.   I think she is competent to raise the
4  question of CRPS, which is what most of the
5  neurologists in my community do.  They don't fully
6  establish a diagnosis.  They raise it so that when
7  they send the patient to me, I can actually opine as
8  to whether it truly is or isn't.  And I would say that
9  that's a mixed bag about what comes back.
10      Q.   Dr. Saeed raised the issue potentially of
11  CRPS on her very first examination of Mr. Narsimhan on
12  7/17/2018.  Did you see that?
13      A.   That is correct, and I'm looking for that
14  record.  I'm having trouble finding it.  But that date
15  is indelled [sic] in my mind, engraved in my mind.  So
16  I remember that date.  I remember seeing that.  But
17  I'm having trouble finding it to read it to remember
18  whether or not she did appropriate documentation on
19  that date.
20      Q.   What does the word -- I saw a word in the
21  records, Doctor, I don't understand.  What is
22  dysesthesias, d-y-s-e-s-t-h-e-s-i-a-s?
23      A.   Could you repeat -- spell it again.  Spell it
24  more slowly, please.
                                                    122

1      Q.   D-y-s-e-s-t-h-e-s-i-a-s.
2      A.   Can you write it on a paper, and just put
3  it --
4          MS. HAY:  I think it's dysesthesias.
5          THE WITNESS:  Oh, "D."  I didn't hear the
6  "D."  Okay, I got it now.  Linda helped me.
7          Dysesthesia means an abnormal sensation.
8  Something feels differently than it's supposed to
9  feel.
10  BY MR. BERMAN:
11      Q.   Is that a potential indication of CRPS
12  sensory criteria?
13      A.   Not a big one unless you consider allodynia
14  dysesthesia, which I don't.  Dysesthesia could be
15  feeling like ants are crawling on you, which is also a
16  form of dysesthesia called formication.  But it's
17  like, if you touch somebody and it feels differently
18  than what you're touching, or you just have
19  different -- dys means not functioning properly, and
20  esthesia means sensation.  So sensations not working
21  right is what dysesthesia is.
22      Q.   Can that be a sensory -- can that relate to
23  the sensory category of CRPS symptoms or signs?
24      A.   Clinically, yes.
                                                    123

1      Q.   What is claudication?
2      A.   Claudication is essentially decreased blood
3  flow to an area.
4      Q.   Is claudication pain and burning pain?
5      A.   No.
6      Q.   No?  What are the symptoms of claudication?
7      A.   Feeling of ischemia.
8      Q.   What does that mean?
9      A.   What does that mean?  Ischemia is decreased
10  blood flow.
11      Q.   What does decreased blood flow feel like to a
12  patient?
13      A.   Very unpleasant.
14      Q.   Painful?
15      A.   Yes.
16      Q.   So claudication-like symptoms would be
17  painful symptoms, right?
18      A.   Yes.
19      Q.   Very painful, right?
20      A.   Caused by decreased blood flow.
21      Q.   Well, claudication-like symptoms would be
22  symptoms that are severely painful, correct?
23      A.   Claudication is claudication.  Claudication
24  is basically too little blood flow to the muscles
                                                    124



1  during exercise is what claudication is.
2      Q.   Is claudication a diagnosis?
3      A.   Well, it's a sign or it's a symptom.
4      Q.   The words "claudication-like symptom" would
5  be describing the feeling a person has from
6  claudication; wouldn't you agree?
7      A.   I don't really understand the question.
8      Q.   You know what claudication is?
9      A.   Right.
10      Q.   You know what claudication symptoms feel
11  like, right?
12      A.   Yeah, it's usually like a cramping of the
13  muscles because -- okay.  There are two kinds of
14  claudication.  There's vascular claudication.  There's
15  spinal claudication.  And basically, you're walking
16  down the street and your legs cramp up because they're
17  not getting enough blood flow or that the spine is not
18  providing enough positive input into the leg that the
19  legs cramp up, and you can't walk anymore.  That's
20  what claudication is.  So it's essentially a muscular
21  kind of problem, not nerve kind of problem.
22      Q.   But patients don't come to you and say, "Hey,
23  Doctor, I'm feeling claudication today," do they?
24      A.   That's -- I mean, is a patient going to come

125

1  to me and tell me they have paroxysmal atrial
2  tachycardia or paroxysmal delanncination.  I mean, a
3  patient doesn't come to me and tell they have
4  claudication.
5      Q.   Right.  Patients comes in and tell you that
6  they're feeling pain or burning pain, and doctors have
7  to describe it in some way, right?
8      A.   Right, okay.
9      Q.   And a doctor may describe burning pain as
10  claudication-like symptoms, right?
11      A.   Are you testifying to that or making it up?
12      Q.   Can you answer my question, Doctor?
13      A.   Well, they wouldn't do that because it's
14  wrong.
15      Q.   I thought you said claudication-like symptoms
16  would be painful.  Is that wrong?
17      A.   Yeah, okay.  Hitting your hand with a hammer
18  is painful and putting a soldering iron on your hand
19  is painful, but they're not the same.  And having
20  muscular pain due to ischemia is very different than
21  having burning nerve pain, and so they're not the
22  same.
23      Q.   So what does the muscular pain due to
24  ischemia feel like?

126

1      A.   Cramping.  It's a severe dull ache.
2      Q.   Severe dull ache, is that what you said?
3      A.   It doesn't even have to be severe.  Dull
4  ache.
5      Q.   It can be severe, though?
6      A.   Can be severe.
7      Q.   So claudication-like symptoms could be a
8  severe dull ache, correct?
9      A.   Correct, yeah.
10      Q.   The only reason I'm asking you that is
11  Dr. Farbman on 2/9/17 wrote down "claudication-like
12  symptom."  Do you know what he's referring to there?
13      A.   Well, I mean, that could be ischemia caused
14  by diabetic -- not peripheral neuropathy, but by
15  sequelae of diabetes because that's very, very common
16  in diabetes.
17      Q.   Or it could just be he's describing a severe
18  dull ache, right?
19      A.   Well, you have to have a reason to have the
20  dull ache.
21      Q.   Going back to your medical examination.
22  Relative to requirement No. 4, you said requirement
23  No. 4 of the Budapest criteria was not met because
24  there was another explanation for Mr. Narsimhan's

127

1  right lower extremity pain, and that was diabetic
2  peripheral neuropathy with pain, correct?
3      A.   Right, which it looks like on this occasion I
4  would have to say that that's not accurate.
5      Q.   What do you mean by that?
6      A.   I mean, I have to withdraw No. 4 not being
7  satisfied.
8      Q.   So previously based on your report, your
9  examination when you said requirement No. 4 was not
10  satisfied, you're withdrawing that, and you're saying
11  it was satisfied as of right now, right?
12      A.   Correct.
13      Q.   Understood.
14           I'm just looking at your report.  I'm just
15  going to wrap up here, just getting some report
16  questions done.
17           In your report on page 5, your independent
18  medical examination report which is Exhibit B-1,
19  page 5, the sixth paragraph down.
20      A.   Hold on.  Okay, page 5.
21      Q.   The sixth paragraph down where it says,
22  "Mr. Narsimhan has diabetes mellitus" -- actually, I'm
23  going to skip that and go down to the next paragraph,
24  which is, "Mr. Narsimhan was not considered to have a

128

Joshua P. Prager, M.D. 06/21/2021

1  diagnosis of complex regional pain syndrome until
2  three years after the incident."  Do you see where you
3  wrote that there?
4      A.  It should have been two.
5      Q.  It should have been two.
6      In your experience, I mean, in your clinic
7  and in your work as a medicolegal examiner, is there
8  some range of timing when CRPS gets actually diagnosed
9  after a traumatic event?
10     A.  Yes.
11     Q.  What is that range?
12     A.  It's usually within three months that the
13 patient has unrelenting problems and seeks care to the
14 point that they get care unless they don't have
15 insurance.  That's the only situation -- I would say
16 that's pretty much the only situation when somebody
17 has active CRPS that they don't start getting treated
18 for CRPS in the first three months unless -- I mean,
19 not in Chicago, okay, but if they were in the boonies
20 somewhere, then it could happen.  But like in LA,
21 which is the same as Chicago for all intents and
22 purposes as we're talking here today, if you have CRPS
23 and you're at month three and things are bugging you,
24 you're going to a doctor on a regular basis and

129

1  complaining about how bad it is.  That's the natural
2  course of CRPS.
3      Now, there are doctors that have a dull ear
4  toe to that.  And, you know, it may be gratuitous for
5  me to be saying that here, but, you know, they still
6  usually will write it down and then ignore it.  But
7  what we have here is a guy who's getting a lot of
8  medical care, and he's just not behaving like a CRPS
9  patient would behave saying, "We got to get rid of
10 this.  You know, you really got to treat me.  I need
11 something done about this."  And we're just not seeing
12 that, and that's the reality of the world I live in.
13     Q.  In Mr. Narsimhan's case, within two months
14 after his incident at Lowe's, so on August 2nd, 2016,
15 he's prescribed a medication called Lyrica.  Is Lyrica
16 used for nerve pain, to treat nerve pain?
17     A.  Yes.
18     Q.  Can Lyrica be used at times to treat CRPS
19 pain?
20     A.  Yes.
21     Q.  I know that obviously we talked about this.
22 At some point the Lyrica was changed to Gabapentin.
23 But at least you agree with me as of August 2nd, so
24 within that three-month time frame after the incident

130

1  at Lowe's, Mr. Narsimhan is being prescribed Lyrica
2  which potentially could be a treatment for CRPS pain,
3  right?
4      MS. HAY:  Objection, asked and answered.  You
5  can answer again, Doctor.
6      THE WITNESS:  I'd say I haven't answered it
7  for Lyrica.  I answered it for Gabapentin.  They're
8  cousins, and either can be used.  And neither is FDA
9  approved for that purpose.  And I don't think we
10 separated out the hand neuropathic pain at that point
11 from leg neuropathic pain, so I don't really know
12 which he was prescribed for.  Are you saying August of
13 2016?
14 BY MR. BERMAN:
15     Q.  Yes, Doctor, 8/2/2016, August 2nd.
16     A.  Is that Farbman?
17     Q.  It is, Doctor.
18     A.  Okay.  Let me just pull it up.
19     I'm just looking for that.  I have
20 Dr. Saeed's notes in front of me now, which I couldn't
21 find before.  I think I have Farbman's notes.  I'm
22 having trouble finding Farbman's notes as we're
23 speaking here.
24     MS. HAY:  I don't know if -- they were under

131

1  Northwest Neurology, if that helps, Doctor.
2      THE WITNESS:  Yeah, except the Northwest
3  Neurology I'm pulling up right now is only pulling up
4  Dr. Saeed's notes.
5      MS. HAY:  I thought they were all in one
6  bundle, but I think some of them might have been a
7  little out of order.
8      Doctor, are your Northwest Neurology notes
9  Bates stamped?
10     THE WITNESS:  They're not Bates stamped.
11 BY MR. BERMAN:
12     Q.  Doctor, for this reason -- at the very
13 beginning of the deposition I asked you to put your
14 file on a disc or in a drive somewhere and get it to
15 defense counsel so they can get it to me.  I'm asking
16 you to get all your records, whatever you reviewed in
17 relation to this case, put it all on one drive, and
18 let me take a look at what you got.  So I appreciate
19 that.  Thank you.
20     MS. HAY:  I don't know if it will help you
21 then, Doctor, but the August 2nd, 2016, note that I
22 have is Bates stamped page 39 out of 58 pages total,
23 if that's helps.
24     THE WITNESS:  It doesn't look like -- I don't

132

1  know what happened, but it looks like it's missing.
2  Oh, wait.
3  BY MR. BERMAN:
4      Q.   Can we move on, Doctor?
5      A.   Well, you want -- yeah, you can.  I'm just
6  having computer problems right now, but I think I
7  found it.  It looks like I found it.  I'm sorry.  It's
8  just not easy to find right now.  You can move on.
9  BY MR. BERMAN:
10     Q.   I'm going to share my screen, and show you
11  what's attached as Exhibit B to your deposition.  And
12  this is B-3.  It's your three-page expert report.
13     A.   Right.
14     Q.   My question for you, Doctor, is this a
15  document you typed or is this something that defense
16  counsel typed and you signed?
17     A.   No, this looks like my typing.
18     Q.   So page 1 of Exhibit B-3 is, No. 1,
19  Qualifications.  That's all your qualifications.
20  That's true for any expert report you do no matter
21  what, right?
22     A.   Correct.
23     Q.   All right.  So this --
24     A.   No, that's not true.  That's true for ones

133

1  that I do with regard to complex regional pain
2  syndrome.
3      Q.   So you use this page of qualifications for
4  any report you do for complex regional pain syndrome?
5      A.   Well, actually, I kind of create each
6  individually, but this is the one I created as my
7  qualifications for CRPS.
8      Q.   Is this a cut-and-paste job for
9  qualifications you've used before?
10     A.   I don't believe so, no.
11     Q.   And page 2 is your opinions, and it goes on
12  to page 3, right?
13     A.   Yes.
14     Q.   And you would amend these opinions based upon
15  your testimony today, right?
16     A.   Excuse me?
17     Q.   You would amend your opinions based upon your
18  testimony today, right?
19     A.   Correct.
20          MS. HAY:  I'm sorry.  You trailed off, Steve.
21  Sorry.
22          MR. BERMAN:  Judy, what did I say?
23               (whereupon, the record
24                was read as follows:

134

1                    "Q. You would amend your opinions
2                     based upon your testimony today,
3                     right?
4                     A. Correct.")
5  BY MR. BERMAN:
6      Q.   Lastly, Doctor, I know we went over your
7  examination.  I'm going a little bit further.  One
8  thing I wanted to ask you relative to your examination
9  of January 15th, 2021, had you upon examination found
10  one additional sign of CRPS in the vasomotor,
11  sudomotor, or even motor/trophic, the Budapest
12  criteria would have been met, and the diagnosis would
13  have actually been CRPS, correct?
14          MS. HAY:  I'm sorry.  Steve, you're just
15  getting distorted.  Ms. Court Reporter, did you hear
16  that?
17               (whereupon, the record
18                was read as requested.)
19          MS. HAY:  Did you hear and understand that,
20  Doctor?
21          THE WITNESS:  I did, and I answered it twice.
22  Yes.
23          MR. BERMAN:  I'm sorry, Doctor, it's been so
24  long.  We're over three hours.  I have no further

135

1  questions at this time.
2          THE WITNESS:  I thought it was going for four
3  hours.
4          MR. BERMAN:  Do you want me go another hour,
5  Doctor?
6          MS. HAY:  I've got some questions.
7          THE COURT REPORTER:  Could I just take two
8  minutes?
9          MS. HAY:  Sure.
10               (whereupon, a short break
11                was taken, after which the
12                following proceedings were
13                had:)
14                    EXAMINATION
15  BY MS. HAY:
16     Q.   Doctor, the report that you prepared with
17  regard to this matter that outlines your
18  qualifications, as well as your opinions, are those
19  all opinions that you hold to a reasonable degree of
20  medical certainty?
21     A.   They're not all of them, no.
22     Q.   Are the ones that are listed here in that
23  report, are those your -- are those opinions all to a
24  reasonable degree of medical certainty, though?

136

1    A.   Wait.
2         MR. BERMAN:  Which report?
3         MS. HAY:  His expert report.
4         THE WITNESS:  So I have to break the
5    question -- I'm not trying to be -- I am a little
6    punctilious here.  But why don't you ask the first
7    question -- oh, the first one was, were they all my
8    opinions; is that correct?
9    BY MS. HAY:
10        Q.   Let me restate it, Doctor.  In your expert
11   report where you lay out your opinions -- do you have
12   that in front of you?
13        A.   No, but I can get it.
14        MR. BERMAN:  Exhibit B-3.
15        THE WITNESS:  You want to just put it on the
16   screen.  It will be easier than me finding it and save
17   us some time.
18        MR. BERMAN:  I can do it quickly.
19        MS. HAY:  If you can do it quickly because
20   I'm on my iPad.
21        THE WITNESS:  Okay, there it is.  Yes.
22   BY MS. HAY:
23        Q.   Doctor, are these all of your opinions to a
24   reasonable degree of medical certainty?

137

1    A.   They are not.
2         Q.   Can you tell me are there -- what's the
3    reason for that?
4         A.   The reason for that is that there are
5    different -- there are additional records that have
6    been provided to me since then, and they have allowed
7    me to form other opinions.
8         Q.   Doctor, can you just be a little more clear
9    for me with regard to which opinions are different?
10        A.   Well, they're not different.  You just said
11   they're additional.
12        Q.   Which are the -- can you tell me what
13   additional opinions you have?
14        A.   Yes.  I have an opinion that there's a marked
15   discrepancy between the way I conducted the exam on
16   1/15/21 than the way Dr. Patel documented the way that
17   Mr. Narsimhan said I did it, and we could go into
18   greater detail.  But what I can tell you is that there
19   was an intervening exam performed a month later which
20   was a month before Dr. Patel's exam, and in that exam
21   there was no mention of an exacerbation occurring as a
22   result of -- I don't know what words to use -- hold
23   on.  I'll get you the exact words so you have it.  In
24   which Mr. Buvanendran indicated that his right --

138

1    Q.   Excuse me.  You mean Mr. Narsimhan?
2    A.   Yes, sorry.  I misspoke.
3         Mr. Narsimhan claims that his right leg was
4    handled in a rough manner in which a flare of his
5    CRPS -- which prompted a flare of his CRPS.  Now, very
6    interesting that the same gentleman who reported that
7    to Dr. Patel on -- in March of 2021, did not report
8    that at an intervening examination in any way that he
9    had a flare or that he had his limb handled in a rough
10   manner.  And what I can say is, number one, in that
11   regard as somebody who's an expert in CRPS, I'm
12   exquisitely sensitive to the fact that CRPS patients
13   can have bad reactions to what is done.  And so I am
14   extra careful in my medical practice in avoiding
15   anything that could traumatize a patient.  Now, that's
16   in my medical practice.
17        In my medicolegal practice, especially when I
18   am evaluating on behalf of defense, I am
19   extraordinarily cognizant of that, and even more
20   careful than I am in my clinical practice.  And what I
21   can tell you based on what my written documentation
22   that was done before this accusation is that I
23   indicated on every occasion that I deferred a part of
24   an examination because of his complaints of pain, and

139

1    it's really incredulous to me with Mr. Berman present
2    who would have stopped me if I was doing anything
3    painful to his client, with my special care to do
4    that, with him not complaining about it a month later
5    that he would then at a plaintiff's expert examination
6    then come up with this accusation is patently not
7    true.
8         Q.   Doctor, as far as the record that you relied
9    upon where that suggestion or outright statement was
10   made, was that to your understanding made in an
11   accounting when he went to Rush Pain Clinic on
12   March 2nd, 2021, and made that complaint to Dr. Patel,
13   a fellow in Dr. Buvanendran's office?
14        A.   Yes.
15        Q.   Was there any indication -- so your
16   independent medical exam was on January 15th of 2021,
17   correct?
18        A.   Correct.
19        Q.   And this complaint then that Mr. Narsimhan
20   made about your rough handling of him was made about
21   two months later, fair?
22        A.   Correct.
23        Q.   And was there any indication that you saw in
24   any of the records that you were provided surrounding

140



1    Dr. Patel/Buvanendran's evaluation on March 2nd that
2    Mr. Narsimhan had contacted any of those doctors at
3    Rush prior to March 2nd but after your examination?
4        A.   No.
5        Q.   Within that time period, Doctor -- well, one
6    other question about that.  Was it your understanding
7    as well that Mr. Narsimhan on March 2nd for the first
8    time told Dr. Patel and/or Dr. Buvanendran that as a
9    result of your rough handling he had a "flare" of his
10   condition in his lower extremity?
11       A.   That's what I just read.
12       Q.   And was it your understanding that at that
13   evaluation as well he now complained that he had had
14   some more significant complaints now to his left lower
15   extremity?
16       A.   Yes.
17       Q.   And that complaint -- I'm looking at the
18   wording in that report, and it says, "Now he has left
19   leg burning pain in dorsum of foot, slow nail growth,
20   no hair growth.  He continues to work."  And that's in
21   the third paragraph under history and physical?
22       A.   Yes.
23       Q.   Within that time period, was it your
24   understanding also, Doctor, that in February of 2021

141

1    that Mr. Narsimhan saw the plaintiff's retained expert
2    for an independent medical exam, Dr. Joshi?
3        A.   Wait.  On what day?
4        Q.   In February of 2021, a month after your
5    examination.
6        A.   Yes.
7        Q.   And I believe the date of that was
8    February 19th, 2021.  Does that sound about right to
9    you?
10       A.   Yes.
11       Q.   Was there anything you recall reading in
12   either the report of Dr. Joshi's independent medical
13   exam or Dr. Joshi's deposition where he indicated that
14   Mr. Narsimhan complained to you that you were rough in
15   your treatment of him in your exam?
16       A.   No.
17       Q.   Was there any indication that you recall
18   reviewing in either Dr. Joshi's examination, report,
19   or in his deposition that Mr. Narsimhan had a flare
20   after your evaluation on January 15th?
21       A.   No.  And just to point out, Ms. Hay, to be
22   fair to all of us, Dr. Joshi did not have his
23   deposition taken until April, so that what occurred in
24   February should have -- he should have commented upon

142

1    it in his deposition should it have occurred, should
2    it have been reported to him as the expert.
3        Q.   With regard to Dr. Joshi, is it your
4    understanding that Dr. Joshi -- well, strike that.
5             Do you believe that your qualifications with
6    regard to this particular case exceed those of
7    Dr. Joshi as it may apply to either your treatment of
8    CRPS patients or your experience, education, and
9    training in the area of diabetes?
10       A.   Well, first, I mean, I want to say in
11   fairness to Dr. Joshi, I believe he's a qualified
12   physician.  He's a qualified pain physician.  So I
13   don't want to underrate him in any regard, and I
14   always have respect for board-certified physicians.
15   He's a board-certified pain physician.  But there are
16   two things that you bring up in your question that
17   really need to be addressed.  And the first one is, do
18   I have more qualifications in CRPS, and I think
19   Dr. Joshi would not dispute that I do.  I mean, it's
20   what I do for a living.  It's 80 percent of my new
21   patients, and I've been doing it for 25 years.  And I
22   believe I have more qualifications in CRPS than he
23   does without trying to diminish him in any other way.
24             with regard to the second question that you

143

1    asked, I am a board-certified internist having taken
2    care of medical patients for a significant portion of
3    my career, having completed an internal medicine
4    residency, and as a result I have experience in
5    dealing with obese, diabetic patients.
6        Q.   Doctor, with regard to -- well, strike that.
7             As to the Budapest criteria, Doctor, do you
8    feel you are well qualified to apply the Budapest
9    criteria?
10       A.   Yes.
11       Q.   Is it important to you, Doctor, in applying
12   the Budapest criteria that there are precise
13   measurements and assessments that are done with regard
14   to the various categories that need to be assessed?
15       A.   Yes.  I wanted to point out one other thing
16   that I wasn't given the opportunity to say, which is,
17   in Dr. Patel's note that was signed by
18   Dr. Buvanendran, we also, once again, have the
19   identical physical examination that has gone through
20   the record from visit to visit to visit.  So I think
21   it is very safe to say that given that that
22   examination was pasted from other examinations that we
23   really do not know what the examination was on that
24   day.

144



1    Q.   Doctor, on page 27 of Dr. Buvanendran's
2  deposition, he was asked this question and answer, and
3  I'm going to read it for you and ask if this is
4  consistent with your comments with regard to the
5  records of Dr. Buvanendran through some of his visits.
6  And for the record, I'm reading on page -- starting on
7  page 26 and continuing on to page 27.  The question
8  is, "And, in fact, the entire examination section that
9  you've written, down to the punctuation is exactly the
10  same as the prior visit.  Is it unusual that your
11  examination of the patient three months later is
12  exactly the same?"  Answer:  "No, it's not.  You
13  asked" -- and then there's some objections.
14  Dr. Buvanendran continues in answer:  "You know, when
15  I see a patient and make a diagnosis, we don't -- it's
16  part of an electronic medical record.  The records are
17  carried over from the previous time.  But the fact is
18  I do examine the patients every time, and if there are
19  similar findings, I don't go correct everything.  It's
20  just this auto populates the facts.  So it is very
21  similar whether it's 2.2 or 2.1.  It's not a huge deal
22  to me.  I'm treating patient -- a patient here.  I'm
23  not treating numbers or doing legal stuff.  So I'm
24  trying to treat the patient, and you want to be able
                                                      145

1  to provide appropriate medical care once you know what
2  the diagnosis is.  You don't need to be documenting
3  every time you see a patient."  And I don't think the
4  last sentence really applies.
5       Does that support, Doctor, your comments with
6  regard to some of the credibility issues about
7  Dr. Buvanendran's findings in his notes?
8       A.   Well, before I answer that, I just want to
9  tell you, Ms. Hay, that I had one of my trainees copy
10  a note from one visit to the next, and I warned him
11  that if he did it again he wouldn't be working with
12  me.  That I feel extremely strongly, and it is -- it's
13  not just me.  It is the standard of care that what you
14  do on a specific day is what happened on a specific
15  day.  And to copy something from another day is -- I
16  mean, sometimes they copy from other doctors, and
17  essentially that's plagiarism.  But here he copied
18  from himself, and whether he cares about the numbers
19  or doesn't care about the numbers, he shouldn't be
20  documenting numbers from another occasion because
21  that's not what happened on that day, and it's
22  misleading.  And it is below the standard of care,
23  very clearly, Ms. Hay, it is below the standard of
24  care to copy a note from one day and put it in another
                                                      146

1       day.
2            Now, there a lot of things that don't change
3  that are self-populated like all the medications the
4  patient is taking, what the prior history is.  But the
5  exam on that day is something that happens on that
6  day, and there is no freedom, absolutely no freedom to
7  copy the exam from a different day into that day.  And
8  I don't think I can be any more clear on that.
9       Q.   Doctor, is it your opinion to a reasonable
10  degree of medical certainty that Mr. Narsimhan does
11  not fit the diagnosis for CRPS?
12       A.   Based on my examination, yes.
13       Q.   You were asked some questions with regard to
14  Dr. Matiwala's assessment of Mr. Narsimhan's diabetic
15  condition, and I know you talked a little bit about
16  his diabetic condition prior to the event at Lowe's.
17  Was it your understanding that in accord with
18  Dr. Matiwala's comment that an AIC over 7 or above
19  would not indicate a good control of a diabetic; that
20  there were AIC numbers that Dr. Matiwala recorded
21  after the Lowe's event that were indeed 7 and above?
22       A.   It's not AIC.  It's A1C.
23       Q.   I'm sorry.  A1C.
24       A.   Sorry.  I'm not being fussy.
                                                      147

1       Q.   That's okay.  Thank you.
2       A.   I am not recalling others.  I don't want to
3  say one way or the other where I saw them or not, but
4  I don't want to swear to the fact that I saw other
5  numbers over 7 in Dr. Matiwala's notes.  But I
6  certainly wouldn't rule that out.  I have to swear
7  that I can't remember.
8       Q.   That's okay.  If you don't remember, Doctor,
9  that's fine.
10            With Dr. Matiwala's records, whatever the A1C
11  numbers are in his records after the event you would
12  agree would be numbers we could rely upon, fair?
13       A.   Exactly and fully fair.
14       Q.   Doctor, we were recently provided with, and I
15  provided you with some photographs that were taken of
16  apparently Mr. Narsimhan's feet.  Do you recall
17  getting those photographs?
18       A.   Yes.  I can pull them up because I do know
19  exactly where those are.
20            Okay, I got them.
21       Q.   And, Doctor, it's our understanding that
22  these photographs -- I'm not sure if you had the
23  actual dates, but on representation by Mr. Berman, and
24  he can correct me if I'm wrong, these photographs were
                                                      148



1 taken by either Mr. Narsimhan or his wife and were
2 taken I believe the first -- it might be tough to
3 pinpoint the actual dates. But the first two were
4 taken in I believe about August 2019 and the remainder
5 in the later half of 2020.
6       MR. BERMAN: For the record, I did provide
7 counsel with the exact dates the pictures were taken,
8 if you recall.
9       MS. HAY: That's correct, you did, Counsel.
10 But I think that's about the range that we were
11 talking about generally speaking.
12 BY MS. HAY:
13       Q.   With regard to those photos, Doctor, does
14 anything in these photos change your opinion that
15 Mr. Narsimhan does not have CRPS?
16       A.   There is only one out of all those
17 photographs, which is the next-to-last photograph that
18 there's a comparison where there appears to be any
19 kind of difference, and that difference is
20 predominantly scaling that we could explain a variety
21 of ways, including not washing your foot. And so all
22 the others -- I could comment on each individually
23 why they don't mean anything to me. And on this fifth
24 one, we would use basically requirement four if it

149

1 were showing up on that day to say that the only thing
2 that looks different is the scaling, and that that
3 scaling -- you know, the color -- likely looking at
4 the other pictures, his one foot has more exposure to
5 the sun than the other one. That's where I would
6 explain the pigmenting in the first picture between
7 the two feet. CRPS pain looks like -- the sign looks
8 like a sun exposure sign. And in this one, which is
9 the next-to-the one, that's not usually what you see
10 as a CRPS skin change anyway, but if you want to call
11 it that. We don't know what circumstances happened.
12 For all we know, that's wet talcum powder on the foot.
13 I don't know. I'm not there. I can't smell it; I
14 can't feel it; and I can't say it means anything
15 anyway.
16       Q.   With regard to CRPS, Doctor, I know you
17 indicated that patients can have some good days and
18 some bad days, right?
19       A.   Correct.
20       Q.   We know, though, that Mr. Narsimhan
21 specifically described what he told Dr. Patel
22 apparently was a flare after your IME, fair?
23       A.   Fair.
24       Q.   Was there any indication in any of the

150

1 records or anything that you've seen that would
2 indicate that Mr. Narsimhan during the course of some
3 flare took any specific photos of his feet during the
4 time of that flare?
5       A.   No.
6       Q.   Is there any indication through any of the
7 other -- of the numerous medical providers that he's
8 seen that would suggest to you that they took any
9 photographs of his feet to confirm how his feet may
10 appear differently by way of a photograph?
11       A.   Well, the answer to the question is there are
12 none. And not to be gratuitous here, but the more
13 important thing is there's no complaints as documented
14 telephonic notes or physician visits that demonstrate
15 that any of that ever occurred.
16       Q.   Doctor, other than the additional opinion
17 that you talked about in light of Dr. Patel's report
18 and we've talked about the photograph, have we
19 essentially covered the bulk of your core opinions in
20 this case with regard to Mr. Narsimhan?
21       A.   Yes. I would just, Ms. Hay, acknowledge that
22 based on the review that Mr. Berman pointed out that
23 the likelihood of diabetic peripheral neuropathy is
24 somewhat decreased, but my most important opinion in

151

1 this case is that there is not adequate documentation
2 between 2016 and 2018 of CRPS. And hypothetically,
3 even if we accepted a diagnosis of CRPS on 1/15/21,
4 there is no way you could make a causal link between
5 what happened in 2016 and what happened in 2018.
6 Because, as I pointed out to Mr. Berman, if there was
7 active CRPS between 2016 and 2018, the person active
8 in the medical system would have complained about what
9 he complained about, and then the Wheaton Chiropractic
10 records where he himself filled out a form where he
11 indicated hand pain but didn't indicate foot pain or
12 leg pain is more evidence that nothing was
13 bothering -- that the foot was not a CRPS kind of foot
14 or leg or not CRPS issues at that time and during the
15 succeeding three months where there was never any
16 mention of the foot or the leg as sufficient
17 information to indicate that between 2016 and 2018
18 that there was no CRPS whether or not we
19 hypothetically accept that there was a diagnosis.
20       Q.   But your opinion as you sit here today is
21 that he does not have CRPS based upon all of the
22 information that you've reviewed, your examination,
23 your report, as well as your education, training, and
24 experience; is that correct?

152



1    A.   Based on my examination, that is true.

2    Q.   And I take it, Doctor, given that you've

3 talked about pretty extensively the nature of your

4 practice with many CRPS patients that you diagnose and

5 do treat that you're familiar with the chronology

6 overall of how CRPS would proceed, and during that

7 time frame, it didn't proceed according to that

8 typical chronology; would that be fair?

9    A.   Yeah, I think that just repeated what I said.

10    MS. HAY:   Thanks, Doctor.  That's all I have.

11    THE WITNESS:  Wait.  I have one other thing

12 that I don't know whether it was put in there or not.

13 But there clearly is a standard of care for a CRPS

14 patient, and that is comprehensive interdisciplinary

15 functional rehabilitation.  That's a whole bunch of

16 long words, and I could -- if Mr. Berman wishes me, I

17 could go into more detail about what that is.  But the

18 bottom line is, Dr. Buvanendran, I expressed a very

19 good opinion of him and said he's well respected.  At

20 the same time, as somebody who has the knowledge of

21 CRPS, he should know that that is the gold standard

22 for care.  Dr. Joshi claims to be an expert in CRPS,

23 and neither Dr. Joshi nor Dr. Buvanendran ever

24 recommended the gold standard for care.

153

1    I mean, we start talking about possibly doing

2 dorsal root ganglion stimulation, which is in Michael

3 Stanton-Hicks -- I think I mentioned him, Mr. Berman,

4 from the article.  And in it he said failure to

5 progress with conservative therapy -- which is the

6 comprehensive program that I was talking about called

7 FRP for functional rehabilitation program.  Failure to

8 progress with that is an indication to move toward

9 interventional therapy.  But until you try FRP, you

10 cannot say the patient is appropriately being treated,

11 and we don't know -- again, hypothetically, if we

12 accept their diagnoses of CRPS, then he long ago

13 should have been involved in functional rehabilitation

14 to get him to a state where he wouldn't be complaining

15 of what he's complaining about.  He wouldn't complain

16 that he was manhandled when he wasn't.

17    So it's very important that this was left out

18 by people who claimed to know about CRPS.  They didn't

19 treat him like a CRPS patient.  And the question that

20 I would ask is, if they truly believe he has CRPS, why

21 wouldn't they treat him like a CRPS patient?

22 BY MS. HAY:

23    Q.   Would it be fair to say then, Doctor, that

24 despite other treaters' diagnoses of CRPS their

154

1 actions with regard to treatment recommendations were

2 inconsistent with that finding?

3    A.   Yes.

4    Q.   And are those your opinions, Doctor, to a

5 reasonable degree of medical certainty as well?

6    A.   Yes.

7    MS. HAY:  That's all I have.  Thank you.

8    FURTHER EXAMINATION

9 BY MR. BERMAN:

10    Q.   I just have a couple follow-up just real

11 quickly.

12    A.   Thank you, Mr. Berman.

13    Q.   During your examination of Mr. Narsimhan when

14 you are actually physically examining him, doing your

15 physical examination, your hands were shaking, Doctor.

16 Can you tell us why that is?

17    A.   Yes.  I have a tremor from hypoglycemia, and

18 I didn't have lunch that day.  Normally, just so you

19 know, when I do surgery and I don't have breakfast, I

20 take a medication that makes that tremor go away.

21    Q.   That's fine.

22    And two other things.  After your

23 examination, Doctor, of Mr. Narsimhan, did you watch

24 him walk down the hall after he left the room where

155

1 you performed the examination?

2    A.   I did.

3    Q.   You watched him walk down the hall?

4    A.   I believe I did, yes.

5    Q.   You're saying you opened the door, you looked

6 out the door, and was watching him go down the

7 hallway?  I was there, Doctor.

8    A.   Right.  And I'm trying to remember because --

9 I did two very similar situations, and I'm just trying

10 to remember if this was the one or the other one was

11 the one.  But I think it may have been the other one.

12 And so, I mean, on one of them, I watched the guy walk

13 down the hall, and there was no limp whatsoever.  I

14 can't swear to it that this was the one of those two,

15 because they were both in reasonable temporal

16 proximity to each other that I did very similar kind

17 of exams.

18    Q.   I can tell you this, because we looked back

19 after as we're walking down the hall, we didn't see

20 you poking your head out the door.  So fair to say

21 that you can't recall observing Mr. Narsimhan walk

22 from the door of the hotel room where the examination

23 was performed down to the elevator; is that fair?

24    A.   I thought I did, but I don't want to swear to

156

```
 1   it.
 2       Q.   Did you watch Mr. Narsimhan go from the hotel
 3   into the car?
 4       A.   No.
 5       Q.   So as far as you can recall, your only
 6   interaction and observations of Mr. Narsimhan were
 7   within the hotel room where the medical examination
 8   was performed, correct?
 9       A.   Correct.
10           MR. BERMAN:  That's all the question I have.
11           MS. HAY:  Thanks, Doctor.  I don't have
12   anything further.  We'll reserve signature.
13                    (Witness excused at 6:57 p.m.)
14
15
16
17
18
19
20
21
22
23
24
                                                        157
```

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3   KRISHNA NARSIMHAN,          )
                                 )
 4            Plaintiff,         )
                                 )
 5       -vs-                    ) Case No. 1:19-cv-01255
                                 )
 6   LOWE'S HOME CENTERS, LLC,   )
                                 )
 7            Defendant.         )
 8       I, JOSHUA P. PRAGER, M.D., being first duly
     sworn, on oath, say that I am the deponent in the
 9   aforesaid deposition, that I have read the foregoing
     transcript of my deposition taken 21st day of
10   June, 2021, consisting of Pages 1 through 160
     inclusive, taken at the aforesaid time and place and
11   that the foregoing is a true and correct transcript of
     my testimony so given.
12
             _____ Corrections have been submitted
13           _____ No corrections have been
                     submitted
14
15   _____
16   JOSHUA P. PRAGER, M.D., Deponent
17
     SUBSCRIBED AND SWORN TO
18   before me this _____ day
     of _____ A.D., 2021.
19
20   _____
     Notary Public
21
22
23
24
                                                        158
```

```
 1   STATE OF ILLINOIS          )
                                )  SS:
 2   COUNTY OF COOK             )
 3
 4       I, Judith T. Lepore, Certified Shorthand
 5   Reporter in the State of Illinois, do hereby certify
 6   that on the 21st day of June, 2021, the deposition of
 7   the witness, JOSHUA P. PRAGER, M.D., called by the
 8   Plaintiff, was taken before me via videoconference,
 9   reported stenographically and was thereafter reduced
10   to typewriting through computer-aided transcription.
11       The said witness, JOSHUA P. PRAGER, M.D., was
12   first duly sworn to tell the truth, the whole truth,
13   and nothing but the truth, and was then examined upon
14   oral interrogatories.
15       I further certify that the foregoing is a
16   true, accurate and complete record of the questions
17   asked of and answers made by the said witness, at the
18   time and place hereinabove referred to.
19       The signature of the witness was not waived
20   by agreement.
21       Pursuant to Rule 30(e) of the Federal Rules
22   of Civil Procedure for the United States District
23   Courts, if deponent fails to read and sign this
24   deposition transcript within 30 days or make other
                                                        159
```

```
 1   arrangements for reading and signing thereof, this
 2   deposition transcript may be used as fully as though
 3   signed, and the instant certificate will then evidence
 4   such failure to read and sign this deposition
 5   transcript as the reason for signature being waived.
 6       The undersigned is not interested in the
 7   within case, nor of kin or counsel to any of the
 8   parties.
 9       IN TESTIMONY WHEREOF:  I have hereunto set my
10   verified digital signature this 8th day of July, 2021.
11
12
13
14
15
     _____
16           Judith T. Lepore, CSR
17
18
     License No. 084-004040
19
20
21
22
23
24
                                                        160
```

Joshua P. Prager, M.D. 06/21/2021

```
1          McCorkle Litigation Services, Inc.
             200 N. LaSalle Street, Suite 770
2              Chicago, Illinois  60601-1014
3    July 8, 2021
4    LINDA HAY, ESQ.
     HEPLER BROOM LLC
5    30 North LaSalle Street
     Suite 2900
6    Chicago, Illinois  60602
7    IN RE:  Krishna Narsimhan v Lowe's Home Centers
     COURT NUMBER:  1:19-cv-01255
8    DATE TAKEN: June 21, 2021
     DEPONENT:  Joshua P. Prager, M.D.
9
     Dear Ms. Hay:
10
     Enclosed is the deposition transcript for the
11   aforementioned deponent in the above-entitled cause.
     Also enclosed are additional signature pages, if
12   applicable, and errata sheets.  Per your agreement to
     secure signature, please submit the transcript to the
13   deponent for review and signature.  All changes or
     corrections must be made on the errata sheets, not on
14   the transcript itself.  All errata sheets should be
     signed and all signature pages need to be signed and
15   notarized.
16   After the deponent has completed the above, please
     return all signature pages and errata sheets to me at
17   the above address, and I will handle distribution to
     the respective parties.  If you have any questions,
18   please call me at the phone number below.
19   Sincerely,              Judith Lepore
     Cindy Alicea            Court Reporter
20   Signature Department     (312) 263-0052
21   cc:  S. Berman
22
23
24
                                        161
```

