16651/SAB/PJB                                    Attorney ID# 6224469

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

KRISHNA NARSIMHAN          )
                                    )
          Plaintiff,          )     Case No.: 1:19-cv-01255
      vs.                      )
                                    )
LOWE'S HOME CENTERS, LLC,   )
                                    )
          Defendant.

### PLAINTIFF'S MOTION IN LIMINE # 16

### TO BAR THE OPINION TESTIMONY OF JOSHUA PRAGER, M.D. RELATING TO PLAINTIFF'S STATE OF MIND AND LEVELS OF PAIN BASED ON RECORDS FROM WHEATON CHIROPRACTIC

NOW COMES Plaintiff, KRISHNA NARSIMHAN, by and through his attorneys, ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., prior to the selection of the jury in this cause, moves this Honorable Court to enter an Order *in Limine* barring and prohibiting Defendant, LOWE'S HOME CENTERS, LLC, or its counsel, agents, employees and/or any witness called by the Defendant, or questions by defense counsel from making statements, offering evidence, testimony , remarks, arguments or from conveying directly or indirectly to the panel by any means, including the fact that this motions have been presented and ruled upon, for the subject matter identified in the title and body of this motion, and in support states as follows:

### INTRODUCTION

Plaintiff seeks an order from the Court barring any testimony of defendant's medical witness, Joshua Prager, MD, regarding the Plaintiff's state of mind and/or the

severity of Plaintiff's subjective complaints of pain in his lower right extremity, based on records from Wheaton Chiropractic. Plaintiff argues this testimony is speculative, irrelevant, unfairly prejudicial since it is unreliable and Defendant cannot meet its evidentiary burden under Federal Rule of Evidence 702.

## **RELEVANT FACTS**

Plaintiff was injured on June 25, 2016 at Lowe's Home Center in Carol Stream wherein one of Defendant's employees caused a metal down rod to strike Plaintiff's right lower extremity. Shortly thereafter the occurrence Plaintiff sought medical treatment for pain in right lower right extremity suffered as a result, including; Northwestern Memorial Convenient Care Center (urgent care), Northwest Neurology (neurologist), SportMed Wheaton *Orthopedic* (orthopedist), Saint Anthony Hospital (2 MRIs) as well as following up with his primary care physical Dr. Sunil N. Matiwala (internist) at Center for Adult Healthcare, SC.

While under the care of these medical providers, Plaintiff visited chiropractor, Scott Hallums, D.C. at Wheaton *Chiropractic*, for chiropractic treatment for an unrelated complaint of left neck pain with radiation into the left wrist with numbness and tingling. At that first visit, as well as subsequent visits, Plaintiff explained the symptoms he was experiencing related to his neck and upper extremities only. Dr. Hallums' chart does not reflect any discussions of other body parts for which he was not treating the Plaintiff.

Defendant's medical witness, Dr. Joshua Prager opines, that regardless of the other treatment Plaintiff received or was receiving at the time of the chiropractic treatment, and regardless of whether Dr. Hallums was treating a completely separate body part, the lack of any notation of right, lower extremity pain is evidence that Plaintiff

was not experiencing pain to that part of his body or was not experiencing pain sufficient to be associated with CRPS because if he had, Plaintiff would have told Dr. Hallums and it would be reflected in the chiropractic records.

## ARGUMENT

Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   *Fed.R.Evid. 401* Relevant evidence is excludable under Federal Rule of Evidence 403, on the basis that its probative value is outweighed by the danger that it will cause unfair prejudice, confuse the issues, mislead the jury, cause undue delay, waste time, or be needlessly cumulative. *Fed. R. Evid. 403.* Dr. Prager is offering evidence of another doctor's state of mind that is irrelevant and prejudicial since he has no basis for such an opinion.

The admissibility of expert witness testimony is governed by Rule 702 of the Federal Rules of Evidence and the body of case law that has developed from the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Under Rule 702, expert testimony is admissible if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 also "requires that (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010)(citing Fed. R. Evid. 702). This rule

"applies to all expert testimony, not just testimony based on science." *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 420 n.10 (7th Cir. 2005).

Rule 702 requires that the district court act as a "'gatekeeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006). In exercising its gatekeeper function, a district court must examine (among other things): (1) the expert's qualifications; (2) the expert's methodologies; and (3) the relevance of the expert's proposed testimony. *Adams v. Ameritech Servs.*, 231 F.3d 414, 423 (7th Cir. 2000).

Courts are expected to reject any subjective belief or speculation by an expert. *Ammons v. Amamark Unif. Servs., Inc.* 368 F.3d 809, 816 (7th Cir. 2004).

**A.     Any Testimony By Dr. Prager Opining or Inferring Plaintiff's State of Mind or Severity of Pain is Speculation and Should Be Barred.**

Any testimony by Dr. Prager as to Plaintiff's state of mind while under the care of Dr. Hallums is pure speculation.  Furthermore, any attempt to use the records characterize or categorize Plaintiff's pain is speculation and not based on any scientific, technical or specialized knowledge.  Dr. Prager offered the following testimony at his deposition as to why Plaintiff did not record or report pain to his right, lower extremity to Dr. Hallums:

*(Exhibit A:  Deposition of Joshua Prager, MD, Vol. 1, Pg. 152, lines 6-19 taken June 21, 2021)*

> A.     Because, as I pointed out to Mr. Berman, if there was active CRPS between 2016 and 2018, the person active in the medical system would have complained about what he complained about, and then the Wheaton Chiropractic records where he himself filled out a form where he indicated hand pain but didn't indicate foot pain or leg pain is more evidence that nothing was bothering -- that

*the foot was not a CRPS kind of foot or leg or not CRPS issues at that time and during the succeeding three months where there was never any mention of the foot or the leg as sufficient information to indicate that between 2016 and 2018 that there was no CRPS whether or not we hypothetically accept that there was a diagnosis.*

*(Exhibit B: Deposition of Joshua Prager, MD, Vol. 2, pg. 189:05-190:01 taken October 7,2021)*

Q.   I know. And I'm asking you if you're making an assumption that not only did Mr. Narsimhan not express that he had right lower extremity pain during his chiropractic care at Wheaton Chiropractic, but is it your opinion that he did not have any right lower extremity pain during that September to December time frame he was being treated by the chiropractor over at Wheaton Chiropractic?

A.   I would -- I -- I -- yes, that would be my opinion.

Q.   Okay. Isn't that then making an assumption about a fact that's actually not in the record?

A.   Well, one -- one does an evaluation at the beginning and then takes a history. What is or is not in that history is what is the legal document. And I'm not the lawyer, but my understanding of medical records is that if it's not there -- if it's not documented, it's not there.

*(Exhibit B: pg. 191:17- pg. 192:09)*

Q.   Okay. So you're making a judgment about Mr. Narsimhan saying that he would have put down right lower extremity pain on the forms, and he would have complained about that to the chiropractor when he's going to see the chiropractor for his neck and forearm and wrists. And since he didn't do that, that means that Mr. Narsimhan wasn't having any pain in his right lower extremity, right?

A.   No. He wasn't having enough to be putting it down there. And, you know, again, we're only looking at a microcosm of -- of this case. And there are a lot -- there's a lot of other relevant information that was discussed in the first part of this deposition that we're not going to discuss today that contributes to my opinions, such as the videos of him.

*(Exhibit B: pg. 192: 22- pg. 193:24)*

Q.   I thought you were saying that it is your opinion that during the time Mr. Narsimhan was going to Wheaton Chiropractic for chiropractor care for his neck, forearms, and wrists that he was, in fact, not having right lower extremity pain or discomfort because it's simply not written down or wasn't reported to the chiropractor.

MS. HAY: I'll just object to as mischaracterizing his prior testimony. But you can go ahead and answer, Doctor.

A.      Well, I think there may – what you heard and what you inferred and what I implied I think are two very different things. And so maybe I should just be more emphatic and ask Margie to strike or to -- for the sake of clarity, I'll just say and -- that we should disregard what was previously stated, because it could seem somewhat convoluted, and state more clearly this is my opinion, disregarding the other part.

Is that the fact that Mr. Narsimhan did not document any pain in his leg on the forms and in the history -- oral history that he provided is an indication to me that his leg was not troubling him at that time.

*(Exhibit B: pg.194:12 – pg. 196:06)*

Q.      I'm trying to follow up and understand what you mean when you say not troubling him.

A.      Okay. That he was not having significant pain enough to write it down --

Q.      Okay.

A.      -- or report it.

Q.      Well, that does help answer my prior questions. And so I guess I just want to make sure we're clear, and just to follow up again one more time.  Is -- what you're saying is during the time that Mr. Narsimhan was seeing the chiropractor over at Wheaton Chiropractic, he may have had some pain or discomfort in his right lower extremity, but just not significant enough at that time to be reportable -- or for him to report it. Is that what you're saying?

A.      I think you're restating, kind of massaging what I said a little bit, that there was no pain of significant consequence to be able to -- for him to feel it was important enough to report it.

Q.      Yeah. But what that means is he may have had some pain or discomfort, but just not to the level of significance enough to report. Am I right? Is that accurate?

A.      Well, you know, if we -- I will accept that with the following caveat that CRPS pain would not fit into that category.

Q.      But would you actually answer my question though?

A.      Well, that is your --

Q.      No.

A.      The answer. I think I am answering your question.

Q.      I didn't ask about CRPS.

A.      I'm saying that if it -- that, perhaps, if I accept your hypothesis that there was some pain, but not enough to report, my opinion is that if that was true, and it could possibly be true, it would only be true if it wasn't the pain of CRPS because that pain would not be characterized by the way that you are characterizing it.

However, Dr. Prager later testifies the pain is simply not documented by Plaintiff or Dr. Hallums but that any inquiry as to why should be answered by the Plaintiff:

*(Exhibit B: pg. 173:13 – 23)*

Q.      The fact that some aspect of his pain or discomfort is not written down in that confidential page -- confidential health report, if it's not written down, it doesn't mean that he doesn't necessarily have pain.

A.      It means he's not documenting it.

Q.      It means he's not documenting, exactly.  And why he's not documenting, we'd have to ask him, not you.  Would you agree?

A.      I would agree.

At most, Dr. Prager could only testify there is no mention of the right lower extremity in the records.  He would be unable to give any reason or speculate why that would be.

**B.      Any Testimony Regarding Plaintiff's Chiropractic Treatment Is Irrelevant to Any Issue In This Case and Should Be Barred.**

Secondly, any testimony relating to treatment received from Dr. Hallums for neck and upper extremity symptoms is irrelevant to the injuries claimed by the Plaintiff. Plaintiff is not claiming he injured his neck or upper extremities in the occurrence nor is he seeking damages for his chiropractic treatment with Dr. Hallums. Dr. Prager does not give any testimony that the symptoms in the neck and upper extremities are the cause of the right lower extremity symptoms, nor does he opine that the treatment provided by Dr. Hallums was in any way connected with the lower extremity.  Dr. Prager only testifies that he thinks a chiropractor would want to know about this:

*(Exhibit B: pg. 170:7-20)*

Q.  Do you have an opinion as to whether Narsimhan's right lower extremity injury would be relevant to the chiropractor in his care and treatment of the neck, forearm, and wrist issues?

A.  Well, the way you're wording the question, the care of the -- the leg would not necessarily be relevant to what he was doing, but the knowledge of it existing would be relevant.

Q.  Why?

A.  Because you need to know everything that's going on in a patient when you're treating them.

*(Exhibit B: pg. 185:24-188:10)*

Q.  In this case there's a lack of information in the Wheaton Chiropractic records documenting any, one way or the other, any information about the right lower extremity; would you agree?

A.  There is no information with regard to the -- to the lower extremities.

Q.  And so the Wheaton -- so when you say no information, what -- what I'm asking you, to be clear, is in the Wheaton Chiropractic records, there's no information about the right lower extremity one way or the other, injured, not injured, pain, not pain, it doesn't even mention it?

A.  Well, actually, that's not necessarily true, because the absence of positive information is negative information.  And the failure to document is basically a statement that there is nothing going on there. Now, you don't have to go along stating a bunch of negative things.  But if things are positive, they need to be stated; and if they're not, it's assumed they're negative.

Q.  So I'm just wondering how -- how extensive that -- that opinion is.  If a patient, such as Mr. Narsimhan, would go to a cardiologist to get tested, but doesn't mention anything about his right lower extremity pain or symptoms, does that mean that he's not having that pain on that day that he sees his cardiologist?

MS. HAY:  I'm going to object as an incomplete hypothetical based on facts not in evidence as well as form. But I think you've answered that.

MR. BERMAN:  And there's no objection such as that in the rule of evidence.  But go ahead and answer it.  Please, answer.

THE WITNESS:  If you're going to a cardiologist with a serious heart problem, you're probably not going to be talking about what's going on in your leg because that's a life-threatening situation. When you're going to a chiropractor and it's all about pain, and they're doing a spinal examination and they have a history form that specifically requests

information regarding all body parts that could be having pain and you leave it out, that's a negative.

Q.     It sounds to me, Doctor, when you say the absence of positive information is the negative information, what you're saying is that, because in the Wheaton Chiropractic records the right lower extremity isn't mentioned one way or the other, that therefore means that during those office visits and during that time frame that Mr. Narsimhan was seeing a chiropractor, he was not having any pain in his right lower extremity. Is that what you're saying?

A.     There is no documented pain in his lower extremity.

Q.     Okay.

A.     And that would be relevant to a chiropractor.

Dr. Prager's testimony assumes that he knows what is relevant for a chiropractor treating a patient even though he has never worked as one (*Ex. B, pg. 166:23-167:10*) or hold himself out as an expert in the field. (Ex. B, pg. 168:9-12) He also assumes what is important to Dr. Hallums relating to the chiropractic treatment of the Plaintiff as it relates to the neck and upper extremities. However Dr. Hallums testified as to what was relevant to him while treating the Plaintiff:

*(Exhibit C: Deposition of Scott Hallums, DC, pgs. 52:20-55:07, taken November 11, 2021)*

Q.     Okay.  The fact that Mr. Narsimhan didn't tell you that he was seeing a neurologist for right lower extremity pain during the time he was seeing you 2016, doesn't mean it didn't exist or that treatment didn't happen, do you agree?

A.     I would agree.

Q.     Okay.  The fact that Mr. Narsimhan didn't talk to you, the doctor who was treating him for neck and upper extremity issues, about his right lower extremity problem that he was seeing another doctor for doesn't mean the right lower extremity problems didn't exist.  Would you agree?

A.     I would agree.

Q.     And as a chiropractor, you don't treat every patient's whole body; is that true?

A.     That is true.

9

Q.     As a chiropractor, sometimes patients come in, they have a particular pain that they want to be treated, whether it be the neck, arms, back, low back, upper back, or the hips or anything, the focus on that pain or that problem that the patient comes in for; right?

A.     That is correct.

Q.     In fact, I think you said early in today's deposition, patients when they come to see you, you do a thorough assessment of what they presented with; right?

A.     That is correct.

Q.     And that's from your review of your records, that's what you did with Mr. Narsimhan. He comes and presents with a neck and upper extremity issue and you do a thorough assessment of that; right?

A.     Correct.

Q.     You weren't focusing on his ankle or feet or his hips; you were focusing on what he came in and presented with; right?

A.     Correct.

Q.     You had asked about your general examination of gait and moving around the office, and there is nothing particularly noted as problems with that; right

A.     Correct.

Q.     Okay. And you didn't notate, though, any indication that he was having pain when he turned his head or moved his head; you didn't put any notes on that even though that's what he's coming in for, neck or upper extremity; right?

MS. FOWLER: I'll object. I think he did note that, Steve. It's in his records.

THE WITNESS: I think I did, but I will -- let me -- right here. Yes. I did note that on his neck with extension he had pain and tenderness, with left lateral bending he had tenderness, with right lateral bending he had pain and tenderness.

Q.     (By Mr. Berman) Perfect. That's exactly what you were focusing on during this examination; right?

A.     Correct.

Q.     So the whole point of this examination really is to focus on his neck and back and upper extremities; right?

A.     It was to focus on what he presented to the office with his chief complaint, yes.

Whether Plaintiff did or did not discuss the right, lower extremity with Dr. Hallums was not relevant to Dr. Hallums and the focus was solely on the neck and upper extremities.

## C. Defendant Cannot Meet Its Burden to Show Dr. Prager's Opinions Based on the Chiropractic Record Satisfy Federal Rule of Evidence 702.

Any probative value this proposed opinion testify by Dr. Prager is substantially outweighed by danger of unfair prejudice, confusion of the issues, and would mislead the jury. But moreover, this testimony does not satisfy Federal Rule of Evidence 702. The testimony discussed above is unreliable because the opinions are simply speculation and conjecture by Dr. Prager. These opinions are not based on scientific, technical, or other specialized knowledge that would assist the jury to understand the evidence or to determine a fact in issue. Dr. Prager's opinions are not the product of any reliable principles and methods, nor could Dr. Prager apply such when he is simply extrapolating a meaning from the absence of reported symptoms in Plaintiff's chiropractic records. However, in forming his opinions about Plaintiff's pain, Dr. Prager ignores or does not consider that Plaintiff was concurrently seeing other providers for CRPS and he was actively under a doctor's care and taking medication for the pain that was later diagnosed to be associated with CRPS. The failure to take this into account show the opinion is not based on all the facts and thus unreliable.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests this Court enter an order barring and prohibiting Defendant, LOWE'S HOME CENTERS, LLC, or its counsel, agents,

employees and/or any witness called by the Defendant, or questions by defense counsel from making statements, offering evidence, testimony, remarks, arguments or from conveying directly or indirectly to the panel by any means, including the fact that this motions have been presented and ruled upon, as to Dr. Prager's testimony or opinions based on the Wheaton Chiropractic records, including:

– Any testimony attempt to explain why right, lower extremity pain is not noted in the chiropractic records;

– Plaintiff's state of mind when treating with Dr. Hallums and what was important;

– Whether Plaintiff was experiencing any right lower extremity pain when under the care of Dr. Hallums;

– Any attempt to characterize or categorize the severity of Plaintiff's pain based on the chiropractic records;

– Any testimony that information about the right, lower extremity would have been relevant to Dr. Hallums;

– Any opinions regarding the standard of care for a chiropractor when Plaintiff was under Dr. Hallum's care.

Respectfully submitted:

/s/Steven A. Berman

Attorneys for Plaintiff

Steven A. Berman sberman@anesilaw.com
Patrick J. Blum pblum@anesilaw.com
**ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.**
161 N. Clark St. / 21st Floor
Chicago, IL   60601
Telephone:  312/372-3822
Fax: 312/372-3833

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION
 3
    KRISHNA NARSIMHAN,        )
 4                           )
                             )
              Plaintiff,      )
 5                           )
                             )
         -vs-                 ) Case No. 1:19-cv-01255
 6                           )
    LOWE'S HOME CENTERS, LLC, )
 7                           )
              Defendant.      )
 8                           )
    _____)
 9
10           The deposition of JOSHUA P. PRAGER, M.D.,
11  called for examination pursuant to the Rules of Civil
12  Procedure for the United States District Courts
13  pertaining to the taking of depositions, taken before
14  Judith T. Lepore, Certified Shorthand Reporter for the
15  State of Illinois, License No. 084-004040, via
16  videoconference, at the hour of 3:03 p.m.
17
18
19
20
21
22
23
24
```

**Page 2**

```
 1  ALL APPEARANCES VIA VIDEOCONFERENCE:
 2     ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD.
 3     BY:  STEVE A. BERMAN, ESQ.
 4     161 North Clark Street
 5     21st Floor
 6     Chicago, Illinois  60601
 7     312.372.3822
 8     sberman@anesilaw.com
 9           Representing the Plaintiff;
10
11     HEPLER BROOM LLC
12     BY:  LINDA HAY, ESQ.
13     30 North LaSalle Street
14     Suite 2900
15     Chicago, Illinois  60602
16     312.230.9100
17     linda.hay@heplerbroom.com
18           Representing the Defendant.
19
20
21
22
23
24
```

**Page 3**

```
 1                        INDEX
 2  WITNESS                              PAGE
 3  JOSHUA P. PRAGER, M.D.
 4     Examination by Mr. Berman        5, 155
       Examination by Ms. Hay           136
 5
 6
 7                      EXHIBITS
 8  EXHIBIT                         MARKED FOR ID
 9  Dr. Prager Deposition
10  Exhibit A                            8
    Exhibit B                           17
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1         THE REPORTER:  On the record.  This
 2  deposition is being taken by means of Zoom video
 3  teleconference.  The attorneys participating in this
 4  deposition acknowledge that I am not physically
 5  present in the deposition, and the oath will be
 6  administered remotely.
 7         The parties and their counsel consent to this
 8  arrangement and waive any objections to this manner of
 9  reporting.
10         Will all counsel present please state your
11  name and indicate your agreement on the record.
12         MR. BERMAN:  Steve Berman.  I agree.
13         MS. HAY:  Linda Hay for the defendant.
14  Agreed.
15              (Witness duly sworn.)
16         MR. BERMAN:  Doctor, will you please state
17  and spell your full name.
18         THE WITNESS:  Joshua P. Prager, M.D., M.S.,
19  D.A.B.P.M.
20         MR. BERMAN:  Is it P-r-a-g-e-r your last
21  name?
22         THE WITNESS:  Correct.
23         MR. BERMAN:  Thank you.
24         For the record this is the deposition of
```

EXHIBIT

A

1  Dr. Joshua Prager taken pursuant to notice and taken
2  pursuant to the applicable Federal Rules of Civil
3  Procedure.
4              JOSHUA P. PRAGER, M.D.,
5  called as a witness herein, having been
6  first duly sworn, was examined and testified
7  as follows:
8              EXAMINATION
9  BY MR. BERMAN:
10     Q.   Dr. Prager, I'm assuming you've given
11  depositions before, right?
12     A.   I have.  I'm just trying to clean up --
13  because I'm having a little trouble hearing you.  So
14  I'm trying to clean up some background noise here, and
15  I think I already did.
16          Okay, I have.  And if you're going to ask me
17  about the admonitions, I'm happy to dispense with all
18  admonitions or no admonitions, but I prefer not to
19  have some --
20     Q.   I'm happy to dispense with all of them.
21  Except for one thing I would to say everybody -- for
22  the record at least I say is, if there's ever a
23  question I ask you that's not clear in any way or not
24  understandably phrased, don't answer and ask me to

5

1  rephrase it.  If you answer the question, I will
2  assume you understood the question the way it is was
3  phrased, okay?
4     A.   Fair.
5     Q.   Let's go through some brief background
6  information.
7          What is your -- what's your date of birth?
8     A.   ▮▮▮▮/49.
9     Q.   What's your residence address?
10    A.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Santa Monica,
11  California.
12    Q.   And what is your profession?
13    A.   I am a licensed medical doctor.
14    Q.   What is the name of your practice or where
15  you practice?
16    A.   Well, it's Joshua Prager, M.D. is one;
17  California Pain Medicine Centers is two; and Center
18  for the Rehabilitation of Pain Syndromes (CRPS) is 3.
19    Q.   Do you have a particular office or address of
20  an office, or do you practice out of multiple
21  locations?
22    A.   I practice out of one office.
23    Q.   What's the address of your office you
24  practice out of?

6

1     A.   2001 Santa Monica Boulevard, Suite 1280 West,
2  Santa Monica, California.
3     Q.   And you're here today because you've been
4  disclosed as a retained medical expert on behalf of
5  the defendant Lowe's in this Narsimhan versus Lowe's
6  litigation, correct?
7     A.   That is correct.
8     Q.   And you performed work as a medicolegal
9  expert on other cases as well, not just this one,
10  correct?
11    A.   Correct.
12    Q.   In this case you reviewed certain records;
13  you performed an examination of Mr. Narsimhan; and
14  you've come to certain opinions and conclusions; is
15  that fair?
16    A.   That is correct.
17    Q.   And as sort of a beginning stage or beginning
18  point, I kind of want to make sure about what you've
19  reviewed, start there.  But before I even do that, I'm
20  going to -- I have literally two exhibits in this
21  deposition, Doctor.  I'll show you what's been marked
22  as Exhibit A, what we're marking as Exhibit A.  And
23  all Exhibit A is is the notice of deposition that has
24  the rider to it, and I'll just show you.

7

1              (whereupon, Exhibit A was marked
2                for identification.)
3  BY MR. BERMAN:
4     Q.   So can you see my screen, Doctor?
5     A.   I can.
6     Q.   So Exhibit A is just a notice of virtual
7  deposition with a rider it says for June 21st,
8  3 o'clock Central Time, and then the rider is attached
9  to it.  Have you seen this document?
10    A.   I have not.
11    Q.   Have you produced to the defense any
12  documents in conjunction with this rider?
13    A.   No, it doesn't look like I have, but I have
14  some of them at my disposal.
15    Q.   Well, let's just talk about that for a
16  moment.
17          Per the rider for Exhibit No. 1 is your CV.
18  I have a copy of your CV that's marked in Deposition
19  Exhibit No. 2, which is going to be the disclosure of
20  yourself which contains your reports and your CV and
21  your testimony list.  So we can dispense with No. 1.
22          No. 2 asks for any and all publications and
23  presentations authored or prepared by you that form
24  the basis for or support any of your opinions in this

8

1  case.  Do you have those with you today?
2      A.  I'm just trying to think if they -- just
3  because I gave a presentation I wouldn't be using it
4  to support, and the same for publications.  So
5  although I've published -- well, I don't know that the
6  publications and even -- well, the publications that I
7  have written about CRPS do not relate to this case,
8  per se.  And the presentations that I give, I don't
9  actually have access to.  So, I mean, the basis for my
10 opinion is literature that I have read, which is not
11 requested here explicitly, and also experience of
12 caring for these kind of patients for better than
13 25 years.
14     Q.  Okay.  So at least it looks like the rider
15 item No. 2, there would be no document that would
16 comply with that because there's no particular
17 publications or presentations that you've prepared or
18 authored that relate specifically to this Narsimhan
19 case?
20     A.  Specifically, correct.
21     Q.  Let's move on to three.  All deposition
22 transcripts, literature, articles, textbooks, other
23 documents, or things you reviewed in conjunction with
24 this case, or do you have those in front of you,

9

1  those items?
2      A.  Yes.
3      Q.  We can go over what those items are.  I'm not
4  going to ask you to list them right now.  I'll do that
5  in a moment, so I will dispense with that one.
6          No. 4 asks for notes, preliminary
7  impressions, opinions, reports, letters, or other
8  documents generated by you in conjunction with this
9  case.  We know you prepared at least two reports; one
10 relating to the medical examination itself, and one
11 that was attached to the 26(a) disclosure.  What I'm
12 wondering is, do you have any notes or handwritten
13 notes or preliminary impressions or thoughts written
14 down other than those reports?
15     A.  I do not.
16     Q.  Do you have any kind of -- going back to
17 No. 3 where it talks about deposition transcripts or
18 documents reviewed by you, do you have medical records
19 that have handwritten notes on them or Post-it notes
20 that include some of your thoughts while you were
21 reviewing those?
22     A.  I reviewed everything electronically, and I
23 didn't create any electronic notes.
24     Q.  So for No. 4 there would be nothing to

10

1  respond to, right?
2      A.  Correct.
3      Q.  No. 5 says, "Copies and citations of any
4  articles, texts, literature, rules, regulations, or
5  other materials upon which you rely to support your
6  opinions in this case."  Are there any articles or
7  texts or literature that you rely on to support your
8  opinions in this case?
9      A.  There would be I would say essentially one
10 article that has particular relevance, which is
11 Harden's article on the diagnosis -- the diagnostic
12 criteria for complex regional pain syndrome; otherwise
13 known as the Budapest criteria.
14     Q.  Dr. Harden's article, when was that from?
15     A.  I believe around '03, but I don't know for
16 sure.
17     Q.  Are there any other literature, articles,
18 texts that you think would be supportive of your
19 opinions in this particular case?
20     A.  Well, you know, actually, I haven't explored
21 with anyone or written about anyone about treatment
22 for CRPS, but I could rely on either treatment
23 guidelines or a particular article regarding treatment
24 algorithm for CRPS.  I hadn't thought about that until

11

1  you're asking me now.  But I certainly know what are
2  in both of those, and either one could suffice to
3  discuss treatment.
4      Q.  Do you have a name or a citation of a
5  particular article in mind that you're referring to
6  right now?
7      A.  There was one originally by Boas, B-o-a-s,
8  and then a modification or just an update on that was
9  written by Stanton-Hicks regarding treatment for CRPS.
10     Q.  What year or years were those articles?
11     A.  They are relatively old.  I think Boas was
12 around '98, and Stanton-Hicks was around 2000.
13     Q.  Do you have the citations for any of those
14 articles that you just --
15     A.  I don't.  It's just that I've read them, and
16 I know them.
17     Q.  And obviously the reason I'm asking you this
18 question in the deposition today is because I put this
19 in the rider asking for this information that would be
20 relevant for me to potentially question you about
21 during today's deposition.  So you haven't produced
22 those to defense counsel who retained you in this
23 case, have you?
24     A.  If we want to take just a brief pause, I

12

1  could probably find them on the internet really
2  quickly and send them to defense counsel who could
3  then send them to you.  I don't think it would take
4  more than five minutes.  Because I haven't done that,
5  I would deduct the time it takes me to do that from
6  time you're paying for and also suspend the time of
7  the deposition if necessary.
8      Q.  I appreciate that, and we can do that when
9  we're off the record.  So I appreciate that.
10      Just to follow up on this one for No. 5 here,
11  are there any articles, texts, or literature say that
12  were written or produced in the last five years that
13  you think are particularly relevant to CRPS or your
14  opinions in this case?
15      A.  No.
16      Q.  Have you written any articles regarding CRPS
17  in the last five years?
18      A.  I think only in relation to the use of
19  ketamine.
20      Q.  The next one is No. 6.  It talks about
21  correspondence between yourself and defense attorneys
22  or anyone on defendant's behalf.  Was there any
23  correspondence between yourself and any attorneys who
24  retained you in this case?

13

1      A.  Nothing besides letters of transmittal.
2      Q.  So there are letters of transmittal?
3      A.  Right.
4      Q.  And you would be able to produce those to me
5  as well?
6      A.  I think so.  I mean, I don't think if -- if
7  you have my file, you will see what has been
8  transmitted to me.  So it will just say we sent you
9  this, and you'll have this.  So there's nothing other
10  than that.
11      Q.  The only reason, Doctor, I'm asking you is I
12  don't have your whole file in front of me.  I did the
13  rider asking for this information, which I wasn't
14  given any information.  I thought you would produce
15  that before today's deposition, but it wasn't.  So I'm
16  asking you about it as we're sitting here.  So that's
17  the reason.
18      MS. HAY:  Steve, I know that the doctor has
19  an electronic file that he has available, and I note
20  on your rider, you know, the request is for him to
21  produce the materials at the time of or prior to the
22  start of this deposition.  So he does have an
23  electronic file in front of him that should contain
24  everything, and we're happy to get a copy of that.

14

1  But he has that there and available.
2      MR. BERMAN:  That's what I'm asking for.  I
3  didn't get it at the time of or the start of the
4  deposition.  So now we're in the middle of the
5  deposition.  We're actually inside the deposition, and
6  I'm asking about those details because I haven't been
7  given that before the deposition.
8      THE WITNESS:  I can have somebody create --
9  while I'm doing it so it doesn't take from our time to
10  upload everything that we have, or at least a list of
11  it, which probably would be more efficient because
12  everything on the list you have.  So if you want me
13  to, I'll ask my assistant to just send that list to
14  you.
15  BY MR. BERMAN:
16      Q.  You know what, in all honesty, I'm not
17  concerned really about you duplicating depositions
18  that you haven't notated or highlighted because I have
19  that stuff or medical records.  But if there's
20  handwritten notes or highlights on there, I'd like to
21  see that.  If there's letters, if there is, for
22  example, correspondence, I'd like to see that.
23  Invoices, I'd like to see those.  Just your entire
24  file relative to this cause of action, I'd like to see

15

1  that.
2      A.  Let's see.  I lost the screen you were
3  sharing.
4      Q.  I'm not sharing it anymore.  I'm not sharing
5  the screen because I think the only answer to this
6  question is, you're going to produce your entire file
7  including all the stuff we just talked about in the
8  rider and send it over to defense counsel.
9      A.  With the exception of my income taxes, which
10  I think is an invasion of privacy, and I will not send
11  them.
12      Q.  I'm not going to push that issue.  That's a
13  standard request that's done for everybody in
14  Illinois, and for right now at the moment, I'm not
15  going to push it because I don't know either side is
16  going to be pushing that issue.
17      A.  Thank you.
18      Q.  You're welcome.  That's all I'm asking for as
19  to Exhibit 1 -- I'm sorry -- Exhibit A, my mistake.
20  For purposes of today's deposition, we'll make
21  Exhibit B the disclosure, so make this really easy.
22  And I'll show you what I'm going to mark.
23
24

16



1          (Whereupon, Exhibit B was marked
2               for identification.)
3  BY MR. BERMAN:
4      Q.   So if you can see my screen, Exhibit B is the
5  document in which you were disclosed as an expert
6  witness in the case, and that's three pages.  And
7  attached there are Exhibits 1, 2, and 3, so B-1, B-2,
8  and B-3.  So B-1 is your IME report, B-2 is your CV,
9  and then B-3 is your expert report in this case, which
10 is three pages.
11     A.   Okay.
12     Q.   And then B-4 is your testimony list.
13     A.   Okay.
14     Q.   I'll just ask you -- I'm not going to go
15 through your CV, Doctor.  I've looked at it.  It's
16 extensive.  I get it.  My only question to you,
17 Doctor, is, the one that was attached here as
18 Exhibit B-2 for your deposition today, is that current
19 and up to date or does that need to be made up to date
20 with additional information?
21     A.   It's not completely up to date, but nothing
22 that would be added if I updated it would be
23 particularly -- would be germane to this case.
24     Q.   Okay, I understand that.

17

1          So let's start with what I want to talk to
2  you about, which is essentially what information do
3  you have in this case, what records or information did
4  you review relative to this case.  And to do that I'm
5  going to go to again Deposition Exhibit B, which is
6  the 26(a)(2) disclosure of yourself.  Have you seen
7  this document before by the way?
8      A.   No.
9      Q.   You can see that it's three pages.  The
10 reason I'm using this is because it seems to list
11 everything that you reviewed.  So I'm going to ask you
12 to take a brief look at it and tell me if the list is
13 accurate.  So starting at facts or data considered
14 here --
15     A.   Right.
16     Q.   -- in forming opinions.  I can make it
17 bigger.  And go through at least one and two and tell
18 me if you reviewed all that information.
19     A.   I have.
20     Q.   Okay, good.
21          And then 3, 4, 5, and 6, did you review all
22 that information?
23     A.   Yes.
24     Q.   Is there anything that you reviewed that's

18

1  not listed in this --
2      A.   I believe I did receive something
3  subsequently.  Let me just go into my file and tell
4  you -- what's the last date that you have of when I
5  received things?  There is 4/23/21.
6      Q.   I don't think it tells us.  Oh, it does.  It
7  says 4/23/21.
8      A.   So on 5/20 I received Wheaton Chiropractic,
9  two files.  On 5/4/21 I received four -- no, three
10 deposition transcripts, which I thought I saw there.
11 Well, Jodi Rankin is one of them.  For whatever reason
12 I have these in No. 6, but it wasn't listed with a
13 date and time.  New ones that I'm showing you are --
14 there were two records in one PDF.  One of them was
15 from a psychologist, and for whatever reason it's not
16 booting on my computer.  Hold on a second.
17          I'm not sure what the problem is.  I could
18 try to do it off this computer.  I have two computers
19 here.  This one doesn't want to let me go to -- here,
20 let me try one other thing.
21     Q.   Sometimes technology doesn't help.
22     A.   Okay, let's try from scratch here.
23          Okay, now it came up.  So there's a
24 Dr. Patricia Merriman.  I have two notes from her.

19

1  And I have a note from Dr. Patel that was cosigned by
2  Dr. -- okay, here's Dr. Patel's note.  By
3  Dr. Buvanendran.  Those are the only things I
4  received.  And in that same receipt of documents were
5  a number of pictures taken by the plaintiff.
6      Q.   So the only thing -- I've gone through this
7  list in your Deposition Exhibit B of the documents you
8  reviewed, facts or data considered by Dr. Prager in
9  forming his opinions, and it's records, it's
10 information, it's also depositions that you reviewed.
11 Correct so far?
12     A.   Yes.
13     Q.   It also includes a video, the video of the --
14 I assume of the incident.
15     A.   Correct.
16     Q.   Did you view that?
17     A.   I did.
18     Q.   Okay, good.
19          It seems to indicate under No. 4 here that
20 you were sent on 4/2/21 your own Rule 35 IME report.
21 Is that accurate?
22     A.   I assume so.  I mean, I already had it.  It's
23 called "Records Received."  Let's see on 5/2 what I
24 have.

20

1     Q.   That's the question that I was wondering.
2  Maybe that was a mistake because it seems like it's
3  your own report.
4     A.   It is my own report, and it was not sent to
5  me on that date.
6     Q.   Fair enough.
7          From looking at this, you reviewed multiple
8  depositions.  I wrote it down.  You reviewed the
9  deposition transcript of Krishna Narsimhan, the
10 plaintiff himself, right?
11    A.   Right.
12    Q.   You reviewed the deposition transcript of
13 Dr. Saeed; is that right?
14    A.   Correct.
15    Q.   You reviewed the deposition transcript of
16 Dr. Joshi?
17    A.   Correct.
18    Q.   You reviewed the deposition transcript of
19 plaintiff's wife, Kerri; is that right?
20    A.   That one I discussed -- no, I don't believe
21 I've reviewed that one.
22    Q.   Fair enough.  That's why I'm going over them.
23 You never know.
24         Did you review the --

21

1  were which I had concern about, if I'm remembering it
2  right.
3     Q.   Well, Jodi Rankin, she was just a store
4  employee.  She was an employee of Lowe's.  She wasn't
5  a medical provider.
6     A.   She is not the one who took a phone call?
7     Q.   She was.
8     A.   Right, okay.  Apparently, Mr. Narsimhan
9  explained -- at least from what I remember of the
10 deposition, he was complaining about burning pain in
11 his leg to her.
12    Q.   Is that relevant to you, to your opinions?
13    A.   Yes.
14    Q.   How?
15    A.   If we have an allegation of CRPS based on the
16 injury that occurred, we wouldn't expect that by a
17 piece of metal hitting the lower part -- or
18 essentially around the ankle from the front would
19 cause burning in the back.  If that were to become a
20 CRPS symptom, it would take weeks to get to that
21 point, and it doesn't make anatomical sense, if I'm
22 remembering that that was the source of that
23 complaint.
24    Q.   So just I'm understanding you for a moment

23

1     A.   Hold on.  I just want to make sure.  I know I
2  didn't review that in preparation for today.  Let me
3  just make sure I never reviewed it.
4     Q.   It's under No. 6 here deposition transcripts.
5  It says, Kerri Krishna.
6     A.   I don't have files that are organized that
7  way.
8          It doesn't look like I have that one.
9     Q.   And it is strange the way it's listed on this
10 Exhibit B.  It's listed in No. 6, Kerri Krishna, not
11 Kerri Narsimhan.  But the bottom line is you don't
12 believe you ever reviewed the deposition transcript of
13 plaintiff's wife, Kerri?
14    A.   Hold on one second.  One more time.
15         I don't believe so, no.  I don't recall.
16    Q.   And next one's listed as Jodi Rankin.  Did
17 you review the deposition transcript of Jodi Rankin?
18    A.   Yes.
19    Q.   Was there anything in that deposition of
20 Jodi Rankin that you felt was relevant to your medical
21 opinions in this case?
22    A.   I reviewed that a while back, and I'm just
23 trying to conjure up in my memory.  But I think she
24 did comment at that time about what his complaints

22

1  before we move on, the complaint -- if the complaint
2  to Jodi Rankin on the day of the occurrence, you know,
3  shortly after the occurrence was that he was having
4  burning pain in the area where he was struck by the
5  bar, would that affect your opinions?
6     A.   Well, I don't remember it being that way.
7  But hypothetically, if he had burning pain exactly
8  where it hit, that might not be extraordinary, but if
9  it were proximal to it, which there certainly are --
10 if that's the place I read it, somewhere else in short
11 temporal proximity to the event, you wouldn't get
12 burning pain proximal to a strike on the ankle if it
13 were CRPS, or to tell you the truth in almost any
14 other situation, right after being hit on the ankle
15 because there's no way to explain why that would
16 occur.
17    Q.   I'm just wondering is it the location of the
18 symptom or the type of symptom itself that's of issue?
19    A.   Well, I think, Mr. Berman, what you're asking
20 me is if it was -- he had burning precisely where the
21 thing hit him, it wouldn't mean that much to me from a
22 negative standpoint.  If it's anywhere else -- now,
23 for distal it's something else, and distal would mean
24 going toward the toes.  But that's not where he's

24

1  complaining about. He's complaining about it going up
2  his leg, and up his leg is something that takes -- I
3  mean, to put it in lay terms, time to percolate.
4      Q.  Right, okay.
5      A.  It wouldn't happen in short temporal
6  proximity.
7      Q.  All right. So let's go on. I was asking
8  about depositions. I'm sorry. I took a little detour
9  there. Sorry about that.
10         So you did read Jodi Rankin's deposition.
11  Did you read the deposition of Physical Therapist
12  Lisa Schwartz?
13     A.  Yes.
14     Q.  Did you review the deposition transcript of
15  Dr. Motiwala?
16     A.  I think you're pronouncing it wrong, but I
17  did read that deposition.
18     Q.  It could be pronounced different, but that's
19  the way it's spelled so I'm going to go with it.
20     A.  No, you put an N in there that I don't think
21  is there.
22     Q.  Matiwala?
23     A.  It's Matiwala, not Mantiwala.
24     Q.  Matiwala.

                                          25

1      A.  Yeah.
2      Q.  That's what I thought I said, but I'm sorry
3  if I messed it up.
4      A.  No apology is necessary to me.
5      Q.  I'll call her later.
6         All right. So the question I have is, did
7  you review the deposition of Physical Therapist
8  Brian Fischer?
9      A.  I don't recall doing that.
10     Q.  Did you review the deposition transcript of
11  Dr. Buvanendran?
12     A.  I did.
13     Q.  You did, okay. That's not listed in this
14  disclosure.
15     A.  Are you sure?
16     Q.  Pretty sure.
17     A.  There it is. The records -- oh, that's
18  Narsimhan right under there. Well, I apologize. I
19  did review that.
20     Q.  That's why I check.
21     A.  Good.
22     Q.  I missed it, too, Doctor. I'm just checking.
23     A.  It would have been in the same batch where I
24  got his CV, so if it's not listed there somebody made

                                          26

1  an error.
2      Q.  Okay. The bottom line is, you did review it?
3      A.  Correct.
4      Q.  Okay, wonderful.
5         MS. HAY: Just to be clear, Steve, I think
6  you might have mentioned it, and I'm not sure if I see
7  it. I was trying to pull up the document, but I'm
8  having a little bit of difficulty. And it's hard to
9  read the entire document you have here. But he did
10  review Dr. Joshi's testimony, too.
11        MR. BERMAN: I think that was on there.
12        THE WITNESS: I think it was on there, too.
13        MS. HAY: I see it there. There it is under
14  No. 5.
15  BY MR. BERMAN:
16     Q.  At least I didn't miss that one.
17        Okay. Are there any other records or
18  deposition transcripts that are not included on that
19  disclosure that you think that you reviewed that we
20  can update or record today?
21     A.  Not that I know of.
22     Q.  Terrific.
23        The records you reviewed, the medical records
24  you reviewed, are those the type of records that a

                                          27

1  doctor such as yourself could reasonably rely on in
2  formulating opinions like this?
3      A.  That's an excellent question, and it's not a
4  simple answer because those kind of records are what I
5  would attempt to rely upon pending the way things are
6  documented -- actually, probably just the best way to
7  put it is, depending on how things are documented, but
8  also depending on how things were particularly done in
9  order to allow me to fully depend upon them.
10     Q.  Let's see if I understand your answer, and I
11  think I do.
12     A.  You may want to mute.
13     Q.  What's that?
14     A.  Somebody may want to mute because there's a
15  siren going.
16     Q.  That's actually coming out of my window.
17     A.  You can't mute, okay.
18     Q.  No.
19     A.  Don't worry about it. If it was one of the
20  other -- well, Judy's on mute herself.
21     Q.  I'm going to suppress background noise.
22     A.  It's gone now.
23     Q.  Is that better?
24     A.  It's much better.

                                          28

Joshua P. Prager, M.D. 06/21/2021

1    Q.   Good.  If there's a problem with the audio,
2  just let me know.  I'll try to fix it.
3         So, again, I'm just going to follow up and
4  come back to your last answer.  The records you
5  reviewed in this case you said you would normally --
6  are the type of records you would rely on except it
7  kind of depends on how the examination findings are
8  documented in the records, right?
9    A.   Correct.
10   Q.   So in other words, when you're reviewing a
11 case such as this -- and you've done this before, I
12 know -- you've come across I assume some doctors that
13 don't document their findings as well as others; is
14 that fair?
15   A.   That's definitely fair.
16   Q.   In this particular case, you reviewed the
17 records, and did you have some concerns about how
18 Dr. Farbman's records were documented?
19   A.   Not particularly.
20   Q.   In this case did you have any concern about
21 how any of the examinations -- strike that -- how any
22 of the doctors documented their findings or
23 examinations relative to my client Mr. Narsimhan?
24   A.   Yeah, I'm just trying to remember.  The first

29

1  doctor in I believe 2018, the first doctor to suggest
2  a diagnosis of complex regional pain syndrome was
3  Saeed, and I'm trying to remember if she adequately
4  documented the criteria in order to entertain such a
5  diagnosis.
6         Are you still there?
7    Q.   I thought you were looking up something to
8  answer the question regarding Dr. Saeed's initial
9  diagnosis of CRPS.  I was just waiting for you
10 honestly.
11   A.   Sorry.  I was waiting for you.  I was just
12 saying that based on my recollection I don't remember
13 seeing in her notes sufficient documentation to
14 establish a diagnosis of CRPS.
15   Q.   You mentioned you received records from a
16 Wheaton Chiropractic Clinic, I believe?
17   A.   That's correct.
18   Q.   Was there any records of information
19 contained in those records that was of relevance to
20 your opinions in this case?
21   A.   Yes.
22   Q.   What?
23   A.   That throughout that treatment that was --
24 I'm just tying to remember how long.  It was, I

30

1  remember, about three months of treatment.  If I
2  remember right, in 2016 from September to December, he
3  was being treated for pain.  And if I remember right,
4  there were about 20 of those visits during that
5  three-month interval, and not once was there a
6  complaint of leg pain.
7    Q.   What was he being treated for during that
8  time frame?
9    A.   His arms and hands.
10   Q.   At Wheaton Chiropractic?
11   A.   If I remember right, yeah.  Why don't we go
12 there and see.
13        Sorry it's taking so long.  Maybe if I did a
14 search under Wheaton, it would come up quicker.  There
15 it is, okay.  So here we have -- that one is not
16 useful.
17        Well, here, just if we look at -- I'm looking
18 for the date of this form that Mr. Narsimhan filled
19 out himself on it looks like 5/20/16.  It's a little
20 hard to read how he filled out the form.  But
21 nonetheless, at some point in 2016 -- oh, it's 9.  He
22 just makes a funny 9.  He fills out a form on 9/20/16
23 where it says, "pain and numbness or cramps," and he
24 puts in his hands but he doesn't put in his feet or

31

1  his legs either.  It's only his hands.
2    Q.   Okay.
3    A.   And he indicates that he has moderate
4  frequency and moderate intensity.  And then the
5  examination report -- okay.  Well, here's a patient
6  progress report dated 10/11 where the only complaints
7  that he fills out or that are filled out relate to the
8  arms and shoulders, and there's nothing on the legs.
9  And what I can tell you is, I have 68 pages of notes.
10 During the course of reviewing those 68 pages of
11 notes -- and here is a form.  I believe this was
12 filled out by the patient himself.  He's only
13 complaining of pain in the wrist, hands, and neck of
14 recurring -- yeah.  And here is a note, a typed note,
15 thank God, left wrist, left forearm, so his complaints
16 are completely limited to his upper extremities.  And
17 what I can tell you -- we can go through all these
18 notes, but I think it's wasting your time and money to
19 do it because my best recollection of all these
20 notes -- I mean, here, we'll go to one of the last
21 notes, neck, arms, wrist, diagnoses, cervical,
22 cervical, forearm, okay, and that's December.  So now
23 we've just spent three months, and we're only up to
24 page 22.  And what I can tell you is, I've been

32

1  through all these notes and not that recently, but it
2  was important to me when I went through them that
3  there was nothing related to his lower extremities,
4  although he's very vocal about the pain and numbness
5  in his upper extremities.
6      Q.  Okay, I understand what you're saying.  From
7  your experience, Doctor, do chiropractors typically
8  treat neuropathic pain?
9      A.  That's what apparently they were treating him
10  for here in the upper extremities, pain.  I mean, I
11  think your question is a good question.  I'm not sure
12  why he's referred there in the first place.
13     Q.  I'm asking you, in your experience, in your
14  opinion, do chiropractors treat neuropathic pain?
15     A.  They can.  It's not what they usually treat.
16     Q.  Do chiropractors treat CRPS?
17     A.  Unfortunately I've seen the case where they
18  have, but I don't think it's a good idea.
19     Q.  I hear you.
20         All right, let's move on.  I'm going to ask
21  you about some of the doctors that names you're
22  familiar with in this case, and the question is going
23  to be for each one:  Are you familiar with one of
24  those doctors or medical professionals personally or

33

1  by representation, okay?
2      A.  Okay.
3      Q.  Let's start with Dr. Farbman, are you
4  familiar with him personally or by reputation?
5      A.  No.
6      Q.  What about Dr. Saeed?
7      A.  No.
8      Q.  What about Dr. Motiwala?
9      A.  No.
10     Q.  What about Physical Therapist Brian Fischer?
11     A.  No.
12     Q.  A Physical Therapist Lisa Schwartz?
13     A.  No.
14     Q.  What about Dr. Buvanendran?
15     A.  It's interesting because I think his name may
16  have sounded slightly familiar to me.  And I looked
17  him up, and so I have some idea who he is.  But very
18  interestingly we were both on a conference call last
19  week.  But he did not say so much as one word, and he
20  didn't put his camera on.  I believe that was him.  I
21  can't say that for sure, but I believe it was.  But
22  his camera wasn't on, and he didn't say a word.  And
23  that's the only contact I remember having with him.
24     Q.  To be fair, with regard to Dr. Buvanendran,

34

1  you don't know him personally?
2      A.  Correct.
3      Q.  And what, if anything, can you tell me you
4  know about Dr. Buvanendran from a professional
5  reputation standpoint?
6      A.  I think he has an interest in CRPS.
7      Q.  Other than that, anything else?
8      A.  He's on the faculty of Northwestern, if I
9  remember right.  He's a medical faculty member.
10     Q.  Anything else?
11     A.  I believe he's esteemed in his field.
12     Q.  Okay, fair enough.
13         I know that you, Doctor, are one of -- I
14  don't know if I'm phrasing this right, but one of the
15  few doctors who performs a dorsal root ganglion
16  stimulation procedure; is that accurate?
17     A.  Yes.  At the time whatever was written said
18  that that was the case.  More people are doing it now.
19     Q.  Dr. Buvanendran is one of those doctors who
20  performs that type of dorsal root ganglion stimulation
21  procedure, correct?
22     A.  I believe so.
23     Q.  I'm going to ask you about -- before we get
24  into the meat of your testimony, I'm going to ask you

35

1  a little about your overall review of -- your time
2  reviewing this particular case.  Can you tell me how
3  much time it took you to review all these records we
4  were just listing earlier?
5      A.  Well, I have to say to you, Mr. Berman, that
6  unfortunately it's never been tabulated.  And I do
7  most of that work from home, and I didn't bring those
8  individuals tabulations.  And what I can promise is,
9  well before trial you will have a summation of all
10  that, but it hasn't been done.  The only thing I've
11  invoiced the defense for is my hotel and air.
12     Q.  Okay, all right.  So let me switch gears and
13  do it this way.  Maybe this will be a shorthand
14  version for you.  I'm going back to Exhibit B.  In
15  Roman numeral six, "a statement of the compensation to
16  be paid," and it lists your compensation schedule.  Is
17  this accurately listed?
18     A.  Well, the independent medical examination is
19  not because it was on out-of-town one, and that's my
20  fee for in-office medical exam.  So the other one
21  is a much higher fee.
22     Q.  What was the fee you charged defense counsel
23  for your independent medical examination of
24  Mr. Narsimhan?

36



1    A.   Well, if you're going to be legalistic, I
2  haven't charged them anything else.
3    Q.   What fee will you be charging?
4    A.   Yeah, it was two days of my time at $8,000 a
5  day.
6    Q.   So $16,000 total for the IME?
7    A.   Correct.  Well, the IME and travel to be
8  fair.
9    Q.   All inclusive?
10    A.   Correct.
11    Q.   Does the rate for performing an IME include
12  the report itself as well, or is that extra?
13    A.   No, that's all inclusive.
14    Q.   Your deposition time, is this accurate,
15  $1,500 per hour?
16    A.   Correct.
17    Q.   Does that start when the deposition starts?
18    A.   Yes.
19    Q.   So in terms of say, for example, time
20  preparing, time reviewing records and getting ready
21  for today's deposition, is that charged at the 960 per
22  hour rate?
23    A.   Correct.
24    Q.   Then I think you said you haven't prepared

37

1  and invoice, but you will.  And that will include
2  specific listings of the amount of time you spent
3  reviewing records, consulting with the attorney,
4  preparing for the deposition, all at that $960 per
5  hour rate, right?
6    A.   In excruciating detail.
7    Q.   And I know you said that you
8  performed -- strike that.
9         I know you've been retained as an expert
10  witness not just in Illinois or California but
11  throughout the country; is that right?
12    A.   That's correct.
13    Q.   And is that because you're a recognized
14  expert in the field of CRPS?
15    A.   Well, it's not only CRPS.  I have expertise
16  in spinal cord stimulation, precision spinal
17  diagnostics and therapeutics, intrathecal pumps, yeah.
18  But, you know, Mr. Berman, you're predominantly right,
19  probably 80 percent of that retention is related to
20  CRPS, but my expertise in spinal cord stimulation is
21  comparable to my expertise in CRPS.
22    Q.   I understand.  And also you're a practicing
23  medical doctor in the field of pain management at this
24  time as well, right?

38

1    A.   That's correct.
2    Q.   So you see patients, right?
3    A.   80 percent of the time.
4    Q.   Okay.  In terms of -- so just take out the
5  times when you're a treating medical doctor, and the
6  times -- I'm just going talk to you about the times
7  you're retained as a medical expert witness in
8  litigation.  For the times you're retained as a
9  medical expert in litigation, what percentage of the
10  times are you retained by a representative of the
11  injured party versus the times you're retained by
12  someone who the injured party has a claim against?
13    A.   Okay.  I'm going to give you a complicated
14  answer that I'm sure you'll be happy.  I am retained
15  initially by the plaintiff probably about two-thirds
16  of the time.  When it comes time for a designation, I
17  am retained -- or the retention is maintained about
18  60 percent by the defense and 40 percent by the
19  plaintiff.  If you want an explanation, I can give you
20  why that is.
21    Q.   I'm not sure even what that means.  Can you
22  explain that?
23    A.   Yeah.
24    Q.   The designation.

39

1    A.   By the end, let's say trial, it would be
2  60 percent defense.  But there's an attrition, for
3  lack of a better word, of many of the plaintiffs'
4  cases before we get to that point.
5    Q.   Got it.  I didn't realize.
6         In terms of your work as a medicolegal
7  expert, how much money do you earn or generate per
8  year say over the last four or five years?
9    A.   I'm prepared to discuss that in percentage,
10  and in percentage up until last year, I was estimating
11  somewhere around 16 percent because 20 percent of my
12  time is not caring for patients.  And of that
13  20 percent, about 80 percent of it is medicolegal.  So
14  up until last year it was about 16 percent.  But
15  during COVID my medical practice decreased, so the
16  percentage of medicolegal percentage-wise went up over
17  20 percent.  Do you follow that?
18    Q.   Not really.  When you answer in percentages,
19  it doesn't really answer my question because it's too
20  vague, so I'm just going to ask you to answer the
21  question that I asked.  If you want me to repeat it,
22  we can repeat it.
23    A.   Well, I think I understand the question.  And
24  we don't break it out here the way revenue comes in,

40



1  so I don't really have a full answer. My estimate is
2  about up until last year under 20 percent, and with
3  COVID over 20 percent.
4      Q.  All right. If I'm understanding what your
5  answer is, you're saying that your revenue that
6  relates to medicolegal work specifically, not treating
7  patients, is 20 percent of your income; is that what
8  you're saying?
9      A.  I'm saying that, yeah, up until last year it
10 was. This year, now that my practice is busy again,
11 the percent of medicolegal is going down again. But
12 last year -- I think you understood what I said --
13 that because my practice income went down and the
14 medicolegal practice stayed about the same, I had a
15 higher percentage of medicolegal than I had in any
16 other prior year because I just -- my medical practice
17 income was substantially reduced.
18     Q.  So then if we're going back to 2019 and
19 you're saying that 20 percent of your practice's
20 income relates to your medicolegal work only, what's
21 the total practice income so I can figure out the
22 20 percent of it?
23     A.  Well, that we would have to have a discovery
24 referee tell you that that's necessary for me to tell.

41

1      Q.  So you won't -- you could answer that
2  question, but you won't?
3          MS. HAY:  I think the doctor -- just a
4  second, Doctor.
5          I think the doctor already testified that he
6  couldn't estimate those specific numbers because his
7  practice isn't set out that way, so I think he's
8  already answered that.
9          MR. BERMAN:  I don't think he answered that
10 specific question. I think he changed the question.
11 Can we have the doctor answer the question
12 specifically?
13         MS. HAY:  Sure. I think he already asked and
14 answered it. But, Doctor, you can answer it again.
15         THE WITNESS:  What I said is that I don't
16 know that that is information that -- it appears to me
17 that that's an invasion of privacy, and that -- I've
18 been asked the same question probably 20 times, and in
19 all 20 times including federal court when I've
20 declined to answer that question, the judge has
21 vindicated my decision to do that.
22 BY MR. BERMAN:
23     Q.  All I'm asking you right now is you
24 understand that the question is, in 2019 what was your

42

1  total practice's revenue so that we could figure out
2  the 20 percent of that as just your federal, you can
3  answer that, but you wouldn't because you think it's
4  an invasion of privacy; is that fair?
5      A.  Correct.
6          MS. HAY:  Note my objection based upon the
7  doctor's answer.
8  BY MR. BERMAN:
9      Q.  Would that be true for 2018 as well,
10 Dr. Prager?
11     A.  It would be true for all years.
12     Q.  For this particular case, can you tell me the
13 name of the law firm that initially retained you?
14     A.  Yes, it was Lewis Brisbois.
15     Q.  My question for you, Doctor, have you ever
16 been retained by any attorneys from the firm Lewis
17 Brisbois other than in this case?
18     A.  Not in Chicago.
19     Q.  What about in any other city?
20     A.  I've probably done two or three cases for
21 Lewis Brisbois' Los Angeles office.
22     Q.  And have those other two cases that you've
23 been retained by defense counsel Lewis Brisbois, have
24 those been retentions on behalf of a defendant in a

43

1  case?
2      A.  I cannot swear to that, but I believe that
3  that would be true.
4      Q.  What about defense counsel that's currently
5  handling the defense of this case Hepler Broom, have
6  you ever worked with that law firm before?
7      A.  I don't believe so. We could ask Ms. Hay
8  if I -- and then I would testify to whatever she tells
9  me, but I don't know of any. I guess only the --
10     Q.  You shouldn't say that, by the way.
11     A.  I think it's only the second case I've done
12 in Chicago.
13     Q.  All right. Turning your attention to
14 Mr. Narsimhan and his case specifically.
15         You understand from your review of the
16 records that Mr. Narsimhan was involved in an incident
17 on June 25th, 2016, in which he was at Lowe's and a
18 metal bar fell onto his right lower extremity just
19 above the ankle, right?
20     A.  Correct.
21     Q.  And you saw the video of that; you know that
22 that incident occurred, correct?
23     A.  Correct.
24     Q.  As far as you reviewed the records of this

44



1  entire case and your entire knowledge of Mr. Narsimhan
2  and his life, is it fair to say that you have no
3  knowledge of Mr. Narsimhan complaining of any prior
4  right lower extremity pain or symptoms prior to the
5  incident of June 25th, 2016?
6      A.  That's correct.
7      Q.  You agree that the impact between the metal
8  bar and Mr. Narsimhan's right lower extremity was a
9  traumatic impact?
10     A.  That's an interesting question, because to a
11 layperson the word "traumatic" has big meaning.  To a
12 physician, it just means something out of the ordinary
13 essentially.  And so we have minor trauma, moderate
14 trauma, severe trauma, and just so that I'm clear on
15 what I'm expressing, I would consider this a minor
16 trauma.
17     Q.  What was the weight of the metal bar that
18 landed on Mr. Narsimhan?
19     A.  I don't remember.
20     Q.  What was the speed at which it contacted
21 Mr. Narsimhan's right lower extremity?
22     A.  I haven't read a biomedical or bioengineering
23 analysis to know the answer to that.
24     Q.  If you don't know the weight of the bar or

45

1  the speed at which it contacted Mr. Narsimhan's right
2  lower extremity, why do you call it a minor or minimal
3  impact?
4      A.  Because I saw the video.
5      Q.  Any other reason?
6      A.  That's a good reason.
7      Q.  Any other reason?
8      A.  No.
9      Q.  You saw in the medical records that since the
10 incident -- sorry.  You saw in the medical records and
11 deposition testimony that since the incident of the
12 impact between the metal bar and Mr. Narsimhan's right
13 lower extremity, he has been consistently complaining
14 of pain and symptoms of discomfort in that right lower
15 extremity, correct?
16     A.  No.
17     Q.  That is not correct?
18     A.  It's correct that it's not correct.
19     Q.  When was Mr. Narsimhan's pain or discomfort
20 healed such that he wasn't complaining of any pain or
21 discomfort in that right lower extremity?
22     A.  During the interval at least from 9/16 to
23 12/16, but I actually don't see complaints really
24 until -- well, there were some complaints, but I

46

1  didn't see anybody entertaining a diagnosis of CRPS
2  for over two years following that incident despite the
3  fact that there were intermittent complaints of pain.
4  But then there were sustained periods, or at least one
5  sustained period where there wasn't, but I believe
6  there were other periods where there were no
7  complaints.
8      Q.  Did you review Dr. Farbman's records,
9  correct?
10     A.  I have.
11     Q.  And he treated Mr. Narsimhan in July 2016,
12 August 2016, October 2016, February 2016, March 2017,
13 May 2017, April -- I'm sorry -- August 2017, February
14 2018, April 2018, May 2018, and June 2018.  You saw
15 those records, correct?
16     A.  I did.
17     Q.  And throughout those records were locations
18 of complaints of pain in the right lower extremity.
19 Do you acknowledge that?
20     A.  Well, throughout might be a stretch, but
21 there were intermittent at least complaints of pain in
22 the right lower extremity.
23     Q.  In what record did you ever see in
24 Mr. Narsimhan's case that says his right lower

47

1  extremity pain had gone away?
2      A.  Well, I don't think there was one where it
3  said it went away, but I think there were ones where
4  there were not descriptors of it.  And I would have to
5  look that up to find out specifically when that was.
6      Q.  When you said -- I think what you said to me
7  was that in the chiropractic records there was no
8  description of right lower extremity pain, correct?
9      A.  I did say that, yes.
10     Q.  Is it your opinion then that during the time
11 that Mr. Narsimhan was seeing a chiropractor for his
12 neck and upper extremities that he was therefore not
13 experiencing pain in his lower extremity?
14     A.  Well, I mean, you're the lawyer with res ips,
15 or I think that's the term, that if you see it --
16 well, if it's not documented, then it's not there.
17     Q.  That's not what res ipsa is, Doctor.
18     A.  No, I know.  I realize it.  That's why I took
19 it back.
20         Okay.  So here I'm just looking here for the
21 date of this evaluation.
22     Q.  Doctor, I know we're pausing here.  I'm
23 waiting for you.  Are you still --
24     A.  That's correct.  I was looking to see if in

48

1  Dr. Farbman's notes, I could find -- I mean, he was
2  talking about pain there.  He wasn't entertaining a
3  diagnosis of CRPS.  He was talking about -- well, he
4  was mentioning the diabetes, if I remember right.  He
5  was mentioning peripheral neuropathy with numbness,
6  which is not a sign of CRPS.  And contemporaneously
7  and previously he was being seen by Dr., I think his
8  name was Ignatius at Northwestern from 2012, 2015.
9  Then in 2016 just before this incident, he began to be
10  seen by the doctor that you pronounced the name wrong
11  Matiwala.  And Dr. Matiwala was constantly discussing
12  the need to better maintain glucose control, and
13  Dr. Matiwala was -- who's I believe a general
14  practitioner, an internist, not a neurologist and not
15  an endocrinologist as misstated by one of your
16  experts.  But Dr. Matiwala was just working really
17  hard to get good insulin control or good -- he said
18  the insulin dosage had not changed in many years.  He
19  wasn't monitoring his glucose.  He was gaining weight.
20  He wasn't watching his diet.  So there was a lot of
21  things contemporaneously going on that went on beyond
22  the period where this incident occurred.
23      Q.   Doctor, I think you're getting pretty far
24  from my actually question, so let me see if I can

49

1  narrow it down.  What I'm wondering is -- I know you
2  reviewed records from before and after the incident of
3  6/25/16.  My question for you is, in the records
4  reviewed after 6/25/16, was there any doctor or
5  medical practitioner who noted that the right lower
6  extremity was healed or that the pain had gone away?
7      A.   Well, I think another way of putting it was
8  were there consistent complaints in the records of
9  those doctors that there was pain.  Because the way
10  those charts are set up, there aren't problem lists
11  where then you say problem terminated, so whatever
12  they were focusing on that day, whether it be arms and
13  hands, were what they were discussing.  And if they
14  weren't discussing the leg at that time, they weren't
15  discussing the leg.  It doesn't mean one way or
16  another whether it went away or didn't went away.  It
17  just meant that it wasn't enough of an issue that it
18  would be in the record.
19      Q.   Sorry, Doctor.  I'm going to ask you to
20  answer the question the way it's phrased, if you can
21  please.
22           Can we have it read back, Judy?
23                (Whereupon, the record
24                was read as follows:

50

1            "Q.  Doctor, I think you're
2            getting pretty far from my
3            actually question, so let me see
4            if I can narrow it down.  What
5            I'm wondering is -- I know you
6            reviewed records from before and
7            after the incident of 6/25/16.
8            My question for you is, in the
9            records reviewed after 6/25/16,
10            was there any doctor or medical
11            practitioner who noted that the
12            right lower extremity was healed
13            or that the pain had gone away?)
14      THE WITNESS:  Okay.  I mean, the construct of
15  the question makes it hard to answer.  And so with
16  that introduction, what I will say is, no one made it
17  go away -- but I want you to include this in my
18  answer -- no one said it went away but there were
19  times where nobody described the problem.
20  BY MR. BERMAN:
21      Q.   And you read Mr. Narsimhan's deposition in
22  which he indicated in his deposition that from the
23  time of the incident of June 2016 up until the time at
24  least his deposition was given he had consistent pain

51

1  in his right lower extremity, correct?
2      A.   Correct.
3      Q.   Mr. Narsimhan himself has indicated that the
4  pain -- (audio interruption) -- any period of time
5  when the right lower extremity pain had gone away or
6  healed subsequent to the incident, correct?
7      MS. HAY:  Excuse me.  Steve, could you just
8  repeat that question?  You were cutting out just a
9  little bit.
10  BY MR. BERMAN:
11      Q.   Upon reviewing Mr. Narsimhan's deposition
12  testimony, you would agree that at least Mr. Narsimhan
13  has indicated that he has had consistent pain in his
14  right lower extremity only since the incident of June
15  2016, correct?
16      A.   He has said that, yes.
17      Q.   And there is no medical documentation to
18  prove otherwise, correct?
19      A.   Well, I actually just provided you
20  documentation otherwise.  If we look at Wheaton
21  Chiropractic, there's a three-month period where he is
22  being actively treated for pain, tingling and
23  numbness, and at no point is the leg ever brought up.
24      Q.   All right.  So the fact it's not brought up,

52

1  I think you said already that that's not an indication
2  he was not complaining of pain in his leg; it's just
3  that it wasn't being treated at the chiropractic
4  clinic?
5       A.   No, he filled out a form himself, okay, in
6  his handwriting with his signature where he did not --
7  where they asked him.  I mean, it was a diagram and a
8  table where his diagram of his pain only included his
9  hands, and the table where you could check off leg or
10  foot was not checked off.  So that was not only the
11  facility or the chiropractor himself, but it was also
12  Mr. Narsimhan not filling in leg pain.
13      Q.   Okay.  So if Mr. Narsimhan didn't fill in leg
14  pain because he wasn't at the chiropractor to treat
15  his leg pain, he was being treated for the leg pain by
16  the neurologist, would that affect your opinions in
17  any way?
18      A.   No.
19      Q.   From your entire review of this case, are you
20  aware of any other traumatic incident or event that
21  injured Mr. Narsimhan's right lower extremity other
22  than the incident at Lowe's in June of 2016?
23      A.   That's a very good question, and I am not.
24      Q.   From your review the record, would you at

53

1  least agree that the impact between the metal bar and
2  Mr. Narsimhan's right lower extremity at Lowe's caused
3  Mr. Narsimhan pain?
4       A.   I agree with that.
5       Q.   You have an opinion as to the diagnosis of
6  the pain that the incident of the metal bar hitting
7  Mr. Narsimhan in right lower extremity, what it was?
8       A.   I think you got garbled again there.  I don't
9  know if anybody else heard it, but I couldn't hear it.
10      Q.   Okay.  Let me ask you some general questions
11  first.  As a recognized expert in CRPS, would you
12  agree that in most patients CRPS is a chronic
13  condition that can be permanent?
14      A.   It is a chronic condition that can be
15  permanent that can also go into remission.
16      Q.   In what percentage of cases that you're aware
17  of are symptoms of CRPS permanent, and in what
18  percentage of cases do those go into remission
19  completely?
20      A.   In my practice more than 50 percent of the
21  patients go into complete remission.
22      Q.   When you say --
23      A.   It doesn't mean they don't come out of
24  complete remission.  But they go into complete

54

1  remission, and we follow the ISP treatment guidelines
2  in how we get there.
3       Q.   Are you talking about -- you said greater
4  than 50 percent of your patients go into remission at
5  some point.  Is that 51 percent, 60 percent?  How
6  would you further characterize it?
7       A.   It's the majority.  And I can tell you that
8  my largest referral source for CRPS and our
9  comprehensive interdisciplinary functional
10  rehabilitation program is the workers' compensation
11  system of the state of California because we get such
12  a high percentage of patients back to work.  And what
13  I can tell you is in the occupational health
14  literature, people who have been out of work for
15  greater than a year only have an 18 percent chance of
16  going back to work ever, and that we get more than
17  50 percent of our patients go back to work.  And the
18  savings they have in terms of not having to pay future
19  wages are substantial.
20      Q.   That's fine.  You didn't answer my actual
21  question, so I'll rephrase it.
22      A.   I answered.
23      Q.   My question is, you say that your clinic gets
24  greater than 50 percent of patients into remission at

55

1  some point, and I'm wondering what that percentage is.
2  What does that mean?
3       A.   I don't have an exact number, but it's more
4  than half.
5       Q.   So there's some percentage less than half of
6  patients that never go into remission of CRPS
7  patients?
8       A.   Well, if you want -- I can tell you that the
9  vast majority, like probably over 90 percent get
10  substantial remission even though they don't get
11  complete remission.
12      Q.   Would you agree that a patient has a
13  better -- a CRPS patient has a better chance of
14  achieving remission of symptoms if the systems are
15  recognized early and effective treatment is initiated
16  early?
17      A.   Yes.
18      Q.   In your opinion, when is the best -- from an
19  early standpoint, when is the best time to recognize
20  the CRPS and begin treatment of it?
21      A.   Three months.
22      Q.   Would you also know that patients who are in
23  their teens or 20s have a better chance of achieving
24  remission of CRPS symptoms than other patients?

56



1    A.    Achieving 100 percent remission, yes.
2    Q.    In your practice do you use Gabapentin as
3 treatment for resolving CRPS pain?
4    A.    Well, not -- resolving is probably not an
5 appropriate term.  It is one of the medications that
6 we use in the treatment of CRPS, as well as other
7 neuropathic pain conditions including diabetic
8 peripheral neuropathy.
9    Q.    So you're saying that Gabapentin is used to
10 treat CRPS, as well as other types of neuropathy such
11 as diabetic neuropathy pain, correct?
12    A.    Right.  And in fact Gabapentin is FDA
13 approved for treating at least two neuropathic pain
14 syndromes of which CRPS is not one of them, and
15 nonetheless, we use it.
16    Q.    That was my next question.  As a recognized
17 expert in CRPS, in your clinic you use Gabapentin as a
18 treatment -- one of the treatments for CRPS pain,
19 right?
20    A.    Right.  It's my number two treatment
21 pharmacologically.
22    Q.    In your experience, though, using this
23 particular drug Gabapentin, how effect is Gabapentin
24 in terms of resolving CRPS pain 100 percent?

57

1    A.    Well, I mean, we keep coming back to
2 resolving the CRPS pain.  I don't think Gabapentin
3 resolves any kind of pain.  Gabapentin treats pain
4 successfully, and the limiting factor on Gabapentin is
5 not any kind of toxicity.  It's just side effects that
6 are not permanent, and they're not dangerous.  But
7 they exist, and that is the limiting factor in using
8 Gabapentin.
9    Q.    I'm not asking you about ketamine yet because
10 I might ask you about that in a minute.  But let's
11 stick with Gabapentin for just a moment, Doctor, if
12 you could.  In your practice or just in general, can
13 you tell me how effective Gabapentin is in bringing
14 CRPS symptoms into remission like we were talking
15 about, remission?
16    A.    I would say zero bringing it into remission.
17    Q.    So is it accurate to say that Gabapentin is
18 used to help minimize the symptoms of CRPS pain?
19    A.    Yes, and also to be a tool to allow other
20 treatments to do what you were talking about to help
21 get people in remission.  Gabapentin by itself will
22 not get you into remission, but it may sufficiently
23 alleviate the pain to allow you to participate in a
24 functional rehabilitation program that can then get

58

1 you into remission.
2    Q.    You said Gabapentin is also used for diabetic
3 neuropathies.  In your opinion is Gabapentin more
4 effective treating diabetic neuropathy?
5    A.    I think it's equally effective.  It's just
6 what I was saying before, Mr. Berman, that it's
7 approved for two neuropathic pain conditions by the
8 FDA.  It doesn't mean it doesn't work in other
9 situations.  And in terms of comparable amount of
10 pain, I would say it's equally effective in
11 diabetic -- it's very hard to measure pain, but by the
12 way the patient describes the pain to you, if they
13 were describing it with an etiology of what we call
14 DPNP, diabetic peripheral neuropathy pain, or CRPS
15 pain, the same degree of pain would be treated
16 comparably.
17    Q.    I'm going to ask you about CRPS symptoms and
18 signs, and you know those are two different things,
19 right?
20    A.    I sure do.  Most don't.  Very good.
21    Q.    I'm going to ask you this question, and if
22 you don't like the way it's phrased, just let me know.
23 I'll break it up.  But I want to just ask you
24 generally, in your experience can CRPS symptoms and

59

1 signs wax and wane from day to day or week to week?
2    A.    Yes.
3    Q.    Can CRPS symptoms and signs wax and wane even
4 throughout the day?
5    A.    Yes.
6    Q.    In your experience can CRPS patients have
7 some good days and some bad days?
8    A.    Yes.
9    Q.    In your experience can CRPS patients have
10 some good days where they have less symptoms and signs
11 than they have on their bad days?
12        MS. HAY:  I'm sorry, Steve.  Could you repeat
13 that question?
14        THE WITNESS:  That one got garbled again.
15 BY MR. BERMAN:
16    Q.    Can CRPS patients have some good days in
17 which they have less symptoms and signs of the CRPS
18 than they have on their bad days?
19    A.    I think that's kind of asked and answered,
20 but the answer is still yes.
21    Q.    I'm still on some of these general questions.
22 This dorsal root ganglion stimulation issue, DRG,
23 that's a surgical procedure; is that right?
24    A.    Correct.

60



1    Q.    That's an invasive procedure, right?
2    A.    Correct.
3    Q.    Are there certain potential surgical
4  complications that go along with that DRG procedure?
5    A.    Something you didn't ask -- at the beginning
6  you said you're one of the few physicians in the
7  country that perform it.  I stopped performing it and
8  do an alternative procedure because of exactly what
9  you're saying.
10    Q.    So what are the potential surgical
11  complications of the DRG procedure that caused you to
12  stop performing?
13    A.    Well, there are a few things.  One is not --
14  two of them are not officially complications as
15  defined.  But I've had a hardware failure in
16  multiple -- multiple kinds of hardware failure
17  including a year later having the lead pull out of the
18  pulse generator so it needed surgical revision.  I've
19  had multiple leads fracture.  And you could call those
20  complications, or you could just call them equipment
21  malfunctions.  But regardless of what they are, they
22  require surgical revision, another surgery.  But the
23  third one is that in placing the dorsal root ganglion
24  lead there is a risk of hurting a nerve, and that's

                                                    61

1  probably the principal reason that I stopped doing it.
2    Q.    But also as a surgeon, would you consider
3  that the potential for infection is a potential
4  surgical complication of DRG?
5    A.    It depends.  Yeah, officially when I have to
6  read and when I go over the risks and benefits of any
7  surgery, I have to tell patients that there is a risk
8  of infection, but we have an extreme -- I also in my
9  practice, unlike cases that I review sometimes in
10  medical malpractice, we have an extremely low, below
11  1 percent infection rate requiring explantation.
12    Q.    Doctor, in your experience, with your
13  knowledge of this procedure, the DRG procedure, do you
14  know what the usual and customary and reasonable cost
15  of such a procedure is?
16    MS. HAY:  Just object to form and foundation.
17    THE WITNESS:  Yes.
18  BY MR. BERMAN:
19    Q.    What is it?
20    MS. HAY:  Same objection, but you can answer,
21  Doctor.
22    THE WITNESS:  Okay.  Well, we have to --
23  there are a minimum of three kinds of charges for
24  performing the procedure.  One is called the facility

                                                    62

1  fee; the other one is either called a technical fee or
2  professional fee; and the third one is the anesthesia
3  fee.  And for a trial the professional fee can be
4  anywhere between $1,000 and $9,800 as far as what I've
5  seen.  And just so you know, Mr. Berman, I actually do
6  reviews for insurance companies, so I have a pretty
7  good idea of this.  I also see lien fees that are
8  multiples of these numbers that I quoted you, but
9  these I don't feel are legitimate fees.
10  BY MR. BERMAN:
11    Q.    That's what I asked you in your opinion what
12  is a reasonable fee, not a --
13    A.    Okay.  Professional between 1,000 and 9,800.
14  For the lead placement, facility, anywhere between
15  5 and $20,000.  For the placement and anesthesia,
16  anywhere between 500 and $1,000.
17    Q.    Is that for the trial of the DRG or permanent
18  implantation?
19    A.    I just gave you numbers for the trial.
20    Q.    What about for the permanent implantation
21  after the trial is completed?
22    MS. HAY:  Just note my continuing form and
23  foundation objections, but you can answer, Doctor.
24    THE WITNESS:  Professional fees, anywhere

                                                    63

1  between probably 3,500 up to 15,000.  Facility fees
2  within reason, anywhere between 28 and 40,000.
3  Anesthesia fees anywhere between 750 and $1,500.
4  BY MR. BERMAN:
5    Q.    And, Doctor, because there was a foundation
6  objection by Ms. Hay, I want to just make sure you and
7  I were clear.  I mean, you were explaining this
8  before.  You are aware of this procedure; you are
9  aware of the cost of the procedure in your practice;
10  and also you review these costs for insurance
11  companies so you're aware what the usual and customary
12  and reasonable costs are.  Is that fair?
13    A.    Just as you were distinguishing between signs
14  and symptoms, I will distinguish between costs and
15  charges.  I think the word you wanted to use was
16  charges rather than costs.  Because somebody charges
17  an amount, it doesn't mean they get it.  And what they
18  get paid is the cost, but what they charge is what
19  they charge.
20    Q.    In your experience, you can review the
21  charges and make a determination of whether that's
22  what's within the realm of reasonable charges or not,
23  right?
24    MS. HAY:  Same ongoing objections.

                                                    64

1    THE WITNESS:  Right.
2  BY MR. BERMAN:
3    Q.   And what you were explaining to us earlier
4  were what you consider reasonable charges for such a
5  DRG procedure, correct?
6    A.   Correct.
7    MS. HAY:  Please note all my continuing
8  objections to all of those questions with regard to
9  costs and charges.
10  BY MR. BERMAN:
11   Q.   Also, I know that you are a recognized expert
12  in ketamine and use of ketamine to treat individuals
13  with CRPS; is that right?
14   A.   Correct.
15   Q.   And you still continue to use that type of
16  treatment, the ketamine treatment to help reduce
17  symptoms or put CRPS symptoms into remission; is that
18  accurate?
19   A.   Not only symptoms, but signs.
20   Q.   Fair enough.  So both?
21   A.   Both.
22   Q.   Let me ask you about that for just a moment.
23  Ketamine treatment, are there some potential side
24  effects or potential risks of that type of treatment

65

1  for CRPS symptoms and signs?
2    A.   Again, I think it depends on who is
3  administering it because I'm certainly -- we spent
4  about 10 years looking at all possible side effects to
5  see how they could all be mitigated, and I think we
6  have a special sauce so that they all can be
7  mitigated.  In terms of actual risks, there is a risk
8  of hepatic injury or liver injury that if you're
9  careful on how you do it; in other words, periodically
10  monitor liver function, if you discontinue it before
11  it becomes a real big problem, it resolves on its own.
12  And, in fact, in our practice, we've noted a few
13  patients that started to have changes in their liver
14  function discontinued, and within a few weeks their
15  liver function was back to normal.  That's why I said
16  it depends on whose hands it is, because unfortunately
17  there are, for lack of a better word, cowboys out
18  there that don't read the literature and don't really
19  care for pain patients but only want to administer
20  ketamine infusions for their own personal reasons who
21  don't really do it as a true physician should and wind
22  up with complications.  But in the people that I know
23  around the country who are administering ketamine,
24  they're administering it carefully and not having

66

1  complications.
2    Q.   In terms of the ketamine treatment that
3  you're familiar with, because you're an expert in it,
4  is this an infusion that's only a one-time infusion;
5  is it multiple times?  How long does it take, in other
6  words, and how many treatments does the ketamine take
7  to get the desired effect of reduction or remission of
8  symptoms?
9    A.   Okay.  That's a very complicated answer.  And
10  this is one where I do give lectures, and the lectures
11  take up a whole hour.  Now, all of that whole hour
12  aren't exactly on the question you asked, but it's a
13  more complicated answer than you may want to hear
14  right now.  I'll try to give you an abbreviated
15  answer.
16   Q.   If you could simplify it for me.
17   A.   Okay.  So there are three different ways at
18  the minimum of administering intravenous ketamine.
19  One is the one-day infusion followed sequentially by
20  others; the other is the 24-hour continuous inpatient
21  infusion that is not coma; and the third one is
22  ketamine coma where the patient has a breathing tube
23  put in the ICU for five days and undergoes very high
24  dosage ketamine treatment with general anesthesia

67

1  simultaneously.
2    What is the most common are the daily
3  infusions, and Dr. Schwartzman who wrote the first
4  articles on this advocated 20 consecutive daily
5  treatments at a relatively low dose that he was doing
6  given the manpower he had administering it with him.
7  There are very few -- I don't know if anybody still --
8  his studies demonstrated efficacy under those
9  circumstances, but I don't know of anybody doing
10  20 days of infusion because it's cost prohibitive.
11   So the more common way, as I mentioned,
12  Mr. Berman, is to do up to ten days of infusions.  And
13  I'll just tell what you our protocol is.  We do a
14  three-day trial, three consecutive days with
15  escalating dosages on each day.  And at the end of
16  three days if on the fourth day the patient still
17  appears to have some benefit a day after the third
18  infusion, we consider then doing a full course of ten,
19  but we don't want to obligate the patient to ten days
20  if it doesn't look like it's going to work.  Now, what
21  I can tell you is that probably 80 percent -- and I
22  don't have the exact number.  But the vast majority of
23  patients after the three-day infusion proceed to the
24  ten days with the infusion.

68

1      Now, what the literature shows is, if you
2  have a successful ketamine treatment -- and in our
3  practice it would be the ten-day course -- that
4  50 percent of the patients have sustained benefit so
5  that they never have to get any ketamine again.  And
6  the remaining 50 percent usually require booster
7  infusions, which the longest -- well, that can be
8  either monthly or every three months for years.
9      Q.   Let's just talk about that sort of common
10  example of ketamine treatment that works, the ten-day
11  treatment.  Do you have knowledge of the reasonable
12  and customary type of cost of that ten-day ketamine
13  treatment?
14      MS. HAY:  I'll object to form and --
15      THE WITNESS:  Yes.
16      MS. HAY:  Just one second.  I'll object to
17  form and documentation given the doctor's locale, but
18  you can go ahead and answer, Doctor.
19      THE WITNESS:  Yes, I see variability between
20  500 and $2,500 per infusion.
21  BY MR. BERMAN:
22      Q.   And I know that you talked about your
23  understanding of these costs as an expert in this
24  field.  Would your understanding of the usual and

69

1  reasonable costs, the reasonable charges differ
2  between California and Illinois and New York and all
3  over the country?
4      A.   The problem is, Mr. Berman, this is not
5  something I have the opportunity to review because
6  none of the guidelines for treatment of any kind of
7  problems aside from depression -- well, none of
8  them -- no guidelines include ketamine infusions for
9  treatment of pain, headaches, or depression, no
10  guidelines do.  So insurance companies tend not to pay
11  for it except by exception, and I've not had the
12  opportunity ever to review billing for that.  But I
13  speak at ketamine conferences, and I speak to the
14  people who are the active ketamine practitioners in
15  the country.  And I have an idea about what people
16  charge.
17      Q.   And that's throughout the country, right?
18      A.   Yes.
19      Q.   So for the DRG you're familiar with what
20  people charge throughout the country, correct?
21      A.   Yes.
22      Q.   Understood.
23      I'm going to switch gears for just a moment.
24  I'm finished talking about the ketamine for now.  Now

70

1  I'm going to switch gears and ask you about diabetic
2  neuropathy.  I know some of your opinions in this case
3  relate to diabetic neuropathy.  Is it your opinion in
4  this case that Mr. Narsimhan's symptoms in his right
5  lower extremity relate to diabetic neuropathy?
6      A.   Yes.
7      Q.   And you've treated diabetic neuropathy pain
8  and symptoms before, right?
9      A.   Right.  I'm a board-certified internist, and
10  I have treated diabetic neuropathy and diabetic
11  neuropathic pain long before I ever became an
12  anesthesiologist and subsequently became a pain
13  physician.  So I was actually an attending physician
14  in internal medicine, practiced internal medicine.
15      Q.   And that's good.  That background's important
16  because the question I have is, how do signs and
17  symptoms of diabetic neuropathy differ from signs and
18  symptoms of CRPS, if at all?
19      A.   Well, the symptoms are the same
20  predominantly.  The signs can be different.  Both can
21  get thinning skin certainly.  Both can get peripheral
22  hair changes.  With diabetic neuropathy, there are
23  other things that can simultaneously be occurring that
24  can cause compromises in calculation, and that's

71

1  actually very common.  And sometimes the compromise in
2  circulation can create pain that's as bad as the
3  peripheral neuropathic pain.  In many ways they're
4  similar, but you can even get sometimes the trophic
5  changes in diabetic peripheral neuropathy.  You can
6  certainly get swelling in diabetic -- well, you can
7  get swelling in diabetes where the extremities are
8  involved, whether it's the diabetic peripheral
9  neuropathy that's causing that problem or the diabetes
10  that hasn't been well controlled.  So I think
11  that's -- we can dig in a little deeper later, but I
12  think that should probably be telling you what you
13  want to know.
14      Q.   Yes, yes.  The reason I asked you the initial
15  question is, I'm wondering in your practice or in your
16  work as an expert witness, have you seen times when
17  diabetic neuropathy has been confused for CRPS and
18  vice versa where CRPS has been confused as diabetic
19  neuropathy?
20      A.   Actually in my neuropathy, which is far more
21  limited than my clinical practice, I have not seen
22  that before.  But it's actually not uncommon for
23  patients to get referred to me from the community
24  where somebody thinks the patient has CRPS, but, in

72

Joshua P. Prager, M.D. 06/21/2021

1 fact, they don't. And it's a substantial
2 percentage -- although 80 percent of the patients that
3 I see in my practice are referred to me for potential
4 diagnosis of CRPS, a significant percentage of them
5 don't have CRPS.
6     Q.   Just to make sure -- just so I'm asking the
7 right question, Doctor, I want to make sure I
8 understand you. In your practice have you seen times
9 when other doctors have diagnosed CRPS when, in fact,
10 the actual diagnosis should have been diabetic
11 neuropathy?
12     A.   Yes.
13     Q.   Have you ever seen times when doctors have
14 diagnosed diabetic neuropathy when, in fact, the
15 diagnosis should have been CRPS?
16     A.   Yes.
17     Q.   You've seen both, okay.
18         And in this case, in this Narsimhan case,
19 you've seen doctors such as Dr. Buvanendran,
20 Dr. Saeed, Dr. Joshi, their diagnosis in this case
21 that Mr. Narsimhan had right lower extremity CRPS;
22 you've seen that, right?
23     A.   They have said that, yes.
24     Q.   And in your opinion, in fact, the diagnosis
                                                    73

1 shouldn't be CRPS; it should be right lower extremity
2 diabetic neuropathy; is that correct?
3     A.   DPNP, yeah. More than just diabetic
4 peripheral neuropathy, but diabetic peripheral -- we
5 call it DPNP, diabetic peripheral neuropathy pain.
6     Q.   DPNP?
7     A.   DPNP.
8     Q.   Got it, okay.
9         And in Mr. Narsimhan's situation, in his
10 case, in your opinion, Doctor, after reviewing the
11 entire record, what brought upon the symptoms of his
12 DPNP?
13     A.   The diabetes out of control.
14     Q.   When did the diabetes become out of control
15 such that the DPNP began?
16     A.   Well, he had DPNP treated by Dr. Farbman in
17 bilateral upper extremities for quite a period of time
18 preceding the incident at Lowe's. And what's really
19 important to understand, Mr. Berman, is that diabetic
20 peripheral neuropathy and DPNP both tend to show
21 themselves in the longest axons. Axon being a nerve,
22 okay. And so it's usually more common to see it in
23 the legs first than the arms, but if you have it in
24 the arms, it usually shows up in the legs shortly
                                                    74

1 thereafter because the legs have longer nerves than
2 the arms do.
3         And, you know, just for you to understand,
4 you know, you don't get DPNP in your chest wall where
5 the nerves are very close -- you know, where they come
6 out is very close to where they wind up. You don't
7 get DPNP on your lips. But you do get DPNP in your
8 hands and feet very commonly for people who have
9 uncontrolled diabetes.
10     Q.   And from reading the records that reflected
11 that at the time just prior to the incident
12 Mr. Narsimhan was being referred to the neurologist
13 Dr. Farbman for bilateral wrist carpal tunnel
14 syndrome. Is that what the records shows?
15     A.   I don't remember that that was the only
16 thing, and I don't remember that the EMG necessarily
17 showed that.
18     Q.   I'm not saying what the actual diagnosis was.
19 I'm saying that's what he was referred to Dr. Farbman
20 for.
21     A.   I don't recall that. We would have to find
22 the exact time and date of the note, and you can put
23 it up on the screen to show me that. Because that's
24 not what I remember, but I won't swear to it.
                                                    75

1     Q.   All right. In your opinion, however, as of
2 July 2016 and prior even to that, is it your opinion
3 that Mr. Narsimhan did not have carpal tunnel syndrome
4 in his wrists?
5     A.   Well, you said wrist, and it's unusual to
6 develop bilateral --
7     Q.   Wrists, plural.
8     A.   Okay. It's unusual to develop bilateral
9 carpal tunnel syndrome simultaneously, but usually one
10 side is predominant. And looking at the pictures that
11 he drew during that time interval, it sure looked like
12 there was asymmetry.
13     Q.   So your opinion was -- what was the cause of
14 the bilateral wrists, plural, pain?
15     A.   Diabetic peripheral neuropathy unless I see
16 records that are to the contrary.
17     Q.   An EMG was done of the upper extremities,
18 right?
19     A.   Correct.
20     Q.   What did that find?
21     A.   I'd have to look it up. I didn't commit
22 everything to memory. But I do know where it is.
23         Okay. It does find bilateral median moderate
24 neuropathy.
                                                    76



1    Q.   Meaning?
2    A.   That means that the median nerve is being
3  compressed.
4    Q.   Consistent with carpal tunnel syndrome?
5    A.   Yes.
6    Q.   And not consistent with DPNP in the wrist,
7  correct?
8    A.   Correct.
9    Q.   And also the right lower extremity was
10 examined in the EMG, and there were no positive
11 findings, were there?
12   A.   Right lower extremity -- no, there wasn't
13 clinical correlation advised.
14   Q.   So to be fair and to be accurate, the EMG
15 that was performed in July about a month after the
16 occurrence at Lowe's found consistent findings of
17 carpal tunnel syndrome in the bilateral wrists and no
18 consistent findings of DPNP in the right lower
19 extremity; is that correct?
20   A.   No polyneuropathy in the lower extremity.
21   Q.   So what I said, is that correct?
22   A.   Well, I just clarified it a little bit, so I
23 stick with what I said.
24   Q.   Well, would DPNP be evidenced by

77

1  polyneuropathy in the lower extremity?
2    A.   It would be one sign of it, yes.
3    Q.   So the EMG that was done of Mr. Narsimhan's
4  right lower extremity of July 26, 2016, was not
5  consistent with DPNP in the right lower extremity; is
6  that correct?
7    A.   Correct.
8    Q.   You also said -- and if I understand what you
9  said -- and I believe I heard what you said -- the way
10 DPNP forms is when diabetes becomes out of control; is
11 that right?
12   A.   Correct.
13   Q.   Can you explain to me, when you say "out of
14 control," exactly what you mean by that?
15   A.   What I mean by that is that you have elevated
16 blood sugars chronically.
17   Q.   You said elevated blood sugars, chronic
18 something, and I didn't hear the rest.
19   A.   Chronically.
20   Q.   Chronically?
21   A.   Yeah.
22   Q.   Anything else?
23   A.   That's what diabetes out of control is.
24   Q.   Okay.  And the way to test for elevated blood

78

1  sugars is an A1C test; is that right?
2    A.   Hemoglobin A1C.
3    Q.   Yes?
4    A.   Yes.
5    Q.   And I think this was discussed in
6  Dr. Matiwala's deposition that if an A1C level was
7  over 7, it means that the diabetes can become out of
8  control, but under 7 the diabetes is in control.  Do
9  you remember him saying that?
10   A.   Yes.
11   Q.   Do you agree with that, that's accurate?
12   A.   People draw the line at different places, but
13 I think that's a reasonable place to draw the line.
14   Q.   And I believe in Dr. Matiwala's records, you
15 reviewed all of his A1C recordings?
16   A.   Yes.
17   Q.   So prior to the incident in Lowe's, we have
18 at least I guess two visits to Dr. Matiwala.  You saw
19 that, right, in the records?
20   A.   Matiwala.
21   Q.   Matiwala.
22   A.   Yes.
23   Q.   You saw in the records that there was a visit
24 of February 2016 and May 31st of 2016 prior to the

79

1  incident at Lowe's, correct?
2    A.   Correct.
3    Q.   And then there was a visit with Dr. Matiwala
4  in September of 2016 that's after the incident at
5  Lowe's, correct?
6    A.   Right.
7    Q.   You saw that initially the A1C in February of
8  2016 was 8.5, and you consider that essentially out of
9  control, correct?
10   A.   That's correct.
11   Q.   And then the next visit of May 31st, 2016, so
12 a little less than a month before our incident of
13 June 25th, 2016, the A1C level was 6.6.  Would you
14 consider that A1C level an indication of under control
15 diabetes?
16   A.   That's borderline under control.
17   Q.   It's under 7, so therefore it's within the
18 in-control level?
19   A.   It's high under control.
20   Q.   What would you consider high then?
21   A.   What I'm saying -- you know, if it's 0.5
22 higher, you would say it's out of control.  So it's
23 borderline.  That's what it is.
24   Q.   Would you agree that -- in your opinion,

80

Joshua P. Prager, M.D. 06/21/2021

1  would you think that a person who has a 6.6 A1C would
2  be at risk for having diabetic peripheral neuropathy
3  with pain, DPNP?
4      A.  If they maintain that, no.
5      Q.  September of 2016 the A1C level was 6.7, so
6  point one higher.  Would that person at that time be
7  susceptible or at risk for DPNP?
8      A.  Marginally.  Likely not, but not impossible.
9      Q.  So what was it about the A1C levels in May
10 and September of 2016 that indicate to you that as of
11 June 25th, 2016, Mr. Narsimhan was complaining of
12 right lower extremity diabetic neuropathy with pain?
13     A.  Say again, please.
14     Q.  What is it about the A1C levels of
15 Mr. Narsimhan in May of 2016 at 6.6 and September of
16 2016 at 6.7 that indicate to you that after 6/25/2016
17 Mr. Narsimhan was complaining of DPNP in his right
18 lower extremity?
19     A.  Those particular ones would not necessarily
20 suggest that he would get diabetic peripheral
21 neuropathy, but he did have others previously that --
22 again, I pointed out that Dr. Matiwala pointed out
23 that his insulin dosage had not changed for years, and
24 that he needed -- I mean, he really needed dietary

81

1  counseling, and that he was not monitoring his
2  glucose.  Now, those two isolated ones I completely
3  agree with you, Mr. Berman, likely would not put him
4  at risk, but we really don't know what went on long
5  before that.  We don't really know so much about what
6  happened subsequently as well.
7      Q.  If a person who has diabetes, the diabetes
8  gets out of control causing DPNP, can one of the
9  treatments for that DPNP be getting diabetes within
10 control?
11     A.  It won't get the neuropathy better.  It will
12 prevent it from progressing.
13     Q.  When did the DPNP symptoms start for
14 Mr. Narsimhan?
15     A.  I don't know.
16     Q.  Dr. Matiwala testified that throughout his
17 time treating Mr. Narsimhan that Mr. Narsimhan had
18 type 2 diabetes mellitus without complications.  Did
19 you see that?
20     A.  Yes.
21     Q.  Would a complication of diabetes be this DPNP
22 that we're discussing?
23     A.  Yes.
24     Q.  So according to Dr. Matiwala's records and

82

1  his deposition, Dr. Matiwala, the doctor who was
2  treating Mr. Narsimhan for the diabetes, felt like the
3  diabetes was without complication, therefore without
4  DPNP, true?
5      A.  Yes.
6      Q.  And also, Dr. Matiwala performed diabetic
7  foot exams.  You saw that, right?
8      A.  Yes.
9      Q.  Is part of the reason why a doctor does
10 diabetic foot exams is to try to see if there is any
11 indication of DPNP or diabetic peripheral neuropathy?
12     A.  No.
13     Q.  Okay.  So a diabetic foot exam, in your
14 opinion, has nothing to do with finding whether a
15 person has diabetic peripheral neuropathy in their
16 feet?
17     A.  Correct.  I shouldn't say -- it's not the
18 main reason they do it.
19     Q.  But it can help to find -- strike that.
20         Diabetic foot exams can help find DPNP in a
21 person's feet?
22     A.  Correct.  Just so you know, that's not the
23 principal reason that that exam is done.
24     Q.  It doesn't have to be the principal reason.

83

1  It can be an ancillary reason.  Dr. Matiwala
2  consistently performed diabetic foot exams and found
3  them to be negative, and, in fact, in his deposition,
4  Dr. Matiwala felt that based on the diabetic foot
5  exams there was no indication of diabetic peripheral
6  neuropathy in Mr. Narsimhan's right lower extremity.
7  Did you see that?
8      A.  I don't remember that.
9      Q.  Would you disagree with that testimony if it
10 was there?
11     A.  Well, if the testimony is there, I wouldn't
12 disagree with what his opinion is.
13     Q.  Switching gears for just a moment.
14         I think you saw in the record -- correct me
15 if I'm wrong, but I think you saw in the record that
16 prior to the incident of June 25th, 2016, at Lowe's,
17 Mr. Narsimhan was very active, ran on the treadmill,
18 did 5Ks, that kind of thing.  Did you see that?
19     A.  Yes.  According to him, yes.
20     Q.  Is that something that if a person has
21 diabetic peripheral neuropathy in their feet or foot
22 that this would make running on the treadmill and
23 performing 5Ks difficult to do?
24     A.  Yes.

84



1    Q.   So do you see any indication in the record
2 prior to June 25th, 2016, that Mr. Narsimhan had
3 diabetic peripheral neuropathy in his right lower
4 extremity?
5    A.   No.
6    Q.   You saw in the record I believe that because
7 of the pain and discomfort in Mr. Narsimhan's right
8 lower extremity that he was less physically active,
9 correct?
10    A.   That's what he says, yes.
11    Q.   Obviously pain in the lower extremity can
12 cause people to be less active, run less, be on their
13 feet less, walk less, that kind of thing, agree?
14    A.   Yes.
15    Q.   Dr. Matiwala was asked on page 41 of his
16 deposition whether the symptoms of right lower leg
17 burning pains, if he was able to eliminate those as
18 diabetic complications, and he said yes, he would.
19 Did you see that in the deposition?
20    A.   Yes.
21    Q.   Do you disagree with Dr. Matiwala, the doctor
22 who was treating Mr. Narsimhan for his diabetes?
23    A.   Hold on a second.
24    Q.   It's page 40, line 23 to page 41, line 3.  It

85

1 says, "Okay.  And these symptoms that he's reporting
2 on a consistent basis, were you able to eliminate
3 those as diabetes complications?"  Answer:  "Yes, I
4 would based on the EMG conduction study he'd
5 undergone."  Do you see that question and answer?
6    A.   I do, yes.
7    Q.   Do you disagree with Dr. Matiwala?
8    A.   No.
9    Q.   On page 45 of Dr. Matiwala's deposition, he
10 was asked at line 10:  "And throughout the time you
11 were seeing Mr. Narsimhan, you were able to get his
12 diabetes under control, correct?"  Answer:  "That is
13 correct."
14    A.   You said 45, 10.  I'm on 45, 10.  I don't see
15 that.  Oh, okay.
16    Q.   Should I reread it?
17    A.   Yes.  Okay, yes.
18    Q.   And the question was:  "Throughout the time
19 that you were seeing Mr. Narsimhan, were you able to
20 get his diabetes under control, correct?"  Answer:
21 "That is correct."  Do you see that?
22    A.   Yes.
23    Q.   Do you disagree with Dr. Matiwala, the doctor
24 who was seeing and treating Mr. Narsimhan for his

86

1 diabetes?
2    A.   No.
3    Q.   If Dr. Matiwala says that he was able to get
4 the diabetes under control, yet you in your opinion
5 testified that the diabetes was out of control which
6 was what caused the DPNP; is that correct?
7    A.   That it had not been under control.
8    Q.   When was the diabetes not under control such
9 that it caused the DPNP in Mr. Narsimhan's right lower
10 extremity?
11    A.   Say the question again, please.
12    Q.   Yes.  The question is when was the diabetes
13 out of control such that it caused DPNP in Mr.
14 Narsimhan's right lower extremity?
15    A.   During the time before he started seeing
16 Dr. Matiwala or at the beginning.
17    Q.   We just went over this, Doctor.  In the
18 beginning when Mr. Narsimhan started seeing
19 Dr. Matiwala in May and September, in those two visits
20 it was under 7, the A1C was under 7.  So that's an
21 indication of the diabetes being in control; you agree
22 with that, right?
23    A.   I think when he first started seeing
24 Dr. Matiwala, that the diabetes was above 7.

87

1    Q.   Yes.  So are you saying that in February 2016
2 the diabetes was out of control such that it caused
3 the DPNP to begin in the right lower extremity?
4    A.   It put the patient at risk.
5    Q.   So when was the diabetes out of control such
6 that it actually caused, not put him at risk, but
7 actually caused the DPNP to begin?
8         MS. HAY:  Just object to asked and answered.
9 If you want to answer again, Doctor, go ahead.
10         THE WITNESS:  He was at risk in February of
11 2016.
12 BY MR. BERMAN:
13    Q.   I know, Doctor, but you said, in your
14 opinion, Mr. Narsimhan has DPNP in the right lower
15 extremity; is that right?
16    A.   Yes.
17    Q.   When was the diabetes out of control such
18 that it caused that to actually begin, the DPNP in the
19 right lower extremity?
20         MS. HAY:  Objection, asked and answered.  You
21 can answer again, Doctor.
22         THE WITNESS:  I think he was set up for it in
23 February '16.
24

88

1  BY MR. BERMAN:
2      Q.  He was what?
3      A.  A setup.
4      Q.  Set up?
5      A.  Yeah.
6      Q.  But the DPNP didn't start in February 2016,
7  did?
8      A.  We don't know.
9      Q.  You don't know?
10     A.  Likely it did not.
11     Q.  So do you know when the DPNP started?
12     A.  No.
13     Q.  The symptoms of DPNP?
14         MS. HAY:  Objection, asked and answered three
15  times.
16  BY MR. BERMAN:
17     Q.  Doctor, is it accurate to say that diabetic
18  peripheral neuropathy typically is seen bilaterally?
19     A.  Yes.
20     Q.  And in this case it's your opinion that the
21  DPNP is exclusive to the right lower extremity of
22  Mr. Narsimhan, correct?
23     A.  Yes.  Well, we don't know exclusively.
24     Q.  What do you know?

                                                    89

1      A.  That on his examination -- well, we know that
2  nobody ever did an distracted examination on this
3  gentleman who makes certain accusations that I know
4  have significant discrepancy.  And I did not see,
5  Mr. Berman, one distracted examination on this man who
6  complains of pain when you look at him and you touch
7  him and he sees you, but he doesn't consistently
8  complain of pain when you distract him.
9      Q.  Which doctor indicated that Mr. Narsimhan
10  does not complain of pain when you touch his right
11  lower extremity when he's distracted?
12     A.  Nobody ever did a distracted examination,
13  which an expert in CRPS would always do.
14     Q.  Because no one ever did that test, are you
15  assuming that it would be negative for CRPS?
16     A.  No, I'm only -- we're not talking for CRPS.
17  We're talking for pain.  We truly don't know what it
18  would have shown.  The only place there's a data point
19  with a distracted exam is my exam where you were
20  there.
21     Q.  So are you assuming that because Dr. Farbman,
22  Dr. Saeed, Dr. Buvanendran, Dr. Matiwala, all these
23  doctors who didn't do a distracted exam for pain that
24  it would have been negative when those doctors saw and

                                                    90

1  examined Mr. Narsimhan?
2      A.  What I'm saying is that we really don't know
3  what a distracted exam would have shown.  That's all I
4  can say.  We know that my distracted exam showed
5  inconsistency.  They never did.  And this is a guy who
6  has a motivation to have pain or to describe pain.
7      Q.  That's true for any plaintiff in the world,
8  right?
9      A.  It's true.  Well, not all of them complain
10  about pain.  They complain about different things.
11     Q.  Any plaintiff who is complaining of pain has
12  a motivation to say they have pain because in your
13  opinion they've got a case, right?
14         MS. HAY:  I'm sorry.  I didn't hear the end
15  of that question, Steve.  Can you repeat it?
16         MR. BERMAN:  Because they have a case.
17         MS. HAY:  Thank you.
18         THE WITNESS:  Any patient that has a
19  complaint of CRPS has motivation to demonstrate they
20  have pain.
21  BY MR. BERMAN:
22     Q.  You didn't diagnose secondary gain in
23  Mr. Narsimhan's case, did you?
24     A.  I don't like to go into secondary gain.  I

                                                    91

1  just see marked discrepancy here.
2      Q.  I'm just asking, did you make the diagnosis
3  or not?
4      A.  What do you mean?
5      Q.  Did you make a diagnosis of secondary gain in
6  Mr. Narsimhan --
7      A.  I don't make a diagnosis of secondary gain.
8  I don't make it.
9      Q.  Let's talk about your examination of
10  Mr. Narsimhan, and that would be relating to the
11  report of 1/21.  Do you have the report in front of
12  you, or do you want me to put it on the screen?
13     A.  I can put it up very quickly so I can have it
14  in front of me.
15         Okay.  We are talking about the independent
16  medical examination performed on 1/15/21; that's what
17  we're talking about at the moment, correct?
18     Q.  We're talking about the examination 1/15/21
19  that you performed in Chicago near O'Hare.
20     A.  Yes.
21     Q.  You called it an independent medical
22  evaluation.  I don't call it an independent medical
23  evaluation because at that time you were retained by
24  the defense to perform the examination, correct?

                                                    92

1      A.   You can call it what you wish.  I do it as an
2  independent exam.
3      Q.   I hear you.  But at the time you examined
4  Mr. Narsimhan, you had been retained by the party that
5  Mr. Narsimhan had a claim against, right?
6      A.   Right.  And it's my job to do an objective
7  exam, which is why I call it independent.
8      Q.   But the answer to my yes is yes; is that
9  correct?
10      A.   The answer to that question is yes.
11      Q.   And during that medical examination, you
12  spent a total of about an hour with Mr. Narsimhan,
13  correct?
14      A.   Yes.
15      Q.   You told Mr. Narsimhan at the time that you
16  were retained by the other side; you told him that,
17  right?
18      A.   That I was retained by the defense, yes.
19      Q.   And you told him that there was no
20  physician-patient relationship generated from this
21  examination; it was for medicolegal purposes only,
22  correct?
23      A.   Correct.
24      Q.   During the examination, you took a history,

93

1  then you did an examination for symptoms and signs of
2  potentially indicating CRPS, right?
3      A.   Well, you don't do an examination for
4  symptoms.  You only do an examination for signs.
5      Q.   So you did a history for symptoms, right?
6      A.   Correct.
7      Q.   You asked the patient -- you asked the
8  client.  I'm sorry.  At the time of your examination,
9  you asked my client what his symptoms were, right?
10      A.   Correct.
11      Q.   And then you performed an examination looking
12  for the signs that might be related to CRPS, right?
13      A.   Correct.
14      Q.   And the signs can be objective signs, right?
15      A.   The exam was the objective signs, correct.
16      Q.   So things like swelling, the way the skin
17  looks, hair changes, moisture, sweating, those are
18  things that can be observed by the examiner, correct?
19      A.   Correct.
20      Q.   And those can be documented at times
21  photographically, those signs, correct?
22      A.   Excuse me?  Say again.
23      Q.   Some of those signs upon examination can be
24  documented photographically because they're objective,

94

1  correct?
2      A.   Correct.
3      Q.   In your examination of Mr. Narsimhan, you
4  took no pictures; is that correct?
5      A.   That is correct.
6      Q.   So to be fair, whether Mr. Narsimhan had any
7  signs relating to a diagnosis of CRPS would not be
8  documented one way or the other by use of photographs
9  from your examination, true?
10      A.   It could -- well, some of them are -- you
11  can't diagnosis temperature with photographs.  You can
12  diagnosis tremor, hypertonia, spasticity with
13  photographs.  What you can diagnose with photographs
14  are changes in the hair.  Edema is hard because the
15  way you diagnose edema is by looking for pitting, and
16  you can't do pitting in a photograph.  So what you can
17  see are changes in the hair, skin, nails, or color
18  changes.
19      Q.   To be fair, Doctor, all I'm asking is, you
20  took no pictures during your examination of
21  Mr. Narsimhan to document the existence of or lack of
22  signs relating to a diagnosis of CRPS, true?
23      MS. HAY:  Objection, asked and answered.  You
24  can answer, Doctor.

95

1      THE WITNESS:  Well, the only answer I give is
2  that I did not take pictures, because I don't agree
3  with what followed.
4  BY MR. BERMAN:
5      Q.   In your examination of Mr. Narsimhan, it
6  said, "Reflexes could not be performed at the ankle."
7  Why is that?
8      A.   Because of pain that he would have
9  experienced based on what he was saying.
10      Q.   That's related to the right ankle, correct?
11      A.   Correct.
12      Q.   The ankle is the one that's at issue in this
13  case, correct?
14      A.   Correct.
15      Q.   Same with sharpness.  It says, "Sharpness
16  examination was deferred in the right leg, as
17  mentioned above."  That's because it would have caused
18  significant pain in the right lower extremity,
19  correct?
20      A.   Because of what he said, yes.
21      Q.   It says, "Calcaneal reflexes were deferred
22  secondary to prevent pain."  Same thing, correct?
23      A.   Correct.
24      Q.   That was only on the right side?

96



1    A.   Correct.
2    Q.   It says, "Dorsiflexion of the right foot was
3  deferred."  What does that mean?
4    A.   It means that I didn't ask him to bend his
5  foot toward the ceiling.
6    Q.   And it says, "deferred."  Why was that in
7  this case?
8    A.   Same thing, because he was complaining of
9  pain.
10   Q.   It was in the right affected leg as opposed
11  to --
12   A.   I was trying to avoid the pain.  I didn't
13  want to cause him any pain.  And you were there, and
14  you saw that I wasn't trying to cause him any pain or
15  did I cause him any pain.
16   Q.   I'm not accusing you of purposefully trying
17  to cause him pain.  I'm saying that -- I think you're
18  agreeing with me that you deferred dorsiflexion of the
19  right foot test because you felt that could cause him
20  increased pain in his right affected lower extremity,
21  correct?
22   A.   If I recall correctly, I did ask him, and he
23  said it was too painful to do, so we deferred it.  So
24  he never attempted it.

97

1    Q.   And let's go to page 4 of your report where
2  you talk about the requirements for CRPS.  These are
3  the Budapest requirements you're referring to
4  specifically, right?
5    A.   Yes.
6    Q.   One was pain out of proportion for the
7  original injury.  It says, "Mr. Narsimhan endorses
8  this."  That means -- well, explain to me what you
9  mean when you say, "Mr. Narsimhan endorses this."
10   A.   Well, that's what he says, so I counted that
11  as positive.  When I do evaluations whether I am
12  retained by the plaintiff or the defense, I don't
13  always say that the plaintiff endorses it, but he
14  endorsed it.
15   Q.   Endorses means is positive in that
16  requirement No. 1 is met?
17   A.   I guess if you want to say it in more simple
18  language, that's what he says.  I mean, I think
19  "endorses" is clear, but if you have trouble -- that's
20  what he says.
21   Q.   So requirement No. 1 of the Budapest test for
22  CRPS is met, correct?
23   A.   Right.
24   Q.   Requirement No. 2 of the Budapest test for

98

1  CRPS is, "Symptoms described by the patient from three
2  out of the four designated diagnostic categories."
3  Mr. Narsimhan endorses this as well, correct?
4    A.   Correct.
5    Q.   So requirement No. 2 for the Budapest test
6  for CRPS is met, correct?
7    A.   Correct.
8    Q.   Requirement No. 3, that's the signs we were
9  talking about upon examination.  Two of the four
10  designated categories is required to have been met.
11  This one was not met, correct?
12   A.   No. 3 was not fully met, right.
13   Q.   So requirement No. 3 was not fully met
14  because only one but not two of the criteria were met;
15  is that accurate?
16   A.   Categories.
17   Q.   Categories.  Accurate?
18   A.   Yes.
19   Q.   All right.  So sensory was met after
20  vasomotor, sudomotor/edema, motor/trophic, correct?
21   A.   Correct.
22   Q.   So the vasomotor are things such as -- let me
23  check my notes, Doctor.  Vasomotor are things like
24  skin color changes, temperature differences, right?

99

1    A.   Right.
2    Q.   Sudomotor/edema are things like sweating or
3  excessive sweating, correct?
4    A.   Sweating, goose bumps.
5    Q.   Motor/trophic changes are things like
6  decreased range of motion, weakness, spasticity,
7  tremor, dryness around the skin, right?
8    A.   Well, a certain kind of dryness of the skin,
9  but yes, it would be scaly skin.
10   Q.   Scaly, okay.
11        You saw in Dr. Buvanendran's notes that he
12  noted upon examination that Mr. Narsimhan had color
13  changes to his right and left; you saw that, right?
14   A.   Right and left?
15   Q.   Yes.
16   A.   Okay.
17   Q.   I'm just asking about Dr. Buvanendran's
18  records that I know you reviewed.
19   A.   If it's right or left, it doesn't mean
20  anything.  Right and left, it doesn't mean anything to
21  me.
22   Q.   All right.  Well, let's be clear then.
23  Dr. Buvanendran noted in his records that there was a
24  color change to the right lower extremity; there was

100



1  temperature difference between the right lower
2  extremity and left lower extremity.  Do you see that?
3      A.  Well, I don't know what page you're on, which
4  document.
5      Q.  Dr. Buvanendran's records.
6      A.  Why don't you put it up on the screen.
7      Q.  I don't have it on the screen.
8  Dr. Buvanendran's record -- it's also on page 49 and
9  50 of his deposition if you want to look it up, if you
10  have access to that as well.
11      A.  Well, I do.
12      Q.  It says here there's change to the nailbeds.
13  What is that considered?  Is that a trophic change or
14  sudomotor change, vasomotor?
15      A.  It's not sudomotor.
16      Q.  I'm sorry.  Say that again.
17      A.  It's not a sudomotor change.  It could be a
18  vasomotor change if it's described as such.
19      Q.  So in Dr. Buvanendran's records and in his
20  deposition on page 49 to 50, he describes on
21  examination observing color change to the right lower
22  extremity, temperature differential, and changes to
23  the nailbeds in the right.  Do you see that?
24      A.  Trophic changes to the nailbed, yeah, he

101

1  does.
2      Q.  So that would -- in terms of signs on
3  examination, that would meet requirement three for the
4  Budapest criteria, correct?
5      A.  He met on that date, yes.
6      Q.  In terms of symptoms, Dr. Buvanendran noted
7  hypersensitivity, the increased sweating, swollen, so
8  edema.  Those would be signs -- I'm sorry.  My
9  mistake.  Those would be symptoms consistent with
10  meeting requirement two of the Budapest -- let me back
11  up, Doctor.  I screwed that up entirely.
12          Dr. Buvanendran in his records and his
13  deposition indicated that there were certain symptoms
14  he elicited during his examination or his history of
15  Mr. Narsimhan which included burning, stabbing pain in
16  the right lower extremity, swollen right lower
17  extremity, color change to the right lower extremity,
18  hypersensitivity to the right lower extremity, and
19  increased swelling in the right lower extremity.  Do
20  you see that?
21      A.  Is that in his deposition or that's in his --
22      Q.  In his records.
23      A.  I'm looking at his record now.  What date?
24      Q.  The first date of examination.

102

1      A.  10/19, something like that?
2          I have 1/13/20, 2/14/20, 1/21/20.  That's a
3  follow-up.
4      Q.  7/30/19, try that one.
5      A.  when?
6      Q.  7/30/19.  Okay?
7      A.  Okay, here, 7/30/19.  Okay, I see it.
8      Q.  Okay, there we go.
9          So in Dr. Buvanendran's record of his
10  examination and history that he took of Mr. Narsimhan
11  on 7/30/19, the requirement Nos. 2 and 3 of the
12  Budapest criteria have been met, correct?
13      A.  Yes.
14      Q.  Requirement one would be met as well because
15  that's ongoing pain that is disproportionate with the
16  inciting event, correct?
17      A.  According to this.
18      Q.  And I think we talked about this earlier, so
19  what I'm wondering is -- I think you said that signs
20  relating to CRPS can wax and wane, and people can have
21  good days and bad days with regard to those signs,
22  right?
23      A.  True.
24      Q.  And do you know, maybe you don't know, but do

103

1  you recall that Mr. Narsimhan when he saw you, when
2  you were asking him questions, he told you that today,
3  when he was seeing you in the examination, was a much
4  better day than usual?  Do you recall that?
5      A.  I don't vividly recall it, but I wouldn't say
6  it didn't happen.
7      Q.  So hypothetically, if Mr. Narsimhan was
8  having a much better day on the day you saw him, which
9  was January 15th, 2021, that means he may have less
10  signs of CRPS than other days, correct?
11      A.  That's true.
12      Q.  Do you disagree with Dr. Buvanendran that
13  when Dr. Buvanendran saw Mr. Narsimhan that
14  Mr. Narsimhan met the requirements of CRPS?
15      A.  I have an issue, but as documented on that
16  visit, it would fulfill the diagnostic criteria for
17  CRPS.
18      Q.  So Dr. Buvanendran's examination and history
19  and findings of Mr. Narsimhan would be consistent with
20  fulfilling the Budapest criteria for CRPS.  True so
21  far?
22      A.  Yeah, I mean, 7/30/19.  Now, where I have
23  issue with Dr. Buvanendran is --
24      Q.  Before you give me your issue, answer the

104



1  question.
2      A.  Okay.  That exam as he documented would be
3  consistent with meeting the Budapest criteria for
4  diagnosis of CRPS.
5      Q.  Now tell me your issue.
6      A.  My issue is that all his exams have the exact
7  same temperatures at the same places, have the same
8  misspelling in words that he used like gauze, and it
9  kind of -- it compromises the credibility of this
10  whole situation if he's cutting and pasting.  There
11  are three exact exams on different dates where he has
12  temperatures measured at 1.5 degrees to the calf;
13  medial area, 2.5 degrees; 2.2 degrees at the foot.
14  And I can tell you that way, way, way beyond medical
15  probability that the temperatures -- three
16  temperatures at three different places to be exactly
17  the same on three different days is virtually
18  impossible.  Statistically way, way less than
19  1 percent.  Within medical probability, within medical
20  reason, within medical anything, you cannot have that,
21  and here's a guy on three different occasions
22  reporting the exact same thing.  That's what I have an
23  issue with.
24      Q.  I understand that.  Here's my question,
                                                    105

1  though, generally for you:  Can a patient meet the
2  Budapest criteria for CRPS on one examination, but
3  then possibly not meet the Budapest criteria on the
4  next examination --
5      A.  Yes.
6      Q.  -- or does it have to be -- okay.
7      A.  I think I answered that question to you a few
8  times already.
9      Q.  Oh, good.
10         So as a treating doctor, if you have a
11  patient who at times doesn't meet the Budapest
12  criteria but had previously met the Budapest criteria,
13  do you change the diagnosis?
14      A.  Actually, what I say under those
15  circumstances is that there are documented diagnoses
16  of CRPS in the chart, and that on my exam it appeared
17  that the CRPS is in remission if there were CRPS
18  before based on credible examinations.
19      Q.  That makes sense.  But you say, "in
20  remission," which does not change the diagnosis.  It
21  continues the diagnosis, but it's just the symptoms
22  are in remission?
23      A.  If they are credible exams, yes.
24         As a matter of fact, last week I did exactly
                                                    106

1  that on a plaintiff's exam.
2      Q.  I'm certain that you reviewed Physical
3  Therapist Schwartz's records and Physical Therapist
4  Fischer's records, correct?
5      A.  I don't know that I have Fischer's records.
6  I reviewed Schwartz's records.
7      Q.  You don't have Fischer's records?
8      A.  I don't think I do.
9      Q.  Maybe I'm mistaken.  I thought you had them,
10  but maybe not.
11      A.  I think I told you at the beginning I didn't.
12      Q.  I'm almost certain you told me you did not
13  have his deposition.  I know that for a fact.  But I
14  thought you had his records.  Maybe that's where I was
15  mistaken.
16      A.  I don't recall the name Fischer as I was
17  doing it.  Do you know the facility where I could look
18  for it?
19      Q.  Yes, I think I do.
20      A.  Hold on.  I can do a search.  Fisher,
21  F-i-s-h-e-r?
22      Q.  I have it, F-i-s-c-h-e-r.
23      A.  Wait.  We have to know for sure which way.
24      Q.  F-i-s-c-h-e-r, Brian Fischer.
                                                    107

1      A.  No items match the search.
2      Q.  In your practice -- let me just ask you this
3  way.  I'm not worried about that at this time.  I'm
4  going to try to wrap up, if I can.
5         In your practice, at times do you prescribe
6  physical therapy for patients with a diagnosis of
7  CRPS?
8      A.  Definitely.
9      Q.  So physical therapy is one recognized method
10  of treatment for CRPS, right?
11      A.  It's one important component.
12      Q.  Okay.  And are there certain -- to your
13  knowledge, are there certain physical therapists who
14  seem to have more training in regards to treating CRPS
15  patients than others?
16      A.  For sure.
17      Q.  Dr. Buvanendran, in fact, prescribed physical
18  therapy for his patient Dr. Narsimhan.  You saw that
19  prescription, right?
20      A.  You said Dr. Narsimhan.  Is he a doctor?
21      Q.  Did I mess up the question?  I had it right
22  for me.  I don't know about you.
23         Dr. Buvanendran prescribed physical therapy
24  to treat the right lower extremity symptoms in his
                                                    108



1  patient Mr. Narsimhan, right?
2      A.  Yes.
3      Q.  You don't have a problem with that
4  prescription for that type of treatment for those
5  symptoms, do you?
6      A.  No.  I'm very careful with how I prescribe it
7  myself, but I don't know his infrastructure to be able
8  to know if I like the way he prescribed it or not.
9  But it's the right thing to do.
10     Q.  And Physical Therapist Fischer -- let me back
11  up.  Physical Therapist Schwartz, who I know you did
12  review her records and her deposition, indicated upon
13  her initial examination of 1/13/20, she wrote down
14  "53-year-old male who presents with signs and symptoms
15  consistent with referring diagnosis."  Do you see
16  that?
17     A.  Yes.  Well, I don't see it.
18     Q.  Well, referring diagnosis, but take out the
19  words CRPS right lower extremity, right?
20     A.  Here, I have Lisa Schwartz in front of me
21  now.
22     Q.  Take a look at 1/13/20.  Its page 97 of the
23  records if it helps at all.
24     A.  Okay.  So she says -- hold on.  It looks like
                                                        109

1  I have 1/13/20, page 1 of 4, and then I don't have
2  pages 2 of 4.  I don't have pages 2 of 4, so I don't
3  have what you're quoting.
4      Q.  Do you have the diagnosis portion of that
5  where it says "Outpatient Physical Therapy Initial
6  Evaluation"?
7      A.  Excuse me.  I have page 1 of 4, which doesn't
8  go down to that.  Then pain location, pain range, and
9  then it goes right into -- unfortunately, it goes into
10  the exam of 2/14.  So I only have one page of that.  I
11  have plaintiff's Bates page 94.  Is that what you're
12  looking at?
13     Q.  No.  No, I'm looking at the records
14  themselves.  Maybe you're missing them.  But the
15  initial evaluation by Lisa Schwartz was on 1/13/2020.
16     A.  Which I have 1/13/2020.  I have that.
17     Q.  That's what I'm looking at.
18     A.  I only have one page of it.
19     Q.  Do you see on 1/13/2020 Lisa Schwartz's
20  records show a diagnosis CRPS --
21     A.  I don't think you're getting what I'm saying.
22  She had four pages of notes.  I only received one.
23     Q.  I'm asking which one?  Do you have a
24  diagnosis on one page?
                                                        110

1      A.  Page 1 of 4, the last thing is, "patient
2  goes".
3      Q.  So do you know what the patient,
4  Mr. Narsimhan, was -- what diagnosis Mr. Narsimhan was
5  referred to Lisa Schwartz to treat?
6      A.  She says the diagnosis was made in 2019.
7  Started with PT immediately after he had his first
8  injections.
9      Q.  So we don't know what the diagnosis was he
10  was referred to her for?
11     A.  Well, no.  It said there was a diagnosis made
12  in 2019.
13     Q.  It says, "a diagnosis."  What was the
14  diagnosis?
15     A.  No, it says, "diagnosis CRPS in 2019."  You
16  should be able to find that in the 1/13.
17     Q.  All right.  So Mr. Narsimhan presented to
18  Lisa Schwartz for physical therapy on 1/13/2020 with a
19  diagnosis of CRPS right lower extremity, agreed?
20     A.  That's what Dr. Buvanendran sent him to her
21  for.
22     Q.  And the assessment that Lisa Schwartz stated
23  in her records was "Patient is a 53-year-old male who
24  presents with signs and symptoms consistent with
                                                        111

1  referring diagnosis."
2      A.  Okay.  Please read her physical examination
3  to me because I don't have it.
4      Q.  I'm just asking you if you've seen the
5  assessment or not.
6      A.  Well, I've told you that I only have page 1
7  of 4 of that.  I've said it like three or four times.
8      Q.  So you're telling me you don't have the
9  assessment in that?
10     A.  I keep telling you the same thing.  Yes, I do
11  not have the assessment.  I only have Bates page 94,
12  page 1 of 4 of Lisa Schwartz's 1/13/20 note, and I'm
13  missing pages 2, 3, and 4.  It didn't come to me on
14  that PDF.
15     Q.  Did you ever ask the attorney who sent you
16  the records to give you more complete records for
17  Ms. Schwartz?
18     A.  I did not.
19     Q.  If you're missing certain portions of the
20  records, wouldn't that be relevant to your opinions?
21     A.  It would.
22     Q.  Then you're missing certain portions of
23  Linda Schwartz's examination and assessments of her
24  patient Mr. Narsimhan, right?
                                                        112



1          MS. HAY:  I think it's Lisa Schwartz, by the
2  way, Steve,
3  BY MR. BERMAN:
4      Q.   Lisa Schwartz.
5      A.   It is.  It's Lisa Schwartz.
6      Q.   With that caveat, can you answer my question?
7      A.   The answer is, it would have been better if I
8  had asked for those records, but I missed that in the
9  plethora of records that I was reviewing.
10     Q.   Let me switch gears.  It is accurate you
11 commonly don't see nerve damage visible in patients
12 diagnosed with CRPS?
13     A.   Can you repeat that, please?
14     Q.   Is it accurate that you commonly don't see
15 nerve damage visible in patients diagnosed with CRPS?
16     A.   In CRPS 1.
17     Q.   In CRPS 1, that's true?
18     A.   That's true in CRPS 1.
19     Q.   CRPS 2 is when there's actual damage to a
20 nerve, correct?
21     A.   Correct.
22     Q.   You saw Dr. Saeed in her records and
23 deposition that she came to the conclusion based upon
24 her examinations of Mr. Narsimhan that her diagnosis

113

1  was CRPS right lower extremity, correct?
2      A.   Right.  And that was, in 7/7/18, two years --
3      Q.   I know when it was.  Just answer my question.
4  That's okay.
5      A.   I answered it.
6      Q.   And you disagree with that diagnosis, right,
7  by Dr. Saeed?
8      A.   I'm having trouble finding that note, but I
9  would like to -- do you have that note in front of
10 you?
11     Q.   Not that I can put on the screen.  I have it
12 in paper.
13     A.   I have a webcam myself.  I can give it to
14 you.
15          She makes a possible diagnosis of CRPS at
16 that time, and I guess my question is, why would that
17 happen two years after the incident?
18     Q.   My question is, Doctor, do you disagree with
19 Dr. Saeed's diagnosis of CRPS right lower extremity?
20     A.   I don't have the note in front of me at the
21 moment, and I can't commit.
22     Q.   You can't say whether you agree or disagree
23 with Dr. Saeed?
24     A.   Until I have the opportunity to review her

114

1  note, I cannot do that.  There are just so many
2  records here.
3      Q.   What about Dr. Buvanendran, Dr. Buvanendran
4  made a diagnosis of CRPS right lower extremity; you
5  saw that in the records, right?
6      A.   Yes.
7      Q.   Do you disagree with Dr. Buvanendran's
8  diagnosis of CRPS right lower extremity?
9      A.   I believe in his multiple duplicated
10 evaluations, that they did provide diagnostic criteria
11 for CRPS.  Asked and answered.
12     Q.   No, I know that you said that there were
13 diagnostic criteria present for CRPS in
14 Dr. Buvanendran's records.  I'm simply asking, as a
15 medical professional based on your review of the
16 records, do you disagree with Dr. Buvanendran's
17 diagnosis of CRPS right lower extremity for
18 Mr. Narsimhan?
19     A.   What I'm saying -- and I think I keep -- I
20 mean, I don't know how I can say it differently.  That
21 his documentation supports a diagnosis of CRPS in the
22 multiple duplicated evaluations that he put in his
23 chart.
24     Q.   So you agree with Dr. Buvanendran's

115

1  diagnosis?
2          MS. HAY:  I'm sorry.  Can you read that -- I
3  missed that question, Steve, or can Ms. Court Reporter
4  read it back?
5  BY MR. BERMAN:
6      Q.   Sure.  I'm simply asking, can you tell me you
7  agree or disagree with Dr. Buvanendran's diagnosis?
8          MS. HAY:  Hold on one second, Doctor.  I'll
9  just object to asked and answered.  I think he's
10 answered it already, but you can go ahead and answer,
11 Doctor.
12          THE WITNESS:  Well, clearly, Mr. Berman, I
13 was not present at that exam.  And what I'm telling
14 you, Mr. Berman, is that his documentation if done
15 accurately, even though I raise the question how three
16 consecutive examinations could have the exact same
17 data in them, but if he is documenting accurately in
18 his three duplicated exams, then they do fulfill the
19 diagnostic criteria for CRPS.  And not being there, I
20 cannot go further in what I have to say.
21 BY MR. BERMAN:
22     Q.   So as a medicolegal consultant in this case,
23 you can't state an opinion of whether you agree or
24 disagree with Dr. Buvanendran's diagnosis?

116

1    A.   I'm going to say the same thing.  I wasn't
2  there.  What I can tell you is that he provided
3  adequate documentation in his duplicated examinations
4  to provide a positive diagnosis utilizing the
5  diagnostic criteria of Budapest -- of the
6  International Association for the Study of Pain for
7  the diagnosis of CRPS.
8    Q.   I know, but you weren't there for any of
9  these doctors who examined Mr. Narsimhan other than
10  yourself.
11    A.   Correct.
12    Q.   So despite that, you're giving opinions about
13  the diagnosis for Mr. Narsimhan's pain even though you
14  weren't present at the examinations of Dr. Saeed,
15  Dr. Buvanendran, Dr. Matiwala, Dr. Farbman, Physical
16  Therapist Fischer, Physical Therapist Schwartz, right?
17    A.   I don't have Physical Therapist Fischer's
18  notes at all, and Physical Therapist Schwartz, I don't
19  have the salient parts of her notes.  And on the
20  others, the only thing I can opine on is whether they
21  met the diagnostic criteria based on their
22  documentation.
23    Q.   It is a fair characterization to say that the
24  only thing you can really opine on is whether the

117

1  records accurately documented the diagnostic criteria
2  for CRPS on any given date?
3    A.   That's what I'm telling you.
4    Q.   So Mr. Narsimhan may have had the diagnostic
5  criteria for CRPS on dates other than the documented
6  dates of Dr. Buvanendran, but it wasn't properly
7  documented, that's possible, fair?
8    A.   Well, that's flipping it the other way.  And
9  what that's saying is, maybe people did completely
10  inadequate exams on other days, and that's why they
11  didn't come up with the diagnosis of CRPS.  I think
12  that's what you're trying to say.
13    Q.   Have you ever seen any doctors who maybe
14  aren't as familiar with the Budapest criteria as you
15  who perform examinations of patients, and then maybe
16  don't document the Budapest criteria as carefully as
17  you?
18    MS. HAY:  Can you read that back, please?
19  That was a long question.
20          (whereupon, the record
21              was read as requested.)
22    MS. HAY:  I'm just going to object to form,
23  foundation and vague and confusing.  But if you
24  understand, you can answer that, Doctor.  Go ahead.

118

1    THE WITNESS:  I'm going to answer it,
2  Ms. Hay, the way I want to answer it.  You may not
3  like the answer.
4    At least what I'm gleaning from what you're
5  saying, Mr. Berman, is do I see people that make a
6  diagnosis of CRPS but did not provide adequate
7  diagnostic criteria to establish that diagnosis, and
8  clearly I see that all the time.
9  BY MR. BERMAN:
10    Q.   And do you see the opposite as well, Doctor,
11  you at times see doctors who fail to recognize CRPS
12  because they don't perform the Budapest criteria
13  examination?
14    A.   Yes, I see that, too.
15    Q.   Okay.  And in this case, Mr. Narsimhan saw
16  Dr. Farbman and Dr. Saeed, and I think in your
17  opinion, the Budapest criteria was not properly
18  documented, correct?
19    A.   Nobody ever -- I mean, Dr. Farbman's account
20  from what I gleaned from reading his notes and the way
21  he does things -- it appears he may have retired.  I
22  don't know.  I got that impression from the chart.
23  But I got the impression he was a competent
24  neurologist that were CRPS present he would have

119

1  picked it up.
2    Q.   What gave you that impression?
3    A.   Because a competent neurologist should be
4  able to do that.
5    Q.   You think any competent neurologist in the
6  world should be able to do that?
7    A.   Well, should and does are two different
8  things, but if it's a competent neurologist, "should"
9  fits.
10    Q.   How do you -- what makes you think that
11  Dr. Farbman is such a competent neurologist that he
12  should be able to perform a Budapest criteria
13  examination and document it properly?
14    A.   Well, that's a whole different thing.  That's
15  different than what you asked me, sir.  What you asked
16  me is would he be competent to be able to make a
17  diagnosis, and documenting it is another thing.  But
18  based on the way his notes are written -- and believe
19  me, I see the broad spectrum of notes.  And based on
20  the quality of his notes, it's my opinion that he's a
21  competent neurologist.  Now, I'm not there at his own
22  institution, but he's not at a shabby institution
23  either.  That in a good institution somebody who keeps
24  good notes, who doesn't copy his notes from visit to

120

1  visit verbatim is a competent neurologist.
2      Q.  Is there any other reason other than doesn't
3  copy his notes from day to day that indicates that
4  Dr. Farbman is a competent neurologist capable of
5  understanding and performing and documenting the
6  Budapest criteria, anything else?
7      MS. HAY:  Just object to misstating his prior
8  testimony about his review of his record, but you can
9  go ahead and answer, Doctor.
10      THE WITNESS:  And, Ms. Hay, thank you,
11  because I was going to use nonlegal words to say he
12  was twisting what I was saying.
13      And the bottom line is, I'm not saying that
14  he was competent to document the diagnostic criteria
15  for CRPS, but he's competent to be able to make a
16  diagnosis even if he doesn't document it properly or
17  at the minimum -- and this is really important -- at
18  the minimum raise in his differential diagnosis, which
19  any competent neurologist would do, would raise the
20  possibility of CRPS if it was present, and he did not
21  do that.
22  BY MR. BERMAN:
23      Q.  What about Dr. Saeed, did you get the
24  impression that she was a competent neurologist to

                                                    121

1  make a diagnosis of CRPS even if she doesn't document
2  the Budapest criteria properly?
3      A.  I think she is competent to raise the
4  question of CRPS, which is what most of the
5  neurologists in my community do.  They don't fully
6  establish a diagnosis.  They raise it so that when
7  they send the patient to me, I can actually opine as
8  to whether it truly is or isn't.  And I would say that
9  that's a mixed bag about what comes back.
10      Q.  Dr. Saeed raised the issue potentially of
11  CRPS on her very first examination of Mr. Narsimhan on
12  7/17/2018.  Did you see that?
13      A.  That is correct, and I'm looking for that
14  record.  I'm having trouble finding it.  But that date
15  is indelled [sic] in my mind, engraved in my mind.  So
16  I remember that date.  I remember seeing that.  But
17  I'm having trouble finding it to read it to remember
18  whether or not she did appropriate documentation on
19  that date.
20      Q.  What does the word -- I saw a word in the
21  records, Doctor, I don't understand.  What is
22  dysesthesias, d-y-s-e-s-t-h-e-s-i-a-s?
23      A.  Could you repeat -- spell it again.  Spell it
24  more slowly, please.

                                                    122

1      Q.  D-y-s-e-s-t-h-e-s-i-a-s.
2      A.  Can you write it on a paper, and just put
3  it --
4      MS. HAY:  I think it's dysesthesias.
5      THE WITNESS:  Oh, "D."  I didn't hear the
6  "D."  Okay, I got it now.  Linda helped me.
7      Dysesthesias means an abnormal sensation.
8  Something feels differently than it's supposed to
9  feel.
10  BY MR. BERMAN:
11      Q.  Is that a potential indication of CRPS
12  sensory criteria?
13      A.  Not a big one unless you consider allodynia
14  dysesthesia, which I don't.  Dysesthesia could be
15  feeling like ants are crawling on you, which is also a
16  form of dysesthesia called formication.  But it's
17  like, if you touch somebody and it feels differently
18  than what you're touching, or you just have
19  different -- dys means not functioning properly, and
20  esthesia means sensation.  So sensations not working
21  right is what dysesthesia is.
22      Q.  Can that be a sensory -- can that relate to
23  the sensory category of CRPS symptoms or signs?
24      A.  Clinically, yes.

                                                    123

1      Q.  What is claudication?
2      A.  Claudication is essentially decreased blood
3  flow to an area.
4      Q.  Is claudication pain and burning pain?
5      A.  No.
6      Q.  No?  What are the symptoms of claudication?
7      A.  Feeling of ischemia.
8      Q.  What does that mean?
9      A.  What does that mean?  Ischemia is decreased
10  blood flow.
11      Q.  What does decreased blood flow feel like to a
12  patient?
13      A.  Very unpleasant.
14      Q.  Painful?
15      A.  Yes.
16      Q.  So claudication-like symptoms would be
17  painful symptoms, right?
18      A.  Yes.
19      Q.  Very painful, right?
20      A.  Caused by decreased blood flow.
21      Q.  Well, claudication-like symptoms would be
22  symptoms that are severely painful, correct?
23      A.  Claudication is claudication.  Claudication
24  is basically too little blood flow to the muscles

                                                    124



1  during exercise is what claudication is.
2      Q.   Is claudication a diagnosis?
3      A.   Well, it's a sign or it's a symptom.
4      Q.   The words "claudication-like symptom" would
5  be describing the feeling a person has from
6  claudication; wouldn't you agree?
7      A.   I don't really understand the question.
8      Q.   You know what claudication is?
9      A.   Right.
10     Q.   You know what claudication symptoms feel
11  like, right?
12     A.   Yeah, it's usually like a cramping of the
13  muscles because -- okay.  There are two kinds of
14  claudication.  There's vascular claudication.  There's
15  spinal claudication.  And basically, you're walking
16  down the street and your legs cramp up because they're
17  not getting enough blood flow or that the spine is not
18  providing enough positive input into the leg that the
19  legs cramp up, and you can't walk anymore.  That's
20  what claudication is.  So it's essentially a muscular
21  kind of problem, not nerve kind of problem.
22     Q.   But patients don't come to you and say, "Hey,
23  Doctor, I'm feeling claudication today," do they?
24     A.   That's -- I mean, is a patient going to come
                                                      125

1  to me and tell me they have paroxysmal atrial
2  tachycardia or paroxysmal delancination.  I mean, a
3  patient doesn't come to me and tell they have
4  claudication.
5      Q.   Right.  Patients comes in and tell you that
6  they're feeling pain or burning pain, and doctors have
7  to describe it in some way, right?
8      A.   Right, okay.
9      Q.   And a doctor may describe burning pain as
10  claudication-like symptoms, right?
11     A.   Are you testifying to that or making it up?
12     Q.   Can you answer my question, Doctor?
13     A.   Well, they wouldn't do that because it's
14  wrong.
15     Q.   I thought you said claudication-like symptoms
16  would be painful.  Is that wrong?
17     A.   Yeah, okay.  Hitting your hand with a hammer
18  is painful and putting a soldering iron on your hand
19  is painful, but they're not the same.  And having
20  muscular pain due to ischemia is very different than
21  having burning nerve pain, and so they're not the
22  same.
23     Q.   So what does the muscular pain due to
24  ischemia feel like?
                                                      126

1      A.   Cramping.  It's a severe dull ache.
2      Q.   Severe dull ache, is that what you said?
3      A.   It doesn't even have to be severe.  Dull
4  ache.
5      Q.   It can be severe, though?
6      A.   Can be severe.
7      Q.   So claudication-like symptoms could be a
8  severe dull ache, correct?
9      A.   Correct, yeah.
10     Q.   The only reason I'm asking you that is
11  Dr. Farbman on 2/9/17 wrote down "claudication-like
12  symptom."  Do you know what he's referring to there?
13     A.   Well, I mean, that could be ischemia caused
14  by diabetic -- not peripheral neuropathy, but by
15  sequelae of diabetes because that's very, very common
16  in diabetes.
17     Q.   Or it could just be he's describing a severe
18  dull ache, right?
19     A.   Well, you have to have a reason to have the
20  dull ache.
21     Q.   Going back to your medical examination.
22  Relative to requirement No. 4, you said requirement
23  No. 4 of the Budapest criteria was not met because
24  there was another explanation for Mr. Narsimhan's
                                                      127

1  right lower extremity pain, and that was diabetic
2  peripheral neuropathy with pain, correct?
3      A.   Right, which it looks like on this occasion I
4  would have to say that that's not accurate.
5      Q.   What do you mean by that?
6      A.   I mean, I have to withdraw No. 4 not being
7  satisfied.
8      Q.   So previously based on your report, your
9  examination when you said requirement No. 4 was not
10  satisfied, you're withdrawing that, and you're saying
11  it was satisfied as of right now, right?
12     A.   Correct.
13     Q.   Understood.
14          I'm just looking at your report.  I'm just
15  going to wrap up here, just getting some report
16  questions done.
17          In your report on page 5, your independent
18  medical examination report which is Exhibit B-1,
19  page 5, the sixth paragraph down.
20     A.   Hold on.  Okay, page 5.
21     Q.   The sixth paragraph down where it says,
22  "Mr. Narsimhan has diabetes mellitus" -- actually, I'm
23  going to skip that and go down to the next paragraph,
24  which is, "Mr. Narsimhan was not considered to have a
                                                      128



1  diagnosis of complex regional pain syndrome until
2  three years after the incident."  Do you see where you
3  wrote that there?
4      A.  It should have been two.
5      Q.  It should have been two.
6      In your experience, I mean, in your clinic
7  and in your work as a medicolegal examiner, is there
8  some range of timing when CRPS gets actually diagnosed
9  after a traumatic event?
10     A.  Yes.
11     Q.  What is that range?
12     A.  It's usually within three months that the
13 patient has unrelenting problems and seeks care to the
14 point that they get care unless they don't have
15 insurance.  That's the only situation -- I would say
16 that's pretty much the only situation when somebody
17 has active CRPS that they don't start getting treated
18 for CRPS in the first three months unless -- I mean,
19 not in Chicago, okay, but if they were in the boonies
20 somewhere, then it could happen.  But like in LA,
21 which is the same as Chicago for all intents and
22 purposes as we're talking here today, if you have CRPS
23 and you're at month three and things are bugging you,
24 you're going to a doctor on a regular basis and

129

1  complaining about how bad it is.  That's the natural
2  course of CRPS.
3      Now, there are doctors that have a dull ear
4  toe to that.  And, you know, it may be gratuitous for
5  me to be saying that here, but, you know, they still
6  usually will write it down and then ignore it.  But
7  what we have here is a guy who's getting a lot of
8  medical care, and he's just not behaving like a CRPS
9  patient would behave saying, "We got to get rid of
10 this.  You know, you really got to treat me.  I need
11 something done about this."  And we're just not seeing
12 that, and that's the reality of the world I live in.
13     Q.  In Mr. Narsimhan's case, within two months
14 after his incident at Lowe's, so on August 2nd, 2016,
15 he's prescribed a medication called Lyrica.  Is Lyrica
16 used for nerve pain, to treat nerve pain?
17     A.  Yes.
18     Q.  Can Lyrica be used at times to treat CRPS
19 pain?
20     A.  Yes.
21     Q.  I know that obviously we talked about this.
22 At some point the Lyrica was changed to Gabapentin.
23 But at least you agree with me as of August 2nd, so
24 within that three-month time frame after the incident

130

1  at Lowe's, Mr. Narsimhan is being prescribed Lyrica
2  which potentially could be a treatment for CRPS pain,
3  right?
4      MS. HAY:  Objection, asked and answered.  You
5  can answer again, Doctor.
6      THE WITNESS:  I'd say I haven't answered it
7  for Lyrica.  I answered it for Gabapentin.  They're
8  cousins, and either can be used.  And neither is FDA
9  approved for that purpose.  And I don't think we
10 separated out the hand neuropathic pain at that point
11 from leg neuropathic pain, so I don't really know
12 which he was prescribed for.  Are you saying August of
13 2016?
14 BY MR. BERMAN:
15     Q.  Yes, Doctor, 8/2/2016, August 2nd.
16     A.  Is that Farbman?
17     Q.  It is, Doctor.
18     A.  Okay.  Let me just pull it up.
19     I'm just looking for that.  I have
20 Dr. Saeed's notes in front of me now, which I couldn't
21 find before.  I think I have Farbman's notes.  I'm
22 having trouble finding Farbman's notes as we're
23 speaking here.
24     MS. HAY:  I don't know if -- they were under

131

1  Northwest Neurology, if that helps, Doctor.
2      THE WITNESS:  Yeah, except the Northwest
3  Neurology I'm pulling up right now is only pulling up
4  Dr. Saeed's notes.
5      MS. HAY:  I thought they were all in one
6  bundle, but I think some of them might have been a
7  little out of order.
8      Doctor, are your Northwest Neurology notes
9  Bates stamped?
10     THE WITNESS:  They're not Bates stamped.
11 BY MR. BERMAN:
12     Q.  Doctor, for this reason -- at the very
13 beginning of the deposition I asked you to put your
14 file on a disc or in a drive somewhere and get it to
15 defense counsel so they can get it to me.  I'm asking
16 you to get all your records, whatever you reviewed in
17 relation to this case, put it all on one drive, and
18 let me take a look at what you got.  So I appreciate
19 that.  Thank you.
20     MS. HAY:  I don't know if it will help you
21 then, Doctor, but the August 2nd, 2016, note that I
22 have is Bates stamped page 39 out of 58 pages total,
23 if that's helps.
24     THE WITNESS:  It doesn't look like -- I don't

132

1 know what happened, but it looks like it's missing.
2 Oh, wait.
3 BY MR. BERMAN:
4     Q.   Can we move on, Doctor?
5     A.   Well, you want -- yeah, you can.  I'm just
6 having computer problems right now, but I think I
7 found it.  It looks like I found it.  I'm sorry.  It's
8 just not easy to find right now.  You can move on.
9 BY MR. BERMAN:
10     Q.   I'm going to share my screen, and show you
11 what's attached as Exhibit B to your deposition.  And
12 this is B-3.  It's your three-page expert report.
13     A.   Right.
14     Q.   My question for you, Doctor, is this a
15 document you typed or is this something that defense
16 counsel typed and you signed?
17     A.   No, this looks like my typing.
18     Q.   So page 1 of Exhibit B-3 is, No. 1,
19 Qualifications.  That's all your qualifications.
20 That's true for any expert report you do no matter
21 what, right?
22     A.   Correct.
23     Q.   All right.  So this --
24     A.   No, that's not true.  That's true for ones

133

1 that I do with regard to complex regional pain
2 syndrome.
3     Q.   So you use this page of qualifications for
4 any report you do for complex regional pain syndrome?
5     A.   Well, actually, I kind of create each
6 individually, but this is the one I created as my
7 qualifications for CRPS.
8     Q.   Is this a cut-and-paste job for
9 qualifications you've used before?
10     A.   I don't believe so, no.
11     Q.   And page 2 is your opinions, and it goes on
12 to page 3, right?
13     A.   Yes.
14     Q.   And you would amend these opinions based upon
15 your testimony today, right?
16     A.   Excuse me?
17     Q.   You would amend your opinions based upon your
18 testimony today, right?
19     A.   Correct.
20         MS. HAY:  I'm sorry.  You trailed off, Steve.
21 Sorry.
22         MR. BERMAN:  Judy, what did I say?
23             (whereupon, the record
24                 was read as follows:

134

1             "Q.  You would amend your opinions
2                 based upon your testimony today,
3                 right?
4                 A.  Correct.")
5 BY MR. BERMAN:
6     Q.   Lastly, Doctor, I know we went over your
7 examination.  I'm going a little bit further.  One
8 thing I wanted to ask you relative to your examination
9 of January 15th, 2021, had you upon examination found
10 one additional sign of CRPS in the vasomotor,
11 sudomotor, or even motor/trophic, the Budapest
12 criteria would have been met, and the diagnosis would
13 have actually been CRPS, correct?
14         MS. HAY:  I'm sorry.  Steve, you're just
15 getting distorted.  Ms. Court Reporter, did you hear
16 that?
17             (whereupon, the record
18                 was read as requested.)
19         MS. HAY:  Did you hear and understand that,
20 Doctor?
21         THE WITNESS:  I did, and I answered it twice.
22 Yes.
23         MR. BERMAN:  I'm sorry, Doctor, it's been so
24 long.  We're over three hours.  I have no further

135

1 questions at this time.
2         THE WITNESS:  I thought it was going for four
3 hours.
4         MR. BERMAN:  Do you want me go another hour,
5 Doctor?
6         MS. HAY:  I've got some questions.
7         THE COURT REPORTER:  Could I just take two
8 minutes?
9         MS. HAY:  Sure.
10             (whereupon, a short break
11                 was taken, after which the
12                 following proceedings were
13                 had:)
14             EXAMINATION
15 BY MS. HAY:
16     Q.   Doctor, the report that you prepared with
17 regard to this matter that outlines your
18 qualifications, as well as your opinions, are those
19 all opinions that you hold to a reasonable degree of
20 medical certainty?
21     A.   They're not all of them, no.
22     Q.   Are the ones that are listed here in that
23 report, are those your -- are those opinions all to a
24 reasonable degree of medical certainty, though?

136



1      A.   Wait.
2           MR. BERMAN:  Which report?
3           MS. HAY:  His expert report.
4           THE WITNESS:  So I have to break the
5   question -- I'm not trying to be -- I am a little
6   punctilious here.  But why don't you ask the first
7   question -- oh, the first one was, were they all my
8   opinions; is that correct?
9   BY MS. HAY:
10     Q.   Let me restate it, Doctor.  In your expert
11  report where you lay out your opinions -- do you have
12  that in front of you?
13     A.   No, but I can get it.
14          MR. BERMAN:  Exhibit B-3.
15          THE WITNESS:  You want to just put it on the
16  screen.  It will be easier than me finding it and save
17  us some time.
18          MR. BERMAN:  I can do it quickly.
19          MS. HAY:  If you can do it quickly because
20  I'm on my iPad.
21          THE WITNESS:  Okay, there it is.  Yes.
22  BY MS. HAY:
23     Q.   Doctor, are these all of your opinions to a
24  reasonable degree of medical certainty?

137

1      A.   They are not.
2      Q.   Can you tell me are there -- what's the
3   reason for that?
4      A.   The reason for that is that there are
5   different -- there are additional records that have
6   been provided to me since then, and they have allowed
7   me to form other opinions.
8      Q.   Doctor, can you just be a little more clear
9   for me with regard to which opinions are different?
10     A.   Well, they're not different.  You just said
11  they're additional.
12     Q.   Which are the -- can you tell me what
13  additional opinions you have?
14     A.   Yes.  I have an opinion that there's a marked
15  discrepancy between the way I conducted the exam on
16  1/15/21 than the way Dr. Patel documented the way that
17  Mr. Narsimhan said I did it, and we could go into
18  greater detail.  But what I can tell you is that there
19  was an intervening exam performed a month later which
20  was a month before Dr. Patel's exam, and in that exam
21  there was no mention of an exacerbation occurring as a
22  result of -- I don't know what words to use -- hold
23  on.  I'll get you the exact words so you have it.  In
24  which Mr. Buvanendran indicated that his right --

138

1      Q.   Excuse me.  You mean Mr. Narsimhan?
2      A.   Yes, sorry.  I misspoke.
3           Mr. Narsimhan claims that his right leg was
4   handled in a rough manner in which a flare of his
5   CRPS -- which prompted a flare of his CRPS.  Now, very
6   interesting that the same gentleman who reported that
7   to Dr. Patel on -- in March of 2021, did not report
8   that at an intervening examination in any way that he
9   had a flare or that he had his limb handled in a rough
10  manner.  And what I can say is, number one, in that
11  regard as somebody who's an expert in CRPS, I'm
12  exquisitely sensitive to the fact that CRPS patients
13  can have bad reactions to what is done.  And so I am
14  extra careful in my medical practice in avoiding
15  anything that could traumatize a patient.  Now, that's
16  in my medical practice.
17          In my medicolegal practice, especially when I
18  am evaluating on behalf of defense, I am
19  extraordinarily cognizant of that, and even more
20  careful than I am in my clinical practice.  And what I
21  can tell you based on what my written documentation
22  that was done before this accusation was that I
23  indicated on every occasion that I deferred a part of
24  an examination because of his complaints of pain, and

139

1   it's really incredulous to me with Mr. Berman present
2   who would have stopped me if I was doing anything
3   painful to his client, with my special care to do
4   that, with him not complaining about it a month later
5   that he would then at a plaintiff's expert examination
6   then come up with this accusation is patently not
7   true.
8      Q.   Doctor, as far as the record that you relied
9   upon where that suggestion or outright statement was
10  made, was that to your understanding made in an
11  accounting when he went to Rush Pain Clinic on
12  March 2nd, 2021, and made that complaint to Dr. Patel,
13  a fellow in Dr. Buvanendran's office?
14     A.   Yes.
15     Q.   Was there any indication -- so your
16  independent medical exam was on January 15th of 2021,
17  correct?
18     A.   Correct.
19     Q.   And this complaint then that Mr. Narsimhan
20  made about your rough handling of him was made about
21  two months later, fair?
22     A.   Correct.
23     Q.   And was there any indication that you saw in
24  any of the records that you were provided surrounding

140



1  Dr. Patel/Buvanendran's evaluation on March 2nd that
2  Mr. Narsimhan had contacted any of those doctors at
3  Rush prior to March 2nd but after your examination?
4      A.  No.
5      Q.  Within that time period, Doctor -- well, one
6  other question about that.  Was it your understanding
7  as well that Mr. Narsimhan on March 2nd for the first
8  time told Dr. Patel and/or Dr. Buvanendran that as a
9  result of your rough handling he had a "flare" of his
10 condition in his lower extremity?
11     A.  That's what I just read.
12     Q.  And was it your understanding that at that
13 evaluation as well he now complained that he had had
14 some more significant complaints now to his left lower
15 extremity?
16     A.  Yes.
17     Q.  And that complaint -- I'm looking at the
18 wording in that report, and it says, "Now he has left
19 leg burning pain in dorsum of foot, slow nail growth,
20 no hair growth.  He continues to work."  And that's in
21 the third paragraph under history and physical?
22     A.  Yes.
23     Q.  Within that time period, was it your
24 understanding also, Doctor, that in February of 2021

141

1  that Mr. Narsimhan saw the plaintiff's retained expert
2  for an independent medical exam, Dr. Joshi?
3      A.  Wait.  On what day?
4      Q.  In February of 2021, a month after your
5  examination.
6      A.  Yes.
7      Q.  And I believe the date of that was
8  February 19th, 2021.  Does that sound about right to
9  you?
10     A.  Yes.
11     Q.  Was there anything you recall reading in
12 either the report of Dr. Joshi's independent medical
13 exam or Dr. Joshi's deposition where he indicated that
14 Mr. Narsimhan complained to you that you were rough in
15 your treatment of him in your exam?
16     A.  No.
17     Q.  Was there any indication that you recall
18 reviewing in either Dr. Joshi's examination, report,
19 or in his deposition that Mr. Narsimhan had a flare
20 after your evaluation on January 15th?
21     A.  No.  And just to point out, Ms. Hay, to be
22 fair to all of us, Dr. Joshi did not have his
23 deposition taken until April, so that what occurred in
24 February should have -- he should have commented upon

142

1  it in his deposition should it have occurred, should
2  it have been reported to him as the expert.
3      Q.  With regard to Dr. Joshi, is it your
4  understanding that Dr. Joshi -- well, strike that.
5          Do you believe that your qualifications with
6  regard to this particular case exceed those of
7  Dr. Joshi as it may apply to either your treatment of
8  CRPS patients or your experience, education, and
9  training in the area of diabetes?
10     A.  Well, first, I mean, I want to say in
11 fairness to Dr. Joshi, I believe he's a qualified
12 physician.  He's a qualified pain physician.  So I
13 don't want to underrate him in any regard, and I
14 always have respect for board-certified physicians.
15 He's a board-certified pain physician.  But there are
16 two things that you bring up in your question that
17 really need to be addressed.  And the first one is, do
18 I have more qualifications in CRPS, and I think
19 Dr. Joshi would not dispute that I do.  I mean, it's
20 what I do for a living.  It's 80 percent of my new
21 patients, and I've been doing it for 25 years.  And I
22 believe I have more qualifications in CRPS than he
23 does without trying to diminish him in any other way.
24         with regard to the second question that you

143

1  asked, I am a board-certified internist having taken
2  care of medical patients for a significant portion of
3  my career, having completed an internal medicine
4  residency, and as a result I have experience in
5  dealing with obese, diabetic patients.
6      Q.  Doctor, with regard to -- well, strike that.
7          As to the Budapest criteria, Doctor, do you
8  feel you are well qualified to apply the Budapest
9  criteria?
10     A.  Yes.
11     Q.  Is it important to you, Doctor, in applying
12 the Budapest criteria that there are precise
13 measurements and assessments that are done with regard
14 to the various categories that need to be assessed?
15     A.  Yes.  I wanted to point out one other thing
16 that I wasn't given the opportunity to say, which is,
17 in Dr. Patel's note that was signed by
18 Dr. Buvanendran, we also, once again, have the
19 identical physical examination that has gone through
20 the record from visit to visit.  So I think
21 it is very safe to say that given that that
22 examination was pasted from other examinations that we
23 really do not know what the examination was on that
24 day.

144



1    Q.   Doctor, on page 27 of Dr. Buvanendran's
2  deposition, he was asked this question and answer, and
3  I'm going to read it for you and ask if this is
4  consistent with your comments with regard to the
5  records of Dr. Buvanendran through some of his visits.
6  And for the record, I'm reading on page -- starting on
7  page 26 and continuing on to page 27.  The question
8  is, "And, in fact, the entire examination section that
9  you've written, down to the punctuation is exactly the
10  same as the prior visit.  Is it unusual that your
11  examination of the patient three months later is
12  exactly the same?"  Answer:  "No, it's not.  You
13  asked" -- and then there's some objections.
14  Dr. Buvanendran continues in answer:  "You know, when
15  I see a patient and make a diagnosis, we don't -- it's
16  part of an electronic medical record.  The records are
17  carried over from the previous time.  But the fact is
18  I do examine the patients every time, and if there are
19  similar findings, I don't go correct everything.  It's
20  just this auto populates the facts.  So it is very
21  similar whether it's 2.2 or 2.1.  It's not a huge deal
22  to me.  I'm treating patient -- a patient here.  I'm
23  not treating numbers or doing legal stuff.  So I'm
24  trying to treat the patient, and you want to be able

145

1  to provide appropriate medical care once you know what
2  the diagnosis is.  You don't need to be documenting
3  every time you see a patient."  And I don't think the
4  last sentence really applies.
5         Does that support, Doctor, your comments with
6  regard to some of the credibility issues about
7  Dr. Buvanendran's findings in his notes?
8    A.   Well, before I answer that, I just want to
9  tell you, Ms. Hay, that I had one of my trainees copy
10  a note from one visit to the next, and I warned him
11  that if he did it again he wouldn't be working with
12  me.  That I feel extremely strongly, and it is -- it's
13  not just me.  It is the standard of care that what you
14  do on a specific day is what happened on a specific
15  day.  And to copy something from another day is -- I
16  mean, sometimes they copy from other doctors, and
17  essentially that's plagiarism.  But here he copied
18  from himself, and whether he cares about the numbers
19  or doesn't care about the numbers, he shouldn't be
20  documenting numbers from another occasion because
21  that's not what happened on that day, and it's
22  misleading.  And it is below the standard of care,
23  very clearly, Ms. Hay, it is below the standard of
24  care to copy a note from one day and put it in another

146

1  day.
2         Now, there a lot of things that don't change
3  that are self-populated like all the medications the
4  patient is taking, what the prior history is.  But the
5  exam on that day is something that happens on that
6  day, and there is no freedom, absolutely no freedom to
7  copy the exam from a different day into that day.  And
8  I don't think I can be any more clear on that.
9    Q.   Doctor, is it your opinion to a reasonable
10  degree of medical certainty that Mr. Narsimhan does
11  not fit the diagnosis for CRPS?
12    A.   Based on my examination, yes.
13    Q.   You were asked some questions with regard to
14  Dr. Matiwala's assessment of Mr. Narsimhan's diabetic
15  condition, and I know you talked a little bit about
16  his diabetic condition prior to the event at Lowe's.
17  Was it your understanding that in accord with
18  Dr. Matiwala's comment that an A1C over 7 or above
19  would not indicate a good control of a diabetic; that
20  there were A1C numbers that Dr. Matiwala recorded
21  after the Lowe's event that were indeed 7 and above?
22    A.   It's not A1C.  It's A1c.
23    Q.   I'm sorry.  A1C.
24    A.   Sorry.  I'm not being fussy.

147

1    Q.   That's okay.  Thank you.
2    A.   I am not recalling others.  I don't want to
3  say one way or the other where I saw them or not, but
4  I don't want to swear to the fact that I saw other
5  numbers over 7 in Dr. Matiwala's notes.  But I
6  certainly wouldn't rule that out.  I have to swear
7  that I can't remember.
8    Q.   That's okay.  If you don't remember, Doctor,
9  that's fine.
10         With Dr. Matiwala's records, whatever the A1C
11  numbers are in his records after the event you would
12  agree would be numbers we could rely upon, fair?
13    A.   Exactly and fully fair.
14    Q.   Doctor, we were recently provided with, and I
15  provided you with some photographs that were taken of
16  apparently Mr. Narsimhan's feet.  Do you recall
17  getting those photographs?
18    A.   Yes.  I can pull them up because I do know
19  exactly where those are.
20         Okay, I got them.
21    Q.   And, Doctor, it's our understanding that
22  these photographs -- I'm not sure if you had the
23  actual dates, but on representation by Mr. Berman, and
24  he can correct me if I'm wrong, these photographs were

148



1 taken by either Mr. Narsimhan or his wife and were
2 taken I believe the first -- it might be tough to
3 pinpoint the actual dates. But the first two were
4 taken in I believe about August 2019 and the remainder
5 in the later half of 2020.
6      MR. BERMAN: For the record, I did provide
7 counsel with the exact dates the pictures were taken,
8 if you recall.
9      MS. HAY: That's correct, you did, Counsel.
10 But I think that's about the range that we were
11 talking about generally speaking.
12 BY MS. HAY:
13     Q.  With regard to those photos, Doctor, does
14 anything in these photos change your opinion that
15 Mr. Narsimhan does not have CRPS?
16     A.  There is only one out of all those
17 photographs, which is the next-to-last photograph that
18 there's a comparison where there appears to be any
19 kind of difference, and that difference is
20 predominantly scaling that we could explain a variety
21 of ways, including not washing your foot. And so all
22 the others -- I could comment on each individually
23 why they don't mean anything to me. And on this fifth
24 one, we would use basically requirement four if it
                                                    149

1 were showing up on that day to say that the only thing
2 that looks different is the scaling, and that that
3 scaling -- you know, the color -- likely looking at
4 the other pictures, his one foot has more exposure to
5 the sun than the other one. That's where I would
6 explain the pigmenting in the first picture between
7 the two feet. CRPS pain looks like -- the sign looks
8 like a sun exposure sign. And in this one, which is
9 the next-to-the one, that's not usually what you see
10 as a CRPS skin change anyway, but if you want to call
11 it that. We don't know what circumstances happened.
12 For all we know, that's wet talcum powder on the foot.
13 I don't know. I'm not there. I can't smell it; I
14 can't feel it; and I can't say it means anything
15 anyway.
16     Q.  With regard to CRPS, Doctor, I know you
17 indicated that patients can have some good days and
18 some bad days, right?
19     A.  Correct.
20     Q.  We know, though, that Mr. Narsimhan
21 specifically described what he told Dr. Patel
22 apparently was a flare after your IME, fair?
23     A.  Fair.
24     Q.  Was there any indication in any of the
                                                    150

1 records or anything that you've seen that would
2 indicate that Mr. Narsimhan during the course of some
3 flare took any specific photos of his feet during the
4 time of that flare?
5     A.  No.
6     Q.  Is there any indication through any of the
7 other -- of the numerous medical providers that he's
8 seen that would suggest to you that they took any
9 photographs of his feet to confirm how his feet may
10 appear differently by way of a photograph?
11     A.  Well, the answer to the question is there are
12 none. And not to be gratuitous here, but the more
13 important thing is there's no complaints as documented
14 telephonic notes or physician visits that demonstrate
15 that any of that ever occurred.
16     Q.  Doctor, other than the additional opinion
17 that you talked about in light of Dr. Patel's report
18 and we've talked about the photograph, have we
19 essentially covered the bulk of your core opinions in
20 this case with regard to Mr. Narsimhan?
21     A.  Yes. I would just, Ms. Hay, acknowledge that
22 based on the review that Mr. Berman pointed out that
23 the likelihood of diabetic peripheral neuropathy is
24 somewhat decreased, but my most important opinion in
                                                    151

1 this case is that there is not adequate documentation
2 between 2016 and 2018 of CRPS. And hypothetically,
3 even if we accepted a diagnosis of CRPS on 1/15/21,
4 there is no way you could make a causal link between
5 what happened in 2016 and what happened in 2018.
6 Because, as I pointed out to Mr. Berman, if there was
7 active CRPS between 2016 and 2018, the person active
8 in the medical system would have complained about what
9 he complained about, and then the Wheaton Chiropractic
10 records where he himself filled out a form where he
11 indicated hand pain but didn't indicate foot pain or
12 leg pain is more evidence that nothing was
13 bothering -- that the foot was not a CRPS kind of foot
14 or leg or not CRPS issues at that time and during the
15 succeeding three months where there was never any
16 mention of the foot or the leg as sufficient
17 information to indicate that between 2016 and 2018
18 that there was no CRPS whether or not we
19 hypothetically accept that there was a diagnosis.
20     Q.  But your opinion as you sit here today is
21 that he does not have CRPS based upon all of the
22 information that you've reviewed, your examination,
23 your report, as well as your education, training, and
24 experience; is that correct?
                                                    152



1       A.   Based on my examination, that is true.
2       Q.   And I take it, Doctor, given that you've
3   talked about pretty extensively the nature of your
4   practice with many CRPS patients that you diagnose and
5   do treat that you're familiar with the chronology
6   overall of how CRPS would proceed, and during that
7   time frame, it didn't proceed according to that
8   typical chronology; would that be fair?
9       A.   Yeah, I think that just repeated what I said.
10           MS. HAY:  Thanks, Doctor.  That's all I have.
11           THE WITNESS:  Wait.  I have one other thing
12   that I don't know whether it was put in there or not.
13   But there clearly is a standard of care for a CRPS
14   patient, and that is comprehensive interdisciplinary
15   functional rehabilitation.  That's a whole bunch of
16   long words, and I could -- if Mr. Berman wishes me, I
17   could go into more detail about what that is.  But the
18   bottom line is, Dr. Buvanendran, I expressed a very
19   good opinion of him and said he's well respected.  At
20   the same time, as somebody who has the knowledge of
21   CRPS, he should know that that is the gold standard
22   for care.  Dr. Joshi claims to be an expert in CRPS,
23   and neither Dr. Joshi nor Dr. Buvanendran ever
24   recommended the gold standard for care.

153

1           I mean, we start talking about possibly doing
2   dorsal root ganglion stimulation, which is in Michael
3   Stanton-Hicks -- I think I mentioned him, Mr. Berman,
4   from the article.  And in it he said failure to
5   progress with conservative therapy -- which is the
6   comprehensive program that I was talking about called
7   FRP for functional rehabilitation program.  Failure to
8   progress with that is an indication to move toward
9   interventional therapy.  But until you try FRP, you
10   cannot say the patient is appropriately being treated,
11   and we don't know -- again, hypothetically, if we
12   accept their diagnoses of CRPS, then he long ago
13   should have been involved in functional rehabilitation
14   to get him to a state where he wouldn't be complaining
15   of what he's complaining about.  He wouldn't complain
16   that he was manhandled when he wasn't.
17           So it's very important that this was left out
18   by people who claimed to know about CRPS.  They didn't
19   treat him like a CRPS patient.  And the question that
20   I would ask is, if they truly believe he has CRPS, why
21   wouldn't they treat him like a CRPS patient?
22   BY MS. HAY:
23       Q.   Would it be fair to say then, Doctor, that
24   despite other treaters' diagnoses of CRPS their

154

1   actions with regard to treatment recommendations were
2   inconsistent with that finding?
3       A.   Yes.
4       Q.   And are those your opinions, Doctor, to a
5   reasonable degree of medical certainty as well?
6       A.   Yes.
7           MS. HAY:  That's all I have.  Thank you.
8               FURTHER EXAMINATION
9   BY MR. BERMAN:
10      Q.   I just have a couple follow-up just real
11   quickly.
12      A.   Thank you, Mr. Berman.
13      Q.   During your examination of Mr. Narsimhan when
14   you are actually physically examining him, doing your
15   physical examination, your hands were shaking, Doctor.
16   Can you tell us why that is?
17      A.   Yes.  I have a tremor from hypoglycemia, and
18   I didn't have lunch that day.  Normally, just so you
19   know, when I do surgery and I don't have breakfast, I
20   take a medication that makes that tremor go away.
21      Q.   That's fine.
22           And two other things.  After your
23   examination, Doctor, of Mr. Narsimhan, did you watch
24   him walk down the hall after he left the room where

155

1   you performed the examination?
2       A.   I did.
3       Q.   You watched him walk down the hall?
4       A.   I believe I did, yes.
5       Q.   You're saying you opened the door, you looked
6   out the door, and was watching him go down the
7   hallway?  I was there, Doctor.
8       A.   Right.  And I'm trying to remember because --
9   I did two very similar situations, and I'm just trying
10   to remember if this was the one or the other one was
11   the one.  But I think it may have been the other one.
12   And so, I mean, on one of them, I watched the guy walk
13   down the hall, and there was no limp whatsoever.  I
14   can't swear to it that this was the one of those two,
15   because they were both in reasonable temporal
16   proximity to each other that I did very similar kind
17   of exams.
18      Q.   I can tell you this, because we looked back
19   after as we're walking down the hall, we didn't see
20   you poking your head out the door.  So fair to say
21   that you can't recall observing Mr. Narsimhan walk
22   from the door of the hotel room where the examination
23   was performed down to the elevator; is that fair?
24      A.   I thought I did, but I don't want to swear to

156

1    it.
2       Q.   Did you watch Mr. Narsimhan go from the hotel
3    into the car?
4       A.   No.
5       Q.   So as far as you can recall, your only
6    interaction and observations of Mr. Narsimhan were
7    within the hotel room where the medical examination
8    was performed, correct?
9       A.   Correct.
10          MR. BERMAN:  That's all the question I have.
11          MS. HAY:  Thanks, Doctor.  I don't have
12   anything further.  We'll reserve signature.
13                    (Witness excused at 6:57 p.m.)
14
15
16
17
18
19
20
21
22
23
24

                                                      157

---

1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION
3    KRISHNA NARSIMHAN,        )
                              )
4          Plaintiff,         )
                              )
5        -vs-                 ) Case No. 1:19-cv-01255
                              )
6    LOWE'S HOME CENTERS, LLC, )
                              )
7          Defendant.         )
8       I, JOSHUA P. PRAGER, M.D., being first duly
     sworn, on oath, say that I am the deponent in the
9    aforesaid deposition, that I have read the foregoing
     transcript of my deposition taken 21st day of
10   June, 2021, consisting of Pages 1 through 160
     inclusive, taken at the aforesaid time and place and
11   that the foregoing is a true and correct transcript of
     my testimony so given.
12
           _____ Corrections have been submitted
13         _____ No corrections have been
                  submitted
14
15   _____
16   JOSHUA P. PRAGER, M.D., Deponent
17
     SUBSCRIBED AND SWORN TO
18   before me this _____ day
     of _____ A.D., 2021.
19
20   _____
     Notary Public
21
22
23
24
                                                      158

---

1    STATE OF ILLINOIS        )
                              )  SS:
2    COUNTY OF COOK           )
3
4        I, Judith T. Lepore, Certified Shorthand
5    Reporter in the State of Illinois, do hereby certify
6    that on the 21st day of June, 2021, the deposition of
7    the witness, JOSHUA P. PRAGER, M.D., called by the
8    Plaintiff, was taken before me via videoconference,
9    reported stenographically and was thereafter reduced
10   to typewriting through computer-aided transcription.
11       The said witness, JOSHUA P. PRAGER, M.D., was
12   first duly sworn to tell the truth, the whole truth,
13   and nothing but the truth, and was then examined upon
14   oral interrogatories.
15       I further certify that the foregoing is a
16   true, accurate and complete record of the questions
17   asked of and answers made by the said witness, at the
18   time and place hereinabove referred to.
19       The signature of the witness was not waived
20   by agreement.
21       Pursuant to Rule 30(e) of the Federal Rules
22   of Civil Procedure for the United States District
23   Courts, if deponent fails to read and sign this
24   deposition transcript within 30 days or make other

                                                      159

---

1    arrangements for reading and signing thereof, this
2    deposition transcript may be used as fully as though
3    signed, and the instant certificate will then evidence
4    such failure to read and sign this deposition
5    transcript as the reason for signature being waived.
6        The undersigned is not interested in the
7    within case, nor of kin or counsel to any of the
8    parties.
9        IN TESTIMONY WHEREOF:  I have hereunto set my
10   verified digital signature this 8th day of July, 2021.
11
12
13
14
15
     _____
16   Judith T. Lepore, CSR
17
18
     License No. 084-004040
19
20
21
22
23
24
                                                      160

---

```
 1          McCorkle Litigation Services, Inc.
               200 N. LaSalle Street, Suite 770
 2           Chicago, Illinois  60601-1014
 3    July 8, 2021
 4    LINDA HAY, ESQ.
      HEPLER BROOM LLC
 5    30 North LaSalle Street
      Suite 2900
 6    Chicago, Illinois  60602
 7    IN RE:  Krishna Narsimhan v Lowe's Home Centers
      COURT NUMBER:  1:19-cv-01255
 8    DATE TAKEN: June 21, 2021
      DEPONENT:  Joshua P. Prager, M.D.
 9
      Dear Ms. Hay:
10
      Enclosed is the deposition transcript for the
11    aforementioned deponent in the above-entitled cause.
      Also enclosed are additional signature pages, if
12    applicable, and errata sheets.  Per your agreement to
      secure signature, please submit the transcript to the
13    deponent for review and signature.  All changes or
      corrections must be made on the errata sheets, not on
14    the transcript itself.  All errata sheets should be
      signed and all signature pages need to be signed and
15    notarized.
16    After the deponent has completed the above, please
      return all signature pages and errata sheets to me at
17    the above address, and I will handle distribution to
      the respective parties.  If you have any questions,
18    please call me at the phone number below.
19    Sincerely,            Judith Lepore
      Cindy Alicea          Court Reporter
20    Signature Department  (312) 263-0052
21    cc:  S. Berman
22
23
24
                                             161
```



**Page 162**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF ILLINOIS
 3             EASTERN DIVISION
 4  KRISHNA NARSIMHAN,           )
 5                               )
 6          Plaintiff,           )
 7     -vs-                      ) No. 1:19-cv-012556
 8  LOWE'S HOME CENTERS, LLC,    )
 9          Defendant.           )
10       PART II of the deposition of
11  JOSHUA PRAGER, M.D., M.S., called for
12  examination pursuant to the Rules of Civil
13  Procedure for the United States District Courts
14  pertaining to the taking of depositions, taken
15  before MARGARET A. RITACCO, a notary public
16  within and for the County of Cook and State
17  of Illinois, on the 7th day of October, 2021,
18  via Zoom, at the hour of 10:30 a.m.
19
20
21
22
23  Reported by:  MARGARET A. RITACCO, CSR
24  License No.:  084-002796
```

**Page 163**

```
 1  APPEARANCES:
 2        ANESI, OZMON, RODIN, NOVAK & KOHEN, LTD., by
 3        MR. STEVE A. BERMAN,
 4        161 North Clark Street, 21st Floor
 5        Chicago, Illinois· 60601
 6        (312) 372-3822
 7        sberman@anesilaw.com
 8             Representing the Plaintiff;
 9
10        HEPLER BROOM LLC, by
11        MS. LINDA J. HAY,
12        30 North LaSalle Street, Suite 2900
13        Chicago, Illinois  60602
14        (312) 230-9100
15        linda.hay@heplerbroom.com
16             Representing Lowe's Home Centers, LLC.
17
18
19
20
21
22  ALSO PRESENT:
23        MR. RYAN CHANCELLOR
24
```

**Page 164**

```
 1                I N D E X
 2  WITNESS                      EXAMINATION
 3  JOSHUA PRAGER, M.D., M.S.
 4    BY MR. BERMAN                    166
 5    BY MS. HAY                       217
 6    BY MR. BERMAN, FURTHER           224
 7
 8
 9
10             E X H I B I T S
11  NUMBER                    IDENTIFICATION
12        (NO EXHIBITS WERE MARKED.)
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 165**

```
 1        THE REPORTER:  My name is Margaret Ritacco, CSR.
 2  This deposition is being taken pursuant to
 3  Governor Pritzker's Executive Order 2020-14.
 4  All parties to this proceeding, including the
 5  court reporter, are attending via videoconference.
 6        Will the parties please introduce
 7  yourselves, state who you represent, and that
 8  you are in agreement with these procedures,
 9  starting with plaintiff's counsel.
10        MR. BERMAN:  Steven Berman, I agree.
11        MS. HAY:  Linda Hay, for the defendants.  We
12  agree.  And also on the call today is Attorney
13  Ryan Chancellor from my office to observe.
14        MR. BERMAN:  And for the record --
15        THE REPORTER:  Doctor, will you -- oh, sorry.
16  Go ahead, Steve.
17        MR. BERMAN:  Before we do anything further,
18  for the record, this is part two of a deposition.
19  The last Deposition went 161 pages with all --
20  at the very, very end, and so this should be a
21  continuation of that.  All right?
22        I don't think you need to re-swear in
23  the witness, but if you want to, that's fine.  I
24  mean, I -- it's up to you.  I think he's already --
```

EXHIBIT
B

1  since it's a continuation, I don't think it's
2  necessary.  But I know -- if you want to go
3  ahead and do that anyway.
4          (Witness sworn.)
5          JOSHUA PRAGER, M.D., M.S.,
6  called as a witness herein, having been first
7  duly sworn, was examined and testified as
8  follows:
9              EXAMINATION
10 BY MR. BERMAN:
11     Q.  And, Doctor, like I said on the record,
12 this is part two of your deposition.  We're here to
13 talk about your review of the Wheaton Chiropractic
14 records and how those records affect your opinions
15 in this case pursuant to the Court's order of
16 9/2/21.  We have an hour.
17         As I said before, I don't think it's
18 going to take an hour.  But I won't go backwards
19 and do anything that was already said in the
20 last deposition.  This is just about those
21 Wheaton Chiropractic records.  All right?
22     A.  Okay.
23     Q.  All right.  So let me get a little bit
24 of background about those records and how it
                                              166

1  affects your opinions.
2         So, first of all, the records we're
3  talking about relate to a chiropractor and
4  chiropractic care, right?
5     A.  That's correct.
6     Q.  And in your career, have you ever been
7  a trained chiropractor?
8     A.  I have not.
9     Q.  Have you ever practiced as a chiropractor?
10    A.  I have not.
11    Q.  Okay.  In your medical practice or your
12 medical group, do you employ any chiropractors?
13    A.  I don't employ them, but I use them.
14    Q.  What do you mean you use them?
15    A.  I do referrals.  And, actually,
16 sometimes I pay for it.  I have a comprehensive
17 rehabilitation program, and as part of the
18 comprehensive rehabilitation program, I use
19 whatever resources are necessary, including
20 massage, yoga, nutrition, and all those are
21 extras in the program that I pay for as part of
22 a global fee for the program.
23    Q.  So are you saying that you sometimes
24 referred your pain management patients to
                                              167

1  chiropractors for additional care?
2     A.  Well, that -- that's understating what
3  I said.  What I said is that as part of my
4  program I actually contract with chiropractors
5  to care for my patients.  But in addition, which
6  would subsume what you said, I -- I also refer
7  to chiropractors as part of the care that I
8  provide.
9     Q.  Okay.  In your work as an expert
10 witness, do you hold yourself out as an expert
11 in chiropractic care?
12    A.  No.
13    Q.  In this case -- and we're going to get
14 into the details of the Wheaton Chiropractic
15 records -- but do you have an opinion as to
16 whether it's a violation of the chiropractic
17 standard of care for a chiropractor to not
18 document injuries or conditions in his office
19 notes that are irrelevant to the chiropractic
20 care he or she is providing?
21    MS. HAY:  I'm sorry, could you repeat that
22 question again?  You broke up a little bit.
23    THE REPORTER:  Steve, can you repeat it?  I
24 was having a little trouble.
                                              168

1  BY MR. BERMAN:
2     Q.  Do you have an opinion as to whether it
3  is a violation of the chiropractic standard of
4  care for a chiropractor to not document injuries
5  or conditions in his office notes that are
6  irrelevant to the chiropractic care he or she is
7  providing?
8     A.  Well, Mr. Berman, in -- as -- as
9  somebody who takes care of patients, whether it
10 be a chiropractor or a physician, when someone
11 takes a comprehensive history, that includes
12 documentation of all problems that exist.
13        If in that history things are provided
14 and that practitioner, once again whether it be
15 a chiropractor or a physician, leaves -- leaves
16 it out, it would be below the standard of care.
17    Q.  So you do have an opinion?
18    A.  I do.
19    Q.  Okay.  Here, in this case, the
20 chiropractor over at Wheaton Chiropractic was
21 treating Mr. Narsimhan for neck and wrist
22 issues, correct?
23    A.  And arm.
24    Q.  What part of the arm?
                                              169



1    A.   Forearm.
2    Q.   Forearm.  Okay.  So here the
3  chiropractor at Wheaton Chiropractic was
4  treating Mr. Narsimhan for neck, forearm and
5  wrist issues, correct?
6    A.   Correct.
7    Q.   Do you have an opinion as to whether
8  Mr. Narsimhan's right lower extremity injury
9  would be relevant to the chiropractor in his
10  care and treatment of the neck, forearm, and
11  wrist issues?
12    A.   Well, the way you're wording the
13  question, the care of the -- leg would not
14  necessarily be relevant to what he was doing,
15  but the knowledge of it existing would be
16  relevant.
17    Q.   Why?
18    A.   Because you need to know everything
19  that's going on in a patient when you're
20  treating them.
21    Q.   Okay.  So, in other words, if I'm
22  understanding you correctly, you'd agree with me
23  at least that when a chiropractor is physically
24  doing his treatments of the neck, forearm, and

170

1  wrist, the pain, discomfort in the right lower
2  extremity is not relevant to those chiropractic
3  treatments; true so far?
4    A.   The wording makes it very difficult to
5  answer that question.  The -- I mean, I'll
6  restate what I said, which is that when you're
7  treating a patient it's important to know other
8  things that are going on.  And when you're
9  treating a pain in one place, it really, truly,
10  is relevant to know that there is pain elsewhere.
11        Whether it would change how he treats
12  the neck would be -- at this -- this juncture
13  would call for speculation on my part, which the
14  admonitions say that I'm not supposed to
15  speculate, so I'm not going to speculate in that
16  regard.
17        But I would say that how he treats the
18  neck wouldn't necessarily be affected by what's
19  going on in the leg.  But, nonetheless, he has
20  to be cognizant of what's going on there.
21    Q.   So in your opinion -- let me see if I
22  understand the scope of that opinion.
23        For a chiropractor, such as this one --
24  this Wheaton Chiropractic Care who's treating

171

1  the neck, forearm, and wrist, if Mr. Narsimhan
2  had a -- a bunion, and had pain in that -- a
3  bunion in his toe, would that be relevant to the
4  chiropractic care?
5    A.   The bunion probably would not.
6    Q.   Okay.  Would --
7    A.   But it still should be included if
8  there's pain from a bunion.
9    Q.   Okay.
10    A.   I might make it simple for you,
11  Mr. Berman.  The -- the Wheaton Chiropractic has
12  a form that I would be -- believe it's on PDF,
13  Page 6, of -- of the -- of the Wheaton -- the
14  68-page Wheaton PDF document.  And on that
15  document, it actually asks the patient to
16  document what -- what problems the patient has,
17  so that would indicate that there's relevance
18  that they want to know that.
19    Q.   Okay.
20    A.   And, in fact, Mr. Narsimhan did not, in
21  any way, indicate that he had pain beyond his
22  hands in that form that he, himself, signed.
23    Q.   Right.  And he didn't even write that
24  he had neck pain or stiffness, did he?

172

1    A.   No, he did not.
2    Q.   Okay.  So in the confidential health
3  report that you're referring to, Mr. Narsimhan
4  didn't write down that he had neck or -- neck
5  pain or stiffness, right?
6    A.   He did not.
7    Q.   So, in your opinion, did he not have
8  neck pain or stiffness?
9    A.   Probably he did.
10    Q.   So why didn't he write it down?
11    A.   Why don't you ask him.
12    Q.   Okay.  That's what -- that's what we
13  intend to do, Doctor, exactly.  In fact, that's
14  my point.  The fact that some aspect of his pain
15  or discomfort is not written down in that
16  confidential page -- confidential health report,
17  if it's not written down, it doesn't mean that
18  he doesn't necessarily have pain.
19    A.   It means he's not documenting it.
20    Q.   It means he's not documenting, exactly.
21  And why he's not documenting, we'd have to ask
22  him, not you.  Would you agree?
23    A.   I would agree.
24    Q.   Okay.  And what you're -- I think what

173

1  you have been saying, and what I think you are
2  going to say, is that the relevant aspect of the
3  Wheaton Chiropractic records for you, in your
4  opinions regarding this case, are that they are
5  silent as to the right lower extremity, true?
6      A.  Well, you know, again, I have to think
7  about your wording of that.  What I would say is
8  that there are pain diagrams, so if you look,
9  for instance, at PDF Page 10 --
10     Q.  Uh-huh.
11     A.  -- we have a visual examination of the
12 patient that is then filled out by the chiropractor,
13 which I think they call a physician, and in it
14 we see where -- where he is documenting pain.
15 And what we see is the -- the shoulder.  We
16 actually don't see -- necessarily see the neck,
17 it could be the neck.  We see the shoulder and
18 we see the forearm and we see the hand.
19     Q.  Okay.
20     A.  And there are multiple examinations
21 with diagrams in the chart.
22     Q.  Sure.  I'm going to show you -- let's
23 make sure we're clear on just what we're talking
24 about.

174

1          It's this page you're referring to.
2  This is Page 10 of the Wheaton Chiropractic
3  records, right?
4      A.  Correct.  Yes.
5      Q.  Okay.  And if we can zoom in on that,
6  this is the pain diagram you're referring to,
7  right?
8      A.  That is correct.
9      Q.  Okay.  And it shows marks in the left
10 inner elbow and down the foreman into the wrist
11 of the left hand, correct?
12     A.  Right.  And thank you for blowing it
13 up, because now I can see the neck better than I
14 was able to see --
15     Q.  Got it.
16     A.  -- it on mine.
17     Q.  And it does show Xs in the neck on the
18 left-hand side and down into the left scapular
19 region, right?
20     A.  Right.
21     Q.  Okay.  And this is written by the
22 chiropractor himself, not by Mr. Narsimhan?
23     A.  That's correct.
24     Q.  Okay.  So the only relevant aspect of

175

1  those pain diagrams is it indicates what the
2  chiropractor noted as to what was relevant to
3  the chiropractor for his care and treatment in
4  terms of complaints.
5          Would you agree?
6      A.  No.
7      Q.  No.  And you've never spoken to the
8  chiropractor, Dr. Hanus, in this case, have you?
9      A.  I have not.
10     Q.  Okay.  Are you familiar with that --
11 I'm sorry, it's Dr. Hallum.  I made a mistake.
12 Correct that.  It's Dr. Hallum.
13         Do you know Dr. Scott Hallum at all?
14     A.  No.
15     Q.  Do you have any knowledge -- other than
16 looking at his -- his chart, this 68 pages, do
17 you have any knowledge as to how Dr. Scott Hallum
18 creates his -- his notes and what he finds
19 relevant to him in his notes?
20     A.  Well, I have some knowledge of it
21 because I've read all the notes carefully.
22     Q.  Okay.  If Dr. Scott Hallum, the
23 chiropractor from Wheaton Chiropractic, would
24 testify that it was not relevant to him as to

176

1  whether his neck, forearm, and wrist patient had
2  any pain in his ankle, and therefore he didn't
3  document it, would that affect your opinions?
4      A.  It would affect --
5      MS. HAY:  Objection --
6      THE WITNESS:  -- my --
7      MS. HAY:  Excuse me, just one second, Doctor.
8  I'll just object as an incomplete hypothetical
9  based on testimony that hasn't been given in
10 this case.
11         But you can answer, Doctor.
12     THE WITNESS:  It -- it would -- I would
13 question the -- how meticulous and careful he is
14 if he's filling out a diagram and he doesn't
15 mark everything that's there, whether it's what
16 he's treating or not.
17 BY MR. BERMAN:
18     Q.  I understand you'd question that.  But
19 how would that affect your opinions in this
20 case?
21     A.  Well, it would lower my opinion if he's
22 not doing a complete job.
23     Q.  Lower your opinion as to what?
24     A.  As to how he documents his care.

177



1    Q.   Okay.  And how would that affect your
2  opinions as to Mr. Narsimhan's right lower
3  extremity injury?
4    A.   I don't understand the question.
5    Q.   Would it affect your opinion, one way
6  or the other, whether the right lower extremity
7  injury was causally related to the incident
8  at Lowe's?
9    A.   Well, they are -- they are -- in this
10  68-page document, there are actually two sets of
11  notes that are done on different systems and
12  from different periods of time.  And both of
13  them are completely consistent in the absence of
14  any documentation of problems in the lower
15  extremity.  And -- oops.  Hold on.
16       So the opinion that I derive from these
17  two sets of records from different periods of
18  time is that Mr. Narsimhan not having pain
19  in the lower extremity that he ever filled out,
20  ever represented, ever discussed and ever was
21  elicited on evaluation.
22       Now, when somebody treats a patient,
23  it's an obligation to evaluate the patient and
24  not to just to -- well, I'm only treating the

178

1  shoulder, so I'm not going to look at anything
2  else when I'm doing a visual spinal examination
3  as is set forth in -- on PDF Page 10.  But we
4  then go to Pages 62, 65 and 67, where there are
5  other chart notes that, once again, do not
6  document anything.
7       Now, my opinion here, very clear,
8  Mr. Berman, is that -- and we're not going to
9  get into my other -- my other analysis of the
10  other records, because that's not our purpose
11  here today.
12    Q.   Right.
13    A.   But what my -- my -- what I derive from
14  this, in addition to the other opinions that I
15  have in this case, is that this giant hiatus of
16  time where there is an absence of him reporting
17  or a healthcare professional documenting any
18  problems in the left leg means to me --
19    MS. HAY:  Excuse me, I think it was the right
20  leg, Doctor.
21    THE WITNESS:  It was the right leg, I'm
22  sorry.
23    MR. BERMAN:  It is the right, yes.
24    THE WITNESS:  Okay, the right leg.  The leg.

179

1    MR. BERMAN:  Yes.
2    THE WITNESS:  It means to me that there was
3  not CRPS there.  And, you know, you heard from
4  me previously, where we're not going to go,
5  about the lack of documentation until somebody,
6  years later, then documents the CRPS.  But the
7  reality of CRPS is that you don't have two years
8  from an injury to then all of sudden present
9  with CRPS symptoms.
10       And if you were to hypothetically state
11  that he did have CRPS at a later date, you would
12  have to then also invoke another injury that was
13  sustained that caused it because there's no --
14  and I'll say this absolutely -- there is no
15  temporal correlation between the incident at
16  Lowe's and the later presentation.  And the --
17  the gap is clearly demonstrated in the Wheaton
18  Chiropractic records.
19    MR. BERMAN:  All right.
20  BY MR. BERMAN:
21    Q.   In the Wheaton Chiropractor --
22  Chiropractic records, in part, seem to indicate
23  that he was treating there with a chiropractor
24  for carpal tunnel syndrome in the wrists; is

180

1  that right?
2    A.   I don't know.  That was -- that was not
3  the entirety.
4    Q.   That's part of it?
5    A.   That's part of it.
6    Q.   In part, okay.  So you agree with me,
7  right?
8    A.   In part, yes.
9    Q.   Okay.  Good.  My question for you is,
10  you're an expert in CRPS, not carpal tunnel
11  syndrome, right?
12    A.   Well, if it were between me and a hand
13  surgeon about carpal tunnel syndrome, I would
14  defer to a -- to a hand surgeon.  Nonetheless, I
15  diagnose and treat carpal tunnel syndrome in
16  this practice.  I am not -- I do not possess the
17  same degree of expertise with regard to carpal
18  tunnel syndrome that I do to CRPS, but I have a
19  modicum of expertise there as well.
20    Q.   Okay.  Does carpal tunnel syndrome
21  cause neuropathic symptoms?
22    A.   Yes.
23    Q.   Does CRPS cause neuropathic symptoms?
24    A.   Yes.

181

1    Q.   When you are acting as an examining --
2 an expert examining doctor, you customarily take
3 a history from people you examine, right?
4    A.   That's correct.
5    Q.   In the history portion of your
6 examination, you can ask the person you're
7 examining for information that the treating
8 doctors may not have asked or may not have
9 documented in their office notes, right?
10    A.   I think it's beyond the scope of this
11 deposition.
12    Q.   No, it's not.
13    A.   Ms. Hay?
14    MS. HAY:  Can you repeat that question,
15 please, Steve?
16    MR. BERMAN:  Sure.
17 BY MR. BERMAN:
18    Q.   In the history portion of your
19 examination, you can ask the person you're
20 examining for information that the treating
21 doctors may not have asked or may not have
22 documented in their office notes?
23    MS. HAY:  Yeah, I'll object, Steve.  I'm not
24 sure how that relates to the Wheaton Chiropractic

182

1 practices, which is not appropriate.  I think
2 you can rephrase that question.
3    MR. BERMAN:  He's an examining doctor in this
4 case.
5    MS. HAY:  Pardon?
6    MR. BERMAN:  He's an examining doctor in this
7 case.  He examined Mr. Narsimhan.
8    MS. HAY:  I understand that.  So that's --
9 asking him about his examination of Mr. Narsimhan
10 does not relate to the Wheaton Chiropractic
11 records as a basis for his opinions.
12    MR. BERMAN:  Are you going to refuse to allow
13 him to answer that question, because I'm going
14 to move to ask him -- attempt to have him answer
15 that question.
16    MS. HAY:  Doctor, if you think you can answer
17 that question in the context of what -- what
18 you've reviewed to prepare for this deposition,
19 go ahead.
20    THE WITNESS:  Sorry, I'm not the lawyer.
21 I already objected saying that I didn't see it
22 was -- see this as relevant to my review of the
23 records that I prepared for today.
24    MR. BERMAN:  So you're refusing to answer the

184

1 records and this portion of the supplemental
2 deposition, or part two.
3    MR. BERMAN:  The whole point is there's a
4 lack of information in the Wheaton Chiropractic
5 records regarding the right lower extremity.  I
6 think there --
7    MS. HAY:  Well, can -- can you ask that
8 question in the nature of the Wheaton Chiropractic
9 records, and restate it?
10    MR. BERMAN:  Well, this is foundational to my
11 next couple of questions that relate specifically
12 to Wheaton Chiropractic.  This is foundational.
13    MS. HAY:  Well, how -- how is -- how is his
14 taking of a history -- well, can you -- repeat
15 the original question one more time, please, I'm
16 sorry, so that I can hear it one more time.
17 BY MR. BERMAN:
18    Q.   In the history portion of your exam you
19 can ask the person you're examining for information
20 that the treating doctors may not have asked or
21 may not have documented in their office notes?
22    MS. HAY:  I do think that that is not related
23 to the Wheaton Chiropractic records, number one.
24 And number two, you're asking about his personal

183

1 question as phrased?
2    THE WITNESS:  Maybe -- why don't you try to
3 ask it in a different way that will make me feel
4 more comfortable about answering.
5    MS. HAY:  And will make me feel comfortable.
6    MR. BERMAN:  So, for the record, you're
7 refusing to answer the question as phrased?
8    THE WITNESS:  As phrased, yes.  But I'm not
9 refusing, necessarily, to answer the question;
10 I'm refusing to answer it as phrased.
11    MS. HAY:  And, Steve, I'm going to ask you to
12 rephrase that question in the context of how that
13 specifically relates to the Wheaton Chiropractic
14 records and in accord with the Court order
15 saying that this is what this deposition is
16 limited to.
17 BY MR. BERMAN:
18    Q.   In this case there's a lack of information
19 in the Wheaton Chiropractic records documenting
20 any, one way or the other, any information about
21 the right lower extremity; would you agree?
22    A.   There is no information with regard to
23 the -- to the lower extremities.
24    Q.   And so the Wheaton -- so when you say

185



1  no information, what -- what I'm asking you, to
2  be clear, is in the Wheaton Chiropractic records,
3  there's no information about the right lower
4  extremity one way or the other, injured, not
5  injured, pain, not pain, it doesn't even mention
6  it?
7       A.   Well, actually, that's not necessarily
8  true, because the absence of positive information
9  is negative information.  And the failure to
10 document is basically a statement that there is
11 nothing going on there.
12          Now, you don't have to go along stating
13 a bunch of negative things.  But if things are
14 positive, they need to be stated; and if they're
15 not, it's assumed they're negative.
16      Q.   So I'm just wondering how -- how extensive
17 that -- that opinion is.  If a patient, such as
18 Mr. Narsimhan, would go to a cardiologist to get
19 tested, but doesn't mention anything about his
20 right lower extremity pain or symptoms, does
21 that mean that he's not having that pain on that
22 day that he sees his cardiologist?
23     MS. HAY:  I'm going to object as an incomplete
24 hypothetical based on facts not in evidence as

186

1  during those office visits and during that time
2  frame that Mr. Narsimhan was seeing a chiropractor,
3  he was not having any pain in his right lower
4  extremity.
5          Is that what you're saying?
6       A.   There is no documented pain in his
7  lower extremity.
8       Q.   Okay.
9       A.   And that would be relevant to a
10 chiropractor.
11      Q.   Well, I didn't ask you about whether it
12 was documented or not.
13     MR. BERMAN:  Can you repeat that last
14 question I had, please, for an answer to that
15 question.
16     THE REPORTER:  Sure.
17          (Record read as requested.)
18     MR. BERMAN:  I just want an answer to that
19 question.
20     THE WITNESS:  Can you, Margie, repeat the
21 last sentence of the question, not the -- you
22 don't have to repeat the entire question or my
23 answer.
24

188

1  well as form.
2          But I think you've answered that.
3      MR. BERMAN:  And there's no objection such as
4  that in the rule of evidence.
5          But go ahead and answer it.  Please,
6  answer.
7      THE WITNESS:  If you're going to a cardiologist
8  with a serious heart problem, you're probably
9  not going to be talking about what's going on in
10 your leg because that's a life-threatening
11 situation.
12          When you're going to a chiropractor and
13 it's all about pain, and they're doing a spinal
14 examination and they have a history form that
15 specifically requests information regarding all
16 body parts that could be having pain and you
17 leave it out, that's a negative.
18 BY MR. BERMAN:
19      Q.   It sounds to me, Doctor, when you say
20 the absence of positive information is the
21 negative information, what you're saying is
22 that, because in the Wheaton Chiropractic records
23 the right lower extremity isn't mentioned one
24 way or the other, that therefore means that

187

1          (Record read as requested.)
2      THE WITNESS:  I'm saying he never expressed
3  it.
4  BY MR. BERMAN:
5      Q.   I know.  And I'm asking you if you're
6  making an assumption that not only did
7  Mr. Narsimhan not express that he had right
8  lower extremity pain during his chiropractic
9  care at Wheaton Chiropractic, but is it your
10 opinion that he did not have any right lower
11 extremity pain during that September to December
12 time frame he was being treated by the
13 chiropractor over at Wheaton Chiropractic?
14      A.   I would -- I -- I -- yes, that would be
15 my opinion.
16      Q.   Okay.  Isn't that then making an
17 assumption about a fact that's actually not in
18 the record?
19      A.   Well, one -- one does an evaluation at
20 the beginning and then takes a history.  what is
21 or is not in that history is what is the legal
22 document.  And I'm not the lawyer, but my
23 understanding of medical records is that if it's
24 not there -- if it's not documented, it's not

189



1 there.
2    Q.   And that kind of goes back to my
3 question before.  If something is not documented
4 and you do an examination of a person, like
5 Mr. Narsimhan, you can, through your personal
6 history, get more information than what's
7 written in the medical charts and records,
8 right, by asking the patient or asking the
9 person you're examining?
10    A.   That's correct.
11    Q.   Okay.  As an expert examining doctor,
12 if there's a lack of information in the records,
13 you don't just make an assumption as to what
14 information would have been in the records had
15 that treating doctor chosen to write it down,
16 right?
17    A.   No, because that's the whole purpose --
18 you know, I believe in this case I was not
19 allowed to submit any forms to Mr. Narsimhan.
20 I'm not sure if this case was one of those
21 where -- no forms will be filled out today.
22         But reality in this situation is that
23 when he presented to the chiropractic office,
24 they gave him a form that he is supposed to

190

1 document what's going on.  And granted, he did
2 leave out the neck for whatever reason.  But
3 what I can tell you, Mr. Berman, emphatically,
4 is that when somebody has CRPS pain, it's
5 something that's at the forefront of their mind
6 and they're not going to leave it out.
7         And so my opinion about him not having
8 CRPS pain there in his leg is based on the fact
9 that this is something he would put down on the
10 form.  And he can -- I don't know if he's going
11 to say he forgot because he was going about his
12 neck.  But when people have CRPS, it's usually
13 the most important issue that they have.  And
14 it -- it's something that I -- I couldn't
15 comprehend why it would be left out if it's
16 bothering him.
17    Q.   Okay.  So you're making a judgment
18 about Mr. Narsimhan saying that he would have
19 put down right lower extremity pain on the
20 forms, and he would have complained about that
21 to the chiropractor when he's going to see the
22 chiropractor for his neck and forearm and
23 wrists.  And since he didn't do that, that means
24 that Mr. Narsimhan wasn't having any pain in his

191

1 right lower extremity, right?
2    A.   No.  He wasn't having enough to be
3 putting it down there.  And, you know, again,
4 we're only looking at a microcosm of -- of this
5 case.  And there are a lot -- there's a lot of
6 other relevant information that was discussed in
7 the first part of this deposition that we're not
8 going to discuss today that contributes to my
9 opinions, such as the videos of him.
10    Q.   Doctor, I'm simply asking you about the
11 Wheaton Chiropractic time frame.
12    A.   Right.
13    Q.   And the time you saw him.
14    A.   Okay.  And -- but you're being
15 punctilious in the way you're asking the
16 questions to try to elicit an opinion from me
17 that he didn't have pain in his leg because he
18 didn't write it down, and I am not affirming
19 that opinion that you're trying to elicit.
20    Q.   Okay.  I thought you were, actually.  I
21 thought you were saying that specifically.  In
22 fact, I thought you were saying that it is your
23 opinion that during the time Mr. Narsimhan was
24 going to Wheaton Chiropractic for chiropractor

192

1 care for his neck, forearms, and wrists that he
2 was, in fact, not having right lower extremity
3 pain or discomfort because it's simply not
4 written down or wasn't reported to the
5 chiropractor.
6    MS. HAY:  I'll just object to as
7 mischaracterizing his prior testimony.
8         But you can go ahead and answer,
9 Doctor.
10    THE WITNESS:  Well, I think there may -- what
11 you heard and what you inferred and what I
12 implied I think are two very different things.
13 And so maybe I should just be more emphatic and
14 ask Margie to strike or to -- for the sake of
15 clarity, I'll just say and -- that we should
16 disregard what was previously stated, because it
17 could seem somewhat convoluted, and state more
18 clearly this is my opinion, disregarding the
19 other part.
20         Is that the fact that Mr. Narsimhan did
21 not document any pain in his leg on the forms
22 and in the history -- oral history that he
23 provided is an indication to me that his leg was
24 not troubling him at that time.

193



1        I hope that's clearer than what I said
2   before.
3        MR. BERMAN: Okay.
4   BY MR. BERMAN:
5        Q.   So when you say not troubling him, I
6   just want to follow up when you say that. You
7   say an indication that his right leg was not
8   troubling him, are you making sort of a
9   characterization to the extent he might have
10  been having some discomfort, but not to the
11  extent it was necessary to report it?
12       I'm trying to follow up and understand
13  what you mean when you say not troubling him.
14       A.   Okay. That he was not having significant
15  pain enough to write it down --
16       Q.   Okay.
17       A.   -- or report it.
18       Q.   Well, that does help answer my prior
19  questions. And so I guess I just want to make
20  sure we're clear, and just to follow up again
21  one more time.
22       Is -- what you're saying is during the
23  time that Mr. Narsimhan was seeing the chiropractor
24  over at Wheaton Chiropractic, he may have had

194

1   some pain or discomfort in his right lower
2   extremity, but just not significant enough at
3   that time to be reportable -- or for him to
4   report it. Is that what you're saying?
5        A.   I think you're restating, kind of
6   massaging what I said a little bit, that there
7   was no pain of significant consequence to be
8   able to -- for him to feel it was important
9   enough to report it.
10       Q.   Yeah. But what that means is he may
11  have had some pain or discomfort, but just not
12  to the level of significance enough to report
13  it. Am I right? Is that accurate?
14       A.   Well, you know, if we -- I will accept
15  that with the following caveat that CRPS pain
16  would not fit into that category.
17       Q.   But would you actually answer my
18  question though?
19       A.   Well, that is your --
20       Q.   No.
21       A.   The answer. I think I am answering
22  your question.
23       Q.   I didn't ask about CRPS.
24       A.   I'm saying that if it -- that, perhaps,

195

1   if I accept your hypothesis that there was some
2   pain, but not enough to report, my opinion is
3   that if that was true, and it could possibly be
4   true, it would only be true if it wasn't the pain
5   of CRPS because that pain would not be characterized
6   by the way that you are characterizing it.
7        Q.   Okay. I think you've already explained
8   it. I'm not going to get into this. But you've
9   already explained that CRPS pain can be treated
10  medically with drugs, like Lyrica or Neurontin
11  or gabapentin, right?
12       A.   Well, we're getting outside the scope.
13       MS. HAY: I'll just object -- hold on just
14  one second, Doctor. Let me just object to going
15  beyond the Wheaton Chiropractic records.
16  BY MR. BERMAN:
17       Q.   Doctor, during the time that Mr. Narsimhan
18  was going to the Wheaton Chiropractic for
19  chiropractic care, he was on drugs, such as
20  Lyrica and gabapentin, which could treat or
21  diminish the symptoms of CRPS, correct?
22       A.   Well, what I have to say is that in
23  preparation for this deposition today, I did not
24  review the other records and cannot tell you

196

1   from memory from several months ago about which
2   medications he was taking at that time and which
3   ones he was not.
4        Q.   Okay. Hypothetically, assuming that
5   during the time that Mr. Narsimhan was treating
6   with Wheaton Chiropractic over at -- with
7   Dr. Scott Hallum, the chiropractor, in September
8   through December of 2016, if Mr. Narsimhan was
9   being treated medically with Lyrica and then
10  gabapentin/Neurontin, those would be the type of
11  medications that would help diminish the pain
12  from CRPS, right?
13       A.   You're asking me if either pregabalin
14  or gabapentin can diminish and usually not
15  eliminate the pain of CRPS, and the answer is
16  those medications can do that.
17       Q.   Okay. When you examined Mr. Narsimhan,
18  you were not aware of the Wheaton Chiropractic
19  records, true?
20       A.   I -- I had not reviewed them.
21       Q.   Okay. Had you reviewed the Wheaton
22  Chiropractic records prior to examining
23  Mr. Narsimhan, would you have asked him about
24  that care and would you have asked him about how

197



1  his right lower extremity was feeling during
2  that period of time when he was seeing the
3  chiropractor over at Wheaton Chiropractic from
4  September to December of 2016?
5      A.   Well, I think -- I mean, again, we're
6  not going to our exam and my history as part of
7  this evaluation.  But to the best of my
8  recollection, I asked him a temporal history,
9  and he didn't indicate that there was a period
10 of hiatus of pain, whether it be from Wheaton
11 Chiropractic or anything else.
12         But I don't -- I have not reviewed that --
13 that -- my -- my examination and my history to be
14 able to say anything sworn under oath emphatically.
15     Q.   I'm just asking you if had you reviewed
16 the Wheaton Chiropractic records, would that
17 have caused you, as an examining doctor, to ask
18 Mr. Narsimhan some questions about those records
19 or about that time frame that he was seeing the
20 chiropractor in September to December of 2016
21 during your examination.
22     A.   It's not my practice to do a comprehensive
23 review of the records before I see a patient in
24 an independent medical examination so that I can

198

1  have an unbiassed opinion not affected by the
2  prior records, but to hear what the patient has
3  to say, and then to do an analysis of the
4  medical records vis-a-vis my exam and history to
5  come up with my final opinions.
6      Q.   Okay.  If you make the assumption that
7  I think -- and I think you are, that during the
8  time that Mr. Narsimhan was seeing the chiropractor
9  over at Wheaton Chiropractic he was not having
10 significant enough right lower extremity pain or
11 symptoms to report those, how does that affect
12 your opinion as to whether Mr. Narsimhan had an
13 injury from the Lowe's incident that was -- an
14 injury that was causally -- strike that.
15         Let me restate it.  If you hold the
16 opinion that during this time frame that
17 Mr. Narsimhan was being treated at Wheaton
18 Chiropractic for his neck and forearm --
19 forearms and wrist during September to
20 December of 2016, that Mr. Narsimhan was having
21 some complaints of pain in his right lower
22 extremity, but just not significant enough to
23 report to his chiropractor, how does that affect
24 your opinion as to whether Mr. Narsimhan had an

199

1  injury -- an injury of some sort causally
2  related to the Lowe's incident of 6/25/16?
3      A.   Well, the scope of my testimony in
4  general in this case will not be whether he
5  sustained any kind of injury at that time.  It
6  would be whether the incident at that time
7  caused the subsequent development of CRPS.
8         And regardless of what my opinion is
9  with regard to whether he sustained an injury at
10 that time, it is my opinion that he did not
11 develop CRPS as a result of that in -- of that
12 incident and that the Wheaton Chiropractic
13 records support that opinion.
14     Q.   Okay.  And then just to follow up on
15 the reason that the Wheaton Chiropractic records
16 support that opinion is because -- and correct
17 me if I'm wrong, if I misheard you earlier --
18 but what you're saying is, if Mr. Narsimhan was
19 complaining of right lower extremity pain caused
20 by the condition CRPS while he was seeing his
21 chiropractor in September through December of
22 2016, the pain in his right lower extremity
23 would have been more so severe and significant
24 that he, more likely than not, would have reported

200

1  that to his chiropractor; is that right?
2      A.   I -- I endorse that summary.
3      Q.   Okay.  During his chiropractic care on
4  October 25, 2016, Mr. Narsimhan had an office
5  visit with his neurologist, Dr. Farbman, who was
6  treating Mr. Narsimhan for leg pain -- right leg
7  pain anterior, and he was treating him with
8  Neurontin.  And when I say treating him, I mean
9  he changed his medications from Lyrica to
10 Neurontin.
11         To be -- to be fair and to be clear,
12 you're not arguing in this case -- or you don't
13 have the opinion in this case that on
14 October 25, 2016, Mr. Narsimhan was not having
15 significant right leg pain -- right leg anterior
16 pain when he saw Dr. Farbman on October 25, 2016;
17 is that right?
18     A.   Once again, we're talking about records
19 that are not the subject of this deposition
20 today, and I didn't review them in preparation
21 for today, and can't make a comment in that
22 regard.
23     Q.   Well, Mr. Narsimhan saw his chiropractor
24 on October 26, 2016, the day after he saw

201

1  Dr. Farbman, and there's no comment whatsoever
2  about Mr. Narsimhan's right leg injury, his
3  right leg anterior pain or discomfort or what he
4  was -- what medications he was on at that time,
5  agreed?
6       MS. HAY:  Let's -- let's --
7       THE WITNESS:  Yeah.
8       MS. HAY:  -- let's take a look at the record,
9  Doctor.
10      THE WITNESS:  Well, no, it's on Page 35 of
11 the record, if I remember.
12      MR. BERMAN:  Page 35.
13      THE WITNESS:  What's that?
14      MR. BERMAN:  Yes, Page 35.
15      THE WITNESS:  Right.  On Page 35, we -- we
16 have the examination of October 26, 2016, and --
17      MR. BERMAN:  I have it up on the screen.
18      THE WITNESS:  Oh, I have it on my screen too.
19      MR. BERMAN:  Okay.
20      THE WITNESS:  So it's a two-page thing.
21 You're not showing -- there's a second page --
22 but there is a second page.
23           And -- well, if the question is is he
24 discussing anything related to the leg, clearly

202

1  he is not.
2       MR. BERMAN:  Okay.
3       THE WITNESS:  And he has an assessment of a
4  bunch of things.  But, I mean, if I go to my
5  own -- my own practice and somebody has, for
6  instance, diabetes -- which isn't also documented
7  here but -- I would be including the diabetes as
8  one of the diagnoses here.  And maybe doctor --
9  the chiropractor wasn't aware of the diabetes.
10 But leg pain is something that is in his
11 wheelhouse.
12      MR. BERMAN:  Uh-huh.
13      THE WITNESS:  Where he -- there are codes for
14 leg pain whether you're treating it or not.  And
15 there's -- and that's something that's within
16 the scope of what he does is pain throughout the
17 body.
18           Now, the other thing, Mr. Berman,
19 that's very important is that should somebody
20 have CRPS, you certainly would want to know
21 about that in doing any kind of treatment.
22      MR. BERMAN:  Okay.
23      THE WITNESS:  Yeah.  And I --
24      MR. BERMAN:  I understand what you're saying.

203

1       THE WITNESS:  What's that?
2       MR. BERMAN:  I understand what you're saying.
3  BY MR. BERMAN:
4       Q.   But if we look at this October 26, 2016,
5  record from the doctor -- from the chiropractor,
6  it says that he's being treated for left-sided
7  lower neck pain which radiates down left arm to
8  left wrist with intermittent numbness and
9  tingling, right?
10      A.   Correct.
11      Q.   It doesn't mention -- this chiropractor
12 visit note of October 26, 2016, doesn't mention
13 anything about the fact that the very day before,
14 on October 25th, this same patient, Mr. Narsimhan,
15 was at his neurologist's office complaining of
16 right lower extremity pain and receiving a
17 medication to treat that right lower extremity
18 anterior pain, correct?
19      A.   Yeah.  Without having recently reviewed
20 Dr. Farbman's records, if what you're saying is
21 true, then that would be correct.
22      Q.   Okay.  And that would lend itself -- so
23 understanding that would lend itself to the
24 understanding that these chiropractic notes are

204

1  not complete when it comes to reporting the
2  history of the right lower extremity pain and
3  discomfort that Mr. Narsimhan was experiencing;
4  is that correct?
5       A.   Well --
6       MS. HAY:  I'm going to object -- hold on just
7  one second.  I'm just going to object to the
8  form of that question with regard to you're now
9  asking him to comment on whether these records
10 are, quote, complete.
11           But you can go ahead and answer,
12 Doctor.
13      THE WITNESS:  The -- the bottom line that --
14 that I -- I have here is that from the onset of
15 the presentation to the chiropractor, the
16 chiropractor is working from documents where
17 Mr. Narsimhan did not -- did not represent that
18 he was having any leg pain, and that the early
19 examinations where there's a diagram that shows
20 where pain is, did not include anything from the
21 leg.
22           And so as we're moving on in time to --
23 what is it, yeah, that was October 26, 2016,
24 clearly at that time the chiropractor is not

205

1  focusing on the leg or probably asking any
2  questions about the leg.  But we have three
3  prior pain diagrams, if I remember right, on
4  9/21/16, 10/11/16 and -- yeah.  And I think --
5  well, Page 10 -- let's just go to Page 10.
6  BY MR. BERMAN:
7      Q.  I think you've already talked about
8  Page 10.  We've already looked at it.
9      A.  Yeah.  But -- but I'm putting things in
10 context here.
11     Q.  There's also a pain diagram on Page 14
12 and 15.
13     A.  Right.
14     Q.  In case you're looking for it.
15     A.  Yeah.  That's what I'm looking for.
16 And on those pain diagrams, there's nothing
17 related to the leg.
18     Q.  Right.  So going back to October 26th
19 for a moment.
20     A.  Right.
21     Q.  That's page -- oops.
22     A.  Pardon me?
23     Q.  That's Page 35.
24     A.  Yeah.

206

1  because now he's working up in the arm and the
2  neck.
3      But the reality is he has no reason to
4  be thinking about the leg anymore, because when
5  he did his evaluation, and when Mr. Narsimhan
6  wrote and signed the document and did not
7  include anything about a leg, and what I said
8  previously is that when you have CRPS pain in
9  the leg, you don't -- you do not neglect to put
10 it down on the form.  If it's bothering you, you
11 put it down on the form because it becomes the
12 main event.
13     The CRPS pain is the main event.  And
14 clearly it's not the main event here, whether it
15 be on intake or even later.  Because it becomes
16 relevant to the chiropractor, and anybody
17 treating him, if there's CRPS and you're talking
18 about doing things that potentially could
19 exacerbate his CRPS or cause a spread to it
20 elsewhere in the body, you better know that
21 something else is going on.
22     And, you know, it's not clear to me why
23 this plaintiff, with all the other information
24 that I found to have discrepancies, it's not

208

1      Q.  Now, assuming that Mr. Narsimhan is
2  still having the same pain in his right lower
3  extremity that he was talking to his neurologist
4  about just a day before, but he went into his
5  chiropractor on October 26th and didn't mention
6  the right lower extremity pain at all, doesn't
7  that affect your opinion as to whether Mr. Narsimhan
8  was having pain -- or significant pain in his
9  right lower extremity during the time he was
10 seeing his chiropractor?
11     A.  Well, you know, what you're saying is
12 on October 25th he went to see Dr. Farbman, he
13 had pain, and Dr. -- the chiropractor is
14 proceeding with his treatment and not paying
15 attention to the pain because -- you see, the
16 way treatment goes, whether it is chiropractic
17 or medical -- let's say medical pain treatment --
18     Q.  Uh-huh.
19     A.  -- is that you gather your basic
20 information and then you go about treating
21 what -- what you treat in the context of the
22 comprehensive evaluation that you do at the
23 beginning.  And so it would not be abnormal at
24 this time for him not to be discussing the leg,

207

1  clear to me why, if he were having bad pain, he
2  would not be disclosing it to the chiropractor,
3  and then it subsequently would not be getting
4  documented.  I think we're kind of going in
5  circles.
6      Q.  Right.
7      A.  Right.
8      Q.  Again, I just want to make sure,
9  because you keep saying it's bad pain.  You're
10 characterizing it in a certain way.
11     When a person feels in terms of pain
12 that's bad or significant, that's really up to
13 the person, right?
14     A.  Pain is subjective, if that's what
15 you're asking.
16     Q.  Subjective.  Okay.  So depending on --
17 in terms of what Mr. Narsimhan chose to complain
18 of or document to his chiropractor, that's kind
19 of -- we have to ask him why he chose to do
20 that.  You can't make that assumption or
21 speculation, right?
22     MS. HAY:  I'll just object to asked and
23 answered.
24     You can answer again, Doctor.

209



1    THE WITNESS:  Well, I think we already agreed
2  that you wish to ask him why he concealed that
3  information, or certainly didn't offer it up.
4        CRPS is -- it's an important problem,
5  and we wouldn't be here in this lit -- as
6  somebody who, you know, specializes in CRPS, and
7  without soliciting legal work gets these kind of
8  cases, the kind of demands that -- and that's
9  not really relevant to me -- but the kind of
10  demands that are made that bring me into a case
11  all the way into Chicago, and have, you know,
12  three lawyers and a court reporter here on the
13  phone are not insignificant kinds of problems
14  that aren't -- or there isn't demand for a lot
15  of damages.
16        And if it's so insignificant that he's
17  not mentioning it at any time in, I don't know
18  how many -- I have exams that start documents on
19  6, 10, 14, 19, 18, 21, 23, 27, 29, 31, 33, 35,
20  37, 39, 41, 43, 45, 47, 49, 51, 53, 55, 57, 59,
21  60, 62, 65, 67.  Those are all individual notes
22  where it never got brought up by this guy now
23  who wants to sue for a lot of money, I assume.
24  I don't know how much he wants to sue for.

                                                210

1        But if he's saying that the CRPS is so
2  substantial that he needs big damages, and he
3  doesn't even report it in that plethora of
4  examinations that I just listed, then something
5  is inconsistent.
6  BY MR. BERMAN:
7     Q.   Earlier in your prior deposition you
8  were critical of Dr. Buvanendran for cutting and
9  pasting some of his records from one day to the
10  next.
11        In the Wheaton Chiropractic records,
12  did you notice that there are certain records
13  that seem to be cut and pasted from one office
14  visit to the next?  You did not?
15     A.   I did notice that.  And, actually, when
16  you were asking me to characterize the care, at
17  one point I was thinking about bringing it up.
18  But I think you asked me another question, so I
19  didn't get the opportunity to share that with
20  you.
21        But the answer is I clearly did because
22  I'm critical of that kind of practice.
23     Q.   Right.  And you're critical of Dr. --
24  the chiropractor, Dr. Hallum's note-taking

                                                211

1  procedure because he cuts and pastes elements of
2  his office visits from one day to another.
3        Are you willing to reply on his office
4  visit notes to indicate that Mr. Narsimhan is
5  not having a significant right lower extremity
6  issue despite the fact that it's not -- the
7  right lower extremity is not mentioned one way
8  or the other, right?
9     A.   Okay.  Well, if I were a lawyer, I
10  would object for that being argumentative.  But
11  what I will tell you is that the initial notes
12  were not cut and pasted, and they -- there was a
13  complete lack of any kind of documentation or
14  even an allusion to anything related to the
15  pain, including pain diagrams that were not cut
16  and pasted because they're each unique.
17     Q.   Okay.  So it's the initial -- it's the
18  chiropractor's initial --
19     A.   You realize that --
20     Q.   -- that are not important.
21     A.   -- where we -- even though we started
22  late, we're running over the hour.
23     Q.   Actually, we're not.  We started at
24  10:42 and it's 11:38.

                                                212

1     MS. HAY:  We've got four minutes.  And I will
2  just have like three questions at the end,
3  Steve.
4     MR. BERMAN:  Okay.
5  BY MR. BERMAN:
6     Q.   So it's the initial -- the chiropractor's
7  initial -- first couple of records that are most
8  significant to you, right?
9     A.   May -- well, then we go -- they're not
10  cut and pasted when you start again on Page --
11  PDF Page 62.  Those -- that's a new system, and
12  there's no cut and pasting into that system.
13  And, once again, there's nothing on Page 62, 65
14  or 67 which represents visits on 7/29, 8/30 and
15  10/31/17 that ever make an allusion, once again,
16  to the leg problem.
17     Q.   Okay.  I'm going to ask you to assume
18  certain things for this next couple of questions.
19        Assuming for this question that
20  Mr. Narsimhan was experiencing right lower
21  extremity anterior pain that continued and
22  persisted throughout the chiropractic treatment,
23  but was never addressed or noted by the
24  chiropractor, would that affect any of your

                                                213



1  opinions in this case regarding causation?
2      MS. HAY:  Objection, asked and answered.
3          You can answer again, Doctor.
4      THE WITNESS:  I -- with all -- you know, I
5  don't know if you want to say they're hypothetical
6  or your assumptions, but with all those assumptions,
7  I would continue to have the same opinion I've
8  been having, which is subsumed and asked and
9  answered.
10     MR. BERMAN:  Doctor --
11     THE WITNESS:  Well, let me finish answering
12  the question.
13     MR. BERMAN:  Go ahead.
14     THE WITNESS:  My opinion would be, if the
15  pain were significant enough, it would have been
16  communicated.  And that the reason I am
17  excluding causation of CRPS from that incident
18  is because at no time did Mr. Narsimhan, who
19  subsequently complained that I abused him or
20  whatever during the exam that you witnessed,
21  where I clearly went out of my way not to do
22  anything that would be painful to him and
23  deferred much of the parts of my examination to
24  avoid harming him.  And then he goes to a visit
                                                    214

1  a month later and doesn't report it, but then
2  two months later he does, we have a big
3  inconsistency.
4          And that's the same kind of inconsistency
5  that we could potentially see where he's going
6  to Dr. Farbman on the 25th, and then on the 26th
7  not saying anything about the pain.  Or when he
8  comes to his first three visits with the
9  chiropractor, one where he fills out a history
10  where he doesn't put it in and three documented
11  pain diagrams where there's nothing in the pain
12  diagram that represents anything related to his
13  pain and they're unique.
14         So I still exclude causation, and
15  that's the bottom line.
16 BY MR. BERMAN:
17     Q.  Doctor, assuming for purposes of this
18  question, that there was right lower extremity
19  anterior pain that started after the impact with
20  a narrow rod at Lowe's, and persistent since
21  that time through September -- September to
22  December 2016 time frame in which Mr. Narsimhan
23  was seeing a chiropractor, and it continues to
24  this day, would that make it more probably true
                                                    215

1  than not, that the right lower extremity pain is
2  causally related to the incident at Lowe's, even
3  if the diagnosis, CRPS, is not accurate?
4      A.  Well, once again, here I didn't review
5  the records.  I didn't review the video of the
6  impact, and I'm trying to remember if the piece
7  of metal actually struck him anteriorly or
8  dorsally.
9      Q.  Well, it was anterior.
10     A.  Okay.  So I still don't make a casual
11  relationship.  But more importantly, I see so
12  many inconsistencies in the chart in this
13  gentleman who is obese, diabetic, with diabetes
14  out of control for significant periods of time.
15  And my working diagnosis is not CRPS when I
16  evaluated him, but instead it was diabetic
17  neuropathic pain, which is a different kettle of
18  fish than CRPS, and is treated with the
19  medications that Dr. Farbman had prescribed him.
20         Now, what I can further say on that is
21  that the -- use of either gabapentin or
22  pregabalin is FDA approved for the treatment of
23  diabetic peripheral neuropathy pain, and it's
24  not approved for the use in complex regional
                                                    216

1  pain syndrome.
2      Q.  I'm just going to object to move to
3  strike any portion of that answer relating to
4  diabetic neuropathy.  We've covered that opinion
5  extensively in your prior deposition, and I
6  didn't ask about diabetic neuropathy.  So with
7  that, I'll pass.
8      MS. HAY:  Just a couple of questions, Doctor.
9          EXAMINATION
10 BY MS. HAY:
11     Q.  In that -- in the Wheaton Chiropractic
12  records, in the initial history forms that
13  Mr. Narsimhan was asked to fill out, was it your
14  understanding from a review of those forms that
15  he was asked to identify any symptoms he either
16  had or had -- either he had at the point in time
17  he went to Wheaton Chiropractic or had prior to
18  that time?
19     A.  Well, I think, Ms. Hay, that the answer
20  to that is on the form.  And I don't know if you
21  didn't see it or if Mr. Berman didn't see it,
22  but it says:  We want to know all about the
23  facts about your health before we accept your
24  case.  Please check the appropriate box for any
                                                    217

1  of the following symptoms which you have or have
2  had previously.
3        So Wheaton Chiropractic is putting it
4  there straight out in front.  Mr. Narsimhan,
5  before you sign this form, tell us everything
6  about yourself so that we know what we need to
7  treat you.  And clearly he did not do that.
8        Now, he may have -- you know, he left
9  out the neck, but he may have seen that as part
10 of a conglomeration relating to the arm.  But in
11 terms of the leg, clearly, if there was a
12 problem, Wheaton Chiropractic wanted to know it.
13 He read this.
14       He is an educated man, and that's not
15 part of this deposition.  But we know that he
16 has beyond a college education.  I believe he
17 has a master's degree, so he's educated.  He can
18 read.  He signs something and leaves out a very
19 important thing.  And my -- what my -- my
20 opinion in that regard is that he just wasn't
21 reporting it because it wasn't significant to
22 him.
23     Q.   Doctor, at some point in time, were
24 the -- did -- did the chiropractor -- one of the

218

1  questions.
2        Dr. Hallum appears to be the
3  chiropractor that saw him at Wheaton Chiropractic,
4  correct?
5     A.   Yes.
6     Q.   Did it appear to you through the 20
7  plus, 25 visits that Dr. Hallum was the same
8  chiropractor that was treating him for all of
9  those visits?
10    A.   I got to remember.  I just got to look
11 at the ones near the end.
12       Yeah, he's the one at the end, and he
13 was the -- oops, hold on.  And he was the one at
14 the beginning.  Yes.  So I -- I -- I had to
15 check to see.  But, yes, he -- he -- he -- he's
16 the chiropractor that saw him during those two
17 intervals of time.
18    Q.   Okay.  And the two intervals of time,
19 Doctor, that was a period from September 2016 to
20 December 2016.  Then further care from I believe
21 it was July of 2017 till end of October, early
22 November of 2017, correct?
23    A.   Yeah, it was July 29th, 2017, through
24 October 31st, 2017.

219

1     Q.   And was it your understanding from
2  review of the records that when he came back in
3  2017 that Mr. Narsimhan and some documents in
4  the Wheaton Chiropractic records again reaffirmed
5  that he had some type of an additional problem
6  with his neck and arms and wrists, and there was
7  no mention of any leg pain?
8     A.   Yeah.  I just have to go back.  Just --
9  I don't want to be -- I don't want to say
10 anything under oath that I don't know for sure.
11    Q.   I'm specifically looking at Page 18,
12 Doctor?
13    A.   18?
14    Q.   Page 18.
15    A.   Oh, the ouch form.
16    Q.   Yes.
17    A.   And that is -- I'm sorry, yeah, the
18 ouch form was from 7/29 of '17, when he resumed
19 care.  And so, once again, Ms. Hay, I would
20 point out to you that this is a form that was
21 filled out by Mr. Narsimhan.  I believe it said:
22 If you have experienced -- because he puts his
23 name, this is his handwriting.  Okay.  And did
24 you receive any other care for this injury.

220

1        But then it says:  If you've
2  experienced a sudden change in your physical
3  condition, we would like to know about it
4  because we want your treatment to be the best
5  possible provided in your current state.  Your
6  complete recounting of any discomfort you have
7  felt and may -- and any accidents or injuries
8  you have recently, even if experienced no
9  apparent reaction, will help us to help you.
10 And there's nothing that he puts down,
11 Mr. Narsimhan puts down related to leg pain.
12       And I believe this diagram is his
13 diagram.  This is not the diagram of the -- of
14 the chiropractor.  This isn't the one filled out
15 by the chiropractor.  This is filled out by
16 Mr. Narsimhan.  And, once again, they're asking
17 for everything, and he's showing his arm, but
18 he's not showing his leg.
19    Q.   Okay.  Doctor, were there some assessments
20 that you saw in the Wheaton Chiropractic records
21 where there was an assessment of the patient's
22 gait or ambulation by the chiropractor?
23    A.   I don't recall that.
24    Q.   Okay.  With regard to some of the

221

1  claims that, apparently, Mr. Narsimhan had as to
2  what -- what activities of daily living he could
3  or couldn't do or that were aggravated by this
4  neck or shoulder, forearm, wrist condition, were
5  some of those claims of activities he couldn't
6  do similar to some of the claims that he's made
7  in this case that relate to his lower extremity?
8       A.   Ms. Hay, I'm just a little confused by
9  the question.
10      Q.   Sure.  Let me ask this.  In terms of
11 the Wheaton Chiropractic records, did you see
12 that Mr. Narsimhan had complained that there
13 were certain things he couldn't do because of
14 his upper extremity injuries?
15      A.   Yes.
16      MR. BERMAN:  Objection, foundation.
17 BY MS. HAY:
18      Q.   Did that include, as to what's noted in
19 the records, problems with playing the guitar?
20      MR. BERMAN:  Objection, foundation, relevance.
21      THE WITNESS:  I -- I -- I believe I saw that,
22 but I don't remember for sure.
23      MS. HAY:  Okay.
24

222

1  BY MS. HAY:
2       Q.   Did you see complaints with regard to
3  problems sleeping?
4       MR. BERMAN:  Objection --
5       THE WITNESS:  Yes.
6       MR. BERMAN:  -- foundation, relevance.
7  BY MS. HAY:
8       Q.   Did you see complaints with regard to
9  him sitting too long or doing computer work?
10      A.   Yes.
11      MR. BERMAN:  Foundation.
12 BY MS. HAY:
13      Q.   Did you see some indications of some
14 problems with -- with rotational issues or
15 turning his body?
16      MR. BERMAN:  Objection, leading.
17      THE WITNESS:  You know, it might be useful to
18 just refer to these -- the documents where they
19 are so that it would refresh my memory.  Because
20 this one line of questioning, I -- somehow I'm
21 missing some of the answers in my head.
22      MS. HAY:  That's, okay, Doctor.  I don't want
23 to spend too much time on it.  I think you've
24 answered the questions that I have.

223

1       And with that, Steve, I'm done.
2       MR. BERMAN:  Okay.  Just -- just one
3  follow-up specifically, on that one form that
4  you -- the health report we talked about.
5       THE WITNESS:  The one called the ouch report?
6       MR. BERMAN:  No.  The case history
7  confidential health report, Page 6 of the
8  record.
9       THE WITNESS:  Okay.  Yes.
10           FURTHER EXAMINATION
11 BY MR. BERMAN:
12      Q.   And I know you -- you quoted from that
13 directly.  Right here, it says -- and I have
14 it -- actually have it up on the screen.
15           You quoted from it when you were
16 testifying.
17      A.   Yeah, I did.
18      Q.   It says:  Please check the appropriate
19 box for any of the following symptoms which you
20 now have or have had previously; O for occasional,
21 F for frequent.
22           Things like headache, there's no box
23 checked for headache.
24           Is it your opinion that Mr. Narsimhan

224

1  was saying that he never had a headache in his
2  life?
3       A.   That is what he's saying.
4       Q.   Okay.
5       A.   Whether it's true or not, I can't tell
6  you.  But he is not saying that he's had a
7  headache.
8       Q.   Here it says:  Neck pain or stiffness.
9  Nothing is checked at all.
10           Is it your opinion that Mr. Narsimhan
11 was saying he didn't have any neck pain or
12 stiffness ever?
13      A.   I think -- I think in answering this
14 haze question, I was saying that he likely
15 neglected that because he was focusing on his
16 hands.  But I -- you know, you'd have to ask him
17 on that one.
18      Q.   So now you're -- what I'm hearing you
19 say is that you're interpreting why he didn't
20 check the box for neck pain or stiffness.
21      A.   Okay.  I'll withdraw and say you'll
22 have to ask him.
23      Q.   Okay.  He also didn't write down that
24 he was having any pain in his arms or elbows --

225

1   I'm trying to highlight it here -- right?
2       A.   Correct.
3       Q.   And the part of the arm is the forearm,
4   right?
5       A.   Yes.
6       Q.   And he was being treated for, in part,
7   forearms, right?
8       A.   Correct.
9       Q.   Are you trying to say that -- is it
10  your opinion that since Mr. Narsimhan failed to
11  write that he was having occasional or frequent
12  pain in his arms that he, in fact, wasn't having
13  any pain in his forearms?
14      A.   I not saying that.  I would say you
15  have to ask him why he left that out.
16      Q.   Okay.  And wouldn't that be true,
17  though, for all these things as to why he left
18  it out, you'd have to ask Mr. Narsimhan why he
19  left it out?
20      A.   The answer to that would be a qualified
21  yes.  And a qualified yes is that the pain of
22  CRPS is not the kind of pain that you leave off
23  a form like this.
24      Q.   I know.  But that's your -- that's your

226

1   quali -- qualified judgment, that's because
2   that's how you feel, but that's not necessarily
3   how Mr. Narsimhan feels, right?
4       A.   Well, you can say that --
5       MS. HAY:  I'm going to -- hold on just a
6   minute, Doctor.
7           I mean, Steve, objection to form.  He's
8   an expert in the case who's giving an opinion.
9   That's different than what, you know -- the
10  question is putting the two together.
11          I think the doctor has clearly testified
12  about this before as to what his opinion is
13  about CRPS and the type of pain, but has said
14  that with regard to these specific forms, you
15  need to go back and ask the patient why he
16  didn't fill it out.  So that's my objection.
17      MR. BERMAN:  Yeah.  But -- I understand.
18  That's the problem.  That's what I'm trying to
19  follow up on.
20      MS. HAY:  Well, I think you've asked him
21  about it a number of times, and he's told you.
22      MR. BERMAN:  Let me just ask the question.
23  BY MR. BERMAN:
24      Q.   In one part of this health report you

227

1   say that there are things Mr. Narsimhan left
2   out, but he may be having those problems.  Why
3   he left it out, you'd have to ask him.
4           But on other things, like his legs or
5   feet, he left out information, but you now know
6   why he left it out, because it wasn't significant
7   to him, right?
8       MS. HAY:  I'm just going to object to form,
9   and mischaracterizing his testimony.  He's
10  already explained it.
11          But go ahead and explain it again,
12  Doctor.
13      THE WITNESS:  Well, I'm not -- basically, you
14  know, I think I -- you asked me to state it
15  emphatically and unequivocally without it being
16  unclear after that whole convoluted discussion
17  previously.
18          Basically, I think it's a one-sentence
19  explanation that I have, or opinion, as my
20  expert opinion, that patients with severe CRPS --
21  with CRPS pain, it's front and center for them,
22  and it's something that they -- it's front and
23  center for them, and it's something they're
24  going to include on something like this if it's

228

1   there, because it -- it -- what I said is it's
2   above all other pain.  CRPS pain is above all
3   other pain.
4   BY MR. BERMAN:
5       Q.   But that really doesn't answer the
6   question I'm trying to ask you.
7           I'm trying to ask you, on the one hand,
8   you are using the confidential health report and
9   saying, well, Mr. Narsimhan left certain things
10  out such as his neck and his arms and hands --
11  I'm sorry, not hands, elbows and arms.
12          But in -- as to why he left that out,
13  well, we don't know.  We'd have to ask him.  He
14  might have been having that problem, but we have
15  to ask him.
16          But as for his right lower extremity,
17  you're not allowing him -- you're not allowing
18  it to say -- well, why he left that off for his
19  right lower extremity, we'd have to ask him why.
20          You just decided.  Doesn't that seem
21  unfair to this person, Mr. Narsimhan?
22      MS. HAY:  I'll just object to form and
23  unfair.
24          Doctor, if you want to answer again, go

229

1 ahead and give him your answer again.
2      THE WITNESS:  I mean, I'm basically saying
3 the same thing over and over again.
4           The pain of CRPS is such that you don't
5 leave it out.  And that's my medical expert
6 opinion.  I deal with these kind of patients all
7 the time.  And I think it's perfectly fair to
8 him to ask him why, if he had bad CRPS pain in
9 his leg or if he can say, well, that really
10 wasn't so bad, then your legal case is a
11 different situation.
12           But if he's saying that it wasn't so
13 bad, and that's why I left it out, then so be
14 it.  And if it's severe and he left it out, you
15 have to ask him why he left it out.
16           But the question is really why did he
17 leave it out?  CRPS pain is not something you
18 leave out.  And that's my opinion, and it's not
19 going to change even if you ask me four more
20 times.
21      MR. BERMAN:  All right.  No further
22 questions.
23      MS. HAY:  Okay.  Thanks much.
24           Doctor, do you want to reserve

230

1 signature or waive it?  I can't remember --
2      THE WITNESS:  No, I never waive it.
3      MS. HAY:  Okay.  So we'll reserve signature,
4 and if a copy is being ordered --
5      MR. BERMAN:  I'll order it.
6      MS. HAY:  -- we'll take a copy.  Okay.
7 Thanks, everyone.
8      THE WITNESS:  Thank you.
9      MR. BERMAN:  All right.  Thank you for your
10 time today.  Appreciate it.
11      MS. HAY:  Thanks.
12      (Proceedings concluded at 11:58 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24

231

1 IN THE UNITED STATES DISTRICT COURT
2 FOR THE NORTHERN DISTRICT OF ILLINOIS
3  EASTERN DIVISION
4 KRISHNA NARSIMHAN,          )
                             )
5           Plaintiff,      )
   -vs-                     ) No. 1:19-cv-012556
6 LOWE'S HOME CENTERS, LLC,   )
           Defendant.       )
7
8      I, JOSHUA PRAGER, M.D., M.S., being
9 first duly sworn, on oath say that I am the
10 deponent in the aforesaid deposition taken on
11 the 7th day of October, 2021; that I have read
12 the foregoing transcript of my deposition and
13 affix my signature to same.
14
15
16      _____
17           JOSHUA PRAGER, M.D., M.S.
18
19
20 Subscribed and sworn to
21 before me this        day
22 of              , 2021
23
24 Notary Public

232

1 STATE OF ILLINOIS     )
2                       )  SS:
3 COUNTY OF C O O K      )
4      I, MARGARET A. RITACCO, a notary public
5 within and for the County of Cook and State of
6 Illinois, do hereby certify that heretofore, to-wit,
7 October 7, 2021, personally appeared before me,
8 via videoconference, JOSHUA PRAGER, M.D., M.S.,
9 in a cause now pending and in the United States
10 District Court for the Northern District of
11 Illinois, Eastern Division, wherein
12 KRISHNA NARSIMHAN is the Plaintiff, and LOWE'S
13 HOME CENTERS, LLC, is the Defendant.
14      I further certify that the said
15 JOSHUA PRAGER, M.D., M.S., was first duly
16 sworn to testify the truth, the whole truth and
17 nothing but the truth in the cause aforesaid;
18 that the testimony then given by said witness
19 was reported stenographically by me in the
20 presence of the said witness, and afterwards
21 reduced to typewriting by Computer-Aided
22 Transcription, and the foregoing is a true and
23 correct transcript of the testimony so given by
24 said witness as aforesaid.

233



1       I further certify that the signature to
2   the foregoing deposition was reserved by counsel
3   for the respective parties.
4       I further certify that the taking of this
5   deposition was pursuant to notice and that there
6   were present at the deposition the attorneys
7   hereinbefore mentioned.
8       I further certify that I am not counsel
9   for nor in any way related to the parties to
10  this suit, nor am I in any way interested in the
11  outcome thereof.
12      IN TESTIMONY WHEREOF:  I have hereunto
13  set my hand and affixed my notarial seal this
14  18th day of October 2021.
15
16
17
18      _Margaret A. Ritacco_
19      _____  ____
20      NOTARY PUBLIC, COOK COUNTY, ILLINOIS
21      LIC. NO. 084-002796
22
23
24
                                        234

1       McCorkle Litigation Services, Inc.
          200 N. LaSalle Street, Suite 770
2            Chicago, Illinois 60601-1014
3   October 18, 2021
4   HEPLER BROOM LLC
    MS. LINDA HAY
5   30 North LaSalle Street, Suite 2900
    Chicago, Illinois· 60602
6
    IN RE:  NARSIMHAN vs.
7           LOWE'S HOME CENTERS, LLC.
    COURT NUMBER:  19-cv-01255
8   DATE TAKEN:  October 7, 2021
    DEPONENT:  JOSHUA PRAGER, M.D., M.S.
9
    Dear Ms. Hay:
10
    Enclosed is the deposition transcript for the
11  aforementioned deponent in the above-entitled
    cause.  Also enclosed are additional signature
12  pages, if applicable, and errata sheets.
13  Per your agreement to secure signature, please
    submit the transcript to the deponent for review
14  and signature.  All changes or corrections must
    be made on the errata sheets, not on the
15  transcript itself.  All errata sheets should be
    signed and all signature pages need to be signed
16  and notarized.
17  After the deponent has completed the above,
    please return all signature pages and errata
18  sheets to me at the above address, and I will
    handle distribution to the respective parties.
19
    If you have any questions, please call me at the
20  phone number below.
21  Sincerely,
    Cindy Alicea              MARGARET A. RITACCO
22  Signature Department      Court Reporter
                              (312)263-0052
23
24  cc:  ALL COUNSEL ORDERING THE TRANSCRIPT
                                        235



Page 1

1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3

4    KRISHNA NARSIMHAN,            )
                                   )
5            Plaintiff,            )
                                   )
6            vs.                   ) No. 1:19-CV-01255
                                   )
7    LOWE'S HOME CENTERS, LLC,     )
                                   )
8            Defendant.            )

9        DEPOSITION OF WILLIAM SCOTT HALLUMS, D.C.,

10   produced, sworn and examined on NOVEMBER 11, 2021,

11   between the hours of nine o'clock in the forenoon and

12   five o'clock in the afternoon of that day, at the

13   offices of Performance Chiropractic, 4 West Drive,

14   Chesterfield, Missouri, 63017, before Jeanne M.

15   Pedrotty, a Certified Court Reporter (MO) and

16   Certified Shorthand Reporter (IL), in a certain cause

17   now pending in the United States District Court,

18   Northern District of Illinois, Eastern Division,

19   between KRISHNA NARSIMHAN, Plaintiff, vs. LOWE'S HOME

20   CENTERS, LLC, Defendant; on behalf of the Defendant.

21

22

23

24

25       Job No. CS4879572

EXHIBIT
C

Page 2

```
 1        I N D E X   O F   E X A M I N A T I O N
 2                        Page
 3     Questions by Ms. Fowler. . . . . . . 4
       Questions by Mr. Berman. . . . . . . 52
 4
 5        I N D E X   O F   E X H I B I T S
 6     Exhibit A (witness disclosure)
       Exhibit B (Dr. Hallums' file)
 7     Exhibit C (Performance website)
       Exhibit D (Dr. Hallums' biography)
 8     Exhibit E (case history)
       Exhibit F (physical exam report)
 9     Exhibit G (Ouch form)
       Exhibit H (treatment records)
10
11        (The exhibits were retained by the court
       reporter and forwarded to the attorney along with
12     their transcript.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2
       For the Plaintiff: (Via phone)
 3
          Steven Berman
 4        Anesi, Ozmon, Rodin, Novak & Kohen
          161 N. Clark Street
 5        Chicago, IL  60601
 6
 7     For the Defendant:
 8        Meg Fowler
          Hepler Broom LLC
 9        130 N. Main Street
          Edwardsville, IL  62025
10
11
12
13
14
15
16
       Court Reporter:
17     Jeanne M. Pedrotty, CCR/CSR
          Missouri CCR #618
18        Illinois CSR #084-003893
          Veritext Legal Solutions
19     701 Market Street
          St. Louis, Missouri 63101
20     (314) 230-7260
          Www.veritext.com
21
22
23
24
25
```

Page 4

```
 1      IT IS HEREBY STIPULATED AND AGREED by and between
 2   counsel for the Plaintiff and counsel for the
 3   Defendant that this deposition may be taken in
 4   shorthand by Jeanne M. Pedrotty, CCR/CSR, a Certified
 5   Court Reporter and Certified Shorthand Reporter, and
 6   afterwards transcribed into typewriting; and the
 7   signature of the witness is expressly waived.
 8             *   *   *   *   *
 9          WILLIAM SCOTT HALLUMS, D.C.,
10   of lawful age, produced, sworn and examined on behalf
11   of the DEFENDANT, deposes and says:
12      (Starting time of the deposition:  12:01)
13             EXAMINATION
14   QUESTIONS BY MS. FOWLER:
15      Q.  Can you please state your name for the
16   record?
17      A.  William Scott Hallums.
18      Q.  And you are a chiropractor?
19      A.  Correct.
20      Q.  I have handed you what's been marked as
21   Exhibit A, and I'll represent that is the Plaintiff's
22   Rule 26A rebuttal witness disclosure.  Do you see
23   that?
24      A.  Yes, ma'am.
25      Q.  Have you had an opportunity to review this
```

Page 5

```
 1   document?
 2      A.  I have.
 3      Q.  Okay.  And when was the first time that the
 4   plaintiff's attorney reached out to you?
 5      A.  Date specific?
 6      Q.  Yes.
 7      A.  I'm going to say it was probably the middle
 8   to end of October; probably more middle of October.
 9      Q.  Of this year?
10      A.  Yes.
11      Q.  Okay.  So the first time you have ever
12   spoken to anyone about this lawsuit would have been in
13   October of 2021?
14      A.  Correct.
15      Q.  Okay.
16      A.  And if it's not, it would be the end of
17   September.  It's somewhere in that time.  This fall.
18      Q.  Sure.  And were you provided  -- were you
19   provided any other documents besides your medical
20   records for Mr. Narsimhan?
21      A.  No.
22      Q.  No deposition transcripts or anything of
23   that sort?
24      A.  Yes.  I was provided the deposition of a
25   doctor.  I think it was Josh Prager.
```

2 (Pages 2 - 5)

Page 6

1    Q.   Okay.
2    A.   I'm not sure of his name, it was in regards
3  -- I think he was an expert in the complex regional
4  pain syndrome.
5    Q.   Is that your file?
6    A.   This is my file.
7    Q.   Do you mind if I take a look at it?  Thank
8  you.  And as I understand this file is the complete
9  file for Krishna Narsimhan; is that correct?
10   A.   Correct.
11   Q.   Within this file we have the patient
12  information and I'm seeing the medical records.
13   A.   Yes.  I think it's the initial treatment
14  visit.  Everything else was in EHR, electronic health
15  record.
16   Q.   Okay.  So this is your hard file, and then
17  we have Rule 26 witness disclosures, and then we have
18  -- this is a printout from the National Institute of
19  Neurological Disorders and Stroke pertaining to
20  complex regional pain syndrome?
21   A.   Yes.
22   Q.   Who printed this off?
23   A.   Me.
24   Q.   And when did you print this off?
25   A.   I believe it was two days ago.

Page 7

1    Q.   What was the purpose of doing that?
2    A.   I was -- based on what I was told this is a
3  condition that the -- I'm assuming the Plaintiff --
4  Mr. Krishna is being treated for, or was diagnosed
5  with I should say.  Not treated for, diagnosed with.
6    Q.   Let's sort of set the table here.  If you
7  treated -- the last date of treatment I have for you
8  with Mr. Narsimhan is 2017, does that sound about
9  right?
10   A.   Yes, ma'am.
11   Q.   And nobody contacted you at any point until
12  October 2021 pertaining to an incident that occurred
13  at Lowe's; is that right?
14   A.   I believe US Legal Support contacted me in
15  March of 2020 or April of 2020 requesting records.
16   Q.   Okay.
17   A.   I did not know what it was for.  All they
18  did was request records.  And I looked back, and they
19  said there was possible depositions that may need to
20  be taken.  I sent in a W9, or my secretary sent in a
21  W9 to US -- I'm assuming US legal support.  And that
22  was the last I heard of it until this fall.
23   Q.   Okay.  And then this fall was the first
24  time that an attorney actually reached out to you; is
25  that right?

Page 8

1    A.   That's correct.
2    Q.   Was that Mr. Berman?
3    A.   Mr. Berman is the only attorney I spoke
4  with, yes.
5    Q.   And what did he tell you?
6    A.   He told me he had a patient that was under
7  my care in the year of 2016, and he indicated that has
8  ongoing lawsuit -- an ongoing case with Lowe's
9  regarding an injury that he suffered.  I believe it
10  was to his right leg or right foot.  And that my name
11  got brought up because of I was treating Krishna at
12  the time he was suffering this injury or at the time
13  that he had this injury going on.  And that my name
14  was brought up because of my treatment and then also
15  in regards to my documentation.
16   Q.   Okay.  And what specifically did he tell
17  you about the records or your documentation?
18   A.   What specifically did he tell me about my
19  records or documentation -- he just informed me that
20  based on -- I guess it was a deposition -- I guess
21  I'm assuming.  I'm assuming with doctor, I guess,
22  Prager -- am I pronouncing his name right?  That there
23  was some question in regards to my documentation that
24  did not denote anything regarding Mr. Krishna's right
25  leg.

Page 9

1    Q.   And what else did he tell you about that?
2    A.   He told me how the injury occurred, that
3  Mr. Krishna was in Lowe's and I believe he was
4  checking out, a metal rod fell through, I'm assuming
5  the shopping cart, hit Mr. Krishna in the foot or
6  ankle, and that Mr. Krishna suffered some pain,
7  discomfort and so forth, and that was the extent of
8  that.
9    Q.   Okay.  And did he say anything about the
10  lawsuit?
11   A.   He indicated that there was an ongoing case
12  between Mr. Krishna and Lowe's.
13   Q.   Okay.  And did he ask you for -- to help
14  him or Mr. Narsimhan with respect to this lawsuit?
15   A.   He said that I would potentially be
16  obtained as an -- in a deposition to go through my
17  notes regarding the case.
18   Q.   Okay.  Did he go through what he wanted you
19  to cover with respect to your notes?
20   A.   We went through the notes in regards to
21  what my notes stated, and that was just basically it.
22   Q.   Okay.  And did he educate you on what
23  complex regional pain syndrome is at all?
24   A.   I have knowledge of it.
25      MR. BERMAN:  I want to place an objection

3 (Pages 6 - 9)

Page 10

1 to that question; foundation and the form to "were you
2 educated".
3     Q. (By Ms. Fowler) Go ahead.
4     A. Based on my background, I have somewhat of
5 some knowledge to it. It was generally called
6 causalgia when I was going through school. And I
7 think they changed it to complex regional pain
8 syndrome. I have a general idea what it was. I did
9 print off some material as well just to make sure.
10     Q. You were no stranger to the concept of what
11 complex regional pain syndrome was back in 2016; is
12 that right?
13     A. Yes. I mean we learned about it -- briefly
14 learned about it in school.
15     Q. Okay. That's something that chiropractors
16 do cover in their training; is that true?
17     A. In their training, yes.
18     Q. So I'm also looking through this file. Did
19 we cover everything Mr. Berman told you and what you
20 all discussed?
21     A. Uh-huh.
22     Q. All right.
23     A. I will step back. I don't know if I stated
24 that right. We learned about causalgia, but it's
25 nothing we learned about in a treatment regimen or in

Page 11

1 regards to treating it.
2     Q. But you learned how to identify it; true?
3     A. Yes.
4     Q. Got it. Okay. And then we have some other
5 medical records in this file. Dr. Prager's deposition
6 is not in the hard file. Where is that kept?
7     A. This is on a pdf on my laptop or iPad.
8     Q. So what I'm looking at, which, Doctor, if
9 it's okay with you, I'd like to mark your file as an
10 Exhibit, Exhibit B?
11     A. That's fine.
12     MR. BERMAN: No objection to marking the
13 document.
14     Q. (By Ms. Fowler) We'll make copies of it
15 and have that, but we won't take your original file.
16     A. Okay.
17     Q. And then the electronic file, as I
18 understand it, consists of Dr. Prager's deposition and
19 then the ongoing treatment records that you have with
20 Mr. Narsimhan; correct?
21     A. Correct. And it also contains Exhibit A,
22 but I have three --
23     MR. BERMAN: Objection to the form of the
24 question; ongoing treatment record. I think his
25 treatment records ended in 2017.

Page 12

1     MS. FOWLER: Well, Steve, just to clarify
2 what we're looking at here in the room is the initial
3 record in the hard copy and ongoing treatment records
4 would be treatment records from after the first date
5 through 2017. That's what we're referring to.
6     MR. BERMAN: Those would be subpoenaed
7 records that were provided to me.
8     Q. (By Ms. Fowler) Okay. So let's talk about
9 the Exhibit A. Are these your words or is this Mr.
10 Berman's words when we look at the subject matter on
11 which the witness is expected to present evidence?
12     A. Me and Mr. Berman had a phone conversation.
13 It probably lasted, I don't know, 20 or 25 minutes,
14 and I spoke to Mr. Berman on the phone and this is
15 what we talked about. And they printed up this report
16 right here.
17     Q. Okay. All right. So let's go through --
18 what I'd like to talk to you about just generally
19 speaking is what chiropractors do, if that's all
20 right.
21     A. Yeah.
22     Q. So I understand -- so I did a little bit of
23 research before coming here today because I didn't
24 want to sound stupid talking to you.
25     A. Yeah.

Page 13

1     Q. But I understand -- I went to the
2 Cleveland Clinic and I just typed in chiropractor.
3 And Cleveland Clinic seems like a reputable place.
4 And I printed off what they have on chiropractic
5 adjustment and all of that good stuff. But as I was
6 going through this, and you can tell me if I'm wrong
7 on this, but if you go to the third page of that, is
8 it true to say that chiropractors can treat pain
9 anywhere in the body?
10     A. Yes.
11     Q. And is it true to say that would include in
12 the head, and the jaws, the shoulders, the elbows,
13 wrists, hips, pelvis, knees, ankles?
14     A. Correct.
15     Q. Okay. And as I understand it a
16 chiropractor would look at the whole musculoskeletal
17 system and try to treat the root of the problem; is
18 that accurate?
19     MR. BERMAN: Object to the form of the
20 question. It's not related pertaining to this
21 particular case. Go ahead.
22     Q. (By Ms. Fowler) Go ahead.
23     A. Okay. They can look at the musculoskeletal
24 system.
25     Q. Okay.

4 (Pages 10 - 13)

Page 14

1     A.  And treat the root of the problem.
2     Q.  All right. So chiropractors -- would you
3 agree chiropractors make sure not only that the joints
4 are moving properly, but also the surrounding muscles
5 are functioning well. That's part of the job; is that
6 right?
7     A.  That's correct.
8     Q.  Okay. And now, in terms of what you do, I
9 understand that you were working at Wheaton
10 Chiropractics?
11     A.  That was my clinic, yes.
12     Q.  That was yours?
13     A.  Yes.
14     Q.  Now you are working for Performance?
15     A.  That is it; correct.
16     Q.  Would you agree that Wheaton Chiropractic
17 and Performance have the same philosophy on how they
18 treat their patients?
19     A.  Correct.
20     Q.  And I understand that Wheaton Chiropractic
21 did have a web site when it was in existence?
22     A.  Correct.
23     Q.  So any patient could go on that web site
24 and see what sort of things that you do for your
25 patients?

Page 15

1     A.  Correct.
2     Q.  And they can look at the philosophy of
3 that?
4     A.  Correct.
5     Q.  So I went on -- since that's no longer
6 existence it's not on the web site, but I just want to
7 go through this. I'm going to have this marked as
8 Exhibit C. This is screen shots of Performance's
9 current, we believe, site. If you can just -- is that
10 true?
11     A.  That is correct.
12     Q.  And what I'm interested in is if we look
13 at, you know, it says welcome to Performance
14 Chiropractic, and the last sentence up here it says,
15 "We strive for our patients to truly come in as
16 strangers and remain as friends."
17     A.  Correct.
18     Q.  That would be true for Wheaton Chiropractic
19 as well?
20     A.  Yes.
21     Q.  That's something that you would have
22 advertised to potential or perspective patients; is
23 that true?
24     MR. BERMAN: Object to the relevance of
25 that.

Page 16

1     Q.  (By Ms. Fowler) Go ahead.
2     A.  I did not advertise this as Wheaton, but,
3 yes, I would feel that it is, you know, an adequate
4 statement.
5     Q.  Okay. It also states, "Our doctors are
6 experienced in techniques to promote healing in all
7 areas of the body." Do you see that?
8     A.  Second paragraph.
9     MR. BERMAN: Object to the relevance.
10     THE WITNESS: Oh, yeah. Promote healing in
11 all areas of the body. Okay.
12     Q.  (By Ms. Fowler) That would be something
13 accurate that you would promote to your patients back
14 at Wheaton; right?
15     A.  Yes.
16     Q.  Okay. And that goes with the philosophy of
17 we treat the body as a whole; correct?
18     MR. BERMAN: Objection to foundation and
19 relevance to this particular witness. Go ahead.
20     THE WITNESS: We treat the body -- in
21 regards to that, I would not say that we treat the
22 body as a whole on every patient, but I'm saying, yes,
23 we treat the body as a whole. We treat the head. We
24 can treat the knee, ankle, the spine, or whatever the
25 case may be.

Page 17

1     Q.  (By Ms. Fowler) And that makes sense to
2 me. And then I went on and I saw your bio.
3     A.  Uh-huh.
4     Q.  I'm going to mark your bio as Exhibit D.
5 Is that a true and accurate copy of your biography as
6 relates to your work as a chiropractor?
7     A.  Just 20 pounds heavier, but yes.
8     Q.  Okay. What intrigued me is that it states
9 that, "Dr. Hallums enjoys treating patients who suffer
10 from common structural injuries, sports-related
11 injuries, headaches, and postural imbalances."
12     A.  Correct.
13     Q.  That's something that you did, you do here,
14 but you also did back in 2016 at Wheaton?
15     A.  That's correct.
16     Q.  And it says he also practice functional
17 medicine?
18     A.  Uh-huh.
19     Q.  That's a new concept for me, I didn't know
20 what that was, so I did look that up. It kind of
21 gives us some context here. It looks at the body
22 symptoms through various lab tests and blood work to
23 find the root cause of many illnesses.
24     A.  Correct.
25     Q.  I wanted to dive a little bit deeper into

5 (Pages 14 - 17)

Page 18

1 the functional medicine concept. So the Internet will
2 set you free. I printed off the role of chiropractic
3 care in functional medicine.
4     A. Okay.
5     Q. What I want to confirm and make sure my
6 understanding of what it is a functional medicine is,
7 something that you do for your patients. It means --
8 if we go to patients center treatment?
9     A. Uh-huh.
10     Q. It says that it means doctors focus on the
11 whole person rather than a disease or disorder; is
12 that right?
13     A. Yes. We look -- we dive down into a deeper
14 level as opposed to more superficial, like just
15 musculoskeletal. We look at gut, gut biome, things of
16 that nature.
17         MR. BERMAN: For the record, I want to
18 place an objection on the record. This is for the
19 court reporter. I place an objection to the
20 foundation of these questions, to the relevance and
21 materiality as they don't relate to the patient at
22 issue, and it's beyond the scope of the disclosure for
23 purposes of this deposition. Beyond that, go ahead.
24         MS. FOWLER: Okay. And it states -- you
25 can have an ongoing objection, Steve. I'm fine with

Page 19

1 that. We can have a rolling objection if you like.
2         MR. BERMAN: I'll have an ongoing objection
3 to these questions because, again, otherwise I have to
4 object to each particular question. That's fine.
5 Thank you.
6     Q. (By Ms. Fowler) Okay. And as a functional
7 medicine chiropractor, am I saying that correctly --
8 is that the way you say it?
9     A. Uh-huh.
10     Q. Instead of finding the quickest way to
11 eradicate symptoms, you -- the functional medicine
12 chiropractor searches for the root of the patient's
13 problems; is that right?
14     A. Correct.
15     Q. And you recognize each patient's
16 individuality rather than taking a one size fits all
17 approach; is that correct?
18     A. Correct.
19     Q. I'm also looking at mind, body, and spirit,
20 as part of functional medicine, chiropractic?
21     A. Uh-huh.
22     Q. You probe deeper than just finding out
23 what's going on physically with your patients; is that
24 true?
25     A. That is correct. Can I say something real

Page 20

1 quick?
2     Q. Go ahead.
3     A. I want to make a note that when I saw Mr.
4 Krishna I did not have a functional medicine degree.
5     Q. Okay.
6     A. I just recently got that.
7     Q. But did you still have that philosophy and
8 mindset that you don't want to just sort of put a
9 blindfold on and feel the spine. You want to have a
10 full, deep level understanding of who your patients
11 were, and what their issues were regardless?
12     A. Correct.
13         MR. BERMAN: I object to the form of the
14 question as well.
15     Q. (By Ms. Fowler) Go ahead.
16     A. Okay. Yes. When a patient entered the
17 office I would address a thorough assessment of what
18 they presented with.
19     Q. So it would be fair to say even though you
20 may not perhaps have had the certificate, degree or
21 whatever is required for functional medicine
22 chiropractic, the mindset that you had and how you
23 treated your patients was the same; is that true?
24     A. The same as -- are we referencing a
25 specific statement or just as the body as a whole?

Page 21

1     Q. Let me ask that question better. Even if
2 you weren't licensed as a functional medicine
3 chiropractor back in 2016, the philosophy that we just
4 talked about and philosophy behind functional medicine
5 chiropractic, you did incorporate that in your
6 treatment of your patients; is that true?
7     A. Yes.
8     Q. Okay. And I think I see that in the
9 records that we see, and we'll get into that, but I
10 just wanted to make sure this was sort of the
11 philosophy that you had back in 2016 so that we can
12 firm this up, but you aim to maximize your overall
13 vitality rather than simply treating the disease, that
14 was true back in 2016 on how you care for your
15 patients?
16     A. Uh-huh.
17     Q. That's yes?
18     A. Yes.
19     Q. Okay. So one of the things that I found
20 interesting also is that taking an integrated
21 approach, and I'm look right here. It's understand
22 how does a chiropractor fit in?
23     A. Okay.
24     Q. Chiropractors can treat complex but common
25 illness such as chronic fatigue syndrome and

6 (Pages 18 - 21)

Page 22

1 fibromyalgia?
2    A.  Uh-huh.
3    Q.  Is that something that you would also have
4 been doing back in 2016 if someone were complaining
5 about those symptoms?
6    A.  Yes.  I have had patients with chronic
7 fatigue syndrome and fibromyalgia.
8    Q.  So it's not just my neck hurts, my spine
9 hurts, you're looking at entire body as a whole to see
10 what's going on with your life, how are you living
11 your life, and how are you doing in your life; is that
12 fair?
13    A.  Yes.
14    MR. BERMAN:  I'll place an objection again,
15 same standing objection, but also specifically that's
16 it doesn't relate to this patient.
17    Q.  (By Ms. Fowler)  Go ahead.
18    A.  I would assess activity of daily living of
19 things of that to incorporate that into their
20 treatment.
21    Q.  Okay.  All right.  And I would imagine that
22 if that is your philosophy you're going to spend some
23 time when you first meet a new patient to kind of
24 understand who they are; is that right?
25    A.  Yes.  Usually we block off 30 minutes for

Page 23

1 new patients.
2    Q.  And that would have been true back in 2016;
3 is that right?
4    A.  That is correct.
5    Q.  So if we go to your initial exam when you
6 first see the plaintiff  --  I will mark that as
7 Exhibit E.  This is the case history.  Here you go,
8 it's easier to do it that way.  And this case history
9 is a form that I would imagine you submit to all your
10 patients; is that true?
11    A.  That's correct.
12    Q.  And did you for the plaintiff as well in
13 this case; true?
14    A.  That is correct.
15    Q.  And to sort of set the scene a little bit,
16 you may or may not know this, but the Lowe's incident
17 happened in April of 2016.  Did you know that?
18    A.  I did not.
19    MR. BERMAN:  It happened in June by the
20 way.  Objection, you're misstating evidence in the
21 case.
22    Q.  (By Ms. Fowler)  Sorry.  Let me ask that
23 question again.  Thank you, Steve.  The Lowe's
24 incident happened in June 2016?
25    A.  Okay.

Page 24

1    Q.  And then the plaintiff came to see you for
2 the first time is September 20 or 21, 2016; is that
3 right?
4    A.  Correct.
5    Q.  Okay.  And this form is a standard form,
6 kind of -- when I saw this after I researched what the
7 philosophy you have in treating your patients it all
8 adds up to me.  This form says we want all the facts
9 about your health before we accept your case.  Did I
10 read that correctly?
11    A.  Yep.
12    Q.  And that's something that you want and you
13 encourage your patients when they come in the door
14 that that is the philosophy of your care; true?
15    A.  We like to gather all information so we
16 know what is going on with the patient.
17    Q.  Okay.  And it says please check the
18 appropriate box for any of the following symptoms
19 which you now have or have had previously.  Did I read
20 that correctly?
21    A.  That's correct.
22    Q.  So basically you're saying I don't only
23 need to know what is going on with you right now in
24 this moment at this time, I want to know about your
25 track record, I want to know everything about you;

Page 25

1 right?
2    A.  That's correct.
3    Q.  And there is various categories in here,
4 this is what sort of we talked about before, you would
5 agree that exhibit -- what is that C -- E?
6    A.  This is E.
7    Q.  Exhibit E is sort of a deep dive philosophy
8 of your practice; true?
9    A.  I wouldn't say it's a deep dive of my
10 practice.  My practice primarily focuses on
11 musculoskeletal conditions, but we like to know
12 underlying conditions the patient may have.
13    Q.  It's important so you have a full picture?
14    A.  Yes.  And in regards to treatment as well.
15    Q.  Sure.  And one of the  -- I mean if we go
16 through these, when we're talking about a deep dive,
17 you're asking questions about whether or not the
18 patient has had any convulsions or dizziness or
19 fainting; right?
20    A.  Correct.
21    Q.  You have asked whether or not they had
22 colon trouble or constipation or even diarrhea;
23 correct?
24    Q.  You have asked about hemorrhoids and liver
25 trouble?

7 (Pages 22 - 25)

Page 26

1    A.  Correct.
2    Q.  You asked things as simple as whether or
3  not they have had a cold or earache or eye pain;
4  right?
5    A.  That is correct.
6    Q.  You want to know about whether or not they
7  have frequent urination, painful urination; true?
8    A.  Correct.
9    Q.  And if it's a women, not only are you
10  asking about what their menstrual flow is like, but
11  you're also wanting to know what the date of the last
12  period was; true?
13    A.  Correct.
14    Q.  And it's not because you're going to do a
15  gynecological exam on a woman or treat a person for,
16  you know, eye issues, but it's so that you have a full
17  understanding of what they have experienced with their
18  history, and what they're currently going through?
19    A.  That is correct.
20    Q.  And one of the things that you have in here
21  on this form is whether or not the patient has
22  suffered from foot trouble; true, if you go under
23  muscle and joint?
24    A.  Muscle and joint, that is on there.  Yes.
25    Q.  And you ask whether or not they have any

Page 27

1  swelling of ankles; true?
2    A.  Swollen joints; is that where we're looking
3  at?
4    Q.  Yes, sir.
5    A.  Yes.  Swollen joints is on there.
6    Q.  And specifically you asked whether they
7  have or have ever experienced pain, numbness, or
8  cramps in their legs or their feet; true?
9    A.  Up there, that is on there; correct.
10    Q.  And in your deep dive not only do you  ask
11  about all of that stuff, you also want to know when
12  their last physical exam was, when their last dental
13  X-ray was, et cetera; true?
14    A.  Correct.
15    Q.  And you also ask whether or not they have
16  -- not only them, but also family members whether or
17  not they have had symptoms or syndromes listed in
18  these categories; true?
19    A.  Correct.
20    Q.  And this  -- at the very end of this, it
21  says after filling out this case history, your
22  signature will attest that the information you have
23  given is accurate and that you have read the case
24  history questions entirely.  Did I read that
25  correctly?

Page 28

1    A.  That is correct.
2    Q.  So not only are you telling them in the
3  beginning of the form, hey, make sure that you respond
4  in full, but you're also saying, hey, listen, when you
5  sign this you're vouching that all of this is accurate
6  information you're giving me; true?
7    A.  Correct.
8    Q.  And let's see how Mr. Narsimhan filled out
9  this form.  The only boxes that he checked in terms of
10  the upper portion of this form is that he had numbness
11  and either pain, numbness or cramps in his hands; is
12  that true?
13    A.  That is all that is checked on the form.
14    Q.  He didn't tell you anything about foot
15  trouble or pain in his legs or his feet did he?
16    A.  No.
17    Q.  All right.  And he did tell you about the
18  dental X-ray he had in 2016?
19    A.  Correct.
20    Q.  But he never mentioned anything about any
21  treatment for his leg or his foot, did he?
22    A.  No, not on the form.
23    Q.  All right.  And you specifically asked
24  again  -- you asked twice on this form whether or not
25  he had any foot problems, and twice he has not checked

Page 29

1  that box; is that true?
2    A.  That is correct.
3    Q.  All right.  But he has told you about his
4  diabetes?
5    A.  He did.
6    Q.  All right.  And now, so this is just you
7  expect your patients to be forthcoming with any issues
8  that would be bothering them in that moment, but also
9  at any point during their life; true?
10    A.  Say that again.
11    Q.  Sure.  Would you expect for your patients
12  to be forthcoming with any issues that are currently
13  troubling them, but any big issues that are going on
14  with their life; true?
15    A.  Whatever is pertinent to them, yes.
16    Q.  Even if -- once again, even if you're not
17  treating those particular things, you still you
18  encourage them, you tell them you have them fill out a
19  form to tell them I want to know those things?
20    A.  Correct.
21    Q.  Now, you also do an independent
22  examination; correct?
23    A.  Correct.
24    Q.  And this is so that you can verify whether
25  or not there might be any issues they forgot to check

8 (Pages 26 - 29)

Page 30

1  that you're seeing something; true?
2      A.  Correct.
3      Q.  I'm going to hand you what's been marked as
4  Exhibit F.  And that is the physical exam or the
5  examination report you did on September 21, 2016; is
6  that right?
7      A.  Yes.  This is the spinal exam form.
8      Q.  Now, when Mr. Narsimhan came to you for the
9  first time he weighed 219 pounds and he was 5' 8"?
10      A.  Correct.
11      Q.  Would you categorize that as obese?
12      A.  Correct.
13      Q.  What does gait mean?
14      A.  Gait is his walking pattern.
15      Q.  All right.  So if a person is walking with
16  a limp or they are wincing in pain or show any issues
17  with them walking, you would note either that it was
18  irrelevant, impaired, slow, or hesitant; is that true?
19      A.  That is correct.
20      Q.  And when you observed him walking in your
21  office, you noted that his gait was normal; correct?
22      A.  Based on this exam, yes.
23      Q.  So based upon your own physical exam of
24  him, you noticed that there was nothing  -- there was
25  nothing wrong with his feet or anything of that sort;

Page 31

1  is that true?
2      A.  Correct.
3      Q.  And then ambulation, what is that?
4      A.  Ambulation is how you get up, up and down
5  from your chair, how you move from your chair to the
6  table, so moving about.
7      Q.  Okay.  So if the person is having terrible
8  pain in their foot or in their leg, you would expect
9  that their ambulation might be a little bit of a
10  hindrance; is that correct?
11      A.  Correct.
12      Q.  And here we see that his ambulation -- his
13  moving around was normal?
14      A.  Correct.
15      Q.  And that's what you observed with your own
16  two eyes; true?
17      A.  Correct.
18      Q.  And you also noticed  -- you note
19  appearance.  Why is appearance important to document?
20      A.  Their overall appearance can tie into their
21  health, their wellness.  You know if somebody is obese
22  or somebody is disheveled, their shirt is untucked or
23  hair is all a mess, we want to note those things as
24  well.
25      Q.  If I'm understanding you, it shows you that

Page 32

1  they may be in distress to some extent if they seem
2  disheveled or things of that sort; am I getting it
3  right?
4      A.  Correct.  Or there could be mental health
5  issue stuff like that as well.
6      Q.  Fair enough.  If a person was being driven
7  by pain, would you expect that they appear distressed
8  and their appearance would not be good; is that fair?
9      A.  Possible, yes.
10      Q.  But you noticed with Mr. Narsimhan when he
11  showed up to you the first day that his appearance was
12  good?
13      A.  Uh-huh.
14      Q.  And that's a good thing?
15      A.  Yes.
16      Q.  Now, if we look at the posture analysis, if
17  I understand this correctly I know that he was there
18  to see you for his hands, his neck, I guess, his arms?
19      A.  Uh-huh.
20      Q.  But you're not only stopping there because,
21  again, that's against your philosophy.  Your
22  philosophy is to look at the body and one of the
23  things is the lumbar spine?
24      A.  Uh-huh.
25      Q.  Now, I see that you are doing flexion  --

Page 33

1  you check his flexion?
2      A.  Uh-huh.
3      Q.  His extension, and all of that good enough?
4      A.  Correct.
5      Q.  So if I'm playing this out in my mind,
6  Doctor, it seems to me that you would be sort of
7  having him bend over, bend back sideways, maybe?
8      A.  Yes.  I am not touching him, but he is
9  performing the acts.
10      Q.  Okay.  You are able to say are you able to
11  bend down all the way, are you able to touch your
12  toes?
13      A.  Yes.
14      Q.  And things of that sort?
15      A.  Correct.
16      Q.  So that, again -- once again if you thought
17  a person was having a burning sensation in their leg
18  and their feet, you might notice that they might have
19  the some limited range of motion in that area; true?
20          MR. BERMAN:  Objection; calls for
21  speculation, form of the question also.
22      Q.  (By Ms. Fowler)  Go ahead.
23      A.  Not in the lower back, no.
24      Q.  Not in the lower back, but when you're
25  doing these exercises a person might winch in pain;

9 (Pages 30 - 33)

Page 34

1 true?
2     A.  Possibly.
3         MR. BERMAN:  Objection; form of the
4 question.
5     Q.  (By Ms. Fowler)  Go ahead.
6     A.  Possibility that they could wince in pain,
7 yes.
8     Q.  I'm trying to play it out in my mind.  If I
9 have terrible leg pain and foot pain and you ask me to
10 bend down and touch my toes or bend backwards, it's
11 probably going to hurt a little bit?
12         MR. BERMAN:  Objection; speculation, all
13 prior objections as well.
14         THE WITNESS:  That joint is not moving.
15 That joint is stationary.  We're looking at the lower
16 back joint.  So if you had pain in the lower back,
17 yes, I would say it would be dependent upon if they
18 would have ankle or foot pain.
19     Q.  (By Ms. Fowler)  Okay.  So the bottom line
20 is this; that your exam is not just limited to
21 checking to see what his situation is with his neck
22 and his hands, but you're looking at, again, the
23 entire spine, the body as a whole; true?
24         MR. BERMAN:  Objection to "body as a
25 whole."

Page 35

1     Q.  (By Ms. Fowler)  Go ahead.
2     A.  In this case we're looking at the spine,
3 primarily neck and upper back.
4     Q.  You also check reflexes?
5     A.  We did.
6     Q.  And reflexes from the leg?
7     A.  We do.
8     Q.  And so how does that work when you're
9 checking, are you hitting the hammer to the knee?
10     A.  Yes.
11     Q.  So you're actually using a device and
12 hitting to make sure  --  so you're actually doing
13 things with his legs; true?
14     A.  Yes.
15     Q.  And I see that you did a straight leg
16 raise?
17     A.  Correct.
18     Q.  So you're actually having him lay on the
19 table and lifting under his leg to see whether or not
20 that creates any pain?
21     A.  I have the patient lift up their leg.  He
22 would be laying supine on his back and he would lift
23 up his leg like this.
24     Q.  Okay.  And, again, if a person is having
25 terrible pain in their foot and leg, at some point

Page 36

1 during this physical examination if they forget to
2 tell you on the form to check the body you're probably
3 going to see it during this 30-minutes interaction;
4 true?
5         MR. BERMAN:  Objection; form, foundation,
6 calls for speculation.
7         THE WITNESS:  Possibly.  I did not do any
8 orthopedic exams during this examine that emphasized
9 anything on the foot or the ankle.  These were on the
10 spine and straight leg raise was for any type of
11 sciatica.
12     Q.  (By Ms. Fowler)  I understand what the
13 purpose is.  But to be clear, you're putting -- I mean
14 his moving his legs around?
15     A.  He is moving his legs, yes.
16     Q.  He is not moving them just a little bit.
17 He is moving them in such a way it's obvious that you
18 can see sitting across the room from him?
19     A.  Correct.
20     Q.  What's going on with him?
21     A.  Correct.
22     Q.  There is portion that says notes, do you
23 see that?
24     A.  Yes.
25     Q.  So even if you're not treating him for his

Page 37

1 leg pain or foot pain, if you notice that he was
2 wincing in terrible pain, you could write it in the
3 notes section that he has pain?
4     A.  Correct.
5     Q.  And I don't see anything in the notes
6 saying anything of that sort?
7     A.  Correct.
8     Q.  What does this say?  I can't read your
9 notes?
10     A.  HP is forward head posture and in
11 hyperkyphosis of thoracic spine, which is kind of
12 rounding of the shoulder.  You have got almost like a
13 hump in your lower back -- excuse me -- in your upper
14 back.  It's postural things.
15     Q.  Okay.  You didn't do that examination
16 report just once, you did it -- in fact, actually,
17 it's the second page of that.  I just put those all
18 together.  You did it again on October 11, 2016, we
19 can see, we can see your work product here.
20     A.  Correct.
21     Q.  And once again, you went through the same
22 thing, you checked his gait and gait was normal; true?
23     A.  Correct.
24     Q.  You checked his moving around and that was
25 normal?

10 (Pages 34 - 37)

Page 38

1     A.  Correct.
2     Q.  He had a good appearance?
3     A.  Correct.
4     Q.  You were still doing the flexion, reflex
5  check and all of that; true?
6     A.  Correct.
7     Q.  And at no point during your physical
8  examine of him did you ever note that he had or was
9  wincing in pain or showed any signs of distress as it
10  would relate to his leg or his foot?
11     A.  Correct.
12     Q.  All right.  And if we go to November 26,
13  2016, again it's same thing, you're again looking for
14  things, you're looking to see if he is walking
15  normally; right?
16     A.  Correct.
17     Q.  You're looking to see whether or not he is
18  able to move around normally?
19     A.  Correct.
20     Q.  And you're looking to see whether or not he
21  appears in distress or anything of that sort; true?
22     A.  Correct.
23     Q.  And you're noting everything is fine;
24  right?
25     A.  Nothing was noted in regards to that;

Page 39

1  correct?
2     Q.  All right.  And once again, you're still
3  doing those physical things, those physical tasks,
4  that would necessarily require him to use his leg and
5  his feet, and you are not noting anything showing that
6  he is in pain or distress; true?
7     A.  There is nothing noted.
8     Q.  Okay.  And certainly, Doctor, if it was
9  something you observed, you certainly would note that;
10  true?
11     A.  Correct.
12     Q.  All right.  So if we go to what I have
13  marked as Exhibit G.  I like the title of this form.
14  It's called the ouch form.  It pretty much describes
15  itself?
16     A.  Yes.
17     Q.  But as I understand it, when I was looking
18  at this form, in case a patient says oh, wait, I
19  forgot to tell the doctor this is going on in my life
20  or wait, I forgot to tell the doctor this is really
21  bothering me, there is actually a form they can submit
22  and it asks those questions and they can answer those
23  things; true?
24     A.  Are you referencing this form right here?
25     Q.  The ouch form, yes.

Page 40

1     A.  Okay.  This form is for patients that have
2  a new injury or have an exacerbation of their
3  condition that have not been in the office over an
4  extended period of time.
5     Q.  Okay.  And certainly, Doctor, if a patient
6  who's been treating you  -- treating with you for his
7  neck and his hands --
8     A.  Uh-huh.
9     Q.  If he were to come to you and say doctor,
10  I'm having a terrible time with my leg and foot, I
11  don't know if that's something you do, but I need to
12  let you know; you would want him to fill something
13  like this out, too?
14     A.  Correct.
15     Q.  And I didn't see any ouch forms pertaining
16  to his leg or his foot?
17     A.  I never treated him for any condition in
18  his leg or foot.
19     Q.  And he never told you about any issue with
20  his leg or foot; true?
21     A.  Correct.
22     Q.  He did tell you about the fact that he had
23  a recurring stiffness in his forearms?
24     A.  Uh-huh.
25     Q.  And the other comments down here I couldn't

Page 41

1  read your handwriting?
2     A.  Two weeks ago mowing the lawn.
3     Q.  Okay.  And what happened?
4     A.  And then it says just bilateral forearm,
5  his right forearm is greater than left, and left
6  cervical spine.
7     Q.  If I'm reading this correctly, back in July
8  29, 2017, it looks like he aggravated his wrist and
9  his hands, neck situation when he was mowing his lawn?
10     A.  That would be correct.
11     Q.  And you were aware at least up until that
12  point he was capable of mowing his lawn; true?
13     A.  I'm assuming.  I had not seen him for seven
14  months.
15        MR. BERMAN:  Objection to the foundation,
16  he was in fact treating him for wrists and forearm as
17  well as neck.  So foundation, to the prior question.
18     Q.  (By Ms. Fowler)  So we'll go through your
19  treatment records.  You were seeing him through 2017
20  -- so 2016 through 2017?
21     A.  Correct.
22     Q.  And at no point did he ever tell you that
23  he was unable to mow his lawn due to his leg or his
24  foot; true?
25     A.  Correct.

11 (Pages 38 - 41)

1    Q.  All right.  Now, if we go to  -- I want to
2  walk you through this.
3    A.  Okay.
4    Q.  Here are -- I'll mark this as Exhibit H.
5  Here are your day-to-day treatment records.  And it
6  does appear that you treated him from 9-21-2016 up
7  until 10-31-2017.  Does that sound about right?
8    A.  That sounds correct.
9    Q.  There may have been some times off or
10  things of that sort, but that was general time period
11  when you saw him; true?
12    A.  Correct.
13    Q.  Now, interestingly -- and, again, at no
14  point -- I know you already reviewed your records to
15  see if he ever made any complaints about his leg or
16  his foot?
17    A.  Correct.
18    Q.  And we can agree as we sit here today he
19  never made mention of either one of those things to
20  you?
21    A.  Correct.
22    Q.  But he does talk about what's going on with
23  his life as it relates to his neck; true?
24    A.  Correct.
25    Q.  And he tells you, Doctor, my neck is really

1  sort of impaired my ability to function fully; true?
2    A.  Correct.
3    Q.  And what he tells you about his neck is
4  that it's bad when he sits too long; true?
5    A.  Correct.
6    Q.  He tells you that prolonged sitting and
7  working on his computer really aggravates his neck?
8    A.  Correct.
9    Q.  And he says that his pain from his neck
10  worsens during sleep; true?
11    A.  Is this in the present problem where we're
12  reading?  Is this in present problems?
13    Q.  Worse during sleep?
14    A.  Oh, yes.
15    Q.  I went through every single one of these
16  records, every single time he tells you my neck is
17  causing me problems with sitting too long, working on
18  my computer, sleeping, and things of that sort; true?
19    A.  He doesn't mention that ever single time.
20    Q.  Actually, if you go through this, he does
21  mention it every single time.
22    A.  That is the initial complaint.
23    Q.  Okay.
24    A.  What my note says is the patient indicates
25  the condition is new.  Let me go on down.  This is

1  kind of going through.
2    Q.  As you go through it, I'll ask a better
3  question.  Certainly if it no longer is an issue you
4  wouldn't have it in the record?
5    A.  Correct.
6    Q.  So we can assume if it's in the record it's
7  going on with him at that moment in time?
8    A.  Correct.
9    Q.  And if I represent to you that every single
10  record, every visit it's the same about prolonged
11  sitting and computer work aggravating his neck pain,
12  and that it's worse during sleep and computer work, we
13  can assume that that was every single time he came to
14  see you?
15    A.  Correct.  Also that it also indicates that
16  certain times that it does get better or stays the
17  same or does have a flare-up and gets worse.
18    Q.  I want to talk to you about that.  We do
19  see  -- you do rate his pain?
20    A.  Uh-huh.
21    Q.  It's scale of one to ten?
22    A.  Uh-huh.
23    Q.  One being  -- what's one?
24    A.  Very minimal pain at  -- zero is no pain at
25  all; ten is most severe pain you can imagine.

1    Q.  Okay.  And he is rating his pain  -- I mean
2  he is never hitting the ten mark?
3    A.  No.
4    Q.  In fact, as he describes his neck pain, the
5  thing that interferes with his computer work and
6  sitting too long and sleeping he is kind of describing
7  like a dull ache; right?
8    A.  Dull ache, yes.
9    Q.  And I see there is also issues with his
10  wrist in there, too, but it's not one of those things
11  where his neck is on fire or his wrists are on fire
12  and he can barely function; is that fair?
13    A.  That would be fair.
14    Q.  Okay.  So you understand the term masking;
15  have you heard that term before?
16    A.  You mean -- can you give me a definition?
17    Q.  Yeah.  Sometimes you might have a patient
18  that may have longstanding, let's say, arthritis in
19  their neck.
20    A.  Uh-huh.
21    Q.  And it hurts, but they get shot in the
22  foot, they are not going to be thinking about their
23  neck so much, they are going to think about the
24  gunshot that is the immediate pain; right?
25    A.  That's correct.

12 (Pages 42 - 45)

Page 46

1    Q.   This is one of those -- I'm getting the
2   impression how you're reporting this is that this is
3   more of a nagging issue for him, not something that is
4   interfering with his ability to function; is that
5   true?
6        MR. BERMAN:   Note my prior objection to
7   foundation and beyond the area of expertise.   Go
8   ahead.
9        THE WITNESS:   That would be a question -- I
10  cannot answer that question.   That would be probably
11  something for Krishna.   But it is causing him
12  discomfort.   It's causing him pain and it's affecting
13  his activities of daily living.
14   Q.   (By Ms. Fowler)   Okay.   But once again when
15  we go through all this, nothing about his leg or his
16  foot is ever mentioned to you; true?
17   A.   Correct.
18   Q.   So there is no indication to you that his
19  leg or his foot is interfering with his ability to
20  function; true?
21   A.   Not based on my notes and not based on my
22  recollection of the case.
23   Q.   One thing I did note is if you go to the
24  12-20-2016 record --
25   A.   I got it.

Page 47

1    Q.   I'm sorry.   I should have tabbed it.   He
2   talks about this was new.   He said that two days ago
3   he was playing his guitar for one and a half hours on
4   Sunday?
5    A.   Uh-huh.
6    Q.   And then the pain began yesterday upon
7   walking and increased into both of his hands; is that
8   right?
9    A.   That is correct.
10   Q.   When he is talking about the pain he is
11  talking about neck pain?
12   A.   Correct.
13   Q.   So if I'm reading this, I can probably put
14  my context clues together to say he is able to play
15  the guitar for one and a half hours; true?
16   A.   Correct.
17   Q.   And the only thing that really upset him
18  was it caused him a little neck pain a day or two
19  later; true?
20        MR. BERMAN:   Objection to foundation; calls
21  for speculation as to what the patient was thinking.
22        MS. FOWLER:   Go ahead.
23        MR. BERMAN:   In addition to my prior
24  objections that are continuing.
25   Q.   (By Ms. Fowler)   Sure.   Go ahead.

Page 48

1    A.   And numbness and tingling into his hands
2   and swelling of his neck.
3    Q.   Okay.   So, again, nothing about his leg or
4   his foot is made mention by him at all?
5    A.   Correct.
6    Q.   With respect to any of that; true?
7    A.   Correct.
8    Q.   Now, if we go to the 7-29-17 record?
9    A.   Okay.
10   Q.   This is we're getting toward the tail end
11  of his treatment with you, but it shows a modifying
12  factors section.   Do you see that?
13   A.   Yes.
14   Q.   He says that his pain  -- again, we're
15  talking about pain in his neck; right?
16   A.   Uh-huh.   Correct.
17   Q.   Is aggravated by computer use, cooking,
18  getting out of bed, looking over his shoulder,
19  repetitive motions and turning; true?
20   A.   Correct.
21   Q.   So the neck is the source of these issues
22  for him?
23   A.   Correct.
24   Q.   He never made one mention of his leg or his
25  foot; true?

Page 49

1    A.   Correct.
2    Q.   All right.   So, Doctor, just to wrap this
3   up, and again going back to the start of our
4   conversation, I want to bring it full circle.   The
5   point of the way that you treat your patients is to
6   take a broad approach to making sure that they are
7   getting the help that they need; true?
8    A.   Correct.
9    Q.   And you encourage them to list any issues.
10  Whether you're treating them for it or not, you
11  encourage them to raise that with you?
12   A.   That is encouraged.
13   Q.   And you do that not just at the very
14  beginning on that one day, but you have an open door
15  policy throughout your entire treatment with your
16  patients; true?
17   A.   Correct.
18   Q.   And you want them to open up to you; true?
19   A.   Yes.
20   Q.   All right.   You have never gone on record
21  or ever given any indication to your patients, look,
22  if it doesn't relate to your neck or your hands or
23  your spine, I don't want to hear about it; true?
24        MR. BERMAN:   Object to the form of the
25  question as well as the other objections.

13 (Pages 46 - 49)

1    Q.   (By Ms. Fowler)  True?

2    A.   True.

3    Q.   And certainly if there were life

4 limitations, caused by pain that they are

5 experiencing, whether or not it's neck or whether or

6 not it's for an issue that you're not treating them

7 for, you have encouraged them time and time again

8 please tell me about that; true?

9    A.   Correct.

10    Q.   Okay.  And when we look at your medical

11 records there is no record that discussions, any

12 burning in his leg, in the Plaintiff's leg; true?

13    A.   True.

14    Q.   He never made mention of any leg or foot

15 swelling; true?

16    A.   True.

17    Q.   He never made mention of any shooting pain

18 up and down his calf or his foot; true?

19    A.   True.

20    Q.   He never mentioned to you that he was icing

21 and taking medication for his leg and foot every day

22 hoping that it would go away; true?

23    A.   True.

24    Q.   And he never reported him walking with a

25 limp; true?

1    A.   True.

2    Q.   You never saw him walking with a limp;

3 true?

4    A.   True.

5    Q.   You never reported him having to change

6 positions due to his pain in his leg; true?

7    A.   True.

8    Q.   And he never made mention to you that he

9 was unable to wear socks on his legs?

10    A.   True.

11    Q.   He never made mention to you that he had to

12 wear special shoes without laces?

13    A.   True.

14    Q.   He never made mention to you that he was

15 showering with his foot in a bucket because the water

16 from the shower caused too much pain?

17    A.   True.

18    Q.   He never made mention to you that he was

19 unable to swim because it hurts to flip flop his legs?

20    A.   True.

21    Q.   He never made mention that he couldn't run

22 or bike because of his pain?

23    A.   True.

24    Q.   He never made mention that he was unable to

25 drive his car because it hurt to press the accelerator

1 with his foot?

2    A.   True.

3    Q.   And, Doctor, he made no mention to you of

4 any hair loss, change in color, swelling, shininess,

5 or scaliness of his foot or leg; true?

6    A.   True.

7    Q.   I have no further questions.  Thank you.

8         EXAMINATION

9 QUESTIONS BY MR. BERMAN:

10    Q.   Doctor, I have some follow-up questions.

11 So based upon all that questioning, the bottom line is

12 that your patient, Krishna Narsimhan never talked to

13 you about his right lower extremity at all; right?

14    A.   That is correct.

15    Q.   Okay.  He also never told you that he was

16 seeing -- being seen and treated by a neurologist for

17 right lower extremity pain during the time he was

18 seeing you, did he?

19    A.   No.

20    Q.   Okay.  The fact that Mr. Narsimhan didn't

21 tell you that he was seeing a neurologist for right

22 lower extremity pain during the time he was seeing you

23 in 2016, doesn't mean it didn't exist or that

24 treatment didn't happen, do you agree?

25    A.   I would agree.

1    Q.   Okay.  The fact that Mr. Narsimhan didn't

2 talk to you, the doctor who was treating him for neck

3 and upper extremity issues, about his right lower

4 extremity problem that he was seeing another doctor

5 for doesn't mean the right lower extremity problems

6 didn't exist.  Would you agree?

7    A.   I would agree.

8    Q.   And as a chiropractor, you don't treat

9 every patient's whole body; is that true?

10    A.   That is true.

11    Q.   As a chiropractor, sometimes patients come

12 in, they have a particular pain that they want to be

13 treated, whether it be the neck, arms, back, low back,

14 upper back, or the hips or anything, the focus on that

15 pain or that problem that the patient comes in for;

16 right?

17    A.   That is correct.

18    Q.   In fact, I think you said early in today's

19 deposition, patients when they come to see you, you do

20 a thorough assessment of what they presented with;

21 right?

22    A.   That is correct.

23    Q.   And that's from your review of your

24 records, that's what you did with Mr. Narsimhan.  He

25 comes and presents with a neck and upper extremity

Page 54

1 issue and you do a thorough assessment of that; right?
2    A.  Correct.
3    Q.  You weren't focusing on his ankle or feet
4 or his hips; you were focusing on what he came in and
5 presented with; right?
6    A.  Correct.
7    Q.  You had asked about your general
8 examination of gait and moving around the office, and
9 there is nothing particularly noted as problems with
10 that; right?
11    A.  Correct.
12    Q.  Okay.  And you didn't notate, though, any
13 indication that he was having pain when he turned his
14 head or moved his head; you didn't put any notes on
15 that even though that's what he's coming in for, neck
16 or upper extremity; right?
17        MS. FOWLER:  I'll object.  I think he did
18 note that, Steve.  It's in his records.
19        THE WITNESS:  I think I did, but I will --
20 let me -- right here.  Yes.  I did note that on his
21 neck with extension he had pain and tenderness, with
22 left lateral bending he had tenderness, with right
23 lateral bending he had pain and tenderness.
24    Q.  (By Mr. Berman)  Perfect.  That's exactly
25 what you were focusing on during this examination;

Page 55

1 right?
2    A.  Correct.
3    Q.  So the whole point of this examination
4 really is to focus on his neck and back and upper
5 extremities; right?
6    A.  It was to focus on what he presented to the
7 office with his chief complaint, yes.
8    Q.  Okay.  Going back to the confidential
9 health report document case history, this is a
10 standard form you have all patients fill out; right?
11    A.  Correct.
12    Q.  And in this case, Mr. Narsimhan did check
13 the box that he never had a headache in his entire
14 life.  Do you take that to mean he never had a
15 headache in his entire life?
16    A.  Say that one more time for me.
17    Q.  Sure.  Looking at the  -- this is the
18 document that was extensively asked about in today's
19 deposition, so I want to ask you about it.
20    A.  Okay.
21    Q.  You have it in front of you.  Under the
22 general, it says -- there is one line that says
23 headache.  Do you see that?
24    A.  Yes, I do.
25    Q.  That box isn't checked one way or the

Page 56

1 other; correct?
2    A.  It is not checked.
3    Q.  And according to the document, the patient
4 is supposed to check the box if he now has or has had
5 it previously; right?
6    A.  Correct.
7    Q.  Okay.  When a patient come in and doesn't
8 check the box "headache", do you assume he never had a
9 headache in his entire life?
10    A.  I would find that hard to believe.
11    Q.  Okay.  What about under the
12 gastrointestinal part that you were asked about during
13 today's deposition?
14    A.  Uh-huh.
15    Q.  Constipation, diarrhea, difficult
16 digestion; that's not marked --
17    A.  Correct.
18    Q.  -- in any way for Krishna?
19    A.  Correct.
20    Q.  When a patient doesn't mark those items;
21 constipation, diarrhea, or difficult digestion, does
22 that in any way make you believe or state to you that
23 a patient never had that problem in their entire life?
24    A.  I would find that hard to believe.
25    Q.  Okay.

Page 57

1    A.  And I think -- I hope I'm answering that
2 correctly.  Just because he did or didn't check it
3 doesn't mean that he's never had it.
4    Q.  Just looking at this confidential health
5 report, there are certain things on the (inaudible) --
6 we'll try again.  In terms of this confidential health
7 report, there are certain items on this document that
8 even if a patient doesn't fill out you would
9 reasonably believe that he probably had those problems
10 at some point in their life?
11    A.  Correct.
12    Q.  Okay.  Including things like cold, nose
13 bleeds, sinus infection, that kind of stuff?
14    A.  Correct.
15    Q.  Is that correct?  But what I'm trying to
16 get at is, there are certain line items such as nose
17 bleeds, sinus infection, et cetera on this form  --
18 the confidential health report -- that even if a
19 patient doesn't mark those, you'd reasonably believe
20 they probably had that stuff previously at some point
21 in their life; right?
22    A.  That is correct.
23    Q.  And when you have a patient fill out this
24 form, it's not significant to you that they don't fill
25 out certain things that they have had previously in

15 (Pages 54 - 57)

Page 58

1 their life. It's just not pertinent to your care and
2 treatment; right?
3    A.  Correct.
4    Q.  So in this case, if Mr. Narsimhan was
5 feeling pain in his ankle or foot, but didn't fill it
6 out on the form, that wouldn't have any relevance to
7 you for your care and treatment of his neck or upper
8 extremities; right?
9       MS. FOWLER:  Objection; calls for
10 speculation.  Subject to that, go ahead.
11       THE WITNESS:  I'm sorry.  I kind of got
12 lost with her objection.  Can you repeat that one more
13 time?  I'm sorry.
14    Q.  (By Mr. Berman)  Sure.  If at this time in
15 September 20th or 21st of 2016, if Mr. Narsimhan was
16 having some pain in his right ankle or foot, and
17 didn't write it down on this confidential health
18 report form, that wouldn't have any relevance or
19 relationship to your care or treatment of his neck or
20 right upper extremity, would it?
21    A.  Not of his neck or upper extremities, no.
22    Q.  Obviously, one of the things he was being
23 treated for was neck and upper extremity.  And you
24 already talked about that.  And on this confidential
25 health report there is specific location under muscle

Page 59

1 and joint for neck pain or stiffness, and that's not
2 even checked either; right?
3    A.  Correct.
4    Q.  That didn't mean that you couldn't
5 reasonably treat this patient because you were able to
6 speak to him and talk to him as well; right?
7    A.  That's correct.
8    Q.  So if this form isn't fully filled out
9 perfectly by the patient, that doesn't mean you can't
10 treat him properly; right?
11    A.  That is correct.
12    Q.  And in your experience, sometimes patients
13 don't fully fill this out; is that fair?
14    A.  That is fair.
15    Q.  And don't spend the time with each and
16 every patient to go over every single line item to ask
17 them if they've ever had in their entire life a
18 headache or diarrhea, et cetera, do you?
19    A.  No.
20    Q.  Okay.  And if this form isn't filled out
21 fully, that didn't affect or change the type of care
22 or treatment you provided to Mr. Narsimhan for his
23 neck and upper extremity, did it?
24    A.  No.
25    Q.  Okay.  Doctor, I think you have been

Page 60

1 practicing as a chiropractor for how many years?
2    A.  Fifteen.
3    Q.  Okay.  And you received training and you're
4 licensed; right?
5    A.  Correct.
6    Q.  Okay.  When you take a history of your
7 patients even though during this deposition it's been
8 characterized as chiropractors treat the whole body,
9 when you take a history, do you normally take a
10 history that's pertaining to the problems that the
11 particular patient is having?
12    A.  Correct.
13    Q.  Doctor, as a trained experienced licensed
14 practicing chiropractor, is it a violation of the
15 chiropractor's standard of care for you to not take a
16 comprehensive medical history that notes all pains or
17 problems a patient of yours is having even if such
18 pains are not relevant to your chiropractic care and
19 are being treated by other doctors?
20    A.  Say that one more time.  Is it not the
21 standard of care or it is standard?
22    Q.  I'm asking you if your -- if you take --
23 strike that.  Let me back up.  When you take a history
24 -- when you took a history of Mr. Narsimhan as well as
25 when you take a history of your patients, is it fair

Page 61

1 to say that you don't take a comprehensive medical
2 history that notes all pains or problems that a
3 patient is having even if they are irrelevant or don't
4 pertain to the reason the patient is seeing you?
5    A.  I take a history of what the patient
6 presents with.
7    Q.  Okay.  And you don't intend to take a
8 comprehensive medical history of all pains or problems
9 a patient is having such like the type of history a
10 primary care doctor would take; is that agreeable?  Is
11 that true?
12    A.  Yes.  I take a history of what is noted and
13 what is -- what the patient presents with.
14    Q.  Okay.  And is that proper -- and is that
15 proper pursuant to the chiropractic standard of care
16 to take the history that you take?
17    A.  I would say yes.
18    Q.  Okay.  It's not a violation of a
19 chiropractic standard of care to not take a whole
20 comprehensive medical history of all systems for a
21 particular patient; true?
22    A.  True.
23    Q.  Okay.  And foundation for saying that is
24 that you are trained, experienced, licensed,
25 practicing chiropractor; right?

16 (Pages 58 - 61)

Page 62

1    A.   That is correct.
2    Q.   Okay.  When handing this confidential
3  health record to patients, is it common that you would
4  tell your patients here's a form to fill out, make
5  sure that everything that's pertinent to your care is
6  written on the form?
7    A.   Correct.
8    Q.   Okay.  In terms of -- I'm just going to
9  switch gears for a moment.  In terms of the gait and
10  ambulation, that's not a specific examination of an
11  ankle, is it?
12    A.   It is noting patients when they walk to the
13  exam room and when they walk and ambulate in and out
14  of the chair and table of the exam room.
15    Q.   But you didn't perform an orthopedic or
16  chiropractic examination of Mr. Narsimhan's ankle;
17  correct?
18    A.   That is true.
19    Q.   And with the gait and ambulation portion of
20  that, you're not focusing in on the ankle as opposed
21  to the feet or the knees or hips; is that fair?
22    A.   I am not focusing  -- no.  I'm not focusing
23  on just the ankle.  I'm just watching the patient
24  walk.
25    Q.   And if a patient has pain in the ankle and

Page 63

1  anterior portion of the ankle, but no fracture or
2  sprain, any -- if a patient has anterior ankle pain
3  but no fracture or sprain or functional injury to that
4  ankle, it's possible for the gait and ambulation to be
5  -- appear normal; right?
6    A.   It could be possible, yes.  It varies from
7  patient to patient.  So anything is possible, yes.
8    Q.   Okay.  All right.  And I just want to
9  follow up on something we started out with; the fact
10  that Mr. Narsimhan didn't mention his right lower
11  extremity pain or discomfort to you just means he
12  didn't tell you, not that it didn't exist at the time.
13  Is that a fair statement?
14    A.   That would be fair.
15    Q.   As for why Mr. Narsimhan didn't mention his
16  right lower extremity pain or discomfort that he may
17  have been experiencing in 2016 do you, you wouldn't
18  speculate on that, would you?
19    A.   No.
20    Q.   Would it be fair to say rather than you
21  speculating as to why Mr. Narsimhan didn't mention his
22  right lower extremity pain or discomfort to you, more
23  appropriately we should just ask Mr. Narsimhan that
24  question?
25    A.   That would be for him to answer, yes.

Page 64

1    Q.   Okay.  And in terms of the disclosure of
2  yours that we filed in this case that, I think, was
3  marked as Exhibit A --
4    A.   A.
5    Q.   With the disclosure that we marked as
6  Exhibit A, all that information is accurate and you
7  agree with all that information; right?
8    A.   That is correct.
9    Q.   Okay.  Okay.  I don't think I have any
10  further questions.
11      MS. FOWLER:  Doctor, at this time you can
12  either read or waive.  Do you want to read the
13  deposition transcript and make sure she's taken
14  everything down true and correct or do you want to
15  waive the process and waive your signature?
16      THE WITNESS:  Waive.
17      (WHEREIN, the deposition was concluded at
18  1:13.)
19
20
21
22
23
24
25

Page 65

1      CERTIFICATE OF REPORTER
2  STATE OF MISSOURI  )
            ) ss.
3  CITY OF ST. LOUIS  )
4  I, Jeanne M. Pedrotty, a Certified Court Reporter (MO)
5  and Certified Shorthand Reporter (IL), do hereby
6  certify that the witness whose testimony appears in
7  the foregoing deposition was duly sworn by me; that
8  the testimony of said witness was taken by me to the
9  best of my ability and thereafter reduced to
10  typewriting under my direction; that I am neither
11  counsel for, related to, nor employed by any of the
12  parties to the action in which this deposition was
13  taken, and further that I am not a relative or
14  employee of any attorney or counsel employed by the
15  parties thereto, nor financially or otherwise
16  interested in the outcome of the action.
17
18                    _Jeanne M. Pedrotty_
19                    Jeanne M. Pedrotty
20
21
22
23
24
25